1   Brian E. Pastuszenski (*pro hac vice*)
    *bpastuszenski@goodwinprocter.com*
2   Inez Friedman-Boyce (*pro hac vice*)
    *ifriedmanboyce@goodwinprocter.com*
3   Brian C. Devine (SBN 222240)
    *bdevine@goodwinprocter.com*
4   **GOODWIN PROCTER LLP**
    Exchange Place
5   Boston, MA 02109-2802
    Tel.: 617-570-1000
6   Fax: 617-570-1231

7   Lloyd Winawer (SBN 157823)
    *lwinawer@goodwinprocter.com*
8   **GOODWIN PROCTER LLP**
    601 South Figueroa Street, 41st Floor
9   Los Angeles, California 90017
    Tel.: 213-426-2500
10  Fax: 213-623-1673

11  *Attorneys for Defendants*
    Countrywide Financial Corporation,
12  Countrywide Home Loans, Inc., CWALT,
    Inc., CWMBS, Inc., CWABS, Inc., CWHEQ,
13  Inc., Countrywide Capital Markets,
    Countrywide Securities Corporation, and N.
14  Joshua Adler

15              **UNITED STATES DISTRICT COURT**

16             **CENTRAL DISTRICT OF CALIFORNIA**

17  In re COUNTRYWIDE FINANCIAL          Case No. 11-ML-02265-MRP (MANx)
18  CORP. MORTGAGE-BACKED
    SECURITIES LITIGATION               **CONSOLIDATED**
19                                      **MEMORANDUM OF POINTS &**
                                        **AUTHORITIES IN SUPPORT OF**
20                                      **THE COUNTRYWIDE**
                                        **DEFENDANTS' MOTIONS TO**
21                                      **DISMISS**

22                                      Date/Time:  February 13, 2012
                                                    11:00 a.m.
23                                      Date/Time:  February 14, 2012
                                                    1:00 p.m.
24                                      Courtroom:  12
                                        Judge:      Hon. Mariana R. Pfaelzer
25  PUTNAM BANK, Individually and
26  on Behalf of All Others Similarly
    Situated,
27
            Plaintiff,
28                                      Case No. 11-CV-04698-MRP (MANx)



v.

COUNTRYWIDE FINANCIAL
CORPORATION, *et al*.,

                    Defendants.


BANKERS INSURANCE
COMPANY*, et al.,*

                    Plaintiffs,

v.

COUNTRYWIDE FINANCIAL
CORPORATION, *et al*.,

                    Defendants.

Case No. 11-CV-07152-MRP (MANx)


STERLING FEDERAL BANK,
F.S.B.,

                    Plaintiff,

v.

COUNTRYWIDE FINANCIAL
CORPORATION, *et al*.,

                    Defendants.

Case No. 11-CV-07163-MRP (MANx)


WESTERN AND SOUTHERN LIFE
INSURANCE COMPANY, *et al.*,

                    Plaintiffs,

v.

COUNTRYWIDE FINANCIAL
CORPORATION, *et al.*,

                    Defendants.

Case No. 11-CV-07166-MRP (MANx)


AMERICAN FIDELITY
ASSURANCE COMPANY

                    Plaintiff,

v.

COUNTRYWIDE FINANCIAL
CORPORATION, *et al.*,

Case No. 11-CV-07167-MRP (MANx)

1          Defendants.

2   SEALINK FUNDING LIMITED,

3          Plaintiff,

4          v.                                    Case No.  11-CV-08896-MRP (MANx)

5   COUNTRYWIDE FINANCIAL

6   CORPORATION, et al.,

7                     Defendants.

8   NATIONAL INTEGRITY LIFE
    INSURANCE COMPANY,

9          Plaintiff,                            Case No.  11-CV-09889-MRP (MANx)

10         v.

11  COUNTRYWIDE FINANCIAL

12  CORPORATION, et al.,

13                    Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND............................................................. 5

ARGUMENT .................................................................................11

I.    THIS COURT HAS ALREADY DISMISSED PREVIOUSLY-FILED, VIRTUALLY IDENTICAL COMPLAINTS AS TIME-BARRED ..............11

    A.    *Maine State I* ....................................................................11

    B.    *Maine State II* ...................................................................12

    C.    *Stichting Pensioenfonds ABP*...........................................13

    D.    *Allstate*............................................................................15

    E.    *Progressive*......................................................................17

II.    ALL CLAIMS IN *PUTNAM* ARE TIME-BARRED  ..................................17

    A.    Putnam's 1933 Act Claims Are Untimely  ...........................17

    B.    Putnam's 1934 Act Claims Are Untimely  ...........................18

    C.    Putnam's Connecticut Uniform Securities Act Claim Is Untimely ......19

III.    ALL CLAIMS IN *AFAC* ARE TIME-BARRED ...........................................20

    A.    AFAC's 1933 Act Claims Are Untimely.............................20

    B.    AFAC's 1934 Act Claims Are Untimely.............................22

    C.    AFAC's Common Law Claims Are Untimely .....................23

        1.    Oklahoma's Choice-of-Law Rules Apply To AFAC's Common Law Claims....................................................23

        2.    AFAC's Fraud-Based Claims Are Untimely Under California's Three-Year Statute Of Limitations.........................25

i

       3.      AFAC's Fraud-Based Claims Are Untimely Under Oklahoma's Two-Year Statute Of Limitations ..........................25

       4.      AFAC's Negligent Misrepresentation Claim Is Untimely..........26

IV.    VIRTUALLY ALL CLAIMS IN *WESTERN & SOUTHERN* ARE TIME-BARRED 27

    A.    Western & Southern's 1933 Act Claims Are Untimely .......................27

    B.    Western & Southern's 1934 Act Claims Are Untimely .......................29

    C.    Western & Southern's Ohio Securities Act Claims Are Untimely.......32

    D.    Western & Southern's Common Law Claims Are Untimely ..............36

       1.      The Relevant Choice Of Law Analysis Requires Application Of Ohio's Statute Of Limitation 36

       2.      Western & Southern's Common Law Claims Are Barred By The OSA's Two-Year Statute Of Limitations...........................38

V.    THE *NATIONAL INTEGRITY* ACTION SHOULD BE DISMISSED IN ITS ENTIRETY OR IN SUBSTANTIAL PART...........................................40

    A.    The Recently-Filed New York Action Was Procedurally Improper And Should Be Dismissed ....................................................40

       1.      Dismissal Is Appropriate Where Plaintiffs Forum Shop Identical Claims In Different Forums..........................................40

       2.      The Equities Favor Dismissal Of National Integrity's Second Filed Suit..................................................................42

    B.    Virtually All Of National Integrity's Claims Are Time-Barred ..........45

       1.      National Integrity's 1933 Act Claims Are Untimely ................45

       2.      National Integrity's 1934 Act Claims Are Untimely ................47

       3.      National Integrity's OSA Claims Are Untimely ........................48

       4.      National Integrity's Common Law Claims Are Untimely .........49

VI.   ALL CLAIMS IN *BANKERS* ARE TIME-BARRED ....................................52

   A.   Under Florida Law, The Statute Of Limitations Of The State With The Most "Significant Relationship" To The Action Applies .............52

   B.   California's Statute Of Limitations Apply Here....................................55

   C.   Banker's Claims Are Untimely Under California's Statutes Of Limitations  ....................................................................................58

VII.   ALL CLAIMS IN *STERLING* ARE TIME-BARRED ...................................59

   A.   Illinois' Statute Of Limitations Bars Sterling's Claims.......................59

   B.   California's Statute Of Limitations, Applied Via Illinois' Borrowing Statute, Bars Sterling's Claims...........................................62

      1.   California's Statute Of Limitations Applies...............................63

         a.   No Party Resides In Illinois .............................................63

         b.   California Has The Most "Significant Relationship" To This Action ....................................................................64

      2.   California's Statute Of Limitations Bars Sterling's Claims.......66

VIII.   SEALINK DOES NOT HAVE ARTICLE III STANDING, AND ALL CLAIMS IN *SEALINK* IN ANY EVENT ARE TIME-BARRED .................66

   A.   Sealink Lacks Standing ........................................................................67

   B.   In Any Event, Sealink's Claims Are Time-Barred Under Germany's Statute Of Limitations Law ..................................................70

      1.   German Law Applies Under New York's Borrowing Statute ...70

      2.   Germany's Three-Year Limitations Period Bars Sealink's Claims ........................................................................................71

      3.   Sealink's Negligent Misrepresentation Claim Is Also Barred Under New York Law ..............................................................75

CONCLUSION.........................................................................................................76

iii

1

## **TABLE OF AUTHORITIES**

2

**PAGE(S)**

3

C**ASES**

4

5
*Aguiar v. Natbony,*
6
    2011 WL 1873590 (S.D.N.Y. May 16, 2011)................................................41, 44

7
*Allstate Ins. Co. v. Countrywide Fin. Corp.,*
    2011 WL 5067128 (C.D. Cal. Oct. 21, 2011) ............................................. *passim*
8

9
*Alltrade, Inc. v. Uniweld Products, Inc.,*
    946 F.2d 622 (9th Cir. 1991) ..............................................................................41
10

11
*In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90,*
    81 F.3d 570 (5th Cir. 1996) ..........................................................................23, 36
12

13
*Allegaert v. Warren,*
    480 F. Supp. 817 (S.D.N.Y. 1979) ......................................................................49
14

15
*Alperin v. Vatican Bank,*
    2006 WL 1663847 (N.D. Cal. June 15, 2006) ....................................................71
16

17
*Ambassador v. Euclid,*
    1984 WL 341 (S.D.N.Y. May 24, 2004) ............................................................76
18

19
*In re Am. Funds Sec. Litig.,*
    556 F. Supp. 2d 1100 (C.D. Cal. 2008)...............................................................75
20

21
*Am. Lumbermens Mut. Cas. Co. of Ill. v. Cochrane,*
    129 N.Y.S.2d 489 (Sup. Ct. 1954) ................................................................ 49-50
22

23
*Am. Pipe & Constr. Co. v. Utah,*
    414 U.S. 538 (1974) ....................................................................... *passim*
24

25
*Am. Signature, Inc. v. Moody's Investors Servs., Inc.,*
    2010 WL 2667367 (S.D. Ohio July 2, 2010) ......................................................41
26

27
*Antone v. General Motors Corp.,*
    472 N.E.2D 742 (N.Y. 1984) ..............................................................................49
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Arandell Corp. v. American Elec. Power Co., Inc.,*
    2010 WL 3667004 (S.D. Ohio Sept. 15, 2010)................................................34, 35

*Arlington Heights v. Metro. Housing Dev. Corp.,*
    429 U.S. 252 (1977) ................................................................................................67

*Atchison, Topeka & Santa Fe Ry. v. Chevron U.S.A., Inc.,*
    1985 WL 2265 (N.D. Ill. Aug. 5, 1985) ................................................................64

*BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.,*
    194 F.3d 1089 (10th Cir. 1999) ............................................................................23

*Basil v. Leidesdorf,*
    713 F. Supp. 1194 (N.D. Ill. 1989).......................................................................61

*Bates v. Cook, Inc.,*
    509 So.2d 1112 (Fla. 1987) ..................................................................................52

*Bernal v. Charter County Mut. Ins. Co.,*
    209 P.3d 309 (Okla. 2009) ....................................................................................24

*Brickner v. Gooden,*
    525 P.2d 632 (Okla. 1974) ....................................................................................24

*In re Brocade Commc'ns Sys., Inc. Deriv. Litig.,*
    615 F. Supp. 2d 1018 (N.D. Cal. 2009)................................................................19

*Cain v. Mid-Ohio Secs., Inc.,*
    2007 WL 2080553 (Ohio App. 9 Dist. July 23, 2007)........................................33

*Cantor Fitzgerald Inc. v. Lutnick,*
    313 F.3d 704 (2d Cir. 2002) ..................................................................................51

*Capri v. Murphy,*
    856 F.2d 473 (2nd Cir. 1986) ...............................................................................20

*Centaur Classic Conv. Arb. Fund Ltd. v. Countrywide Fin. Corp.,*
    No. 10-cv-05699-MRP (MANx), slip op. (C.D. Cal. Jan. 20, 2011) ............28, 46

v

*Colon v. Banco Popular N. Am.,*
   59 A.D.3d 300 (N.Y.A.D. 1st Dep't 2009) ..........................................................76

*Consolidated Grain & Barge Co. v. Structural Sys., Inc.,*
   212 P.3d 1168 (Okla. 2009) ..........................................................24

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.,*
   2011 WL 3569969 (J.P.M.L. Aug. 15, 2011) ..........................................................56

*In re Countrywide Fin. Corp. Sec. Litig.,*
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..........................................................16, 67

*Crown, Cork & Seal Co. v. Parker,*
   462 U.S. 345 (1983) ..........................................................11

*Curtis v. Citibank, N.A.,*
   226 F.3d 133 (2d Cir. 2006) ..........................................................40

*Dart Indus., Inc. v. Acor,*
   2008 WL 4816612 (M.D. Fla. Nov. 5, 2008) ..........................................................57

*Digoia v. H. Koch & Sons,*
   944 F.2d 809 (11th Cir. 1991) ..........................................................52, 54

*Downing Trucking, Inc. v. Cline Wood Agency, Inc.,*
   2007 WL 2816200 (W.D. Okla. 2007) ..........................................................26

*Dudek v. Thomas & Thomas, Att'ys & Counselors at Law, LLC,*
   702 F. Supp. 2d 826 (N.D. Ohio 2010) ..........................................................37

*Dunn & Fenley, LLC v. Diederich,*
   2010 WL 28662 (D. Or. Jan. 5, 2010) ..........................................................41

*Eaton v. Keyser,*
   53 A.D.3d 1029 (N.Y. App. Div. 2008) ..........................................................49

*Employers Ins. of Wausau v. Ehlco Liquidating Trust,*
   723 N.E.2d 687 (Ill. App. Ct. 1999) ..........................................................59, 63

*Epstein v. Haas Sec. Corp.,*
   731 F. Supp. 1166 (S.D.N.Y. 1990) ..........................................................70-71

vi

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Exxon Mobil Corp. Sec. Litig.,*
    500 F.3d 189 (3d Cir. 2007) ............................................................19, 23, 32, 48

*Fed. Deposit Ins. Corp. v. Grant,*
    8 F. Supp. 2d 1275 (N.D. Okla. 1998) ...............................................................27

*Feldman v. Pioneer Petroleum, Inc.,*
    606 F. Supp. 916 (W.D. Okla. 1985) ............................................................24, 25

*First Nat'l Bank of Boston v. Heuer,*
    702 F. Supp. 173 (N.D. Ill. 1988)..................................................................57, 64

*Frees v. ITT Tech. School,*
    2010 WL 4323026 (Ohio App. 2 Dist. Oct. 29, 2010).......................................35

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ......................................................................................4, 67

*In re Gen. Am. Life Ins. Co. Sales Practices Litig.,*
    391 F.3d 907 (8th Cir. 1996) ..............................................................................36

*Genentech, Inc. v. Eli Lilly and Co.,*
    998 F.2d 931 (Fed. Ct. App. 1993) .....................................................................40

*Global Fin. Corp. v. Triarc Corp.,*
    93 N.Y.2d 525 (1999)....................................................................................51, 70

*Goldberg v. Cohen,*
    2002 WL 1371031 (Ohio App. 7th Dist. June 13, 2002)....................................38

*Gordon & Co. v. Ross,*
    63 F. Supp. 2d 405 (S.D.N.Y. 1999) ............................................................51, 70

*Greenberg Traurig of New York, P.C. v. Moody,*
    161 S.W.3D 56 (Tex. App. 2004) .................................................................56, 57

*Grumhaus v. Comerica Sec. Inc.,*
    2003 WL 21504185 (N.D. Ill. June 30, 2003) ....................................................62

vii

*Halbrecht v. Prudential-Bache Props., Inc.,*
     1992 WL 336757 (D. Conn. 1992)..................................................20

*Hardin v. Reliance Trust Co.,*
     2006 WL 285045 (N.D. Ohio Sept. 29, 2006) ...................................39

*Helman v. EPL Prolong, Inc.,*
     743 N.E.2d 484 (Ohio Ct. App. 2000) ............................................38

*Hoover v. Langston Equip. Assocs.,*
     958 F.2d 742 (6th Cir. 1992) .........................................................35

*Howard v. Allen,*
     283 N.E.2d 167 (Ohio 1972) ..........................................................34

*HSBC Bank USA v. Bond, Schoeneck & King, PLLC,*
     16 Misc.3d 813 (N.Y. Sup. Ct. 2007).............................................76

*IBM Corp. v. Bajorek,*
     191 F.3d 1033 (9th Cir. 1999) .......................................................52

*Intellivision v. Microsoft Corp.,*
     784 F. Supp. 2d 356 (S.D.N.Y. 2011) ............................................70

*IT Corp. v. Ecology & Envt'l Eng'g,*
     275 A.D.2d 958 (N.Y.A.D. 4th Dep't 2000)....................................76

*Italian Colors Rest. v. Am. Express Co.,*
     2003 WL 22682482 (N.D. Cal. Nov. 10, 2003)...........................41, 44

*Judge v. Am. Motors Corp.,*
     908 F.2d 1565 (11th Cir. 1990) .....................................................54

*Kalmich v. Bruno,*
     404 F. Supp. 57 (N.D. Ill. 1975).....................................................62

*Kellen Co. v. Calphalon Corp.,,*
     54 F. Supp. 2d 218 (S.D.N.Y. 1999) .......................................40-41, 44

*Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.,*
     342 U.S. 180 (1952) ......................................................................40

LIBA/2243779.1

*Krause v. Case Western Reserve Univ.*,
    1996 WL 732537 (Ohio Ct. App. Dec. 19, 1996) .......................................... 39-40

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991) ...........................................................................................19

*Lang v. Paine, Webber, Jackson & Curtis, Inc.*,
    582 F. Supp. 1421 (S.D.N.Y. 1984) ...................................................................70

*LeBlanc v. G.D. Searle & Co.*,
    533 N.E.2d 41 (Ill. App. Ct. 1988) ....................................................................63

*Lucas v. Downtown Greenville Investors L.P.*,
    671 N.E.2d 389 (Ill. App. Ct. 1996) ..................................................................62

*Marshall v. Fenton, Fenton, Smith, Reneau and Moon P.C.*,
    899 F.2d 621 (Okla. 1995) .................................................................................26

*McCann v. Hy-Vee, Inc.*,
    2011 WL 5924414 (7th Cir. Nov. 22, 2011) .....................................................19

*McMahan & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    727 F. Supp. 833 (S.D.N.Y. 1989) ........................................................49, 50, 51

*McNeil v. CSX Transp., Inc.*,
    832 So.2d 227 (Fla. Dist. Ct. App. 2002) ..........................................................54

*Me. State Retirement Sys., Inc. v. Countrywide Fin. Corp.*,
    722 F. Supp. 2d 1157 (C.D. Cal. 2010) ...................................................... *passim*

*Me. State Retirement Sys., Inc. v. Countrywide Fin. Corp.*,
    2011 WL 4389689 (C.D. Cal. May 5, 2011) ............................................... *passim*

*Merck & Co. v. Reynolds*,
    130 S. Ct. 1784 (2010) ......................................................................................19

*Merrick Bank Corp. v. Savvis, Inc.*,
    2008 WL 5146545 (E.D. Mo. Dec. 8, 2008) ...............................................41, 44

*Metz v. Unizan Bank*,
    649 F.3d 492 (6th Cir. 2011) .............................................................................33

ix

*Mezroub v. Capella,*
    702 So.2d 562 (Fla. Dist. Ct. App. 1997)................................................................54

*Michael v. Michael,*
    2000 WL 1005209 (Ohio Ct. App. July 21, 2000)............................................39

*Morgan v. Biro Mfg. Co.,*
    474 N.E.2d 286 (Ohio 1984) ...........................................................................36

*Morris B. Chapman & Assoc., Ltd. v. Kitzman,*
    716 N.E.2d 829 (Ill. 1999)................................................................................64

*Newell Co. v. Petersen,*
    325 Ill. App. 3d 661 (Ill. App. Ct. 2001)......................................................59, 62

*Newton v. Thomason,*
    22 F.3d 1455 (9th Cir. 1994) ............................................................................53

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) .........................................................................................43

*Oglesby v. County of Kern,*
    2005 WL 3031466 (E.D. Cal. Nov. 4, 2005) ...................................................42

*Platt Elec. Supply, Inc. v. EOFF Elec., Inc.,*
    522 F.3d 1049 (9th Cir. 2008)......................................................................26, 58

*Putnam Bank v. Countrywide Fin. Corp.,*
    No. 3:11-CV-00145, slip op. (D. Conn. May 16, 2011) ...............................55, 57

*Raniere v. Citigroup, Inc.,*
    2011 WL 5881926 (S.D.N.Y. Nov. 22, 2011) ..................................................40

*Rein v. David A. Noyes & Co.,*
    595 N.E.2d 565 (Ill. App. Ct. 1992)..................................................................61

*Rota v. Colonial Realty/USA Corp.,*
    1996 WL 434228 (D. Conn. 1996)....................................................................20

*Ruble v. Ream,*
    2003 WL 22532858 (Ohio App. 4th Dist. Oct. 29, 2003)...................................34

x

*Secretary of State of Md. v. Joseph H. Munson Co.,*
    467 U.S. 947 (1984) .......................................................................67

*Semmes Motors, Inc. v. Ford Motor Co.,*
    429 F.2d 1197 (2d Cir. 1970) .......................................................41, 44

*Siemers v. Wells Fargo & Co.,*
    2006 WL 3041090 (N.D. Cal. Oct. 24, 2006) .....................................67

*Sonic Auto., Inc. v. Chrysler Ins. Co.,*
    2011 WL 4063020 (S.D. Ohio Sept. 13, 2011) ...............................36-37

*Stephens v. Household Fin. Corp.,*
    566 P.2d 1163 599 (Okla. 1977) ....................................................24

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.,*
    2011 WL 3558173 (C.D. Cal. Aug. 9, 2011) ........................... *passim*

*Thornton v. State Farm Mut. Auto Ins. Co.,*
    2006 WL 3359448 (N.D. Ohio Nov. 17, 2006) ...............................34, 35

*Thornton v. T&W Tire, L.P.,*
    410 F. Supp. 2d 1098 (W.D. Okla. 2006) .........................................24

*Toll Bros., Inc. v. Dryvit Sys., Inc.,*
    432 F.3d 564 (4th Cir. 2005) ........................................................36

*Topp v. Uniden Am. Corp.,*
    483 F. Supp. 2d 1187 (S.D. Fla. 2007)................................... *passim*

*Townsend v. Sears, Roebuck and Co.,*
    879 N.E.2D 893 (Ill. 2007)........................................................64, 65

*Tregenza v. Lehman Bros.,*
    287 Ill. App. 3d 108 (1997) .........................................................60

*Trumpet Vine Invs., N.V. v. Union Capital Partners, Inc.,*
    92 F.3d 1110 (11th Cir. 1996) .....................................................54, 58

LIBA/2243779.1

*United Fin. Casualty Co. v. Countrywide Fin. Corp.,*
    No. 11-CV-04766-MRP (MANx), slip op. (C.D. Cal. Nov. 16, 2011) ................1

*Vaccariello v. Smith & Nephew Richards, Inc.,*
    763 N.E.2d 160 (Ohio 2002) ...................................................... *passim*

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..................................................................67

*Washington v. Spitzer Mgmt. Co.,*
    2003 WL 1759617 (Ohio 8th Dist. Apr. 3, 2002) ................................38

*In re Woodward,*
    549 F.2d 1207 (Okla. 1976) .......................................................26

*Wuliger v. Anstaett,*
    363 F. Supp. 2d 917 (N.D. Ohio 2005) ..........................................38

*Wyser-Pratte Mgmt. Co. v. Telxon Corp.,*
    413 F.3d 553 (6th Cir. 2005) ............................................33, 35, 38

*Ysbrand v. DaimlerChrysler Corp.,*
    81 P.3d 618 (Okla. 2003) ..........................................................24

*Zemcik v. LaPine Truck Sales & Equip. Co.,*
    124 Ohio App. 3d 581 (1998)......................................................35

**FEDERAL STATUTES, REGULATIONS AND RULES**

12 U.S.C. § 1464(a)(1) ...............................................................63

15 U.S.C. § 77k.................................................................. *passim*

15 U.S.C. § 77l(a)(2) ........................................................... *passim*

15 U.S.C. § 77m ......................................................................17

15 U.S.C. § 77o.................................................................. *passim*

15 U.S.C. § 78j(b) ............................................................... *passim*

15 U.S.C. § 78t-a ................................................................ *passim*

LIBA/2243779.1

28 U.S.C. § 1404(a) ................................................................................43

28 U.S.C. § 1407.............................................................................52, 59

28 U.S.C. § 1658(b) ...........................................................19, 22, 29, 47

Fed. R. Civ. P. 44.1 ...............................................................................71

**STATE STATUTES, REGULATIONS AND RULES**

Cal. Code Civ. P. § 338(d)................................................................25, 58

Conn. Gen. Stat. § 36b-4 ........................................................................8

Conn. Gen. Stat. § 36b-29(f) ................................................................20

735 Ill. Comp. Stat. § 5/13-210 ............................................................63

815 Ill. Comp. Stat. § 5/13(d) ...................................................60, 61, 62

N.Y. C.P.L.R. § 202............................................................................. *passim*

N.Y. C.P.L.R. § 214(4)...........................................................................76

Ohio Rev. Code Ann. § 1707.43(B) ..................................................32, 38

Ohio Rev. Code § 2305.03(B) ................................................................37

Ohio Rev. Code § 2305.09 .....................................................................38

Ohio Rev. Code § 2305.19 ...................................................28, 34, 46

12 Okla. Stat. § 95(A)(3) ...............................................................24, 25, 26

12 Okla. Stat. § 105 ..............................................................................24

**OTHER AUTHORITIES**

Restatement (Second) Conflict of Laws § 6(2) ....................................53

Restatement (Second) Conflict of Laws § 142................................36, 59, 62

Restatement (Second) Conflict of Laws § 142(1) ...................................37

Restatement (Second) Conflict of Laws § 142, cmt. f ............................62

Restatement (Second) Conflict of Laws § 145.................................52, 64

LIBA/2243779.1

1

Restatement (Second) Conflict of Laws § 145(2) ....................................................53

2

Restatement (Second) Conflict of Laws § 145(2)(c ) ...............................................58

3

Restatement (Second) Conflict of Laws § 145(a) ...................................................58

4

5

Restatement (Second) Conflict of Laws § 145(c) ...................................................58

6

Restatement (Second) Conflict of Laws § 148.........................................................64

7

Restatement (Second) Conflict of Laws § 148(c) ...................................................65

8

Restatement (Second) Conflict of Laws § 148(d) ...................................................58

9

Restatement (Second) Conflict of Laws § 148(1) ...................................................54

10

Restatement (Second) Conflict of Laws § 148(2) ...................................................54

11

12

Restatement (Second) Conflict of Laws § 148(2)(a)...............................................56

13

Restatement (Second) Conflict of Laws § 148(2)(c ) .........................................55, 65

14

Restatement (Second) Conflict of Laws § 148(2)(d ) .........................................58, 65

15

Restatement (Second) Conflict of Laws § 148 cmt. f .........................................54, 57

16

Restatement (Second) Conflict of Laws § 148 cmt. g.........................................55, 57

17

18

19

20

21

22

23

24

25

26

27

28

## PRELIMINARY STATEMENT

Virtually all of the primary-liability claims alleged in the seven actions addressed in this motion—Putnam Bank, American Fidelity Assurance Co., Western & Southern Life Ins. Co., National Integrity Life Ins. Co., Bankers Ins. Co., Sterling Federal Bank, and Sealink Funding Ltd.—are time-barred under the applicable statutes of limitations and repose and therefore must be dismissed with prejudice.[1] Each of these cases makes fundamentally the same factual allegations – i.e., that Countrywide abandoned its underwriting guidelines and made loans without regard to borrower ability to pay, that appraisals were manipulated resulting in inflated loan to value ratios ("LTV"), and that owner occupancy data disclosed in MBS prospectus supplements was materially false.  This Court already has held identical claims to be time-barred in four other cases included in the Countrywide MBS MDL.[2]  Because the seven actions addressed in this motion are indistinguishable from—and were filed later than—the cases previously dismissed by the Court as untimely, these cases too are untimely and should be dismissed.

In addition to being time-barred, the *Sealink* case should be dismissed for the separate and independent reason that the plaintiff lacks standing, and the *National Integrity* case similarly should be dismissed because of the flagrant forum shopping reflected in National Integrity's decision to drop out of the *Western & Southern* case and re-file an identical complaint in the Southern District of New York.  More

_____

[1] In this memorandum these cases will be referred to as follows:  *Putnam Bank* ("*Putnam*"), *American Fidelity Assurance Co.* ("*AFAC*"), *Western & Southern Life Ins. Co.* ("*Western & Southern*" or "*W&S*"), *National Integrity Life Ins. Co.* ("*National Integrity*" or "*NI*"), *Bankers Ins. Co.* ("*Bankers*"), *Sterling Federal Bank* ("*Sterling*"), *and Sealink Funding Ltd.* ("*Sealink*").

[2] *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157 (C.D. Cal. 2010) ("*Maine State I*"); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689 (C.D. Cal. May 5, 2011) ("*Maine State II*"); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 2011 WL 3558173 (C.D. Cal. Aug. 9, 2011) ("*Stichting*"); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 2011 WL 5067128 (C.D. Cal. Oct. 21, 2011); *United Fin. Casualty Co. v. Countrywide Fin. Corp.*, No. 11-CV-04766-MRP (MANx), slip op. (C.D. Cal. Nov. 16, 2011) ("*Progressive*") (RJN Ex. 104).

1

1   specifically:

2   **_1933 Act Claims_**.  Four of the seven actions at issue (*Putnam*, *AFAC*, *Western*

3   *& Southern*, and *National Integrity*) assert claims under the Securities Act of 1933

4   ("1933 Act").  As this Court has held, however, a reasonable investor in

5   Countrywide MBS either discovered or should have discovered the facts underlying

6   its claims by no later than "late 2007 or early 2008."  *Stichting*, 2011 WL 3558173,

7   at *8, 11.  Here, all MBS purchased by Plaintiffs in these four actions were offered

8   and sold more than three years before their respective complaints were filed.  As

9   such, both the 1933 Act's one-year statute of limitations and three-year statute of

10  repose have expired.  Plaintiffs argue that the limitations and repose periods were

11  tolled by the filing of the *Luther* class action in California state court, pursuant to

12  *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).  As this Court has held,

13  however, *American Pipe* tolling is inapplicable as to any MBS tranches for which

14  the *Luther* named plaintiffs lacked standing.  Here, because virtually none of the

15  MBS certificates that Plaintiffs purchased also had been purchased by the *Luther*

16  named plaintiffs, tolling does not apply and Plaintiffs' 1933 Act claims as to those

17  certificates are time-barred.

18  **_1934 Act Claims_**.  The same four actions (*Putnam*, *AFAC*, *Western &*

19  *Southern*, and *National Integrity*) also assert claims under the Securities Exchange

20  Act of 1934 ("1934 Act").  In *Stichting*, *Allstate*, and *Progressive*, the Court held

21  that the 1934 Act's two-year statute of limitations barred identical claims because a

22  reasonable investor in Countrywide MBS should have discovered facts sufficient to

23  state such claims—including facts related to scienter—more than two years before

24  those actions were filed.  Here, all four actions asserting 1934 Act claims were filed

25  between January 27, 2011 and November 9, 2011—*i.e.*, *after* the fraud claims in

26  *Allstate* had been filed and more than two years *after* the 1934 Act's statute of

27  limitations had expired.  In addition, for many of the MBS purchased by Plaintiffs,

28  the alleged misrepresentations in the offering documents were made more than five

2

1    years before the relevant complaint was filed. As a result, the 1934 Act's five-year

2    repose period also had expired as to those MBS. All 1934 Act claims are thus time-

3    barred and must be dismissed.

4        ***State "Blue Sky" Claims.*** Three actions (*Putnam*, *Western & Southern*, and

5    *National Integrity*) assert claims under state law "Blue Sky" statutes—more

6    specifically, the Connecticut Uniform Securities Act and the Ohio Securities Act.

7    Each of those statutes contains a two-year limitations period and a five-year repose

8    period. Each of these cases was filed in 2011, more than two years after this Court

9    has held a reasonable investor in Countrywide MBS would have discovered the

10    factual basis of their claims in late 2007 or early 2008. In addition, because many of

11    the alleged misrepresentations and sales occurred more than five years before the

12    complaint was filed, many of these state Blue Sky law claims are time-barred under

13    the five-year repose period as well.

14        ***Common Law Fraud, Negligent Misrepresentation.*** Six of the actions

15    (*AFAC*, *Western & Southern*, *National Integrity*, *Bankers*, *Sterling*, and *Sealink*)

16    assert common law fraud and negligent misrepresentation claims. Because all six

17    actions were filed in other districts and transferred to this Court under 28 U.S.C. §

18    1407, this Court must apply the choice-of-law rules of the various transferor courts

19    to determine which limitations and repose periods apply in each case. As a general

20    matter,[3] Plaintiffs' claims would be time-barred in the transferor courts to the extent

21    they are untimely under either (1) the limitations periods of the forum state where

22    the action was filed (*i.e.*, Oklahoma, Ohio, New York, Florida, Illinois) or (2) the

23    limitations periods of the jurisdiction where the claim accrued, as defined by the

24    applicable borrowing statute (*i.e.*, California for *AFAC*, *Western & Southern*,

25    *Bankers*, and *Sterling*; Ohio for *National Integrity*; and Germany for *Sealink*). Here,

26    the choice of law rules applicable in each case require application of either two- or

27

    _____

28   [3] The specific choice of law rules governing each individual action are set forth in
Sections II-VIII, *infra*.

1   three-year limitations periods for all common law primary-liability claims.  Because

2   a reasonable investor in Countrywide MBS should have discovered the same alleged

3   misstatements asserted in these six present actions by "late 2007 or early 2008,"

4   *Stichting*, 2011 WL 3558173, at *8, 11, more than three years before any of these

5   six actions was filed, all of Plaintiffs' common law primary-liability claims are

6   time-barred under the applicable two- and three-year statutes of limitations.

7   Moreover, as to *Sterling*, this Court in *Allstate* dismissed substantially identical

8   fraud and negligent misrepresentation claims under the Illinois statute of repose as

9   to MBS purchased more than five years before the complaint had been filed.  *See*

10  *Allstate*, 2011 WL 5067128, at *13.  All but one of the MBS at issue in the later-

11  filed *Sterling* case were purchased more than five years before suit, and all claims

12  based on those MBS are likewise barred by the same repose period.

13          Moreover, the same reasons that require application of German limitations

14  periods in *Sealink* require dismissal of that case for lack of standing.  The plaintiff in

15  *Sealink* is a special purpose investment vehicle ("SPV") that was formed by a

16  German entity known as Sachsen LB.  Plaintiff has incurred no losses (and will

17  incur no losses) as to the MBS over which it has sued because a group of German

18  banks have agreed to make it whole (should any losses occur) pursuant to the banks'

19  financing arrangements with Saschen.  Absent any such injury, the plaintiff in

20  *Sealink* lacks standing under Article III of the U.S. Constitution.  *Friends of the*

21  *Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

22          Likewise, the same reasons that require application of Ohio's borrowing

23  statute and make National Integrity's claims untimely also require dismissal of the

24  *National Integrity* case on grounds of judicial estoppel and flagrant forum shopping.

25  National Integrity dropped out of the *Western & Southern* case and filed a new case

26  in November 2011 in the Southern District of New York, in an obvious attempt to

27  trigger the application of New York's longer statute of limitations for fraud claims.

28  But National Integrity is a resident of Ohio for purposes of New York's borrowing

4

statute, consistent with the representations it previously made to the Southern District of Ohio about where the investment decision was made to purchase the MBS at issue here and the concession in its new complaint that its senior management is in Ohio.  Further, by filing a separate action in New York, National Integrity has created tremendous judicial inefficiency, asking two courts and potentially two juries to address precisely the same claims against identical defendants involving precisely the same conduct relating to the same tranches of the same MBS offering that were purchased on precisely the same days by the same or affiliated portfolio managers.  Such forum shopping should be disregarded and not rewarded, and its complaint dismissed.

For all of these reasons, *Putnam*, *AFAC*, *Western & Southern*, *National Integrity*, *Bankers*, *Sterling*, and *Sealink* all should be dismissed with prejudice.

## **FACTUAL BACKGROUND**

The plaintiffs in the seven cases addressed in this consolidated motion to dismiss are all large, sophisticated institutional investors, including federally chartered savings banks, insurance companies, and investment advisors and/or managers.[4]  The earliest of these seven complaints was filed on January 27, 2011, and the latest was filed on November 9, 2011.[5]  Like each of the other actions previously filed in or transferred to this Court as part of the *Countrywide MBS MDL*,

---

[4] Putnam is a federally chartered stock savings bank. *Putnam* Compl. ¶ 15.  AFAC is an insurance company. *AFAC* First Amended Compl. ("FAC") ¶ 7.  The Western & Southern Plaintiffs are four mutual insurance companies and one registered investment advisor.  *W&S* Amended Complaint ("AC") ¶¶ 2, 19.  National Integrity is an insurance company that primarily sells annuities. *NI* Compl. ¶ 15.  The Bankers plaintiffs are insurance companies. *Bankers* Compl. ¶ 18-21.  Sterling is a federally chartered savings bank. *Sterling* Compl. ¶ 19.  Sealink is a SPV established to "receive, hold and manage RMBS purchased by certain [other] special purpose vehicles." *Sealink* Compl. ¶ 12.  Collectively, the plaintiffs in all actions are referred to herein as "Plaintiffs."

[5] *Putnam* was filed on January 27, 2011; *Sterling* was filed on March 23, 2011; *AFAC* was filed on April 1, 2011, and the First Amended Complaint was filed on June 7, 2011; *Western & Southern* was filed on April 27, 2011, and an amended complaint was filed on November 8, 2011; *Bankers* was filed on July 22, 2011; *Sealink* was filed on September 29, 2011; and *NI* was filed on November 9, 2011.

5

1   the complaints in these seven cases are all based on common factual allegations—

2   allegations that are also substantially similar (if not identical) to the allegations in

3   the *Stichting* and *Allstate* complaints previously dismissed in whole or in large part

4   by this Court.  Detailed charts comparing the key factual allegations in *Stichting*,

5   *Allstate*, and each of the seven complaints at issue in this motion are attached hereto

6   as Appendix ("App.") 1-7.

7          Just as in *Stichting* and *Allstate*, the core allegation of the seven complaints at

8   issue is that the shelf registration statements and prospectus supplements issued in

9   connection with the MBS that Plaintiffs purchased (collectively, the "Offering

10  Documents") failed to disclose that Countrywide allegedly "systematically

11  disregard[ed] the mortgage loan underwriting guidelines that [were] stated in the

12  Certificates' Offering Documents."  *Putnam* Compl. ¶ 5; *Stichting*, 2011 WL

13  3558173, at *9 ("the gravamen of Plaintiff's claim is that Countrywide wholly

14  abandoned its underwriting standards").[6]  As in both *Stichting* and *Allstate*,

15  Plaintiffs here all allege that Countrywide abandoned its underwriting guidelines

16  when it (1) "adopted a 'matching' strategy [whereby it] would [provide] any

17  mortgage product feature offered by a competitor"; (2) "set up a system whereby

18  any loan [c]ould be approved by way of underwriting 'exceptions'"; and (3)

19  "coached borrowers on how to apply for loan products that required little or no

20  income or asset verification."  *Putnam* Compl. ¶¶ 6-7.[7]  Plaintiffs also allege that

21  [6] *Accord Bankers* Compl. ¶ 55 (Countrywide "systematically disregard[ed] its stated underwriting standards"); *Sterling* Compl. ¶ 52 (same); *AFAC* FAC ¶ 2
22  (Countrywide "systematically ignore[d] the underwriting standards it touted"); *Western & Southern* AC ¶¶ 65, 84 (Countrywide "disregard[ed] [ ] its own
23  underwriting guidelines in favor of blindly approving nearly any kind of loan" and "systematically abusing the 'exceptions' process in order to further circumvent its
24  purported underwriting standards"); *NI* Compl. ¶¶ 65, 84 (same); *Sealink* Compl.
25  ¶ 82 ("Countrywide 'developed a systematic pattern and practice of abandoning its own guidelines for loan origination and underwriting . . . .'").
26  [7] *Accord AFAC* FAC ¶¶ 2-3 (same); *Western & Southern* AC ¶ 85-86 (same); *NI* Compl. ¶¶ 85-86 (same); *Bankers* Compl. ¶¶ 42, 75, 107 (Countrywide (i)
27  "implemented a program which allowed loan officers to 'match' the most aggressive product or policy of any loan origination competitor;" (ii) "created and approved
28  riskier loan products not only by implementing looser stated underwriting guidelines, but also by applying numerous exceptions to its already weakened

6

1  "Countrywide used affiliated rather than independent appraisers, and . . . pressur[ed]

2  appraisers to inflate their appraisal" and allegedly cherry-picked loans for

3  securitization by "keeping higher-quality loans for its own portfolio," overstated the

4  percentage of full-documentation loans in the Offering Documents, "facilitated the

5  widespread falsification" of borrower information, and provided "incomplete and

6  error-ridden loan data" to credit rating agencies.  *Putnam* Compl. ¶¶ 70-71, 76, 79,

7  82.[8]

8       All of this was done, according to Plaintiffs, to allow Countrywide to "capture

9  market share and quick profits" as it "experienced exponential growth in its

10  subprime mortgage loan origination business."  *Putnam* Compl. ¶¶ 5, 50.[9]

11  _____

12  standards;" and (iii) "coached [loan] applicants on the level of employment income needed to qualify for a mortgage loan"); *Sterling* Compl. ¶¶ 39, 72, 104

13  (Countrywide (i) "implemented a program which allowed loan officers to 'match' the most aggressive product or policy of any loan origination competitor;" (ii)

14  "appl[ied] numerous exceptions to its already weakened [underwriting] standards;" and (iii) "coached [loan] applicants on the level of employment income needed to

15  qualify for a mortgage loan"); *Sealink* Compl. ¶ 64 ("Countrywide . . . allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors").

16  [8] *Accord Bankers* Compl. ¶¶ 129, 158, 167, 218 (Countrywide allegedly "did not consistently evaluate the borrowers' ability to repay the loans," "engaged in

17  widespread appraisal-related misconduct by inflating the value of properties in order to support the loans that it wished to make," "knowingly select[ed] risky loans for

18  the Certificates while 'cherry picking' the best loans for [its] own portfolio," and "provided false information about the mortgage loans underlying the Certificates to

19  the credit rating agencies"); *Sterling* Compl. ¶¶ 126, 156, 165, 216 (same); *Western & Southern* AC ¶¶ 89, 244, 258 (Countrywide allegedly "regularly pressured

20  appraisers to value mortgaged properties at pre-determined, inflated and false values;" had a "practice of 'cherry picking' toxic loans for inclusion in

21  securitizations;" and "essentially pre-determined the ratings by 'feeding garbage' into the ratings system"); *NI* Compl. ¶¶ 89, 244, 258 (same); *AFAC* FAC ¶¶ 81, 84,

22  185 (Countrywide allegedly "used affiliated rather than independent appraisers, and . . . pressur[ed] appraisers to inflate their appraisals;" "'cherry-pick[ed]' the higher-

23  quality loans" for itself; and "essentially pre-determined the ratings" by providing false "garbage" data to the ratings agencies); *Sealink* Compl. ¶ 100 ("[t]he credit

24  ratings of the RMBS were further compromised by misinformation provided by Defendants regarding the abandonment of the originators' underwriting standards,

25  rampant use of aggressive exceptions, Defendants' knowledge or reckless disregard of pervasive fraud in the stated income loan programs, and the inflated appraisals

26  assigned to the underlying collateral . . . .").

27  [9] *Accord AFAC* FAC ¶¶ 2, 52 (Countrywide "singularly focused on increasing its market share" as it "greatly increased production of subprime loans"); *Western &

28  Southern* AC ¶¶ 63, 65 (alleged misconduct intended to allow Countrywide to "increase its market share" as part of "its quest for larger and larger loan volume");

According to Plaintiffs, these practices were not disclosed by Countrywide in the Offering Documents, and thus Plaintiffs allege that they purchased MBS that "were in fact far riskier than Countrywide had described them to be" and have "incurred substantial losses in market value and lost principal and interest payments." *Putnam* Compl. ¶¶ 57, 99-101.[10] Thus, Plaintiffs' alleged injury in each of these actions is the same injury alleged by the plaintiff in *Stichting*: "[t]he injury that Plaintiff alleges is that it purchased riskier-than-advertised RMBS because of Countrywide's misrepresentations." 2011 WL 3558173, at *7.

The Plaintiffs' various MBS purchases and claims are asserted in the respective complaints as follows:

**_Putnam_**: Putnam allegedly purchased eight MBS, issued in eight separate offerings by Countrywide, between February 6, 2006 and October 10, 2007. *Putnam* Compl. ¶ 15. The details of Putnam's purchases, including the offerings and tranches purchased, purchase dates, and dates for the relevant Offering Documents are summarized in App. 8. The Complaint, filed on January 27, 2011, asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") (Counts I and II), Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act") (Counts III-V), and Section 36b-4 of the Connecticut Uniform Securities Act (Count VI).

---

*NI* Compl. ¶¶ 63, 65 (same); *Bankers* Compl. ¶ 55 (alleged goal was to increase market share by "originat[ing] an unprecedented number of loans for securitization"); *Sterling* Compl. ¶ 52 (same); *Sealink* Compl. ¶¶ 1, 5 ("Countrywide was driven to purchase and securitize defective loans . . . for a sole purpose: to securitize as many mortgage loans as possible into RMBS and generate profits for the Countrywide Defendants").

[10] *Accord AFAC* FAC ¶¶ 256-57 (same); *Western & Southern* AC ¶¶ 286, 288 (MBS "were far riskier than [Countrywide] described" and Plaintiffs have "seen substantial losses in the market value of [the] Certificates"); *NI* Compl. ¶¶ 286, 288 (same); *Bankers* Compl. ¶¶ 158, 183-84 (MBS "were far riskier . . . than they were represented to be by the Countrywide Defendants" and Plaintiffs have suffered losses "because the mortgage loans underlying the Certificates experienced defaults and delinquencies," which have "significantly devalued [Plaintiffs'] investment and foreclosed the full payment of [principal and interest]"); *Sterling* Compl. ¶¶ 156, 181-84 (same); *Sealink* Compl. ¶¶ 8, 52, 58, 101, 114 (same).

8

***AFAC***:  AFAC allegedly purchased nine MBS, issued in nine separate offerings by Countrywide, between August 4, 2005 and May 1, 2008.  *AFAC* FAC ¶ 32.  The details of these purchases, including the offerings and tranches purchased, purchase dates, and dates for the relevant Offering Documents are summarized in App. 9.  The First Amended Complaint, filed on June 7, 2011, asserts violations of Sections 10(b) and 20(a) of the 1934 Act (Counts I and II), common law fraud (Count III), aiding and abetting common law fraud (Count IV), common law negligent misrepresentation (Count V), and Sections 11, 12(a)(2), and 15 of the 1933 Act (Counts VI-VIII).

***Western & Southern***:  The Western & Southern plaintiffs allegedly purchased 36 MBS, issued in 32 separate offerings by Countrywide, between June 21, 2005 and March 25, 2008, in both initial offerings and in the after-market.  *W&S* AC ¶ 75, Ex. A.  The details of these purchases, including the offerings and tranches purchased, purchase dates, and dates for the relevant Offering Documents are summarized in App. 10.  The Amended Complaint, filed on November 8, 2011, asserts violations of the Ohio Securities Act (Counts I-V), the Ohio Corrupt Activities Act (Count VI), common law negligent misrepresentation (Count VII), Sections 10(b) and 20(a) of the 1934 Act (Counts VIII and IX), Sections 11, 12(a)(2), and 15 of the 1933 Act (Counts X-XII), common law fraud (Count XIV), and civil conspiracy (Count XV).

***National Integrity***:  National Integrity was originally a plaintiff in the *Western & Southern* action, but dropped out of that action when the Western & Southern plaintiffs filed their Amended Complaint.  National Integrity then filed a separate—but substantively identical—action in the Southern District of New York on November 9, 2011.  National Integrity allegedly purchased 26 MBS, issued in 24 separate offerings by Countrywide, between September 30, 2005 and March 25, 2008, in both initial offerings and in the after-market.  *NI* Compl. Ex. A.  The details of these purchases, including the offerings and tranches purchased, purchase dates,

9

and dates for the relevant Offering Documents are summarized in App. 11.  The *NI* Complaint, filed on November 9, 2011, asserts exactly the same primary-liability claims asserted in *Western & Southern*:  violations of the Ohio Securities Act (Counts I-V), the Ohio Corrupt Activities Act (Count VI), common law negligent misrepresentation (Count VII), Sections 10(b) and 20(a) of the 1934 Act (Counts VIII and IX), Sections 11, 12(a)(2), and 15 of the 1933 Act (Counts X-XII), common law fraud (Count XIV), and civil conspiracy (Count XV).

***Bankers***:  The *Bankers* plaintiffs allegedly purchased 16 MBS, issued in 15 separate offerings by Countrywide, between November 22, 2005 and July 16, 2008. *Bankers* Compl. ¶ 6.  The details of these purchases, including the offerings and tranches purchased, purchase dates, and dates for the relevant Offering Documents are summarized in App. 12.  The Complaint, filed on July 22, 2011, asserts primary-liability claims for common law fraud (Count I), fraudulent inducement (Count II), aiding and abetting fraud (Count III), and negligent misrepresentation (Count V).

***Sterling***:  Sterling allegedly purchased four Countrywide-issued MBS between September 30, 2004 and November 6, 2006.  *Sterling* Compl. ¶¶ 1, 6, 25, 26.  The details of these purchases, including the offerings and tranches purchased, purchase dates, and dates for the relevant Offering Documents are summarized in App. 13.  The Complaint, filed on March 23, 2011, asserts primary-liability claims for common law fraud (Count I), fraudulent inducement (Count II), aiding and abetting fraud (Count III), and common law negligent misrepresentation (Count V).

***Sealink***:  Sealink is suing over 31 MBS issued or underwritten in 30 separate offerings by Countrywide, between 2005 and 2007.  *Sealink* Compl. ¶¶ 2, 33.  The details of these purchases, including the offerings and tranches purchased, and dates for the relevant Offering Documents are summarized in App. 14.  The Complaint, filed on September 29, 2011, asserts primary-liability claims for common law fraud (Count I), fraudulent inducement (Count II), aiding and abetting fraud (Count III), and common law negligent misrepresentation (Count IV).

1

## **ARGUMENT**

2   **I.   THIS COURT HAS ALREADY DISMISSED PREVIOUSLY FILED,
3        VIRTUALLY IDENTICAL COMPLAINTS AS TIME-BARRED.**

4            In other cases pending in the *Countrywide MBS MDL*, this Court already has

5   dismissed previously filed complaints as time-barred pursuant to the applicable

6   statutes of limitations and repose.  Because those complaints asserted claims and

7   factual allegations that were virtually identical to those asserted here, this Court's

8   prior dismissal rulings also require the dismissal of the complaints in *Putnam*,

9   *AFAC*, *Western & Southern*, *National Integrity*, *Bankers*, *Sterling*, and *Sealink*.

10           **A.   *Maine State I***

11           In *Maine State I*, the Court dismissed claims under Sections 11, 12(a)(2), and

12  15 of the 1933 Act asserted on behalf of a putative class of purchasers in 427

13  offerings of Countrywide MBS, holding that they were time-barred under the 1933

14  Act's one-year statute of limitations and three-year statute of repose.  More

15  specifically, the Court concluded that plaintiffs discovered the basis of their 1933

16  Act claims in the 2007-08 period, and that the statute of limitations therefore expired

17  long before plaintiffs filed their complaint in January 2010.  *See Maine State I*, 722

18  F. Supp. 2d at 1165.  In addition, the Court held that any 1933 Act claims based on

19  MBS that were offered or sold prior to January 2007—*i.e.*, over three years before

20  the complaint was filed—were time-barred by the statute of repose.  *See id.*

21           The *Maine State* plaintiffs argued that their claims were tolled by the filing of

22  the *Luther* class action,[11] pursuant to the class action tolling doctrine set forth in

23  *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).[12]  The Court, however,

---

24  [11] As the Court is well aware, *Luther v. Countrywide Home Loans Servicing LP*, No.
    BC380698 (Cal. Super. Ct. Nov. 14, 2007) and *Wash. State Plumbing & Pipefitting*
25  *Pension Trust v. Countrywide Fin. Corp.*, No. BC392571 (Cal. Super. Ct. June 12,
    2008) (collectively, "*Luther*"), are putative state court class actions asserting 1933
26  Act claims on behalf of investors in 429 Countrywide MBS offerings, based on the
    same underlying allegations made in the seven cases at issue here.
27  [12] *American Pipe* and its progeny held that "[t]he filing of a class action tolls the
    statute of limitations 'as to all asserted members of the class.'"  *Crown, Cork & Seal*
28  *Co., Inc. v. Parker*, 462 U.S. 345, 350 (1983).

11

1  held that any potential *American Pipe* tolling "applies only to securities where the

2  named plaintiffs [in the class action] had actual standing to bring the lawsuit."

3  *Maine State I*, 722 F. Supp. 2d at 1166-67.  Thus, because "a plaintiff lacks standing

4  . . . to represent the interests of investors in MBS offerings in which the plaintiffs

5  did not themselves buy," *id*. at 1163, the Court concluded that *American Pipe* tolling

6  was inapplicable to any MBS offerings for which no *Luther* named plaintiff actually

7  purchased securities.  *Id*. at 1166-67.  It then dismissed the complaint in its entirety,

8  finding that "Plaintiffs have not adequately pleaded their reliance on *American Pipe*

9  tolling to preserve their claims."  *Id*. at 1162, 1167-68.

10  **B.   *Maine State II***

11  In *Maine State II*, the Court held that plaintiffs must establish that they have

12  "tranche-based standing" under the 1933 Act—that is, a plaintiff's standing is

13  limited to the specific tranche it actually purchased, and does not extend to all

14  tranches in the associated offering.  2011 WL 4389689, at *2-8.[13]  Thus, because

15  any potential *American Pipe* tolling based on *Luther* is applicable "only with respect

16  to those securities as to which the named plaintiffs in *Luther* and *Washington State*

17  had standing to sue," "[t]here can be no tolling with respect to securities [*i.e.*,

18  tranches] the *Luther* plaintiffs did not purchase."  *Id*. at *4, *6.  Instead, "to the

19  extent that the *Luther* state court plaintiffs did not themselves buy particular

20  Certificates included in the [Amended Complaint], the relevant limitations periods

21  continued to run with respect to those tranches."  *Id*. at *6.

22  As a result of the Court's rulings in *Maine State I* and *II*, the scope of the case

23  was reduced from 427 offerings to just eight individual tranches of MBS.  The Court

24  also noted that its rulings would have a significant impact beyond *Maine State*, and

25  would apply to any plaintiff—like those here—that asserts tolling based on the filing

26  of *Luther*:  "the Court's decision about whether to impose a tranche standing

27  _____

28  [13] The Court held that Article III of the U.S. Constitution imposes this same
requirement.  *See id*. at *6-8.

12

1   requirement affects not only the litigants in this case, but potentially any other

2   plaintiffs who seek the benefits of tolling based on *Luther*." *Id*. at *4.

3        **C.** ***Stichting Pensioenfonds ABP***

4        In *Stichting*, the Court dismissed substantially similar claims under the 1933

5   Act, the 1934 Act, the California Corporations Code, and for common law fraud,

6   aiding and abetting fraud, and negligent misrepresentation.

7        First, the Court concluded that the plaintiff's 1933 Act claims were untimely

8   as to all MBS at issue because they were offered or sold more than three years

9   before the complaint was filed.  As such, the 1933 Act statute of repose had expired.

10  *See Stichting*, 2011 WL 3558173, at *2.  The Court then reaffirmed its tolling

11  rulings in *Maine State I* and *II*, holding that "the *Luther* complaints only toll claims

12  for certificates which the named plaintiffs in *Luther* had purchased. . . . *i.e.*, that the

13  named plaintiff in *Luther* must have purchased the same certificate, in the same

14  tranche, to toll a claim under *American Pipe*." *Id*.  Given these rulings, the Court

15  granted the Countrywide Defendants' motion to dismiss, because the plaintiff failed

16  to allege "the grounds for asserting that a *Luther* plaintiff also purchased the

17  security; the tranche of the security that the *Luther* plaintiff purchased; and the date

18  on which that *Luther* plaintiff joined the *Luther* case." *Id*.[14]

19       Second, the Court dismissed the 1934 Act claims with prejudice, holding that

20  "a reasonable plaintiff exercising reasonable diligence . . . should have discovered

21  facts sufficient to state every element of its claim"—including scienter—"at least

22  prior to February 14, 2009 [*i.e.*, two years before the filing of the relevant

23  complaint]." *Id*. at *11.  Thus, the two-year statute of limitations had expired, and

24  plaintiff's 1934 Act claims were time-barred.  Among other things, the Court made

25  the following findings, all of which are equally applicable to the seven cases here:

26  ──────────────
    [14] *See also id*. ("Plaintiff may not assert §§ 11 or 12(a)(2) claims for any certificate
27  which a *Luther* plaintiff did not purchase, nor for any certificate for which the three-
    year statute of repose expired before the *Luther* plaintiff either acquired the security
    or joined the *Luther* case.")  The Court granted the *Stichting* plaintiff leave to re-
28  plead its 1933 Act claims, *see id*., but plaintiff declined to do so.

13

- "Other complaints and public press reports make clear that a reasonable investor would have been aware of problems with underwriting at Countrywide by early 2008. . . . Many of these investigations and lawsuits were public and well-publicized." *Id.* at *8 (summarizing complaints filed in 2007-08 that alleged substantially similar 1934 Act claims).
- "[R]eports of problems with underwriting at Countrywide were widely disseminated in the press, corroborated in government hearings and by the announcement of investigations, and bolstered further when several state Attorneys General filed suit. . . ." *Id.* at *8 n.9.
- "Plaintiff was clearly on notice of Countrywide's misrepresentations regarding underwriting standards by late 2007 or early 2008." *Id.* at *8.
- The "gravamen of Plaintiff's claim is that Countrywide wholly abandoned its underwriting standards.  The press and numerous widely reported lawsuits had made exactly this allegation by the end of 2007." *Id.* at *9.
- "Numerous lawsuits alleging risky loan-origination practices at Countrywide have, in fact, survived motions to dismiss. . . .  The Court takes judicial notice of these suits as evidence that a reasonably diligent investor should have been aware of facts regarding Countrywide's risky loan origination operations and the associated misrepresentations." *Id.*
- "The shareholder, debentureholder, and derivative suits against Countrywide all made the same allegation:  Countrywide stock/debt decreased in value when the market realized that Countrywide had been misrepresenting the quality of the loans it was writing.  These allegations involve the same underlying conduct (abandonment of underwriting standards) and the same fraudulent purpose . . . alleged here." *Id.* at *10.
- "[P]ublic press reports and earlier-filed lawsuits placed Plaintiff on notice regarding the scienter element of its claim." *Id.* at *11.
- "All of these facts were publicly reported and appear in multiple

14

1   complaints filed in 2007 and 2008. . . .  Other plaintiffs recognized that

2   such facts were available by 2007, and this Court subsequently held that

3   those plaintiffs had pleaded scienter adequately." *Id*.

4   The Court also concluded that plaintiff's 1934 Act claims as to certain MBS

5   were independently time-barred by the five-year statute of repose. *See id*. at *6.

6   Reognizing that the repose period "begins to run on the date that the plaintiff

7   purchased the securities at issue," the Court held that "Plaintiff may not assert a §

8   10(b) claim for any certificate which it purchased prior to February 14, 2006 [*i.e.*,

9   five years before the relevant complaint]" and dismissed the claims as to those

10  MBS. *Id*.

11  Third, the Court dismissed plaintiff's California Corporations Code and

12  California common law negligent misrepresentation claims for the same reasons it

13  dismissed the 1934 Act claims. *See id*. at *13.  Like the 1934 Act claims, the

14  California Corporation Code and negligent misrepresentation claims were subject to

15  two-year statutes of limitations, and thus were time-barred because "a reasonable

16  plaintiff exercising reasonable diligence . . . should have discovered facts sufficient

17  to state every element of its claim at least prior to February 14, 2009." *Id*. at *11.

18  Fourth, the Court also dismissed plaintiff's California common law fraud and

19  aiding and abetting claims, which were subject to a three-year statute of limitations.

20  *See id*. at *12.  Applying the inquiry notice standard under California law, the Court

21  held that "[t]he widespread public press coverage combined with the filing of the

22  shareholder suits in August 2007, the *Arkansas Teachers Retirement System* action

23  in November 2007, and the *New York City Employees Retirement System* action in

24  January 2008 were enough to alert a reasonable person to wrongdoing in

25  Countrywide's loan origination business" prior to February 14, 2008 (*i.e.*, three

26  years before the relevant complaint).  *Id*.

27  **D.   _Allstate_**

28  In *Allstate*, the Court dismissed as time-barred nearly identical claims under

15

1   the 1933 Act and the 1934 Act, and certain claims for common law fraud, aiding
2   and abetting fraud, and negligent misrepresentation under Illinois law.

3     For the 1933 Act claims, the Court reaffirmed its *Maine State I* and *II* and
4   *Stichting* rulings, holding that "the doctrine of *American Pipe* tolled the statute of
5   limitations [and repose] only for those Certificates that the named plaintiffs in the
6   prior putative class actions had standing to sue, *i.e.*, those tranches that the *Luther*
7   named plaintiffs had actually purchased." 2011 WL 5067128, at *1, *10.  Thus,
8   because "[n]one of the *Luther* named plaintiffs purchased any of the Certificates that
9   Allstate is now claiming losses on," "Allstate is therefore not entitled to *American*
10  *Pipe* tolling" and "Allstate's claims are time-barred." *Id.* at *10.

11    For the 1934 Act claims, the Court held that Allstate reasonably should have
12  discovered facts sufficient to state its claims at least by December 27, 2008 (*i.e.*,
13  more than two years before filing its complaint on December 27, 2010). *Id.* at *11.
14  Relying on its holding in *Stichting*, the Court concluded that Allstate's allegation of
15  systematic abandonment of underwriting standards was the same allegation that had
16  been made in the various press reports and earlier-filed lawsuits in 2007-08, "and
17  which has been repeated by every Countrywide plaintiff since." *Id.*[15]  The Court
18  also noted that it denied motions to dismiss in the Countrywide shareholder class
19  action—finding, among other things, "a sufficient inference of scienter"—"several
20  weeks before the § 10(b) threshold date of December 27, 2008." *Id.* (citing *In re*
21  *Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008) (Dec. 1,
22  2008)).  Allstate argued that *Stichting* was distinguishable for several reasons, but
23  the Court concluded that "[n]one of Allstate's arguments are persuasive." *Id.*

24    For the state law fraud, aiding and abetting, and negligent misrepresentation
25  claims, the Court applied New York's borrowing statute and determined that the
26  claims of certain plaintiffs (who were Illinois residents) were subject to the three-

27  [15] The 2007-08 complaints that were before the Court in *Stichting* and *Allstate* are
28  attached to the Countrywide Defendants' Request for Judicial Notice at Exs. 71-78, 80-87, 91.

16

1   year statute of limitations and five-year statute of repose of the Illinois Securities

2   Law.  *See id*. at *8-9.  Because the five-year repose period runs "from the date of

3   sale," the Court then held that it "therefore prohibits claims for any RMBS that the

4   Illinois Plaintiffs purchased before December 27, 2005 [*i.e.*, five years before the

5   complaint was filed on December 27, 2010]."  *Id*. at *13.[16]

6        **E.    *Progressive***

7        Finally, in *Progressive*, the Court dismissed claims under the 1934 Act, the

8   California Corporations Code, and California common law as time-barred.  Because

9   *Progressive* was "indistinguishable from *Stichting*," and was filed after *Stichting*,

10  the Court concluded that the *Progressive* complaint was untimely and dismissed it

11  with prejudice.  RJN Ex. 104 at 2-3.

12  **II.    ALL CLAIMS IN *PUTNAM* ARE TIME-BARRED.**

13       **A.    Putnam's 1933 Act Claims Are Untimely.**

14       As in *Maine State*, *Stichting*, and *Allstate*, Putnam's 1933 Act claims are

15  time-barred by both the one-year statute of limitations and the three-year statute of

16  repose.  *See* 15 U.S.C. § 77m.[17]  First, all eight MBS at issue were offered to the

17  public and sold to Putnam before January 27, 2008—*i.e.*, more than three years

18  before the complaint was filed.  *See Putnam* Compl. ¶ 15; App. 8 (latest shelf

19  registration statement at issue dated April 24, 2007; latest prospectus supplement at

20  issue dated September 27, 2007; latest Putnam purchase dated October 10, 2007).[18]

21  ─────────────────

22  [16] With respect to the three-year statute of limitations, however, the Court noted that while "[i]t is possible, even probable, that Defendants will be able to . . . show that the Illinois Plaintiffs' claims are time-barred," the relevant legal standard "require[d]

23  fact-specific inquiries that render this issue more appropriate for summary judgment."  *Id*. at *14.

24  [17] *See id.* (1933 Act claims must be filed "within *one year* after the discovery of the untrue statement or omission, or after such discovery should have been made by the

25  exercise of reasonable diligence," and "[*i*]*n no event* . . . more than *three years* after the security was bona fide offered to the public [for Section 11 claims], or . . . the

26  sale [for Section 12(a)(2) claims]") (emphasis added).

27  [18] As this Court held in *Maine State I*, for purposes of the statute of repose applicable to Section 11 claims, the relevant "offering" date to trigger the repose

28  period is the effective date of the shelf registration statement for shelf registrations before December 1, 2005, and the date of the prospectus supplement for issuers and

1   In addition, as the Court held in *Maine State*, *Stichting*, and *Allstate*, Putnam either

2   discovered or should have discovered by the exercise of reasonable diligence the

3   allegedly untrue statements long before January 27, 2010—*i.e.*, more than one year

4   before the complaint was filed.[19]   Thus, Putnam's 1933 Act claims are plainly time-

5   barred on their face.

6          Like the plaintiffs in *Maine State*, *Stichting*, and *Allstate*, Putnam argues that

7   its 1933 Act claims were tolled under *American Pipe* by the filing of the *Luther*

8   class action.  *See Putnam* Compl. ¶¶ 105-17.  That is wrong.  Under this Court's

9   rulings in *Maine State*, *Stichting*, and *Allstate*, the only MBS eligible for *American*

10  *Pipe* tolling are those for which "the named plaintiffs in the prior putative class

11  actions had standing to sue, *i.e.*, those tranches that the *Luther* named plaintiffs had

12  actually purchased."  *Allstate*, 2011 WL 5067128, at *1, *10; *accord Maine State II*,

13  2011 WL 4389689, at *2-8; *Stichting*, 2011 WL 3558173, at *2.  Here, none of the

14  *Luther* named plaintiffs purchased in any of eight *offerings*—let alone the same

15  *tranche* within those offerings—as Putnam.  *See Putnam* Compl. ¶¶ 1, 15; RJN Ex.

16  102; App. 8.[20]   As such, Putnam is not entitled to *American Pipe* tolling, and its

17  1933 Act claims are time-barred as to all eight MBS.

18          **B.      Putnam's 1934 Act Claims Are Untimely.**

19          Putnam's 1934 Act claims are also time-barred as to all eight MBS by the

20  ─────────────────────────────────

21  underwriters for shelf registrations after December 1, 2005.  *Maine State I*, 722 F.
    Supp. 2d at 1165 n.8.

22  [19] *See Maine State I*, 722 F. Supp. 2d at 1165 (holding that plaintiffs discovered the
    basis for their 1933 Act claims no later than 2007-08); *Stichting*, 2011 WL 3558173,
    at *8 ("Plaintiff was clearly on notice of Countrywide's misrepresentations

23  regarding underwriting standards by late 2007 or early 2008."); *Allstate*, 2011 WL
    5067128, at *10-11 (same).  Putnam's argument that it "had no way of knowing

24  [that] Defendants['] representations in the Offering Documents were false" until the
    SEC made certain documents public in 2009-10, *see Putnam* Compl. ¶ 118, was

25  flatly rejected in *Stichting*.  *See* 2011 WL 3558173, at *9 ("Plaintiff is not entitled to
    rely on the SEC complaint as its 'trigger' event with respect to Countrywide's

26  alleged misrepresentations regarding its underwriting practices.").

27  [20] The Complaint alleges that the *Luther* named plaintiffs purchased in CWHL 2006-
    12.  *See Putnam* Compl. ¶ 112.  The *Luther* named plaintiffs' publicly-filed PSLRA
    certifications, however—of which the Court may take judicial notice (RJN at 12-

28  13)—clearly shows that they did not.  *See* RJN Ex. 102; App. 8.

1  applicable two-year statute of limitations.  *See* 28 U.S.C. § 1658(b).[21]  In *Allstate*,

2  the Court held that a reasonable investor in Countrywide MBS, exercising

3  reasonable diligence, should have discovered facts sufficient to state every element

4  of a 1934 Act claim based on Countrywide's alleged abandonment of underwriting

5  standards—including scienter—by no later than *December 27, 2008*.  *See* 2011 WL

6  5067128, at *11-13.  By definition, then, Putnam clearly should have discovered

7  such facts before *January 27, 2009—i.e.*, more than two years before the complaint

8  was filed.[22]  In short, because the 1934 Act claims in *Putnam* are effectively

9  identical to the 1934 Act claims found to be untimely in *Allstate*, *see supra* at 15-17

10  & App. 1, and *Allstate* was filed before *Putnam*, it necessarily follows that Putnam's

11  1934 Act claims are also time-barred and must be dismissed with prejudice.[23]

12  ## C.    Putnam's Connecticut Uniform Securities Act Claim Is Untimely.

13       Putnam's claim under the Connecticut Uniform Securities Act ("CUSA") is

14  also time-barred.  For CUSA claims "arising out of intentional misrepresentation or

15  _____

16  [21] *See id.* (1934 Act claims must be asserted "not later than the earlier of . . . *two years* after the discovery of the facts constituting the violation; or . . . *five years* after such violation"); *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1798 (2010) (holding that scienter is among "the facts constituting the violation" for Section 10(b) claim).

17
18  [22] Because *Luther* did not assert 1934 Act claims, there is no class action that could conceivably serve as a basis for *American Pipe* tolling of Putnam's 1934 Act claims.

19  [23] Putnam's 1934 Act claim as to CWALT 2005-43 is also time-barred by the five-year statute of repose, because the relevant registration statement and prospectus supplement were filed more than five years before the *Putnam* complaint was filed.

20  *See In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 200 (3d Cir. 2007) ("the repose period applicable to § 10(b) claims . . . begins to run on the date of the alleged misrepresentation" because "the specific acts targeted by a § 10(b) cause of

21  action are [the] fraudulent statements themselves"); *McCann v. Hy-Vee, Inc.*, 2011 WL 5924414, at *6 (7th Cir. Nov. 22, 2011) ("violation" is "defined . . . as the

22  misrepresentation"); *In re Brocade Commc'ns Sys., Inc. Deriv. Litig.*, 615 F. Supp. 2d 1018, 1035 (N.D. Cal. 2009) ("begins to run on the date of the [allegedly] false

23  representation"); *accord Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991) (repose period measured from date of "alleged

24  misrepresentations").  The Countrywide Defendants are aware that the Court has held that the 1934 Act repose period begins to run on the date of purchase, *see*

25  *Stichting*, 2011 WL 3558173, at *6, but respectfully request that the Court reconsider its ruling.  As explained in *Exxon* and *McCann*, the repose period runs

26  from the date of the "violation" (*i.e.*, when a material false statement is made with scienter), not the date of accrual of a plaintiff's private right of action (*i.e.*, when all

27  required elements of the alleged claim have occurred).

28

1   fraud in the purchase or sale of securities," "no person may bring an action more

2   than *two years* from the date when the misrepresentation or fraud is discovered or in

3   the exercise of reasonable care should have been discovered, except that no such

4   action may be brought more than *five years* from the date of such misrepresentation

5   or fraud." CONN. GEN. STAT. § 36b-29(f) (emphasis added). Because the CUSA

6   limitations/repose statute is substantially similar to that governing Putnam's 1934

7   Act claims, they should be interpreted and applied the same way.[24]

8        Putnam's CUSA claim is thus time-barred for the same reasons that its 1934

9   Act claims are time-barred. As the Court held in *Allstate*, Putnam should have

10  reasonably discovered "the misrepresentation or fraud" by no later than December

11  2008, if not sooner. *See* 2011 WL 5067128, at *11-12. Because Putnam did not

12  assert its CUSA claim until more than two years later—in January 2011—it was

13  untimely. *See Halbrecht v. Prudential-Bache Props., Inc.*, 1992 WL 336757, at *6

14  (D. Conn. July 25, 1991) (CUSA claim barred by statute of limitations where

15  complaint filed more than two years after the date on which plaintiffs discovered the

16  alleged fraud). For all of these reasons, the *Putnam* complaint should be dismissed

17  with prejudice in its entirety.

18  **III.    ALL CLAIMS IN *AFAC* ARE TIME-BARRED.**

19        **A.    AFAC's 1933 Act Claims Are Untimely.**

20        As in *Maine State*, *Stichting*, and *Allstate*, both the one-year statute of

21  limitations and the three-year statute of repose applicable to AFAC's 1933 Act

22  claims (Counts VI, VII, and VIII) expired before AFAC filed its complaint on April

23  1, 2011. First, all nine MBS at issue were offered to the public for purposes of

24  AFAC's Section 11 claim more than three years before AFAC filed the complaint.

25  [24] *See, e.g.*, *Rota v. Colonial Realty/USA Corp.*, 1996 WL 434228, at *4 (Conn.
    Super. Ct. July 17, 1996) ("[a]lthough CUSA and the federal securities laws are not
26  identical, in interpreting CUSA it is instructive to look to rulings of the federal
    courts interpreting federal securities law, particularly where the language of CUSA
27  is similar to that of the federal law"); *Capri v. Murphy*, 856 F.2d 473, 479 (2d Cir.
    1988) ("in the absence of state authority to the contrary, [CUSA] will be interpreted
28  similarly" to the federal securities laws when language is "virtually identical").

1   *See* App. 9 (latest shelf registration statement at issue dated April 24, 2007; latest

2   prospectus supplement at issue dated June 28, 2007). Second, with respect to

3   AFAC's Section 12(a)(2) claims, the three-year repose period had expired for seven

4   of the nine MBS purchased by AFAC before its complaint was filed, because those

5   purchases took place no later than February 7, 2008. *AFAC* FAC ¶ 32.[25]  Moreover,

6   the one-year statute of limitations also had expired as to both Section 11 and Section

7   12(a)(2) claims because, as in *Maine State*, *Stichting*, and *Allstate*, AFAC

8   discovered or reasonably should have discovered the allegedly untrue statements

9   prior to April 1, 2010—*i.e.*, more than one year before its complaint was filed.[26]

10          Acknowledging that its 1933 Act claims are otherwise time-barred, AFAC

11   asserts that *American Pipe* tolling applies to these claims by virtue of the filing of

12   the *Luther* and *Washington State* state court class actions. *AFAC* FAC ¶¶ 380-90.

13   AFAC's argument lacks merit. As this Court has held, the only MBS eligible for

14   *American Pipe* tolling are those as to which "the named plaintiffs in the prior

15   putative class actions had standing to sue, *i.e.*, those tranches that the *Luther* named

16   plaintiffs had actually purchased." *Allstate*, 2011 WL 5067128, at *1; *accord Maine*

17   *State II*, 2011 WL 4389689, at *2-8; *Stichting*, 2011 WL 3558173, at *2. AFAC

18   acknowledges in the Amended Complaint that its "investments appear not to overlap

19   with the investments of the named plaintiffs" in the *Luther* class action. *AFAC* FAC

20   ¶ 387. AFAC is correct—the *Luther* named plaintiffs did not purchase any MBS in

21   the tranches that AFAC purchased here. *Id*. ¶ 32; RJN Ex. 102; App. 9. As such,

22   _____

23   [25] AFAC's two remaining purchases in CWHL 2007-J2 and CWHL 2007-8 took
     place on April 1, 2008 and May 1, 2008, respectively. *AFAC* FAC ¶ 32. Because
     AFAC did not purchase these MBS in the initial public offerings, however—the

24   relevant offerings occurred almost a year earlier, on June 1, 2007—AFAC does not
     have standing to assert Section 12(a)(2) claims based upon these two aftermarket

25   purchases, and these claims must be dismissed in any event. *See Maine State II*,
     2011 WL 4389689, at *11; App. 9.

26   [26] *See Maine State I*, 722 F. Supp. 2d at 1165 (holding that Plaintiffs discovered the
     basis for their 1933 Act claims no later than  2007-2008); *Stichting*, 2011 WL

27   3558173, at *8 ("Plaintiff was clearly on notice of Countrywide's
     misrepresentations regarding underwriting standards by late 2007 or early 2008");

28   *Allstate*, 2011 WL 5067128, at *11 (same).

1   AFAC is not entitled to *American Pipe* tolling and its claims must be dismissed.

2       Finally, AFAC's claim for "control person" liability under Section 15 of the

3   1933 Act (Count XIII) also must be dismissed. *AFAC* FAC ¶¶ 458-66. To sustain a

4   claim under Section 15, AFAC must plead a primary violation of the 1933 Act.

5   *Allstate*, 2011 WL 5067128, at *13 (dismissing Section 15 claims where all possible

6   predicate violations were dismissed as time-barred). Because all of AFAC's Section

7   11 and 12(a)(2) claims are time-barred (or otherwise must be dismissed), its

8   corresponding Section 15 claims also fail and likewise must be dismissed. *Id.*[27]

9      **B.**   **AFAC's 1934 Act Claims Are Untimely.**

10      The applicable two-year statute of limitations applicable to AFAC's 1934 Act

11   claims (Counts I and II) also expired before AFAC filed its complaint on April 1,

12   2011. *See* 28 U.S.C. § 1658(b). The two-year statute of limitations begins to run

13   when "[p]laintiff either knew, or through the exercise of reasonable diligence should

14   have known, 'the facts constituting the violation.'" *Stichting*, 2011 WL 3558173, at

15   *6; *Allstate*, 2011 WL 5067128, at *11. In *Stichting*, this Court held that a

16   "reasonable plaintiff exercising reasonable diligence . . . should have discovered

17   facts sufficient to state every element of its [Section 10(b)] claim at least prior to

18   *February 14, 2009*," two years before that case was filed. *Stichting*, 2011 WL

19   3558173, at *11 (emphasis added); *accord Allstate*, 2011 WL 5067128, at *11

20   (dismissing Section 10(b) claim as time-barred because plaintiffs should have

21   discovered every element to state their claim by at least December 27, 2008, two

22   years before complaint filed). By definition, AFAC certainly should have

23   discovered facts sufficient to state its 1934 Act claims before *April 1, 2009*—more

24  [27] With respect to Mr. Adler, AFAC attempts to ground potential Section 11 liability

25  on his alleged role as a "signatory" of the registration statements for four Offerings (CWALT 2007-15CB, CWHL 2007-8, CWHL 2007-J2 and CWHL-2007-J3). *AFAC* FAC ¶¶ 22, 442. Because the *Luther* plaintiffs did not purchase any

26  securities in these four Offerings, however, *Luther* could not have tolled the running of the applicable limitations and repose periods. Any Section 11 claims against Mr.

27  Adler are thus time-barred. *See* RJN Ex. 102. And because AFAC's Section 11 claim against Countrywide must be dismissed as untimely, its Section 15 "control

28  person" claim against Mr. Adler also must be dismissed. *See supra*, at 20-21.

1   than two years prior to the filing of its complaint.  *Id*.  AFAC's Section 10(b) claims

2   are therefore time-barred.[28]

3       Because the predicate Section 10(b) claims on which AFAC's Section 20(a)

4   claim is based (*AFAC* FAC ¶ 407) are untimely, the Court likewise should dismiss

5   the Section 20(a) control person claim as it did in *Stichting* and *Allstate*.  *Stichting*,

6   2011 WL 3558173, at *11 (dismissing Section 20(a) claim because Section 10(b)

7   claims time-barred); *Allstate*, 2011 WL 5067128, at *13 (same).[29]

8                           **C.    AFAC's Common Law Claims Are Untimely.**

9       Counts III, IV, and V allege claims for common law fraud, aiding and

10  abetting fraud, and negligent misrepresentation.  *AFAC* FAC ¶¶ 409-32.  Each of

11  these claims is untimely under the statutes of limitations of both Oklahoma and

12  California and must be dismissed with prejudice.

13                    **1.    Oklahoma's Choice-of-Law Rules Apply To AFAC's
14                           Common Law Claims.**

15      "Where a transferee court presides over several diversity actions consolidated

16  under the multidistrict rules, the choice of law rules of each jurisdiction in which the

17  transferred actions were originally filed must be applied."  *In re Air Disaster at*

18  *Ramstein Air Base, Germany, on 8/29/90*, 81 F.3d 570, 576 (5th Cir. 1996).

19  Because this action was originally filed in the Western District of Oklahoma,

20  Oklahoma's choice of law rules must be applied to determine which statute of

21  limitations governs AFAC's common law claims.  *See BancOklahoma Mortg. Corp.*

22  *v. Capital Title Co., Inc.*, 194 F.3d 1089, 1103 (10th Cir. 1999).  In Oklahoma,

23  "when the question is which state's limitations period applies, choice of law

24  principles hold that it is ordinarily the limitations period of the forum state which

25  _____

26  [28] AFAC's 1934 Act claim as to CWALT 2005-21CB also should be dismissed
    because it is barred by the Act's five-year statute of repose.  The relevant prospectus

27  supplement and shelf registration statement for this offering were filed with the SEC
    in April 2005, more than five years before this suit was filed.  *See supra*, at n. 23__
    (citing *Exxon*, 500 F.3d at 200); RJN Ex. 9.

28  [29] The 1934 Act claims against Mr. Adler are all time-barred for the same reasons.

1  applies." *Thornton v. T&W Tire, L.P.,* 410 F. Supp. 2d 1098, 1101 (W.D. Okla.

2  2006); *Stephens v. Household Fin. Corp.*, 566 P.2d 1163, 1165 (Okla. 1977) ("As a

3  general rule the statute of limitations of the forum state applies."); *see also Feldman*

4  *v. Pioneer Petroleum, Inc.*, 606 F. Supp. 916, 921 (W.D. Okla. 1985) (applying the

5  forum state's law of limitations).  Here, Oklahoma's statute of limitations applicable

6  to AFAC's fraud, aiding and abetting fraud, and negligent misrepresentation claims

7  is two years.  12 OKLA. STAT. ANN. § 95(A)(3).

8       But "Oklahoma law may require the Court to apply another state's statute of

9  limitations" as a result of Oklahoma's borrowing statute.  *Feldman*, 606 F. Supp. at

10  921.  Oklahoma's borrowing statute provides that "[t]he period of limitation

11  applicable to a claim accruing outside of this state shall be that prescribed either by

12  the law of the place where the claim accrued or by the law of this state, whichever

13  *last* bars the claim."  12 OKLA. STAT. ANN. § 105 (emphasis added).[30]  For tort

14  claims, Oklahoma courts apply the "most significant relationship test" to determine

15  where a claim accrued for purposes of the borrowing statute.  *Bernal v. Charter*

16  *County Mut. Ins. Co.*, 209 P.3d 309, 315-16 (Okla. 2009) (citing *Brickner v.*

17  *Gooden*, 525 P.2d 632 (Okla. 1974)); *Feldman*, 606 F. Supp. at 921-22.[31]

18       Here, one could argue that AFAC's common law primary-liability claims

19  accrued in Oklahoma, where AFAC is allegedly domiciled and has its principal

20  place of business (*AFAC* FAC ¶ 7), or in California, where the complaint alleges all

21

22  [30] The borrowing statute "essentially operates to preserve a remedy for an accrued cause of action for the longest applicable time period," which has "the opposite

23  effect of most borrowing statutes that select the earliest time bar."  *Consolidated Grain & Barge Co. v. Structural Sys., Inc.*, 212 P. 3d 1168, 1174 (Okla. 2009).

24  [31] In general, there are four factors Oklahoma courts consider under this test:  (1) the place where the injury occurred; (2) the place where the conduct causing the injury

25  occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; (4) the place where the relationship, if any, between the

26  parties occurred.  *Brickner*, 525 P.2d at 637; *Feldman*, 606 F. Supp. at 921.  For actions that seek to recover damages based on allegedly false representations, the

27  Oklahoma Supreme Court applies Section 148 of the Restatement (Second) of Conflict of Laws.  *See Ysbrand v. DaimlerChrysler Corp.*, 81 P.3d 618, 626 (Okla.

28  2003).  For a more detailed discussion of the Section 148 factors, see *infra* at 52-54.

1  of the Countrywide Defendants have their principal place of business (*id*. ¶¶ 8-11).

2  The Court need not resolve this question, however, because AFAC's common law

3  claims are time-barred under the applicable limitations periods of *both* Oklahoma

4  and California.

5       **2.   AFAC's Fraud-Based Claims Are Untimely Under**
           **California's Three-Year Statute of Limitations.**

6

7       The statute of limitations for fraud-based claims in California is three years

8  from the discovery "of the facts constituting the fraud or mistake." Cal. Code Civ.

9  P. § 338(d); *Stichting*, 2011 WL 3558173, at *12. Under the "lenient inquiry notice

10 standard" of California law, the statute of limitations begins to run "when the

11 plaintiff suspected or should have suspected that an injury was caused by

12 wrongdoing." *Stichting*, 2011 WL 3558173, at *12; *accord Allstate*, 2011 WL

13 5067128, at *13. In *Stichting*, this Court applied California law and dismissed as

14 time-barred fraud and aiding and abetting claims that were based on facts *identical*

15 to those at issue here. *See* App. 2 (comparing allegations in *Stichting* to allegations

16 in AFAC's FAC). Specifically, the Court found that the widespread public press

17 coverage and shareholder suits in August 2007, combined with the filing of actions

18 in November 2007 and January 2008, "were enough to alert a reasonable person to

19 wrongdoing in Countrywide's loan origination business" prior to *February 2008*.

20 *Stichting*, 2011 WL 3558173, at *12. Accordingly, AFAC was on inquiry notice

21 prior to April 1, 2008, more than three years before the complaint was first filed, and

22 its primarily-liability fraud-based claims must be dismissed under California law.

23      **3.   AFAC's Fraud-Based Claims Are Untimely Under**
           **Oklahoma's Two-Year Statute Of Limitations.**

24

25      Oklahoma's statute of limitations applicable to AFAC's fraud-based claims is

26 two years. 12 OKLA. STAT. ANN. § 95(A)(3). As with its Section 10(b) claims, the

27 statute "begins to run when the aggrieved party discovers, or should have discovered

28 by the exercise of reasonable diligence, the facts constituting the fraud." *Feldman*,

25

1    606 F. Supp. at 922; *accord In re Woodward*, 549 P.2d 1207, 1209 (Okla. 1976).  In

2    *Stichting*, this Court held that a "reasonable plaintiff exercising reasonable diligence

3    . . . should have discovered facts sufficient to state every element of its [fraud] claim

4    at least prior to February 14, 2009."  *Stichting*, 2011 WL 3558173, at *11; *accord*

5    *Allstate*, 2011 WL 5067128, at *11.  Thus, by definition, AFAC knew or reasonably

6    should have discovered facts sufficient to state its primary-liability fraud-based

7    claims well before April 1, 2009, and these claims are therefore time-barred under

8    Oklahoma's statute of limitations as well as under California's two-year period.

9                    **4.     AFAC's Negligent Misrepresentation Claim Is Untimely.**

10              AFAC's negligent misrepresentation claim is subject to a two-year statute of

11   limitations under either California or Oklahoma law.  *See Platt Elec. Supply, Inc. v.*

12   *EOFF Elec., Inc.*, 522 F.3d 1049, 1055 (9th Cir. 2008) ("For negligent

13   misrepresentation, there is a two-year statute of limitations [in California].");  12

14   OKLA. STAT. ANN. § 95(A)(3); *Downing Trucking, Inc. v. Cline Wood Agency, Inc.*,

15   2007 WL 2816200, at *6 (W.D. Okla. 2007) ("In Oklahoma, the statute of

16   limitations for asserting claims such as . . . negligent misrepresentation is two

17   years.").  Under California law, AFAC's negligent misrepresentation claim is time-

18   barred for the same reasons that the negligent misrepresentation claim in *Stichting*

19   was held to be time-barred—*i.e.,* AFAC discovered or should have discovered the

20   basis for this claim before April 1, 2009—more than two years before the complaint

21   was initially filed.  *See Stichting*, 2011 WL 3558173, at *13.

22              In Oklahoma, the two-year statute of limitations begins to run when the

23   plaintiff could first have maintained its action to a successful conclusion, which

24   requires a plaintiff to be able to "allege injury or damages that are certain and not

25   speculative."  *Marshall v. Fenton, Fenton, Smith, Reneau and Moon P.C.*, 899 P.2d

26   621, 623 (Okla. 1995).  The plaintiff does not need to *sustain* damages for the

27   statute of limitations to begin running; rather, "the important moment in time is the

28   moment it becomes a certainty that a plaintiff will be damaged, even if the damage

                                                 26

1  will not occur for some time in the future." *Fed. Deposit Ins. Corp. v. Grant*, 8 F.

2  Supp. 2d 1275, 1290-90 (N.D. Okla. 1998).  Here, AFAC alleges that the alleged

3  misrepresentations "caused [it] damage because the Certificates were in fact far

4  riskier than Countrywide had described them to be." *AFAC* FAC ¶ 256.  Therefore,

5  as this Court has held, "[i]t follows that the injury accrued at the same time the

6  alleged misrepresentations came to light, not at the time the risk actually

7  materialized in the form of defaults or lower market values." *Stichting*, 2011 WL

8  3558173, at *7.  Because complaints filed by other plaintiffs and public press

9  reports make it clear that the alleged misrepresentations came to light "by early

10 2008," *id.* at *8, and AFAC did not file its complaint until more than three years

11 later in April 2011, its negligent misrepresentation claim is time-barred under

12 Oklahoma's statute of limitations.

13 **IV.   VIRTUALLY ALL CLAIMS IN *WESTERN & SOUTHERN***
14 **ARE TIME-BARRED.**

15      **A.      Western & Southern's 1933 Act Claims Are Untimely.**

16      As in *Maine State*, *Stichting*, and *Allstate*, both the one-year statute of

17 limitations and the three-year statute of repose applicable to Western & Southern's

18 1933 Act claims expired before Western & Southern filed its original complaint on

19 April 27, 2011.  First, all of the 36 MBS at issue here were offered to the public for

20 purposes of Western & Southern's Section 11 claims prior to April 27, 2008.  *See*

21 App. 10 (latest registration statement at issue dated April 24, 2007; latest prospectus

22 supplement at issue dated June 28, 2007).  Second, with respect to Western &

23 Southern's Section 12(a)(2) claims, all 36 MBS at issue were purchased by Western

24 & Southern by no later than March 25, 2008.  *W&S* AC ¶ 75 & Ex. A; App. 10.  As

25 such, the three-year repose period expired as to all 36 MBS.

26      In addition, the one-year statute of limitations also expired as to both Section

27 11 and Section 12 claims because, as in *Maine State*, *Stichting*, and *Allstate*,

28 Western & Southern discovered or should have discovered had it exercised

1    reasonable diligence the allegedly untrue statements prior to April 27, 2010—*i.e.*,

2    more than one year before its complaint was filed.  *See Maine State I*, 722 F. Supp.

3    2d at 1165; *Stichting*, 2011 WL 3558173, at *8; *Allstate*, 2011 WL 5067128, at *10.

4              Western & Southern argues that the *Luther* and *Washington State* class

5    actions triggered *American Pipe* tolling.  *W&S* AC ¶¶ 389-95.[32]  But as this Court

6    held in *Maine State*, *Stichting*, and *Allstate*, the only MBS eligible for *American*

7    *Pipe* tolling are those for which "the named plaintiffs in the prior putative class

8    actions had standing to sue, *i.e.*, those tranches that the *Luther* named plaintiffs had

9    actually purchased."  *Allstate*, 2011 WL 5067128, at *10; *accord Maine State II*,

10   2011 WL 4389689, at *2-8; *Stichting*, 2011 WL 3558173, at *2; *see also W&S* AC ¶

11   397-98 (acknowledging *Maine State I* and *Maine State II* standing rulings).  Here,

12   however, no named *Luther* plaintiff purchased 34 of the 36 MBS (across 30 of the

13   32 offerings at issue) purchased by Western & Southern.  *See W&S* AC ¶ 75 and Ex.

14   A; RJN Ex. 102.  Western & Southern, therefore, is not entitled to *American Pipe*

15   tolling as to these 34 MBS, and its 1933 Act claims based on these offerings must be

16   dismissed under the Act's one-year limitations period.  *Allstate*, 2011 WL 5067128,

17   at *10 (citing *Stichting*, 2011 WL 3558173, at *2).[33]

18             As to one of the two remaining MBS, CWALT 2005-26CB, Western &

19   Southern's Section 11 claims are barred by the three-year statute of repose.

20

21   [32] Western & Southern also asserts that its 1933 Act claims are tolled under
22   *Vaccariello v. Smith & Nephew Richards, Inc.*, 94 Ohio St. 3d 380 (Ohio 2002), and
     ORC § 2305.19.  *W&S* AC ¶ 388.  But state law limitations periods and tolling rules
     do not apply to federal claims like the 1933 Act that have their own federal
23   limitations period.  *Centaur Classic Conv. Arbitrage Fund Ltd. v. Countrywide Fin.*
     *Corp.*, No. 10-CV-05699-MRP (MANx), slip op. at 6-7 (Jan. 20, 2011).
24   [33] Even if Plaintiffs here were entitled to *American Pipe* tolling for their 1933 Act
     claims as to CWALT 2005-J1 (which they are not), their Section 11 claims as to this
25   Offering would be time-barred in any event.  The repose period for CWALT 2005-
     J1 began to run on September 23, 2004, the effective date of the applicable shelf
26   registration statement, and thus expired on September 23, 2007.  *See* App. 10.  But
     the *Luther* named plaintiff that purchased in this offering did not join *Luther* until
27   September 9, 2008—*after* the repose period had already expired.  *See* RJN Ex. 72.
     Thus, the repose period expired before any *American Pipe* tolling could have
28   possibly begun, and the Section 11 claims as to CWALT 2005-J1 are time-barred.

1   CWALT 2005-26CB was offered to the public on April 21, 2005, the effective date

2   of the relevant shelf registration statement. *See* App. 10. Accordingly, the repose

3   period expired on April 21, 2008. And no tolling applies to this claim—the *Luther*

4   complaint that included a named plaintiff that purchased the relevant tranche of

5   CWALT 2005-26CB was not filed until April 21, 2008, *after* the repose period

6   already had expired. *See* RJN Ex. 72; *Stichting*, 2011 WL 3558173, at *2 ("Plaintiff

7   may not assert §§ 11 or 12(a)(2) claims . . . for which the three-year statute of repose

8   expired before the *Luther* plaintiff either acquired the security or joined the *Luther*

9   case").[34]

10      And Western & Southern's claim for "control person" liability under Section

11  15 of the 1933 Act also must be dismissed because the predicate Section 11 and

12  12(a)(2) claims on which this claim is based are time-barred. *See, e.g., Allstate*,

13  2011 WL 5067128, at *13 (dismissing Section 15 claims where all possible

14  predicate violations were dismissed as time-barred).

15      **B.      Western & Southern's 1934 Act Claims Are Untimely**.

16      The two-year statute of limitations applicable to Western & Southern's 1934

17  Act claims also expired before Western & Southern filed its complaint on April 27,

18  2011. *See* 28 U.S.C. § 1658(b). In *Stichting*, this Court held that a "reasonable

19  plaintiff exercising reasonable diligence . . . should have discovered facts sufficient

20  to state every element of its [Section 10(b)] claim at least prior to *February 14,*

21  *2009*," two years before the fraud claims in that case were filed. *Stichting*, 2011 WL

22  3558173, at *11 (emphasis added); *accord Allstate*, 2011 WL 5067128, at *11

---

23  [34] Western & Southern alleges that Mr. Adler signed the registration statement for
24  seven Offerings (CWALT 2007-15CB, CWALT 2007-16CB, CWALT 2007-17CB,
    CWALT 2007-21CB, CWHL 2007-14, CWHL 2007-15, and CWL 2007-11),
25  triggering Section 11 liability. *W&S* AC ¶¶ 36, 460. But the *Luther* plaintiffs did
    not purchase the same tranches in these Offerings as Western & Southern did, *see*
26  RJN Ex. 102, and no *American Pipe* tolling applies to the Section 11 claims based
    on these tranches. The Section 11 claims against Mr. Adler based upon these
27  Offerings thus must be dismissed. Moreover, because Mr. Adler is not alleged to
    have signed the registration statement for CWHEQ 2006-S9 (purchased by both the
28  *Luther* plaintiffs and Western & Southern), he cannot be liable under Section 11
    based upon this Offering.

29

1  (dismissing Section 10(b) claim as time-barred because plaintiffs should have

2  discovered every element to state their claim by no later than December 27, 2008).

3  By definition, Western & Southern too should have discovered facts sufficient to

4  state its Section 10(b) claim before *April 27, 2009*—more than two years prior to the

5  filing of its complaint.  *Id*.  Western & Southern's Section 10(b) claim is therefore

6  time-barred.

7       Western & Southern attempts to end-run this Court's rulings in *Allstate* and

8  *Stichting* by inserting an entirely new section in the Amended Complaint alleging

9  that it "did not know and could not have known of its claims prior to June 2009."

10  *See W&S* AC ¶¶ 12, 372-87.  Western & Southern argues that it developed and used

11  so-called "proprietary" models to perform "loan-level analysis" and "fair value

12  pricing" through June 2009 "to determine the likelihood and magnitude of any

13  losses it could expect to sustain" on the MBS they purchased.  *Id*. ¶¶ 374-77.

14  Western & Southern further alleges that based on this analysis, as of April 2009, it

15  had "not impaired twenty-seven out of thirty-six tranches it owned (meaning as a

16  'buy and hold' investor Western & Southern did not have notice that it would take

17  material losses on any Certificates [*i.e.*, the 27 tranches] it had not yet impaired)."

18  *Id*. ¶ 378.  These new allegations provide no basis for avoiding this Court's holdings

19  in *Stichting* and *Allstate*.

20       For one thing, according to the Amended Complaint itself, Western &

21  Southern now claims to have been on notice as of April 2009 that as to nine of the

22  MBS it purchased it allegedly would incur material losses.  *Id*.  As for the remaining

23  27 MBS, this Court has held that conclusions based on "complex and unverifiable

24  mathematical models" like what Western & Southern claims to have developed are

25  opinions, not *facts* previously unavailable to MBS investors.  *Allstate*, 2011 WL

26  5067128, at *12.  Those *facts* were available more than two years before the filing

27  of the *Western & Southern* complaint.  Moreover, like the plaintiffs in both *Stichting*

28  and *Allstate*, Western & Southern alleges that it incurred injury immediately upon

30

1  purchasing the MBS at issue because these securities allegedly "were far riskier than

2  Defendants described, and for that reason, far less valuable than the prices [Western

3  & Southern] paid." *W&S* AC ¶ 286; *see Stichting*, 2011 WL 3558173, at *7;

4  *Allstate*, 2011 WL 5067128, at *11.  Accordingly, the date on which the statute of

5  limitations began to run is "coterminal" with the date Western & Southern knew or

6  reasonably should have known that "Countrywide's statements about its lending

7  standards were [allegedly] false." *Stichting*, 2011 WL 3558173, at *7.[35]

8  Accordingly, whether Western & Southern's "proprietary," internal models

9  predicted losses as of any given date is irrelevant to determining the date on which

10 the 1934 Act statute of limitations began to run.[36]

11      Like the plaintiff in *Stichting*, Western & Southern also argues that it could

12 not have discovered the facts underlying its 1934 Act claim until June 2009, when

13 "the SEC released internal Countrywide emails revealing conscious disregard for the

14 underwriting guidelines touted in the Offering Materials and a deliberate scheme to

15 originate toxic loans and sell them to unsuspecting investors." *W&S* AC ¶ 385.  *See*

16 *Stichting*, 2011 WL 3558173, at *8.  This Court flatly rejected this argument in

17 *Stichting*, however, holding that the plaintiff was "not entitled to rely on the SEC

18 complaint as its 'trigger' event with respect to Countrywide's alleged

19 misrepresentations regarding its underwriting practices." *Id*. at *9.  The Court

20 reasoned:  "the gravamen of Plaintiff's claim is that Countrywide wholly abandoned

21 its underwriting standards.  The press and numerous widely reported lawsuits had

22 made exactly this allegation by the end of 2007." *Id*.[37]  The Court further explained

---

23 [35] *Accord Allstate*, 2011 WL 5067128, at *13 (rejecting argument that plaintiff could
24 not have been aware of its damages until its MBS were downgraded because "any
   damages accrued when the truth regarding Countrywide's underwriting practices
25 came to light," which occurred "well before . . . December 27, 2008").

26 [36] For the same reasons, Western & Southern's allegation that it "did not suffer any
   diminution in interest or principal payments prior to February 2010 . . . and only six
27 of Western & Southern's thirty-six tranches have suffered principal or interest
   shortfalls to date" is likewise irrelevant.  *W&S* AC ¶ 384.

28 [37] Moreover, like the plaintiff in *Stichting*, Western & Southern cites the very same
   press reports, investigations and other lawsuits in its complaint as ostensible support

1  that the "SEC complaint may perhaps include more detail than earlier-filed

2  complaints, but it does not contain any fundamentally new revelation.  All the facts

3  alleged had been widely reported already[.]"  *Id.* at *11.[38]

4         Thus, as in *Stichting* and *Allstate*, Western & Southern reasonably should

5  have discovered the factual basis for its Section 10(b) claims long before April 27,

6  2009, two years prior to the filing of the Complaint.  *See Stichting*, 2011 WL

7  3558173, at *8, 11.[39]  Because these predicate Section 10(b) claims must be

8  dismissed as time-barred, Western & Southern's Section 20(a) claim likewise must

9  be dismissed.  *See Stichting*, 2011 WL 3558173, at *11; *Allstate*, 2011 WL

10  5067128, at *13; *W&S* AC ¶ 456 (Section 20(a) claim predicated on alleged

11  violation of Section 10(b)).

12         **C.      Western & Southern's Ohio Securities Act Claims Are Untimely.**

13         Western & Southern's five claims under the Ohio Securities Act ("OSA")

14  must be dismissed because the applicable two-year statute of limitations had long

15  expired by the time it filed its complaint in April 2011.  The OSA bars "any

16  recovery based upon or arising out of a sale or contract for sale . . . more than *two*

17  *years* after the plaintiff knew, or had reason to know, of the facts by reason of which

18  the actions of the person or director were unlawful, or more than *five years* from the

19  date of such sale or contract for sale, whichever is the shorter period."  OHIO REV.

20  CODE ANN. § 1707.43(B) (2011) (emphasis added).  As the Sixth Circuit has

21

22  for its fraud allegations.  *See, e.g.*, *W&S* AC ¶¶ 165-66, 168-69.

[38] To the extent plaintiffs in other actions argue that they could not have reasonably
23  discovered the facts underlying their claims until the SEC publicly disclosed certain
    Countrywide documents and/or testimony when it filed its complaint in June 2009
24  (*see, e.g.*, *Putnam* Compl. ¶¶ 86, 118; *AFAC* FAC ¶ 104, 136; *Bankers* Compl. ¶¶ 9,
    65; *Sterling* Compl. ¶ 9; *Sealink* Compl. ¶ 6), such arguments likewise fail under
25  this Court's holdings in *Stichting* detailed above.

[39] Western & Southern's 1934 Act claims as to 15 of the offerings at issue should
26  also be dismissed because they are barred by the five-year statute of repose
    governing such claims.  *See Stichting*, 2011 WL 3558173, at *6; App. 10.  The
27  relevant prospectus supplements and shelf registration statements for each of these
    15 offerings were filed with the SEC before April 27, 2006, more than five years
28  before this suit was filed.  *See id.*; *supra*, at n. 23 (citing *Exxon*, 500 F.3d at 200).

32

1   explained "because Ohio has adopted a limitations period specific to claims arising

2   out of the sale of securities . . . Ohio courts would apply a standard consistent with

3   the . . . standard applicable to similar federal securities fraud claims." *Wyser-Pratte*

4   *Mgmt Co. v. Telxon Corp.*, 413 F.3d 553, 561-64 (6th Cir. 2005); *see also Cain v.*

5   *Mid-Ohio Securities, Inc.*, 2007 WL 2080553 at *2-3 (Ohio App. 9 Dist. July 23,

6   2007) (applying standard applicable to federal securities claims and dismissing OSA

7   claims as time-barred).  Accordingly, the OSA's two-year statute of limitations

8   begins to run when the plaintiff discovers, or should have discovered through the

9   exercise of reasonable diligence, the facts underlying the alleged fraud.

10       Applying the analogous federal standard under the 1934 Act, this Court held

11   in *Stichting* that a "reasonable plaintiff exercising reasonable diligence . . . should

12   have discovered facts sufficient to state every element of its [Section 10(b)] claim at

13   least prior to *February 14, 2009*."  *Stichting*, 2011 WL 3558173, at *11 (emphasis

14   added); *accord Allstate*, 2011 WL 5067128, at *11-13 (dismissing Section 10(b)

15   claim as time-barred because plaintiffs should have discovered every element to

16   state their claim by December 27, 2008).  Thus, it necessarily follows that Western

17   & Southern should have discovered facts sufficient to state its OSA claims prior to

18   April 27, 2009, and as a result these claims are time-barred and must be dismissed.

19   *See Stichting*, 2011 WL 3558173, at *11; *Metz v. Unizan Bank*, 649 F.3d 492, 499

20   (6th Cir. 2011) (dismissing OSA claims because "Plaintiffs should have discovered

21   any alleged misconduct by the defendant banks" more than two years before filing

22   their complaint).

23       Western & Southern argues that its OSA claims are tolled under *Vaccariello*

24   *v. Smith & Nephew Richards, Inc.*, 763 N.E.2d 160 (Ohio 2002), Ohio's state law

25   counterpart to *American Pipe* tolling.  W&S AC ¶ 388.  In *Vaccariello*, the Ohio

26   Supreme Court adopted class action tolling but narrowly confined it, holding that

27   "the filing of a class action . . . ***in Ohio or the federal court system***[] tolls the

28   statute of limitations as to all asserted members of the class who would have been

1    parties had the suit been permitted to continue as a class action." 763 N.E.2d at 163

2    (emphasis added).  Because the *Luther* and *Washington State* class actions were

3    filed in **California state court**, and not "in Ohio or the federal court system," they

4    did not toll the applicable statute of limitations under *Vaccariello*.  *Id.*; *accord*

5    *Arandell Corp. v. American Elec. Power Co.*, 2010 WL 3667004, at *10 (S.D. Ohio

6    Sept. 15, 2010) (no tolling where class action was initially filed in Wisconsin state

7    court and later removed to federal court); *Thornton v. State Farm Mut. Auto Ins.*

8    *Co.*, 2006 WL 3359448, at *8 (N.D. Ohio Nov. 17, 2006) (because class action was

9    commenced in Illinois, not in Ohio or federal court, it did not toll statute of

10   limitations).[40]

11       Although the *Maine State* class action was filed in federal court, it likewise

12   has no tolling effect under *Vaccariello* because the statute of limitations had already

13   expired by the time *Maine State* was filed on January 14, 2010.  As this Court held

14   in *Stichting*, Western & Southern was "clearly on notice of Countrywide's

15   misrepresentations regarding underwriting standards by late 2007 or early 2008."

16   2011 WL 3558173, at *8.  Western & Southern's claims therefore accrued more

17   than two years before *Maine State* was filed.  Where, as here, "the applicable two-

18   year statute of limitations expired before th[e] class action was filed," the class

19

20   [40] Western & Southern also asserts that the filing of *Luther* and *Washington State*
     provide tolling due to O.R.C. §2305.19, Ohio's "savings statute."  *W&S* AC ¶ 388-
21   95.  That statute provides:  "In any action that is commenced or attempted to be
     commenced, if in due time a judgment for the plaintiff is reversed or if the plaintiff
22   fails otherwise than upon the merits, the plaintiff . . . may commence a new action
     within one year after the date of the reversal of the judgment or the plaintiff's failure
23   otherwise than upon the merits or within the period of the original applicable statute
     of limitations, whichever occurs later."  OHIO REV. CODE ANN. § 2305.19(A)
24   (2010).  The savings statute, however, is entirely irrelevant here.  First, this is not a
     situation where a timely filed action was dismissed and the plaintiff seeks to re-file
25   within the savings period.  Second, the savings statute applies only where the initial
     action is filed in Ohio or in the federal courts—here, *Luther* and *Washington State*
26   were filed in a California state court.  *See Vacciarello*, 763 N.E.2d at 162 (§2305.19
     "applies only to actions 'commenced or attempted to be commenced' in Ohio within
27   the appropriate statute of limitations") (*citing Howard v. Allen*, 283 N.E.2d 167
     (Ohio 1972)); *Ruble v. Ream*, 2003 WL 22532858, at *7 (Ohio App. 4th Dist. Oct.
28   29, 2003) (holding that tolling under Ohio savings statute did not apply to action
     initially brought in West Virginia).

34

1    action has no tolling effect.  *Wyser-Pratte*, 413 F.3d at 568.  Moreover, *Maine State*

2    cannot be the basis for class action tolling in any event because the *Maine State*

3    named plaintiffs lacked standing as to the MBS purchased by Western & Southern.

4    *See supra*, at 11-13; RJN Ex. 102.[41]

5         Finally, Western & Southern contends that the OSA statute of limitations was

6    equitably tolled due to alleged "fraudulent concealment."  *W&S* AC ¶ 383-87.  This

7    argument likewise fails.  Under Ohio law, fraudulent concealment may be used as

8    grounds for equitable tolling *only* where the plaintiff alleges facts showing "(1) that

9    [defendant] engaged in a course of conduct to conceal evidence of the alleged

10   wrongdoing; and (2) that [plaintiff] failed to discover the facts giving rise to the

11   claim despite the exercise of due diligence."  *Frees v. ITT Technical School*, 2010

12   WL 4323026, at *5 (Ohio App. 2 Dist. Oct. 29, 2010); *see also Hoover v. Langston*

13   *Equip. Assocs.*, 958 F.2d 742, 744-45 (6th Cir. 1992).  Equitable tolling due to

14   fraudulent concealment is an extraordinary remedy that "is only available in

15   compelling cases which justify a departure from established procedure."  *Frees*,

16   2010 WL 4323026, at *5.  Mere silence from a defendant thus will not toll a

17   plaintiff's claims—rather, there must be "some affirmative act by the defendant

18   designed to prevent discovery of the cause of action."  *Thornton*, 2006 WL

19   3359448, at *1.  Moreover, because fraudulent concealment only tolls claims when

20   plaintiffs have failed to discover fraud despite the exercise of due diligence, "[o]nce

21   sufficient indicia of fraud are shown, a party cannot rely on its unawareness or the

22   efforts of the opposition to lull it into a false security to toll the statute."  *Zemcik v.*

23   *LaPine Truck Sales & Equip. Co.*, 706 N.E.2d 860, 866 (Ohio Ct. App. 1998)

24   (finding statute of limitations was not tolled once plaintiff had constructive

25   knowledge of fraud).

26        Here, Western & Southern meets none of the requirements for equitable

27

28   _____
     [41] As of January 2010, the named plaintiffs in *Maine State* were identical to the
     *Luther* named plaintiffs, except that David Luther was not a plaintiff in *Maine State*.

35

1   tolling based on fraudulent concealment.  First, Western & Southern has failed to

2   plead facts showing that Countrywide engaged in any conduct designed to conceal

3   the alleged fraud.  Although Western & Southern includes in its amended complaint

4   a single, conclusory allegation that a "robo-signing conspiracy" obscured the

5   existence of its claims (*W&S* AC ¶ 387), it pleads no facts whatsoever explaining

6   how this alleged "robo-signing" is relevant to its allegations about how the loans

7   backing the MBS it bought were originated, much less how this "robo-signing"

8   prevented it from discovering the fraud that it alleges.  Nor could it, given that many

9   other plaintiffs filed complaints years before it did based on exactly the same

10  wrongdoing it alleges was "concealed."  *See supra* at 11-17.  Indeed, this Court

11  already has ruled that MBS investors exercising reasonable diligence would have

12  discovered the facts giving rise to their claims no later than late 2007 or early 2008.

13  *Stichting*, 2011 WL 3558173 at *8; *Maine State I*, 722 F. Supp. 2d 1157, 1165-66

14  (C.D. Cal. 2010).  Accordingly, equitable tolling is inapplicable here.

**D.  Western & Southern's Common Law Claims Are Untimely.**

**1.  The Relevant Choice Of Law Analysis Requires Application Of Ohio's Statute Of Limitations.**

18  Because Ohio is the transferor forum, this Court must apply its choice of law

19  rules in assessing the timeliness of Western & Southern's common law claims.[42]

20  Ohio has adopted the Restatement (Second) of Conflict of Laws (the

21  "Restatement").  *See Morgan v. Biro Mfg. Co., Inc.*, 474 N.E.2d 286, 288-89 (Ohio

22  1984) ("[w]e hereby adopt the theory stated in the Restatement of the Law of

23  Conflicts, as it is more reflective of our past decisions and also provides sufficient

24  guidelines for future litigation").  With respect to conflicts involving statutes of

25  limitations, Ohio applies Section 142 of the Restatement.  *Sonic Auto., Inc. v.*

---

[42] *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d at 576; *Toll Bros., Inc. v. Dryvit Sys., Inc.*, 432 F.3d 564, 568 n.4 (4th Cir. 2005) (applying law of transferor state); *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 391 F.3d 907, 911 (8th Cir. 2004) (same).

1   *Chrysler Ins. Co.*, 2011 WL 4063020, at *5-6 (S.D. Ohio Sept. 13, 2011).  Although

2   there is some disagreement (which the Ohio Supreme Court has not yet addressed)

3   as to whether the original, 1971 version of Section 142 or the 1988 revised version

4   should be applied, the "majority position adopted by both state and federal courts

5   applying Ohio law" is that the 1971 version of Section 142 applies.  *Id.* at *6.

6          The 1971 version of Section 142 provides:  "An action will not be maintained

7   if it is barred by the statute of limitations of the forum, including a provision

8   borrowing the statute of limitations of another state."  Restatement (Second)

9   Conflict of Laws § 142(1) (1971).  Ohio's borrowing statute provides:

10          No civil action that is based upon a cause of action that accrued in any

11          other state, territory, district or foreign jurisdiction may be commenced

12          and maintained in this state if the period of limitation that applies to

13          that action under the laws of that other state, territory, district or foreign

14          jurisdiction has expired or the period of limitation that applies to that

15          action under the laws of this state has expired.

16   OHIO REV. CODE ANN. § 2305.03(B) (2005).  Thus, under Ohio's borrowing statute,

17   "if *either* Ohio's statute of limitations *or* the limitations period of the state where the

18   cause of action accrued has expired, the action should be dismissed."  *Dudek v.*

19   *Thomas & Thomas Att'ys & Counselors at Law, LLC*, 702 F. Supp. 2d 826, 835-36

20   (N.D. Ohio 2010) (emphasis added).  As a result, because Ohio's statute of

21   limitations bars Western & Southern's primary-liability common law claims, the

22   Court need not consider the statutes of limitation of any other jurisdiction, *see Sonic*,

23   2011 WL 4063020, at *6, and Western & Southern's claims must be dismissed.[43]

24   _____

25   [43] Given the allegations in the *Western & Southern* complaint, the only other
     conceivable state in which its claims could have accrued for purposes of the Ohio
     borrowing statute is California, where Countrywide had its principal place of
26   business.  As in *Stichting*, however, Western & Southern's primary-liability
     common law claims would nevertheless be time-barred under California's three-
27   year statute of limitations for fraud and two-year statute of limitations for negligent
     misrepresentation.  *See* 2011 WL 3558173, at *12-13; *see also infra*, at 58-59_
28   (analyzing California law).

**2.     Western & Southern's Common Law Claims Are Barred By
The OSA's Two-Year Statute Of Limitations.**

Western & Southern's claims for common law fraud and negligent misrepre-
sentation are also time-barred.  Although Ohio's four-year statute of limitation
generally applies to common law fraud and negligent misrepresentation claims, *see
Washington v. Spitzer Mgmt. Inc.*, 2003 WL 1759617, at *5 (Ohio App. 8 Dist. Apr.
3, 2003), "Ohio law is clear that [when] fraud claims arise out of or are predicated
on the sale of securities, they are governed by the specific statute of limitations set
forth in OHIO REV. CODE § 1707.43(B); not the four-year general statute of
limitations for fraud claims found in Ohio Rev. Code § 2305.09." *Wyser-Pratte*,
413 F.3d at 561.  The same rule applies to negligent misrepresentation claims based
on the sale of securities.  *Wuliger v. Anstaett*, 363 F. Supp. 2d 917, 933-35 (N.D.
Ohio 2005) (applying OSA's two-year statute of limitations to negligent
misrepresentation claim where representations concerned investments).  And the
two-year statute of limitations applies regardless of how Western & Southern styled
its claims, as Ohio courts "look to the actual nature or subject matter of the case,
rather than the form in which an action is pleaded, to determine the applicable
limitations period." *Helman v. EPL Prolong, Inc.*, 743 N.E.2d 484, 493-94 (Ohio
Ct. App. 2000) (applying OSA's two-year statute of limitations to contract action
where claim was "based upon and inextricably interwoven with a fraudulent sale of
securities"); *Goldberg v. Cohen*, 2002 WL 1371031, at *3 (Ohio App. 7 Dist. June
13, 2002) (same).

Here, not only do Western & Southern's common law fraud and negligent
misrepresentation claims arise out of the allegedly fraudulent sale of securities, they
are based on precisely the same alleged conduct that forms the basis of Western &
Southern's OSA claims.  *Compare W&S* AC ¶ 434 (negligent misrepresentation
claim:  "Defendants . . . made misrepresentations which they knew, or were
negligent in not knowing at the time to be false, in order to induce Western &

38

1   Southern's investment in the Offerings") *with id*. ¶ 402 (OSA claim:  "[a]s a result

2   of Defendants' dissemination of materially false and misleading information and

3   their failure to disclose material facts, Western & Southern was misled").  Western

4   & Southern's common law fraud and negligent misrepresentation claims are thus

5   subject to the OSA's two-year statute of limitations, and are time-barred for the very

6   same reasons its OSA claims are time-barred. *See supra*, at 32-34.

7        Asserted for the first time in its Amended Complaint, Western & Southern's

8   civil conspiracy claim is also barred by the OSA's two-year statute of limitations.

9   Where, as here, a civil conspiracy claim shares "the same factual basis" as alleged

10  OSA and fraud claims, it is subject to the same two-year statute of limitations as

11  those claims. *See Hardin v. Reliance Trust Co.*, 2006 WL 285045, at *11 (N.D.

12  Ohio Sept. 29, 2006) (applying OSA's two-year statute of limitations to civil

13  conspiracy claim based on same allegations as securities fraud claim).  In analyzing

14  the proper limitations period for a civil conspiracy claim, the Court must "examin[e]

15  the nature of the underlying cause of action." *Michael v. Michael*, 2000 WL

16  1005209, at *3 (Ohio Ct. App. July 21, 2000) (applying one-year limitations period

17  for assault to claim for conspiracy to commit fraud because "the nature of the claim

18  [was] based upon assault and battery").

19        Here, Western & Southern alleges that Defendants "conspired to underwrite

20  and purchase fraudulently and improperly underwritten loans, to package those

21  loans for resale, and to fraudulently service such loans through use of fraudulent and

22  forged documents in foreclosures and overcharges to borrowers for insurance and

23  other services." *W&S* AC ¶ 497.  This is precisely the same alleged conduct

24  underlying Western & Southern's OSA and fraud claims. *See id.* ¶¶ 402, 491.

25  Accordingly, the OSA's two-year statute of limitations applies and bars Western &

26  Southern's civil conspiracy claims, and its " belated claim of conspiracy to thwart

27  the bar of the short statute of limitations does not advance the plaintiff's cause."

28  *Krause v. Case Western Reserve Univ.*, 1996 WL 732537, at *10 (Ohio Ct. App.

1    Dec. 19, 1996)

2    **V.     THE *NATIONAL INTEGRITY* ACTION SHOULD BE DISMISSED IN ITS ENTIRETY OR IN SUBSTANTIAL PART.**

3

4        Apparently realizing that the vast majority of its claims—including *all* of its

5    federal and primary-liability common law claims—would be dismissed under

6    Ohio's applicable statutes of limitation (for the reasons explained *supra*, at 32-39),

7    National Integrity recently dropped out of the *Western & Southern* action and filed a

8    new, separate (but substantively identical) action in the Southern District of New

9    York on November 9, 2011.  National Integrity's newly filed action should be

10   dismissed as blatant forum shopping that, if permitted, would result in inefficient,

11   duplicative litigation of identical claims involving identical parties and witnesses.

12   In any event, even if the *National Integrity* action were not dismissed for this reason,

13   all but one of the claims in that action are untimely for the same reasons that

14   Western & Southern's claims are untimely.

15       **A.     The Recently-Filed New York Action Was Procedurally Improper And Should Be Dismissed.**

16

17           **1.     Dismissal Is Appropriate Where Plaintiffs Forum Shop Identical Claims In Different Forums.**

18       A district court has inherent discretion to dismiss an action to control its

19   docket. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2006).  "[T]he Second

20   Circuit has noted that . . . a district court is required to 'consider the equities of the

21   situation when exercising its discretion.'" *Raniere v. Citigroup Inc.*, 2011 WL

22   5881926, at *3 (S.D.N.Y. Nov. 22, 2011).  In this regard, the Supreme Court has

23   "stress[ed] the importance of conservation of judicial resources and the

24   comprehensive disposition of litigation." *Genentech, Inc. v. Eli Lilly & Co.*, 998

25   F.2d 931, 938 (Fed. Cir. 1993) (citing *Kerotest Mfg. Co. v. C-O-Two Fire Equip.*

26   *Co.*, 342 U.S. 180, 183 (1952)).

27       In considering whether the equities favor dismissal of a subsequently filed

28   suit, courts apply the following factors:

40

1    (1) the convenience of witnesses; (2) the location of relevant documents and

2    the relative ease of access to sources of proof; (3) the convenience of the

3    parties; (4) the locus of the operative facts; (5) the availability of process to

4    compel attendance of unwilling witnesses; (6) the relative means of the

5    parties; (7) a forum's familiarity with the governing law; (8) the weight

6    accorded a plaintiff's choice of forum; and (9) trial efficiency and the

7    interests of justice, based on the totality of the circumstances.

8  *Kellen Co. v. Calphalon Corp.*, 54 F. Supp. 2d 218, 221 (S.D.N.Y. 1999); *accord*

9  *Dunn & Fenley, LLC v. Diederich*, 2010 WL 28662, at *2 (D. Ore. Jan. 5, 2010)

10  (listing comparable factors identified by the Ninth Circuit).  Application of these

11  factors, for example, has led to dismissal of a second-filed suit in New York that

12  "involv[ed] the same issues, the same parties, and the same subject matter" as a suit

13  first-filed in Ohio federal court.  *Kellen*, 54 F. Supp. 2d at 222 (dismissal of the

14  later-filed action discouraged "wasteful use of [judicial] resources").

15      Where a plaintiff has engaged in forum shopping, its choice of forum is not

16  entitled to deference and should be disregarded.  *See Aguiar v. Natbony*, 2011 WL

17  1873590, at *7 (S.D.N.Y. May 16, 2011).[44]  And a plaintiff's filing of a subsequent

18  suit to avoid the application of the first forum's statute of limitations—like the filing

19  of the *National Integrity* suit here—epitomizes forum shopping.  *See Merrick Bank*

20  *Corp. v. Savvis, Inc.*, 2008 WL 5146545, at *5 (E.D. Mo. Dec. 8, 2008).[45]  As the

21  ───────────────
[44] "[T]he Ninth Circuit has established that courts should disregard a plaintiff's
forum choice where the suit is a result of forum-shopping."  *Italian Colors Rest. v.*
22  *Am. Express Co.*, 2003 WL 22682482, at *4 (N.D. Cal. Nov. 10, 2003) (citing
*Alltrade Inc., v. Uniweld Prods., Inc.*, 946 F.2d 622, 628 (9th Cir. 1991)).  And
23  courts in the Southern District of Ohio (National Integrity's first choice of forum)
agree as well:  "a plaintiff's choice of forum is given little weight where none of the
24  conduct complained of occurred in the forum selected by the plaintiff."  *Am.*
*Signature Inc. v. Moody's Investors Servs., Inc.*, 2010 WL 2667367, at *2 (S.D.
25  Ohio July 2, 2010) (internal quotations and citations omitted).

26  [45] Although *Merrick* involved a more typical case where a defendant in the first-filed
action engages in forum shopping, the rule applies equally where the same plaintiff
27  has brought successive suits in different fora.  *Semmes Motors, Inc. v. Ford Motor*
*Co.*, 429 F.2d 1197, 1202-03 (2d Cir. 1970); *Kellen*, 54 F. Supp. 2d at 223
28  (plaintiffs' choice of forum should be disregarded "[w]hen they see a storm brewing
in the first court, they try to weigh anchor and set sail for the hopefully more

41

district court in *Oglesby v. County of Kern*, 2005 WL 3031466, at \*7 (E.D. Cal.
Nov. 4, 2005), said in words entirely apt here:

> The Court seriously doubts how Plaintiffs' filing suit in another forum in
> order to avoid unfavorable precedent applicable only to the original forum is
> not garden-variety forum shopping. *See* BLACK'S LAW DICTIONARY 655 (6th
> ed. 1990) ("Forum shopping. Such occurs when a party attempts to have his
> action tried in a particular court or jurisdiction where he feels he will receive
> the most favorable judgment or verdict.").

### 2.    The Equities Favor Dismissal of National Integrity's Second Filed Suit.

Here, a balancing of the equities weighs heavily in favor of dismissal.
Indeed, *every one* of the non-neutral factors support dismissal.

More specifically, National Integrity was one of the six initial plaintiffs in the
*Western & Southern* litigation.  It joined its affiliates and parent[46] in bringing suit in
the Southern District of Ohio on April 27, 2011.  Over its objection, National
Integrity's (and its affiliates') claims were transferred to this Court for pre-trial
purposes as part of the Countrywide MBS MDL, to be returned to Ohio for trial
barring further order of the MDL Court.  *See Western & Southern*, No. 11-cv-7166,
Dkt. Nos. 75 (National Integrity opposition to transfer), 100 (MDL Order
transferring cases for pre-trial purposes), and 102 (Judge Spiegel order denying
transfer pursuant to 28 U.S.C. §1404(a)).  On November 8, 2011, National
Integrity's affiliates filed an amended complaint in *Western & Southern*.  Although
originally part of this same action, National Integrity filed the *NI* Complaint in
federal court in New York City a short time later.  National Integrity admits,
however, that its separate action "involve[s] the same defendants, the same legal

---

favorable waters of another district.") (quoting *Semmes*).

[46] *See W&S* Compl. ¶ 23 (National Integrity "is a wholly-owned subsidiary of
Integrity Life Insurance Company").

1   claims and substantially the same substantive factual allegations" as the *Western &*
2   *Southern* Amended Complaint. Dkt. No. 143, at 2. That is an understatement: the
3   *National Integrity* Complaint contains *precisely the same* allegations against
4   *precisely the same* defendants concerning *precisely the same* MBS purchases that
5   are identified in the *Western & Southern* Complaint. *Compare W&S* Compl. Ex. B
6   *with NI* Compl. Ex. A.[47] By its own admission, National Integrity has attempted to
7   change forum here solely "to avail itself of certain rights" it hopes to trigger by
8   filing in New York. Dkt. No. 143, at 2.

9          Given this context, all the relevant factors support dismissal. As Countrywide
10  previously argued to Southern District of Ohio Judge Spiegel, California is a more
11  appropriate forum for the convenience of witnesses, access to proof, and the locus of
12  primary-liability operative facts. *W&S* Dkt. No. 54, at 15-19. National Integrity
13  disagreed. It did not argue that any witness resided, proof could be found, or
14  conduct occurred in New York. Instead, it asserted "that Countrywide actively
15  marketed its mortgage-backed securities to [National Integrity and its affiliates,
16  collectively "Western & Southern"] *in Ohio*, including transmitting marketing
17  materials into the state. Western & Southern purchased the securities *in Ohio* and
18  such investments continue to be managed from Western & Southern's headquarters
19  *in Cincinnati*." Dkt. No. 75, at 11-12 (emphasis added).[48] Moreover, in three other

20

21  _____
    [47] Exhibit B to the *Western & Southern* complaint alleges that the very same tranche
22  in each of the 37 MBS offerings that the other Western & Southern companies
    bought was also purchased on the same day by one or more National Integrity
23  affiliates. The *Western & Southern* amended complaint and the *National Integrity*
    complaint challenge exactly the same statements in exactly the same prospectus
24  supplements and registration statements for exactly the same offerings, but without
    explanation the *Western & Southern* amended complaint no longer seeks relief as to
25  the CWALT 2007-15CB A6 tranche. *Compare NI* Compl. Ex. B at 17-18 *with*
    *W&S* AC Ex. B at 27-28.
    [48] National Integrity cannot now in fairness contradict its prior argument to the
26  federal district court in Ohio that the relevant facts occurred in Ohio. Indeed,
    National Integrity itself has asserted that a party is "judicially estopped from
27  arguing" a position contrary to one it has previously proffered. *Id.* at 15 (quoting
    *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). National Integrity's own
28  words describe its conduct here precisely.

                                    43

1   recent instances, National Integrity has joined with its affiliates in filing suit *in
2   Ohio*—not New York—challenging other purchases of other MBS issued by
3   different entities.[49]  And National Integrity's most recent complaint against
4   Countrywide alleges that National Integrity's "senior management" and "portfolio
5   managers" are located in the forum it first chose, *Ohio*, and its "investment
6   decisions, including the decision to purchase Certificates, are made by National
7   Integrity officials or its affiliates in *Cincinnati, Ohio*."  *NI* Compl. ¶¶ 16-18
8   (emphasis added).  Accordingly, National Integrity cannot now argue that the
9   convenience of the witnesses, or the parties, or the locus of documents or operative
10  facts concerning its primary-liability claims, is not in Ohio, but in New York
11  instead.

12      The other *Kellen* factors are neutral or also favor dismissal.[50]  National
13  Integrity cannot credibly argue that a New York forum would have more familiarity
14  than Ohio as to the Ohio statutory law at issue in the first seven counts of its
15  Complaint.  National Integrity's blatant forum shopping also precludes giving any
16  weight to its newest choice of forum.  *See, e.g.*, *Semmes Motors, Inc.*, 429 F.2d at
17  1202-03; *Aguiar*, 2011 WL 1873590, at *7; *Merrick Bank Corp.*, 2008 WL
18  5146545, at *5; *Italian Colors Rest.*, 2003 WL 22682482, at *4.  Finally, what
19  National Integrity has attempted to do by filing a new action in New York despite its
20  prior pending action before this Court in the *Countrywide MBS MDL* would spawn
21  gross judicial inefficiency, asking two courts and potentially two juries to address
22  precisely the same claims against identical defendants involving precisely the same
23  conduct relating to the same tranches of the same MBS offering that were purchased

24  ─────────────
25  [49] *See* Complaint, *Western & Southern Life Ins. Co. v. JPMorgan Chase Bank, N.A.*,
    11-CV-000495-SJD (Ct. C.P. Ohio June 22, 2011); Complaint, *Western & Southern
26  Life Ins. Co. v. Morgan Stanley Mortg. Cap. Inc.*, 11-CV-00576-SAS-KLL (Ct. C.P.
    Ohio July 18, 2011); Complaint, *Western & Southern Life Ins. Co. v. Bank of
27  America, N.A.*, 11-CV-00667-SAS-SKB (Ct. C.P. Ohio Aug. 18, 2011).  In each of
    these cases, National Integrity lists its residence as 400 Broadway, Cincinnati, Ohio.
28  [50] The availability of process and the relative means of the parties to litigate in the
    Southern District of Ohio are neutral factors.

44

1   on precisely the same days by the same or affiliated portfolio managers located in

2   precisely the same state (Ohio).  *Compare W&S* Compl. Ex. A with *NI* Compl. Ex.

3   A.  Accordingly, the *National Integrity* complaint should be dismissed to avoid such

4   judicial inefficiency and not reward National Integrity's blatant forum shopping.

5        **B.   <u>Virtually All Of National Integrity's Claims Are Time-Barred</u>.**

6             **1.   <u>National Integrity's 1933 Act Claims Are Untimely</u>.**

7        The *National Integrity* complaint should be dismissed for the separate and

8   independent reason that it is time-barred.  As in *Maine State*, *Stichting*, and *Allstate*,

9   both the one-year statute of limitations and the three-year statute of repose

10  applicable to National Integrity's 1933 Act claims expired before National Integrity

11  filed its original Complaint on April 27, 2011.  First, all 26 MBS at issue here were

12  offered to the public for purposes of National Integrity's Section 11 claims prior to

13  November 9, 2008.  *See* App. 11 (latest registration statement at issue dated April

14  24, 2007; latest prospectus supplement at issue dated July 27, 2007).  Second, with

15  respect to National Integrity's Section 12(a)(2) claims, all 26 MBS at issue were

16  purchased by National Integrity by no later than March 25, 2008.  *NI* Compl. ¶ 75

17  and Ex. A; App. 11.  As such, the three-year repose period has expired as to all 26

18  MBS.

19       In addition, the one-year statute of limitations also expired as to both Section

20  11 and Section 12 claims before suit was filed.  Given this Court's rulings in *Maine*

21  *State*, *Stichting*, and *Allstate* as to the date by when reasonably diligent MBS

22  investors would have discovered the facts that they contend support their claims,

23  National Integrity discovered or reasonably should have discovered the allegedly

24  untrue statements prior to November 9, 2010—*i.e.*, more than one year before its

25  Complaint was filed.  *See Maine State I*, 722 F. Supp. 2d at 1165; *Stichting*, 2011

26  WL 3558173, at *8; *Allstate*, 2011 WL 5067128, at *10.

27       Like the other Western & Southern companies, National Integrity argues that

28  *American Pipe* tolling saves its 1933 Act claims due to the filing of the *Luther* and

45

1   *Washington State* class actions.  *NI* Compl. ¶¶ 389-95.[51]  This argument fails for the

2   very same reasons it fails in *Western & Southern*.  The only MBS eligible for

3   *American Pipe* tolling are those as to which "the named plaintiffs in the prior

4   putative class actions had standing to sue, *i.e.*, those tranches that the *Luther* named

5   plaintiffs had actually purchased."  *Allstate*, 2011 WL 5067128, at *10; *accord*

6   *Maine State II*, 2011 WL 4389689, at *2-8; *Stichting*, 2011 WL 3558173, at *2; *see*

7   *also NI* Compl. ¶¶ 397-98 (acknowledging *Maine State I* and *Maine State II*

8   standing rulings).  Here, no named *Luther* plaintiff purchased 25 of the 26 MBS

9   purchased by National Integrity, *see NI* Compl. Ex. A; RJN Ex. 102, and its claims

10  based on those 25 securities thus must be dismissed.  *Allstate*, 2011 WL 5067128, at

11  *10 (citing *Stichting*, 2011 WL 3558173, at *2).

12        As to the one remaining MBS, CWALT 2005-26CB, National Integrity's

13  Section 11 claims are barred by the three-year statute of repose.  CWALT 2005-

14  26CB was offered to the public on May 21, 2005, the effective date of the relevant

15  shelf registration statement.  *See* App. 11.  Accordingly, the repose period expired

16  on May 21, 2008, prior to the September 9, 2008 filing of the first *Luther* complaint

17  that included a named plaintiff that purchased the relevant tranche of CWALT 2005-

18  26CB.  In other words, the repose period had already expired before any *American*

19  *Pipe* tolling could have been triggered.  *See* RJN Ex. 72;  *Stichting*, 2011 WL

20  3558173, at *2 ("Plaintiff may not assert §§ 11 or 12(a)(2) claims . . . for which the

21  three-year statute of repose expired before the *Luther* plaintiff either acquired the

22  security or joined the *Luther* case").

23        Finally, National Integrity's claim for "control person" liability under Section

24  15 of the 1933 Act also must be dismissed because its predicate Section 11 and

25  12(a)(2) claims are time-barred.  *See, e.g.*, *Allstate*, 2011 WL 5067128, at *13

---

26  [51] Like the other Western & Southern companies, National Integrity also argues that
27  its 1933 Act claims are tolled under *Vaccariello*, 763 N.E.2d 160 (Ohio 2002), and
    ORC § 2305.19.  *NI* Compl. ¶ 388.  But state law tolling principles do not apply to
28  federal claims.  *Centaur Classic Conv. Arbitrage Fund Ltd. v. Countrywide Fin.*
    *Corp.*, No. 10-CV-05699-MRP (MANx), slip op. at 6-7 (C.D. Cal. Jan. 20, 2011).

1 (dismissing Section 15 claims where all possible predicate violations were dismissed

2 as time-barred).

3              **2.**      **National Integrity's 1934 Act Claims Are Untimely.**

4       The two-year statute of limitations applicable to National Integrity's 1934 Act

5 claims also expired before National Integrity filed its complaint on November 9,

6 2011. *See* 28 U.S.C. § 1658(b). Because a "reasonable plaintiff exercising

7 reasonable diligence . . . should have discovered facts sufficient to state every

8 element of its [Section 10(b)] claim at least prior to *February 14, 2009*," two years

9 before the filing of any fraud claims in *Stichting*, *Stichting*, 2011 WL 3558173, at

10 *11 (emphasis added); *accord Allstate*, 2011 WL 5067128, at *11 (dismissing

11 Section 10(b) claim as time-barred because plaintiffs should have discovered every

12 element to state their claim by December 27, 2008, two years prior to the filing of

13 the *Allstate* complaint), National Integrity by definition should have discovered facts

14 sufficient to state its Section 10(b) claim before *November 9, 2009*—more than two

15 years prior to the filing of its complaint. *Id*. National Integrity's Section 10(b)

16 claim is therefore time-barred.

17       Like the other Western & Southern companies, National Integrity tries to

18 circumvent *Allstate* and *Stichting* by alleging that it "did not know and could not

19 have known of its claims prior to June 2009," making the making the very same

20 allegations that the other Western & Southern companies make in their amended

21 complaint about the development and use of "proprietary" models to perform "loan-

22 level analysis" and "fair value pricing" through June 2009, *see NI* Compl. ¶¶ 374-

23 78, and the very same allegations about information that supposedly first became

24 public in June 2009 in the SEC enforcement action. *See NI* Compl. ¶ 385. These

25 arguments fail for the very same reasons they fail in *Western & Southern*. *See*

26 *supra*, at 30-31.

27       In short, like the plaintiffs in *Stichting*, *Allstate* and *Western & Southern*,

28 National Integrity reasonably should have discovered the factual basis for its Section

10(b) claims long before November 9, 2009, two years prior to the filing of the Complaint. *See Stichting*, 2011 WL 3558173, at *8, 11. National Integrity's Section 10(b) claims are time-barred.[52]

Finally, National Integrity's Section 20(a) claim must be dismissed because its predicate Section 10(b) claims are time-barred and must be dismissed. *Stichting*, 2011 WL 3558173, at *11; *Allstate*, 2011 WL 5067128, at *13; *NI* Compl. ¶ 456 (Section 10(b) claims form predicate for Section 20(a) claims).

### 3.    National Integrity's OSA Claims Are Untimely.

As in *Western & Southern*, National Integrity alleges five claims for violations of the Ohio Securities Act ("OSA"). These claims, and the allegations supporting these claims, are identical to those asserted by Western & Southern. *See W&S* AC ¶¶ 399-417; *NI* Compl. ¶¶ 399-417. National Integrity's OSA claims, therefore, are time-barred under the OSA's two-year statute of limitations (OHIO REV. CODE § 1707.34(B)) for the same reasons that Western & Southern's OSA claims are time-barred. *See supra*, at 32-36. More specifically, applying this Court's previous rulings in *Stichting*, National Integrity should have discovered facts sufficient to state its OSA claims prior to November 9, 2009, and as a result these claims are time-barred and must be dismissed. *Id.* (quoting *Stichting*, 2011 WL 3558173, at *11).

As in *Western & Southern*, National Integrity also argues that its OSA claims are tolled under *Vaccariello v. Smith & Nephew Richards, Inc.*, 763 N.E.2d 160 (Ohio 2002). *NI* Compl. ¶ 388. For the reasons discussed in detail *supra* at 33-35, *Vaccariello* does not permit cross-jurisdictional tolling based on a case not filed in either Ohio or the federal courts, and thus provides no basis for tolling the OSA

---

[52] National Integrity's 1934 Act claims as to 11 of the Offerings at issue also should be dismissed because they are barred by the five-year statute of repose governing such claims. *See Stichting*, 2011 WL 3558173, at *6; App.11. The relevant prospectus supplements and shelf registration statements for each of these 11 Offerings were filed with the SEC before November 9, 2006, more than five years before this suit was filed. *See id.*; *supra*, at n. 23 (citing *Exxon*, 500 F.3d at 200).

48

1   claims here.  Nor does the extraordinary remedy of equitable tolling based on

2   alleged "fraudulent concealment," *NI* Compl. ¶ 383-87, apply to National Integrity's

3   OSA claims.  National Integrity's "fraudulent concealment" allegations are identical

4   to Western & Southern's, and fail for the same reasons those mirror-image

5   allegations do.  *See  NI* Compl. ¶¶ 383-87; *W&S* AC ¶¶ 383-87; *supra*, at 35-36.

6       **4.       National Integrity's Common Law Claims Are Untimely.**

7       As the New York Court of Appeals has held, the primary purpose of New

8   York's borrowing statute (N.Y. C.P.L.R. § 202 (McKinney 2003)) is to prevent

9   precisely what National Integrity has attempted to do here:  "forum shopping by a

10  nonresident seeking to take advantage of a more favorable Statute of Limitations in

11  New York." *Antone v. Gen. Motors Corp.*, 473 N.E.2d 742, 745 (N.Y. 1984); *see*

12  *also supra*, at 40-45 (describing National Integrity's forum shopping).[53]  For this

13  reason, the Court of Appeals has explicitly distinguished the term "resident" as used

14  in the New York borrowing statute from "domiciliary" and held that "the

15  determination of whether a plaintiff is a New York resident . . . turns on whether he

16  has a *significant connection* with some locality in the State."  *Id*. at 746 (emphasis

17  added); *Eaton v. Keyser*, 53 A.D.3d 1029, 1030 (N.Y. App. Div. 2008).  With

18  respect to corporations, New York courts have generally held that, for purposes of

19  New York's borrowing statute, "[a] corporation's principal place of business, rather

20  than its state of incorporation, determines its residence."  *McMahan & Co. v.*

21  *Donaldson, Lufkin & Jenrette Sec. Corp.*, 727 F. Supp. 833, 834 (S.D.N.Y 1989)

22  (citing *Allegaert v. Warren*, 480 F. Supp. 817, 820 (S.D.N.Y. 1979)).  Accordingly,

23  New York courts have held that "a foreign corporation cannot take advantage of the

24  borrowing statute simply because it is qualified to do business in New York and

25  maintains an office in the state."  *Allegaert*, 480 F. Supp. at 820; *accord Am.*

26  ―――――――――――――――

[53] *See* N.Y. C.P.L.R. § 202 (McKinney 2003) ("An action based upon a cause of
27  action accruing without the state cannot be commenced after the expiration of the time
limited by the laws of either the state or the place without the state where the cause of
action accrued, except that where the cause of action accrued in favor of a resident of
28  the state the time limited by the laws of the state shall apply.").

49

*Lumbermens Mut. Cas. Co. of Ill. v. Cochrane*, 129 N.Y.S.2d 489, 490-91 (Sup. Ct. 1954) (holding plaintiff should not be afforded benefits of residency for purposes of New York borrowing statute where it was "qualified to business in the State of New York, and maintain[ed] an office in the City of New York").

Here, National Integrity's own allegations confirm that its principal place of business is not in New York, but rather in Ohio.  In its new complaint filed in the Southern District of New York, National Integrity *does not* allege that its principal place of business is in New York.  Rather, National Integrity alleges that its "senior management is based in Cincinnati, Ohio," and that it maintains "its principal underwriting and insurance operations in Goshen, New York." *NI* Compl. ¶¶ 15-16 (emphasis added).[54]  Moreover, National Integrity also alleges that its "investment decisions, including the decision to purchase [the] Certificates, are made by National Integrity officials or its affiliates in Cincinnati, Ohio" and that its "investments are managed by portfolio managers located in Cincinnati, Ohio." *Id.* ¶¶ 17-18.

National Integrity's own allegations, therefore, make clear that its "principal place of business" is not New York, but rather Cincinnati, Ohio, and National Integrity does not contend otherwise in its opportunistic complaint recently filed in Manhattan.  According to National Integrity itself in that complaint, Ohio is where both its "senior management" and the portfolio managers that made the decision to purchase the MBS at issue are located. *NI* Compl. ¶¶ 16-18.  Accordingly, National Integrity may not use the New York borrowing statute to apply a longer New York statute of limitations to its common law fraud, negligent misrepresentation, and civil conspiracy claims.  For precisely this reason, the district court in *McMahan*, 727 F.

---

[54] In the original *Western & Southern* action filed in the Southern District of Ohio, National Integrity inconsistently represented that it maintained "its principal place of business in Goshen, New York." *W&S* Compl. ¶ 23.  National Integrity apparently decided in its subsequent Southern District complaint to articulate more accurately the nature of the operations it actually has in New York as contrasted with where management decisions are made.

50

1    Supp. at 834, held that the plaintiff—a partnership formed in New York state—

2    could not use the New York borrowing statute to trigger application of the New

3    York statute of limitations because its principal place of business was in Connecticut

4    and was a Connecticut resident for purposes of the borrowing statute.

5         Because National Integrity is not a resident of New York for purposes of the

6    New York borrowing statute, New York's borrowing statute requires that the Court

7    next determine *where* the cause of action accrued.  *See Global Fin. Corp. v. Triarc*

8    *Corp.*, 93 N.Y.2d 525, 528 (1999).  "When a nonresident sues on a cause of action

9    accruing outside of New York, CPLR 202 requires the cause of action to be timely

10   under the limitations periods of both New York and the jurisdiction where the cause

11   of action accrued."  *Id.*; *accord Cantor Fitzgerald Inc. v. Lutnick*, 313 F. 3d 704,

12   710 (2d Cir. 2002) ("a case filed by a non-resident plaintiff requires application of

13   the shorter statute of limitations period . . . provided either by New York or the state

14   where the cause of action accrued").  As this Court has recognized, for purposes of

15   the New York borrowing statute, "a cause of action accrues where the [alleged]

16   injury is sustained," and "the place of injury . . . is where the economic impact of the

17   defendant's conduct is felt, which is usually the plaintiff's place of residence."

18   *Allstate*, 2011 WL 5067128, at *8 (quoting *Gordon & Co. v. Ross*, 63 F. Supp. 2d

19   405, 408 (S.D.N.Y. 1999)).

20        Here, National Integrity's allegations demonstrate that the place of injury for

21   its primary-liability claims is Cincinnati, Ohio.  National Integrity alleges that its

22   injury is as follows:  "The false and misleading statements of material facts and the

23   omissions of material facts in the Offering Materials directly caused National

24   Integrity damage, because the Certificates were far riskier than Defendants

25   described, and for that reason, far less valuable than the prices paid by National

26   Integrity."  *NI* Compl. ¶ 286.  Because the "investment decisions, including the

27   decision to purchase [the] Certificates [were] made by National Integrity officials . .

28   . in Cincinnati, Ohio" (*id*. ¶ 18), and these securities allegedly are "managed by

51

portfolio managers located in Cincinnati, Ohio" (*id.* ¶ 17), it necessarily follows that the place of injury is Cincinnati, Ohio.  Accordingly, Ohio's two-year statute of limitations applies to National Integrity's common law fraud, negligent misrepresentation and civil conspiracy claims.  *See supra*, at 36-37.  National Integrity's common law claims are thus time-barred for the very same reasons that Western & Southern's identical common law claims are time-barred.  *See supra*, at 38-39.

## VI.   ALL CLAIMS IN *BANKERS* ARE TIME-BARRED.

### A.   Under Florida Law, The Statute Of Limitations Of The State With The Most "Significant Relationship" To The Action Applies.

Florida's borrowing statute (which is to be considered due to the *Bankers* action having originally been filed in federal court in Florida) provides:

> When a cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state.

FLA. STAT. § 95.10 (2011).  In other words, "[i]f the cause of action arose in another state and the action is time-barred because of that state's limitation statutes, the borrowing statute precludes the maintenance of the action in Florida." *Bates v. Cook, Inc.*, 509 So. 2d 1112, 1113 (Fla. 1987).

To determine where a cause of action "arose" for purposes of Florida's borrowing statute, courts apply the Restatement's "significant relationship" test. *Bates*, 509 So. 2d at 1114-15 ("[J]ust as in the case of other issues of substantive law, the significant relationships test should be used to decide conflicts of law questions concerning the statute of limitations," and in particular, "to decide in which state the cause of action 'arose.'").[55]  In fraud and misrepresentation actions, courts applying Florida law look to both Restatement Section 145 (which outlines

---

[55] *Accord Digoia v. H. Koch & Sons, Div. of Wickes Mfg. Co.*, 944 F.2d 809, 812 (11th Cir. 1991) (explaining that significant relationship test in § 145 governs determination of where claim arose for purposes of Florida borrowing statute).

the contacts to be considered in tort actions generally) and Section 148 (which outlines the contacts to be considered in fraud and misrepresentation cases in particular) to determine which state has the most "significant relationship" with the action.  *See Topp, Inc. v. Uniden Am. Corp.*, 483 F. Supp. 2d 1187, 1191 (S.D. Fla. 2007) (considering Sections 145 and 148 "together" because "the contacts set out in each [section] overlap substantially").  Under Section 145 of the Restatement, the following contacts guide the determination of which state "has the most significant relationship to the occurrence and the parties under the principles stated in § 6"[56]:

> (a) the place where the injury occurred;
>
> (b) the place where the conduct causing the injury occurred;
>
> (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties; and
>
> (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2) (1971).  Under Section 148 of the Restatement, courts consider the following contacts to determine the state with the most "significant relationship" to the action:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations;
>
> (b) the place where the plaintiff received the representations;
>
> (c) the place where the defendant made the representations;
>
> (d) the domicil[e], residence, nationality, place of incorporation and place of business of the parties;
>
> (e) the place where a tangible thing which is the subject of the transaction

---

[56] The following considerations outlined in Section 6 of the Restatement guide the "significant relationship" analysis:  (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. Restatement (Second) of Conflict of Laws § 6(2) (1971).

53

1    between the parties was situated at the time; and

2    (f) the place where the plaintiff is to render performance under a contract

3    which he has been induced to enter by the false representations of the

4    defendant.

5    Restatement (Second) of Conflict of Laws § 148(2) (1971).[57]

6         Courts applying Florida law do not simply add up the Restatement factors and

7    apply "the law of the sovereign with the greatest numerical total." *Judge v. Am.*

8    *Motors Corp.*, 908 F.2d 1565, 1569 (11th Cir. 1990). Rather, the factors are a tool

9    "to determine which sovereign has the most significant contact" based on the facts

10   and circumstances presented in each individual case. *Id.* Furthermore, although

11   Florida courts have announced several principles applicable to the choice of law

12   analysis,[58] Florida courts regard the Restatement factors as "rather malleable,"

13   *Mezroub v. Capella*, 702 So. 2d 562, 565 (Fla. Dist. Ct. App. 1997), and have

14   eschewed "hard-and-fast rules" to guide the significant relationship test, because

15   such questions "cannot be resolved by reciting general pronouncements," *Digioia*,

16   944 F.2d at 812-13.

17

18

19   [57] This assumes that the alleged misrepresentations and the *Bankers* plaintiffs'
     actions in reliance did not take place wholly in one state (*i.e.*, not all in California).

20   If the alleged misrepresentations and the plaintiff's actions in reliance did take place
     in one state, the law of that state will generally apply. *See* Restatement (Second) of

21   Conflict of Laws § 148(1) (1971). Here, the complaint is silent as to the location of
     the *Bankers* plaintiffs' actions in reliance on the alleged misrepresentations.

22   [58] In tort cases, Florida courts generally presume "that the law of place of injury will
     apply," unless "another state has a more 'significant relationship.'" *McNeil v. CSX*

23   *Transp., Inc.*, 832 So.2d 227, 229 (Fla. Dist. Ct. App. 2002). But in
     misrepresentation cases, the place of injury is decidedly "less significant." *Trumpet*

24   *Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1116 (11th Cir.
     1996) (quoting Restatement (Second) Conflict of Laws § 145 cmt. f). Indeed, the

25   place of injury "takes a backseat to other contacts" in cases involving alleged
     misrepresentations. *Topp*, 483 F. Supp. 2d at 1192. In addition, although the state

26   in which a plaintiff claims to have relied on the alleged misrepresentations is often a
     focal point of the "significant relationship" analysis, where—as here—acts in

27   reliance may have occurred in two or more states as opposed to a single state the
     location of such acts becomes less important. *See* Restatement (Second) of Conflict

28   of Laws § 148, cmt. f (1971).

54

**B.    California's Statutes Of Limitations Apply Here.**

Here, California has the most significant relationship to the alleged primary-liability occurrences and the parties in this action, by virtue of being the "place where the defendant[s] made the representations."  Restatement (Second) of Conflict of Laws § 148(2)(c).  The gravamen of the *Bankers* complaint is that Countrywide allegedly misstated the riskiness and credit quality of the mortgage loans backing the MBS certificates that the *Bankers* plaintiffs bought through the registration statements, prospectuses and prospectus supplements, term sheets and other written materials issued in connection with the sale and offering of those securities.  Indeed, the vast majority of the Complaint—spanning almost fifty pages—details the supposed actions and statements of Countrywide entities and personnel.  *See, e.g.*, *Bankers* Compl. ¶¶ 35-151, 161-86.  And virtually all of these alleged actions (if true) would have occurred in Calabasas, California, where the relevant offering materials were negotiated, approved, and issued.[59]  *See Putnam Bank v. Countrywide Fin. Corp.*, No. 3:11-cv-00145, slip op. at 9-10 (D. Conn. May 16, 2011) (transferring case to Central District of California, and noting that "[t]he documents were approved in and issued out of Countrywide's offices in Calabasas, California"); *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 2011 WL

---

[59] Countrywide's so-called "deceptive scheme," whereby the company allegedly disregarded its underwriting guidelines "in order to maximize its profits from the sale of . . . loans to the secondary market," *Bankers* Compl. ¶ 10, allegedly traces to decisions and misrepresentations made by Countrywide personnel that worked out of Countrywide's California offices.  *See id.* ¶ 86 ("[I]nternal documents and its employees' admissions provide evidence that, *under management's direction*, approval of 'exceptions' was the rule."); *see id.* ¶ 96 ("*Countrywide executives* knew that risky loans that were routed out of the normal underwriting process (because they violated underwriting standards) were regularly being approved, even when they had been previously declined."); *see id.* ¶ 64 ("Under the direction of [*Countrywide executives*], Countrywide *adopted a new corporate culture* of writing as many mortgage loans as possible . . . regardless of the creditworthiness or evident fraud of the borrower.") (emphases added).  As the United States District Court for the District of Connecticut noted in transferring the *Putnam* case to this Court, "[a]llegations of systemic wrongdoing by a corporate defendant clearly call into issue the conduct of corporate policy makers, who were located at corporate headquarters within the Central District of California."  *Putnam Bank v. Countrywide Fin. Corp.*, No. 3:11-cv-00145, slip op. at 10 (D. Conn. May 16, 2011).

55

1  3569969, at *4 (J.P.M.L. Aug. 15, 2011) (selecting the Central District of California

2  as the appropriate forum for the Countrywide MBS multidistrict litigation

3  proceeding, in part because "Countrywide parties, witnesses, and documents are

4  located primarily" in the Central District); *Allstate Ins. Co. v. Countrywide Fin.*

5  *Corp.*, 2011 WL 2360274, at *2 (S.D.N.Y. June 14, 2011) (transferring case to

6  Central District of California after considering, among other factors, the "locus of

7  operative facts").

8      The *Bankers* plaintiffs[60] may argue that they received and relied on the

9  alleged misrepresentations in Florida (Restatement § 148(2)(a)), and that Florida's

10  limitations period ought to apply.  But any such argument should not be accorded

11  significant weight because the Complaint contains no allegations regarding where

12  any supposed acts of reliance may have occurred.  Particularly because there may be

13  any number of intermediaries involved in the purchases at issue (e.g., portfolio

14  managers, investment advisers, and/or brokers) and any number of alleged acts in

15  reliance taking place in different locations, it cannot be assumed that any alleged

16  reliance occurred in Florida, or that any contact with Florida should predominate,

17  simply because three of the *Bankers* plaintiffs allegedly have their places of business

18  there.  *See, e.g., Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 72

19  n.12, 75-76 (Tex. App. 2004) ("no state emerges as the sole place of reliance" by

20  plaintiff located in Texas where some acts in reliance occurred in Pennsylvania,

21  including investors' decision to invest while visiting facility in Pennsylvania, while

22  other acts, such as sending checks and wiring money from Texas for stock

23  purchases, occurred in Texas; holding instead that New York, as place from where

24  alleged misrepresentations emanated, controlled); *Topp*, 483 F. Supp. 2d at 1191

25  _____

26  [60] BIC, BLIC, and FCIC allegedly purchased all but one of the certificates at issue.
*Bankers* Compl. ¶¶ 6, 18-20.  The Complaint does not disclose the identity of the
remaining purchaser, merely identifying it as "BBSC," an acronym which is not

27  defined or referenced elsewhere in the Complaint. *Id.* ¶ 6.  "BSIC" is defined in the
Complaint as a Louisiana corporation, but it is not alleged to have purchased any of

28  the certificates. *Id.* ¶¶ 6, 21.

1   (finding that no particular state could be identified as place where

2   misrepresentations were made or received and accordingly placing less weight on

3   these factors where plaintiff did not allege that misrepresentations took place at a

4   specific physical meeting).[61]

5        Furthermore, even if some acts of reliance allegedly did occur in Florida, the

6   allegations in the Complaint as a whole relate only minimally to the actions of the

7   *Bankers* plaintiffs.  Indeed, according to the Complaint, the alleged abandonment of

8   underwriting guidelines was not limited to the specific securitizations purchased by

9   the *Bankers* plaintiffs but affected all of the MBS that Countrywide's subsidiaries

10  issued; nor is there any allegation that the alleged misrepresentations at issue were

11  directed to the *Bankers* plaintiffs or to Florida in particular.  Rather, the *Bankers*

12  plaintiffs allege *systemic* conduct by Countrywide occurring almost exclusively in

13  California, resulting in representations that were widely disseminated to investors

14  throughout the country.  In circumstances like this, courts in Florida and elsewhere

15  have held that the state in which the allegedly fraudulent conduct occurred has a

16  more significant relationship to the action than the state where the plaintiff allegedly

17  received and relied on the representations.[62]  Thus, in light of the significant contacts

18  [61] *See* Restatement § 148, cmt. f (noting that a plaintiff's reliance may take many forms, and "provides a more important contact when it is confined to a single state

19  that when it is divided among two or more").

20  [62] *See Dart Indus., Inc. v. Acor*, 2008 WL 4816612, at *13 n.14 (M.D. Fla. Nov. 5, 2008) (under Restatement § 148, Tennessee law applied even though plaintiff, with

21  a principal place of business in Florida, received the misrepresentations and acted upon them in Florida); *First Nat'l Bank of Boston v. Heuer*, 702 F. Supp. 173, 175-

22  76 (N.D. Ill. 1988) (under Restatement § 148, Illinois law applied "[b]ecause the alleged misrepresentations were made in Illinois," despite plaintiff's principal place

23  of business in Massachusetts); *Greenberg Traurig of N.Y.*, 161 S.W.3d at 72-76 (applying New York law because defendant's misrepresentations emanated from

24  New York, where defendant law firm had offices and performed services; holding that "when evaluating fraud-based claims to determine governing law, the principal

25  focus is where the conduct occurred," and that New York has "substantial interest in regulating fraudulent conduct occurring in New York").  Indeed, in granting the

26  motion to transfer the *Putnam* case from the District of Connecticut to this Court, the district court held that "the central events addressed in th[e] action occurred

27  within the Central District of California" because the documents were approved in and issued out of Countrywide's offices in Calabasas, California" and because the

28  alleged conduct took place at corporate headquarters within the judicial district. *Putnam Bank*, slip op. at 9-10.  The court further noted that "[t]he single, individual

57

1    that the parties and the alleged occurrences have with California, the *Bankers*

2    plaintiffs' causes of action arose in California and are governed by California's

3    statutes of limitations.[63]

4         **C.    Banker's Claims Are Untimely Under California's**
              **Statutes Of Limitations.**

5

6         The *Bankers* plaintiffs' claims are time-barred by California's applicable

7    statutes of limitations for (i) fraud, which is three years from "discovery, by the

8    aggrieved party, of the facts constituting the fraud or mistake," CAL. CIV. PROC.

9    CODE § 338(d) (2006); and (ii) negligent misrepresentation, which is subject to a

10   two-year statute of limitations.  *See Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522

11   F.3d 1049, 1054 (9th Cir. 2008).  As detailed above and in the Court's prior rulings,

12   these limitations periods are subject to a "lenient inquiry notice standard," and begin

13   to run "when the plaintiff suspected or should have suspected that an injury was

14   caused by wrongdoing."  *Stichting*, 2011 WL 3558173, at *12; *accord Allstate*, 2011

15   WL 5067128, at *13.

16

17   state with the strongest interest in this action would appear to be California, the state
     where the primary defendants were located and where the allegedly unlawful
18   activities occurred.  California presumably has a strong interest in allegations of
     illegal activity on the part of one of its largest financial institutions.  *Id.*
19   [63] The remaining factors are neutral, inapplicable, or favor California.  With respect
     to the location and state of incorporation of the parties, one of the four *Bankers*
20   plaintiffs is incorporated and allegedly has its principal place of business in
     Louisiana, the remainder in Florida; the Countrywide Defendants are primarily
21   located in California, though some are incorporated elsewhere, but none is
     incorporated in or has a principal place of business in Florida.  Thus, the "domicile,
22   residence, . . . and place of business of the parties" does not favor Florida or
     California (or any other state).  *See* Restatement § 145(2)(c); *id.* § 148(2)(d).  The
23   place of required performance and the location of the "tangible thing" at issue are
     both inapplicable.  *Id.* § 148(2)(e)-(f).  The central location of the plaintiffs'
24   relationship with the Countrywide Defendants was, if anywhere, California.  *See* §
     145(2)(d).  As the location of Countrywide's headquarters, California was the
25   origination point of the MBS offerings at issue, which were made available to
     investors across the country and had no particular focus on investors in Florida.
26   Finally, with respect to § 145(2)(a), even assuming the *Bankers* plaintiffs sustained
     their alleged injuries in Florida (and the Complaint contains no such allegation), the
27   place of injury "takes a backseat to other contacts in fraud cases," *Topp*, 483 F.
     Supp. 2d at 1192, and is "less significant" than the place where the misconduct
28   originated.  *Trumpet Vine*, 92 F.3d at 1115-16.

                                            58

1    In *Stichting*, this Court dismissed the plaintiff's common law fraud and

2  negligent misrepresentation claims as time-barred because, in light of widespread

3  press coverage and prior lawsuits filed against Countrywide, a reasonable person

4  would have been alerted to "wrongdoing in Countrywide's loan origination

5  business" in late 2007 or at least by January 2008—and therefore before February

6  14, 2008 (*i.e.*, more than three years before the relevant complaint in February

7  2011).  *Id.*  As detailed in App. 5, the allegations in the *Bankers* complaint are

8  identical to those in *Stichting*.  Yet *Bankers* was not filed until July 22, 2011—more

9  than five months *after* the *Stichting* complaint that the Court has already held to be

10  time-barred.  Thus, for the same reasons set forth in *Stichting*, the *Bankers* plaintiffs

11  were on inquiry notice of their claims more than three years before their complaint

12  was filed, and their claims are time-barred under California law.

13  ## VII.   ALL CLAIMS IN *STERLING* ARE TIME-BARRED.

14    The *Sterling* case was transferred from the Northern District of Illinois, and

15  that forum's choice of law rules must be applied.  *See supra* at 23.  In procedural

16  matters, including which statute of limitations governs, Illinois applies the law of the

17  forum state.  *Newell Co. v. Petersen*, 758 N.E.2d 903, 908 (Ill. App. Ct. 2001).

18  Under Illinois law, "an action cannot be maintained in the forum state if it is barred

19  either by the statute of limitations of the forum state or by a statute of limitations

20  that the forum state has 'borrowed' from another jurisdiction in accordance with the

21  forum state's 'borrowing statute.'"  *Id.* (citing Restatement (Second) of Conflicts of

22  Law § 142 (1971)); *see also Employers Ins. of Wausau v. Ehlco Liquidating Trust*,

23  723 N.E.2d 687, 692-93 (Ill. App. Ct. 1999) (same).  Here, Sterling's primary-

24  liability claims are barred both by (i) Illinois' statute of limitations and (ii)

25  California's statute of limitations, as borrowed in accordance with Illinois'

26  borrowing statute.

27  ### A.   Illinois' Statute of Limitations Bars Sterling's Claims.

28    In Illinois, fraud and negligent misrepresentation claims arising out of the

1    purchase of securities are subject to the statute of limitations applicable to claims

2    under the Illinois Securities Law, 815 ILL. COMP. STAT. 5/13(D).  *Tregenza v.*

3    *Lehman Bros., Inc.*, 687 N.E.2d 14, 15 (Ill. App. Ct. 1997).  In *Allstate*, this Court

4    held that allegations paralleling those made here (*see* App. 6)—namely, that

5    "Countrywide misrepresented the quality of the loans underlying its RMBS"—

6    concerned conduct "squarely governed by the ISL" and that the ISL, therefore,

7    provides the applicable statute of limitations for common law claims based on such

8    allegations.  2011 WL 5067128, at *9.  Here, as in *Allstate*, the ISL's limitations

9    period is applicable to Sterling's claims.

10          The Illinois Securities Law states that "[n]o action shall be brought for relief

11   under this Section or upon or because of any of the matters for which relief is

12   granted by this Section after 3 years from the date of sale."  815 ILL. COMP. STAT.

13   5/13(D) (2010).  The statute further provides:

14          [I]f the party bringing the action neither knew nor in the exercise of

15          reasonable diligence should have known of any alleged violation . . . which is

16          the basis for the action, the 3 year period provided herein shall begin to run

17          upon the earlier of:

18          (1)  the date upon which the party bringing the action has actual

19                 knowledge of the alleged violation of this Act; or

20          (2)  the date upon which the party bringing the action has notice of facts

21                 which in the exercise of reasonable diligence would lead to actual

22                 knowledge of the alleged violation of this Act; but in no event shall

23                 the period of limitation so extended be more than 2 years beyond the

24                 expiration of the 3 year period otherwise applicable.

25   *Id*.  In other words, the three-year limitations period set out in the statute may be

26   lengthened by equitable tolling up to an additional two years, but in no event may a

27   claim be asserted more than five years after the date of sale (the repose period).  *See*

28   *Allstate*, 2011 WL 5067128, at *8-9.

1    Accordingly, Sterling's claims with respect to three of its four purchases are

2  time-barred by the statute's five-year period of repose.[64]  More specifically, Sterling

3  filed its complaint on March 23, 2011, and alleges that it made three of its four MBS

4  purchases before March 23, 2006 (two were made in 2004 and one in 2005).

5  *Sterling* Compl. ¶ 6.  Because those purchases were made more than five years

6  before the Complaint was filed, the common law claims associated with those

7  purchases are time-barred by the repose period and must be dismissed with

8  prejudice.  *See Allstate*, 2011 WL 5067128, at *13.

9    Sterling's claims based on its one remaining purchase—made on November

10  6, 2006 and thus within the five-year repose period—are nevertheless barred by the

11  ISL's three-year statute of limitations.  Sterling bears the burden of pleading facts

12  sufficient to invoke the equitable tolling exception in the statute—in other words,

13  sufficient to lengthen the period within which a claim may be brought beyond three

14  years from the date of sale.  *See Rein v. David A. Noyes & Co.*, 595 N.E.2d 565, 568

15  (Ill. App. Ct. 1992) (equitable tolling provision of 815 ILL. COMP. STAT. 5/13(D)

16  may extend the three-year limitations period by up to two years, "provided that

17  plaintiffs properly allege and demonstrate the requisite grounds"); *Basil v.*

18  *Leidesdorf*, 713 F. Supp. 1194, 1201 (N.D.Ill. 1989) (Illinois tolling principles

19  require a plaintiff to plead both due diligence and fraudulent concealment).  Here,

20  Sterling has alleged no facts whatsoever regarding when it discovered the alleged

21  violations, any efforts undertaken to discover the alleged violations, or why the

22  exercise of reasonable diligence would not have led to discovery of the violation

23  within three years of its purchases.  Nor does Sterling allege anything remotely

24  resembling fraudulent concealment by any of the Defendants.[65]  Given Sterling's

25  _____

26  [64] Because Sterling has not borne its burden of pleading facts sufficient to invoke the
equitable tolling exception in Section 13(D) of the ISL, its claims based on these
three purchases would be barred even under the three-year limitations period.  *See*

27  *infra* at 61-62.

28  [65] The Complaint does not mention 815 ILL. COMP. STAT. 5/13(D) at all, let alone
attempt to invoke the equitable tolling provisions of the statute.

1    failure to plead any facts sufficient to invoke the statute's equitable tolling

2    provision, Sterling's claims based on its November 2006 purchase are time-barred

3    by the plain language of 815 ILL. COMP. STAT. 5/13(D) because it did not file its

4    action until more than three years later (March 23, 2011).[66]

5        **B.    California's Statute Of Limitations, Applied Via Illinois'
             Borrowing Statute, Bars Sterling's Claims.**
6

7        Regardless of whether Sterling's primary-liability claims are barred by

8    Illinois' limitations period, its claims are barred as a result of application of Illinois'

9    borrowing statute.[67]  Illinois' borrowing statute provides:

10

11   [66] Even if Sterling had invoked the statute's equitable tolling provisions, its claims
     based on the November 6, 2006 purchase nevertheless would be barred under the
12   statute's inquiry notice standard.  Sterling reasonably should have discovered the
     facts underlying its claims no later than January 2008—more than three years before
13   the filing of this Complaint.  *See Stichting*, 2011 WL 3558173, at *8.  In this regard,
     the Countrywide Defendants acknowledge, but respectfully disagree with, this
14   Court's interpretation in *Allstate* of 815 ILL. COMP. STAT. 5/13(D) as requiring a
     plaintiff to have had actual knowledge of facts that should have triggered an
15   investigation that in turn would have unearthed actual knowledge of a violation.  *See
     Allstate*, 2011 WL 5067128, at *14.  The Countrywide Defendants respectfully
16   submit that the standard applicable to the Illinois Securities Law's limitation
     provision is "inquiry notice" such that "[t]he statute of limitations be[gins] to run
17   when [plaintiff] ha[s] notice of suspicious activity so that a reasonable person would
     investigate, even if he was not aware of the full extent of the injury."  *Grumhaus v.
18   Comerica Secs. Inc.*, 2003 WL 21504185, at *2-3 (N.D. Ill. June 30, 2003); *accord
     Lucas v. Downtown Greenville Investors Ltd. P'ship*, 671 N.E.2d 389, 396 (Ill. App.
19   Ct. 1996) (plaintiffs who received memoranda containing terms contrary to their
     understanding of agreement were on notice of a "potential ambiguity" and, had they
20   exercised reasonable diligence, would have learned of misrepresentation).
     [67] Because Sterling's claims are barred under the applicable Illinois statute of
21   limitations, the Court need not apply any other jurisdiction's limitations law that
     otherwise would be borrowed under Illinois' borrowing statute.  *See Kalmich v.
22   Bruno*, 404 F. Supp. 57, 68 (N.D. Ill. 1975), *rev'd on other grounds*, 553 F.2d 549
     (7th Cir. 1977) (where Illinois statute of limitations bars the claim, the borrowing
23   statute is inapplicable); *Newell*, 758 N.E.2d at 908 ("[A]n action cannot be
     maintained in the forum state if it is barred by *either* the statute of limitations of the
24   forum state *or* by a statute of limitations that the forum state has 'borrowed' from
     another jurisdiction in accordance with the forum state's 'borrowing statute'")
25   (emphasis added); Restatement (Second) of Conflict of Laws § 142 (1971), cmt. f
     ("Borrowing statutes are usually held to provide that a suit will be barred if it would
26   be barred either under the statute of limitations of the state referred to by the
     forum's borrowing statute or under the local statute of limitations of the forum.").
27   Nevertheless, Sterling's claims are analyzed herein under Illinois' borrowing statute
     in the event that this Court determines that claims based on any of Sterling's four
28   purchases are not barred by Illinois' own statute of limitations.

                                      62

1  When a cause of action has arisen in a state or territory out of this State, or in

2  a foreign country, and, by the laws thereof, an action thereon cannot be

3  maintained by reasons of the lapse of time, an action thereon shall not be

4  maintained in this State.

5  735 ILL. COMP. STAT. 5/13-210 (2010).  Pursuant to the borrowing statute, Sterling's

6  claims arose in California and are thus barred by the applicable three-year statute of

7  limitations.

8                            **1.      California's Statute of Limitations Applies.**

9         The requirements for application of Illinois' borrowing statute are satisfied:

10 (i) no party resides in Illinois and (ii) the cause of action arose outside of Illinois—

11 namely, in California for the primary-liability claims.  *See LeBlanc v. G.D. Searle &*

12 *Co.*, 533 N.E.2d 41, 42 (Ill. App. Ct. 1988) (setting out requirements for application

13 of borrowing statute).

14                           **a.      No Party Resides In Illinois.**

15        Here, no party resides in Illinois.  "For purposes of the Illinois borrowing

16 statute, a corporation is considered a resident only of the state in which it is

17 incorporated; it is not considered a resident of the state in which it has its principal

18 place of business or the state where it is licensed to do business."  *Employers Ins. of*

19 *Wausau*, 723 N.E.2d at 693; *accord LeBlanc*, 533 N.E.2d at 42-43 (Illinois courts

20 have expressly rejected the approach of some other states that a corporation's

21 principal place of business can suffice to establish residency).  Sterling is "a federal

22 savings bank chartered under the laws of the United States," *Sterling* Compl. ¶ 19,

23 and is thus not incorporated in Illinois or any other state.  *See* 12 U.S.C. §

24 1464(a)(1) (2006).  As such, Sterling is not a resident of Illinois for purposes of the

25 borrowing statute.  Nor are any of the Countrywide Defendants residents of Illinois.

26 Instead, they are corporations incorporated in Delaware, New York or California—

27 none in Illinois.  *See Sterling* Compl. ¶¶ 20-26.[68]  Because none of the parties

28 _____

[68] The remaining defendants are also not residents of Illinois for purposes of the

1   resides in Illinois, the first requirement for application of the borrowing statute is

2   satisfied.

3              **b.      California Has The Most "Significant Relationship"
                         To This Action.**

4

5              When determining where a cause of action arose for purposes of Illinois'

6   borrowing statute, Illinois courts apply the Restatement (Second) of Conflicts of

7   Laws §148 (1971) to determine what state "has the most significant relationship to

8   the occurrence and the parties."  Restatement (Second) of Conflict of Laws § 145

9   (1971); *Atchinson, Topeka & Santa Fe Ry. Co. v. Chevron U.S.A., Inc.*, 1985 WL

10  2265, at *4 (N.D. Ill. Aug. 5, 1985) ("Illinois courts now use the 'most significant

11  relationship test' to determine where the cause of action arose.").  The specific

12  factors considered under § 148 are set forth *supra*, at 53.  Illinois courts do not

13  resolve choice of law questions under § 148 by merely counting contacts, but

14  instead consider "the interests and public policies of potentially concerned states"

15  and "the manner and extent of such policies as they relate to the transaction."

16  *Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 716 N.E.2d 829, 837 (Ill. App. Ct.

17  1999); *accord Townsend v. Sears, Roebuck and Co.*, 879 N.E.2d 893, 905 (Ill.

18  2007).  Contrary to the presumption applicable in tort cases generally that the place

19  of injury controls, *see Townsend*, 879 N.E.2d at 903, "in cases of fraud or

20  misrepresentation . . . the place of loss is less important than the place the defendant

21  allegedly made the misrepresentations," *First Nat'l Bank of Boston*, 702 F. Supp. at

22  175.

23             For the same reasons set forth above with respect to the *Bankers* action,

24  California has the most "significant relationship" to the parties and occurrences in

25  borrowing statute.  Bank of America Corp., NB Holdings Corp., and The Bank of
    New York Mellon Corp. are incorporated under the laws of Delaware.  *Sterling*
26  Compl. ¶¶ 28, 30-31; Bank of America Corp., Annual Report (Form 10-K), at 1
    (Feb. 25, 2011), RJN Ex. 117; The Bank of New York Mellon Corp., Annual Report
27  (Form 10-K), at 4 (Feb. 28, 2011), RJN Ex. 118.  BAC Home Loans Servicing, L.P.
    (formerly known as Countrywide Home Loans Servicing, L.P.) is alleged to be a
28  limited partnership organized under the laws of Texas.  *Sterling* Compl. ¶ 29.

1   *Sterling's* primary-liability claims by virtue of being "the place where the

2   defendant[s] made the representations" (Restatement § 148(2)(c)).[69]  *See supra*, at

3   55-58.  Like the nearly identical *Bankers* claims, the primary thrust of the *Sterling*

4   complaint (which was drafted by the same lawyers) is that Countrywide allegedly

5   misstated the riskiness and credit quality of the mortgage loans backing the MBS

6   certificates in which Sterling invested.  In short, because (i) California was the hub

7   of the Countrywide Defendants' MBS activity and the location where the offering

8   materials alleged to be misleading were negotiated, approved, and issued,[70] (ii) the

9   Sterling complaint focuses on the allegedly systemic conduct of Countrywide

10   occurring almost exclusively in California and the complaint's allegations relate

11   only minimally to the actions of Sterling, and (iii) there is no allegation that the

12   misrepresentations at issue were directed to Sterling or to Illinois in particular, the

13   claims arose in California for purposes of Illinois' borrowing statute and

14   California's limitations periods therefore control.

15

16   [69] Like the complaint in *Bankers*, the *Sterling* complaint contains no allegations
     regarding "where the plaintiff received the representations," Restatement §

17   148(2)(b), or "where the plaintiff acted in reliance upon the defendant[s']
     representations," Restatement § 148(2)(a). Given that there may be any number of

18   intermediaries involved in the purchases at issue and any number of alleged acts in
     reliance taking place in difference locations, it cannot be assumed that any reliance

19   occurred in Illinois simply because Sterling has its place of business there, or that
     this factor ought to predominate in the analysis. In addition, as to § 148(2)(d),

20   although Sterling's principal place of business is in Illinois, its relationship to
     Illinois—as a nationally chartered bank—is not as strong as it would be were it also

21   incorporated in Illinois. *Sterling* Compl. ¶ 19. The Countrywide Defendants have
     significant ties to California given that plaintiff concedes their primary places of

22   business are in California. *Id.* ¶¶ 20-26. Thus, factor (d) is essentially neutral. *See
     Townsend*, 879 N.E.2d at 906 ("domicile, residence, place of incorporation, and

23   place of business of the parties" factor "a wash" where plaintiffs resided in
     Michigan and defendant was headquartered in Illinois). Factors (e) and (f) do not

24   apply to the allegations at issue.
     [70] As in *Bankers*, the "deceptive scheme" alleged by Sterling is based on decisions

25   and misrepresentations allegedly made by Countrywide personnel that worked out
     of Countrywide's California offices. *See Sterling* Compl. ¶ 10; *id.* ¶ 83 ("internal

26   documents and its employees' admissions provide evidence that, *under
     management's direction*, approval of 'exceptions' was the rule"); *id.* ¶ 93

27   ("*Countrywide executives* knew that risky loans that were routed out of the normal
     underwriting process (because they violated underwriting standards) were regularly

28   being approved, even when they had been previously declined") (emphases added).

65

2. **California's Statute Of Limitations Bars Sterling's Claims.**

Sterling's claims are barred by California's three-year statute of limitations for fraud claims and two-year statute of limitations for negligent misrepresentation claims, applicable through Illinois' borrowing statute. *See supra*, at 58-59.  The *Sterling* complaint was filed *after* the filing of the virtually identical *Stichting* complaint that the Court has already found time-barred under California law. Because a reasonable investor in Countrywide MBS would have been alerted to alleged "wrongdoing in Countrywide's loan origination business" no later than February 2008, three years before the filing of *Stichting* and more than three years before the filing of *Sterling*, Sterling's fraud and negligent misrepresentation claims are untimely under California law and must be dismissed with prejudice. *Stichting*, 2011 WL 3558173, at *12.

## VIII. SEALINK DOES NOT HAVE ARTICLE III STANDING, AND ALL CLAIMS IN *SEALINK* IN ANY EVENT ARE TIME-BARRED.

Sealink's claims against the Countrywide Defendants are barred for two reasons:  (1) Sealink does not have Article III standing to bring such claims; and (2) those claims are barred by the applicable statute of limitations.  Sealink alleges that it "is a company incorporated under the laws of Ireland that was established to receive, hold and manage RMBS purchased by [two] special purpose vehicles formerly sponsored by Sachsen LB ('the SPVs')." *Sealink* Compl. ¶ 12.  Sachsen LB was one of a number of large, state-owned German "Landesbanks" until it failed in April 2008 and was acquired by Landesbank Baden Wurttemburg ("LBBW"). RJN Ex. 114 at 4-5 (2007 Sachsen LB Annual Report).  Between 2005 and 2007 (from four to six years before Sealink filed its Complaint), while sponsored by Sachsen LB, the two SPVs allegedly purchased 31 MBS (issued in 30 Offerings) that certain Countrywide Defendants either issued or underwrote. *See Sealink* Compl. ¶¶ 2, 33.  On September 29, 2011, Sealink brought these claims in New York state court alleging four causes of action:  common-law fraud, fraudulent

1   inducement, aiding and abetting fraud, and negligent misrepresentation.  The claims

2   are based on allegations that the Countrywide Defendants' offering materials

3   misrepresented the characteristics and risks of the MBS.[71]  *See id.* ¶¶ 1, 128–167.

4   Sealink does not have standing to bring these claims, and in any event the claims are

5   time-barred under the applicable German statute of limitations, which applies here

6   under New York's borrowing statute.  N.Y. C.P.L.R. § 202.

7        **A.    <u>Sealink Lacks Standing</u>.**

8        To satisfy standing requirements under Article III of the U.S. Constitution, a

9   plaintiff must show that it has suffered an "injury in fact" that is "fairly traceable to

10  the challenged action of the defendant."  *Friends of the Earth, Inc. v. Laidlaw Envtl.*

11  *Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  As this Court itself has noted, the

12  absence of injury can be "addressed as a standing inquiry."  *In re Countrywide Fin.*

13  *Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1168 (C.D. Cal. 2008); *accord Siemers v.*

14  *Wells Fargo & Co.*, 2006 WL 3041090, at *7 (N.D. Cal. Oct. 24, 2006) ("[w]ithout

15  the requisite demonstration of an injury, none of the named Plaintiffs may seek relief

16  on behalf of himself or any other member of the class.") (citation omitted).  A

17  plaintiff must assert its own legal rights, and not the rights of others, in order to have

18  standing to bring a claim.  *See e.g., Warth v. Seldin,* 422 U.S. 490 (1975) (explaining

19  that plaintiff "generally must assert his own *legal rights* and interests, and cannot

20  rest his claim to relief on the *legal rights* or interests of third parties") (emphasis

21  added); *Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 263 (1977)

22  ("In the ordinary case, a party is denied standing to assert the rights of third

23  persons") (citation omitted); *Sec'y of State of Md. v. Joseph H. Munson Co.,* 467

24  U.S. 947, 955 (1984) (a plaintiff "cannot rest his claim to relief on the legal rights or

25  interests of third parties") (citation omitted).

26  ---

[71] Sealink's claims are now before this Court following (i) the Countrywide
Defendants' October 6, 2011 removal of the case to the Southern District of New

27  York, and (ii) the JPML's October 27, 2011 transfer of this case to the *Countrywide
MBS MDL.*  Although Sealink moved to remand on November 7, 2011, it withdrew

28  that motion on November 18, 2011.  *See* Dkt. No. 26.

Publicly available, judicially-noticeable documents show that Sealink has not suffered any injury in connection with holding the MBS at issue, nor could it, due to guarantees extended to it by several German banks in connection with its purchase of the MBS.  Specifically, these documents show the following:

• *German bank Sachsen LB financed the SPVs that purchased the MBS.* Sachsen LB initially sponsored the two SPVs (known as Ormond Quay and Saschen Funding I) that purchased the MBS at issue here—*i.e.*, this German bank supplied the assets with which these two SPVs purchased the MBS.  *See* RJN Ex. 114 at 21 (2007 Sachsen LB Annual Report).  In 2007, after the onset of the global financial markets crisis, it "decided to provide support to these [SPVs]" in view of "the withdrawal of investors from the funding of the conduit structures and the resulting drop in the price of positions."  *Id.* at 44.  v That support "led to a significant strain on liquidity," and Sachsen LB was then forced to seek liquidity from other German banks.  "It was only through the bank pooling agreement among the Landesbanks and the investment in Sachsen LB by [Landesbank Baden-Wurttemberg ('LBBW')] that the funding . . . could be stabilized and secured for the long term."  *Id.*

• *When German bank LBBW acquired Sachsen LB, the SPVs' MBS portfolios were transferred to Sealink.*  LBBW acquired most of Sachsen LB's assets in or about December 2007 because Sachsen LB was "heavily impacted by the effects of the subprime crisis."  *Id.* at 10.  As a result, Sachsen LB transferred the assets of the SPVs (including the MBS at issue here) into Sealink—"a new special purpose entity financed by LBBW" and by other German Landesbanks.  *Id.* According to LBBW's June 30, 2010 publicly-filed Financial Stability Forum Report, "structured portfolios Ormond Quay and Sachsen Funding I [which purchased the MBS at issue here] were excluded from [LBBW's] acquisition" of Sachsen LB, and "transferred to the Irish special purpose vehicle, Sealink Funding Ltd., established in 2008."  RJN Ex. 115 at 20 (Financial Stability Forum Report).

• *German entities will bear any and all losses arising from the portfolio*

68

1   *assets.*  Sealink's publicly-filed 2009 financial statements disclose that a group of

2   senior lenders, all German Landesbanks, and a junior lender, LBBW, have agreed to

3   cover any and all losses incurred on the MBS at issue here.  Those financial

4   statements state that "the funding provided by the Senior and Junior lenders is

5   limited recourse in nature, . . . with the repayment of loan principal dependent

6   entirely on the returns generated by [Sealink's] portfolio.  ***Therefore all losses made***

7   ***by [Sealink] will ultimately be borne by the loan holders.***"  RJN Ex. 116 at 7, 9,

8   and 10 (2009 Sealink Abridged Financial Statements) (emphasis added.)

9   •       *The German bank LBBW and a German state entity have provided*

10  *Sealink with guaranties against any losses on these MBS.*  Sealink is not only

11  structured so that the German Landesbank lenders will incur all losses resulting

12  from diminished cash flows (if any) from the MBS, but LBBW and Germany's Free

13  State of Saxony are guarantors of "all indirect and direct risk in relation to payment

14  defaults on the portfolio assets."  *Id.* at 7, 11; *see also* RJN Ex. 115 at 4 (Financial

15  Stability Forum Report).[72]  In other words, because of Sealink's financial structure

16  and the guarantees it has received from LBBW and Saxony, German Landesbanks

17  and the Free State of Saxony will incur any and all losses here.  Thus, according to

18  Sealink's own public reports, it has admitted that its lenders and guarantors would

19  incur any economic losses that may be associated with the Countrywide MBS at

20  issue.  Because Sealink itself will incur no losses, its claims must be dismissed with

21  prejudice for lack of standing.

22

23

---

24  [72]  *See also* RJN Ex. 115 at 20 (Financial Stability Forum Report) ("The Free State of Saxony has issued a first loss guarantee in the amount of EUR 2.75 billion to

25  cover losses arising from the Sealink portfolio.  Losses relating to former Sachsen Funding I assets were covered by LBBW up to an amount of EUR 71.3 million (the

26  "Special First Loss Guarantee").  Since June 30, 2009, defaults exceeding the guarantee provided by the Free State of Saxony up to an amount of EUR 6 billion

27  have been covered by the risk shield of the State of Baden-Wurttemberg.  All other losses beyond this amount would be assumed predominantly by the other

28  Landesbanks involved.").

69

### B.    In Any Event, Sealink's Claims Are Time-Barred Under Germany's Statute Of Limitations Law.

### 1.    German Law Applies Under New York's Borrowing Statute.

Even if Sealink had standing to pursue its claims, which it does not, its primary-liability claims would be time-barred under German law.  Under New York's borrowing statute, a non-New York plaintiff's claim that accrues outside of New York must "be timely under the limitations periods of *both* New York and the jurisdiction where the cause of action accrued." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528 (1999) (emphasis added).[73]  As this Court has held, "[a] cause of action 'accrues where the injury is sustained rather than where the defendant committed the wrongful acts.'" *Allstate*, 2011 WL 5067128, at *8 (quoting *Gordon & Co. v. Ross*, 63 F. Supp. 2d 405, 408 (S.D.N.Y. 1999)).  Although a plaintiff often sustains economic injuries at its principal place of business, that "need not necessarily be the situs of the economic impact of the fraud, and the court can properly consider all relevant factors in determining where the loss is felt." *Lang v. Paine, Webber, Jackson & Curtis, Inc.,* 582 F. Supp. 1421, 1425-26 (S.D.N.Y. 1984) ("[T]he place of injury in this case was Massachusetts, the situs of Lang's American bank account, his brokerage account, and the Paine Webber office through which all trades were placed, and not Ottawa, which is his residence."); *accord Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 369 (S.D.N.Y. 2011) (economic injury may occur at a place other than the plaintiff's residence "where a plaintiff maintains a separate financial base and where the impact of the financial loss is felt at that location.") (internal citations, quotation marks, and alterations omitted); *Epstein v. Haas Sec. Corp.*, 731 F. Supp. 1166, 1178-79 (S.D.N.Y. 1990) (finding that even though plaintiffs resided in Pennsylvania and New Jersey, New

---

[73]  *See* N.Y. C.P.L.R. § 202 ("An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.").

1    York was the "situs of the injury for purposes of the borrowing statute") .

2           Here, the relevant factors all show that any injury would be incurred (if

3    anywhere) in Germany.  Sealink is an SPV that holds MBS purchased by two other

4    SPVs that had been created to invest the assets of Sachsen LB (a German bank).

5    Sealink continues to serve as a mere conduit for several German Landesbanks that

6    hold the financial interest in its assets.  More specifically, when German Bank

7    LBBW acquired Sachsen LB, it and a group of senior German Landesbanks

8    assumed any and all losses arising from the assets in Sealink's portfolio.  In

9    addition, LBBW and the Free State of Saxony have guaranteed the performance of

10   those assets, and will incur any losses associated with them.  Accordingly, any

11   injury in this case would be felt in Germany, and New York's borrowing statute

12   would therefore apply German limitations rules to Sealink's four common-law tort

13   claims.

14                  **2.     Germany's Three-Year Limitations Period Bars**
                    **Sealink's Claims.**
15

16          Germany's statute of limitations for tort claims is three years.  *See*

17   Declaration of Thomas M. Buhl ("Buhl Decl.)[74] ¶ 4 (citing BGB § 195).  This

18   limitations period begins to run at the end of the year in which the claim accrues.

19   *Id.* ¶ 4 (citing BGB § 199).  Under German law, a claim accrues when plaintiff

20   either (i) gained knowledge of the circumstances and party giving rise to the claim,

21   or (ii) would have acquired such knowledge but for its own gross negligence.  *Id.*

22   Here, such knowledge would have been acquired by any reasonable investor no later

23   than late 2007.

24          More specifically, the gravamen of Sealink's primary-liability claims is that

25   _____

26   [74] Under Federal Rule of Civil Procedure 44.1, the Countrywide Defendants hereby
     give notice of their intent to raise an issue about German law.  *See* Fed. R. Civ. P.
     44.1; *see also Alperin v. Vatican Bank*, 2006 WL 1663847, at *1 (N.D. Cal. June 15,
27   2006) (considering declaration concerning foreign law issue pursuant to Fed. R. Civ.
     P. 44.1).

28
                                         71

1   Countrywide "abandon[ed] its own guidelines for loan origination and

2   underwriting." *See, e.g.*, Compl. ¶ 82.  In *Stichting*, where "the gravamen of

3   Plaintiff's claim" likewise was "that Countrywide wholly abandoned its

4   underwriting standards," this Court found that "[t]he press and numerous widely

5   reported lawsuits had made exactly this allegation by the end of 2007."  2011 WL

6   3558173, at *9.  In that regard, the Court considered three October and November

7   2007 complaints against the Countrywide Defendants:  (i) an October 30, 2007

8   putative class-action complaint, *Argent Classic Convertible Arbitrage Fund L.P. v.*

9   *Countrywide Fin. Corp., et al.* (C.D. Cal., No. 07-CV-07097) ("*Argent*"), alleging

10  violations of the 1934 Act and various other claims; (ii) a November 14, 2007

11  putative class-action complaint in *Luther*, alleging violations of the 1933 Act; and

12  (iii) a November 26, 2007 shareholder derivative complaint, *Ark. Teacher Ret. Sys.,*

13  *et al. v. Mozilo* (C.D. Cal., No. 07-CV-06923) ("*Arkansas Teacher*"), alleging

14  violations of the 1934 Act and various other claims.[75]

15      Each of these complaints alleged that Countrywide misrepresented the quality

16  of its MBS and/or the loans backing its MBS, and their allegations are virtually

17  identical to Sealink's allegations.  The following chart lists just a few examples of

18  _____

19  [75] The *Luther*, *Argent,* and *Ark. Teachers* complaints are attached as Exhibits 71, 78, and 89-91 to the RJN.  These complaints followed even earlier lawsuits that had made substantially similar allegations, including a consumer class action alleging

20  that the Countrywide Defendants were making unsuitable loans to borrowers.  *See Fitzhugh v. Countrywide Fin. Corp.*, No. 04-6830 B (D.C. Super. Ct. Sept. 13,

21  2004) (alleging that Countrywide perpetrated "a fraud and predatory lending conspiracy . . . designed to deceive the Federal Housing Administration ('FHA'),

22  Fannie Mae, investors and Plaintiffs") (RJN Ex. 92).  Likewise, as the secondary mortgage market and credit markets seized up and Countrywide's stock price

23  dropped sharply beginning in the third quarter of 2007, additional plaintiffs in a series of putative securities class action complaints asserted similar fraud claims

24  about Countrywide's origination of "risky" loans, the "erosion of underwriting guidelines" at Countrywide, the "rapidly deteriorating performance of its loan

25  portfolio and securities," its supposedly "shocking" and "unexpected" disclosures, and its allegedly "knowing" or "reckless" misstatements regarding its lending

26  practices. *See Saratoga Advantage Trust v. Countrywide Fin. Corp.*, No. 07-CV-06635 (C.D. Cal. Oct. 11, 2007) (RJN Ex. 77); *Norfolk County Retirement Sys. v.*

27  *Countrywide Fin. Corp.*, No. 07-CV-05727 (C.D. Cal. Aug. 31, 2007) (RJN Ex. 76); *Pappas v. Countrywide Fin. Corp.*, No. 07-CV-05295 (C.D. Cal. Aug. 14, 2007)

28  (RJN 75).

this overlap:

| ***Sealink* Allegations** | **Allegations in the *Argent*, *Luther*, and *Arkansas Teacher* Complaints** |
|---|---|
| "Countrywide 'developed a systematic pattern and practice of abandoning its own guidelines for loan origination and underwriting . . . .'" (*Sealink* Compl. ¶ 82.) | "While the Company consistently touted its underwriting, Defendants completely abandoned any pretense of doing their job in this regard." (*Ark. Teacher* Compl. ¶ 100.) |
| | "As a result [of omissions and or misrepresentations in the Registration Statements], the Certificates sold to plaintiff and the Class were much riskier than represented in the Registration Statement." (*Luther* Compl. ¶ 8.) |
| | Defendants "did not follow Countrywide's reportedly strict underwriting and loan-origination practices. . . ." (*Argent* Compl. ¶ 4.) |
| "Countrywide developed a systematic pattern and practice of . . . knowingly lending to borrowers who could not afford to repay the loans. . . or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending that Countrywide claimed to use." (*Sealink* Compl. ¶ 82.) | "Countrywide has also regularly made significant amounts of subprime loans to individuals with minimal or no documentation of income, employment or significant assets." "Defendants . . . made a material portion of Countrywide loans with little, if any, supporting documentation, such that Countrywide had no way of confirming the credit worthiness of many loan applicants." (*Argent* Compl. ¶¶ 2, 4.) |
| | "The Registration Statements omitted and/or misrepresented that the sellers . . . were issuing many of the mortgages to borrowers who . . . did not have the income required buy the lenders' own guidelines to afford the required mortgage payments." (*Luther* Compl. ¶ 7.) |

73

| *Sealink* Allegations | Allegations in the *Argent*, *Luther*, and *Arkansas Teacher* Complaints |
|---|---|
| "Countrywide . . . allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors . . . ." (*Sealink* Compl. ¶ 64.) | "Countrywide Home Loans was granting exceptions to 'standard underwriting practices,' regardless of whether 'compensating factors' existed." (*Luther* Compl. ¶ 53.) |
| | "Countrywide pushed one goal above all others – originating loans and selling them to the secondary markets as fast as possible, regardless of the quality of the loans, the suitability of the products for the borrower at issue, or the number and magnitude of 'exceptions' to Countrywide's supposed underwriting standards that were necessary to place the loans with the borrowers." (*Ark. Teachers* Compl. ¶ 117.) |

Additional examples of the substantially identical allegations in the *Sealink* complaint and complaints filed in 2007 are listed in the Appendix at 15.

At the same time that these allegations were being made in these complaints, the media reported that Countrywide "intended to wring maximum profits out of the mortgage lending boom no matter what it cost borrowers."  Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. Times, August 26, 2007, § 3 (Money and Business/Financial Desk) at 1 (RJN Ex. 112); *accord* E. Scott Reckard, *Prime Loans Seeing Rise in Defaults*, L.A. Times, December 28, 2007, § C (Business) at 1 (RJN Ex. 113).)  As a result, the media alleged, Countrywide's "[d]elinquency and foreclosure rates have soared."  Michael A. Hiltzik, *Countrywide's Confident Tone Turned to Crisis*, L.A. Times, September 3, 2007, § C (Business at 1 (RJN Ex. 111).

Any investor reasonably should have gained knowledge of the information underlying these allegations and media reports absent their own gross negligence. As this Court held in *Stichting*, "a reasonably diligent investor should have been

74

1   aware of at least some . . . of [t]he[se] allegations, [which] involve the same

2   underlying conduct (abandonment of underwriting standards) and the same

3   fraudulent purpose (concealing true loan quality from the market so that

4   Countrywide could continue to increase market share, sell RMBS, and inflate its

5   stock price) as alleged here." *Stichting*, 2011 WL 3558173, at *8, 10.  For these

6   reasons, the Court in *Stichting* concluded "that public press reports and earlier-filed

7   lawsuits placed Plaintiff on notice regarding the scienter element of its claim."  *Id.* at

8   *11; *accord Allstate*, 2011 WL 5067128, at *11 ("[A] sufficient inference of

9   scienter exists to support the allegation that Countrywide knew that it had

10  abandoned its underwriting standards.").

11       So too here.  These press reports and the claims asserted by numerous other

12  investors by late 2007—which were factually and legally identical to Sealink's

13  primary-liability claims here—are "near dispositive" proof that by late 2007 Sealink

14  as well should have gained knowledge of the circumstances that it contends support

15  its fraud and negligent-misrepresentation claims.  *See In re Am. Funds Sec. Litig.*,

16  556 F. Supp. 2d 1100, 1109 (C.D. Cal. 2008).  Under German law, the limitations

17  period on those claims thus began to run on December 31, 2007 (*i.e.*, the end of the

18  year in which the claims accrued), and then expired on December 31, 2010, three

19  years later and almost ten months before this suit was filed.  *See* Buhl Decl. ¶ 4.

20  Thus, Sealink's September 29, 2011 complaint is untimely, and its claims against

21  the Countrywide Defendants (in the first four counts of its complaint) should be

22  dismissed with prejudice.

### 3.   Sealink's Negligent Misrepresentation Claim Is Also Barred Under New York Law.

25       Sealink's negligent misrepresentation claim (Count IV) is also time-barred

26  under New York law.  Under the New York borrowing statute, a claim must be

27  timely under both the limitations period applicable in New York as well as the

28  limitations period of the jurisdiction in which the claim accrued.  *See* N.Y. C.P.L.R.

75

§ 202.  In New York, a negligent misrepresentation claim not involving fraud is subject to a three-year statute of limitations, which runs from the date the alleged misstatement was made.  *See* N.Y. C.P.L.R. § 214(4); *Colon v. Banco Popular N. Am.*, 59 A.D.3d 300 (N.Y.A.D. 1st Dep't 2009); *HSBC Bank USA v. Bond, Schoeneck & King, PLLC*, 16 Misc. 3d 813, 834 (N.Y. Sup. Ct. 2007), rev'd on other grounds, 55 A.D.3d 1426 (N.Y.A.D. 4th Dep't 2008); *IT Corp. v. Ecology & Envt'l Eng'g*, 275 A.D.2d 958 (N.Y.A.D. 4th Dep't 2000); *Ambassador v. Euclid*, 1984 WL 341, at *4 n.7 (S.D.N.Y. May 24, 1984).  Because Sealink's negligent misrepresentation claim "expressly disclaims any claim of fraud or intentional misconduct," *Sealink* Compl. ¶ 153, that three-year limitations period applies here. *Cf. Stichting*, 2011 WL 3558173, at *13 n.11 (applying two-year limitations period to negligent misrepresentation claim under California law, because plaintiff "expressly disclaimed all of its scienter allegations with respect to its negligence-based claims").[76]  And because all of the alleged misstatements occurred before September 29, 2008 (*i.e.*, more than three years before the Complaint was filed), Sealink's negligent misrepresentation claim is time-barred under New York law.

## CONCLUSION

For all the reasons set forth above, the Countrywide Defendants respectfully request that the Court dismiss all time-barred claims in *Putnam*, *AFAC*, *Western & Southern*, *National Integrity*, *Bankers*, *Sterling*, and *Sealink* with prejudice.

Dated:  December 7, 2011

**GOODWIN PROCTER LLP**

/s/ Brian E. Pastuszenski_____
Brian E. Pastuszenski (*pro hac vice*)
Lloyd Winawer (State Bar No. 157823)
Inez H. Friedman-Boyce (*pro hac vice*)
Brian C. Devine (State Bar No. 222240)

*Counsel for the Countrywide Defendants*

---

[76] *See Sealink* Compl. ¶ 153 ("Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein, except any allegations that the Countrywide Defendants made any untrue statements and omissions intentionally or recklessly.").