1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10

11  In re COUNTRYWIDE FINANCIAL         Case No. 2:11-ML-02265-MRP
12  CORP. MORTGAGE-BACKED               (MANx)
    SECURITIES LITIGATION
13                                      **ORDER RE MOTIONS TO**
                                        **DISMISS**
14
15
16
17
18
19
20
21  WESTERN AND SOUTHERN LIFE           Case No. 2:11-cv-07166-MRP
22  INSURANCE COMPANY, *et al.*,        (MANx)
23              Plaintiffs,
        v.
24
    COUNTRYWIDE FINANCIAL
25  CORPORATION, *et al.*
26              Defendants.
27
28

1
2

NATIONAL INTEGRITY LIFE
INSURANCE COMPANY,

Case No. 2:11-cv-09889-MRP
(MANx)

3

Plaintiff,

4

v.

5

COUNTRYWIDE FINANCIAL
CORPORATION, *et al.*

6

Defendants.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   INTRODUCTION & BACKGROUND

This Order concerns Defendants' motions to dismiss the related *Western and Southern Life Ins. Co. v. Countrywide Fin. Corp.*, 11-CV-07166-MRP (MANx) ("*Western and Southern*") and *National Integrity Life Ins. Co. v. Countrywide Fin. Corp.*, 11-CV-09889-MRP (MANx) ("*National Integrity*") actions.  *Western and Southern* and *National Integrity* are part of Multidistrict Litigation No. 2265, captioned *In Re Countrywide Financial Corp. Mortgage-Backed Securities Litigation* ("the MDL").  This Order is being released contemporaneously with an omnibus order (the "Omnibus Order") that decides motions to dismiss in five other Countrywide RMBS cases.  No. 11-ML-2265-MRP (MANx).  Like other plaintiffs in Countrywide RMBS cases, the plaintiffs in *Western and Southern* and *National Integrity* allege violations of the Securities Act of 1933 ("the Securities Act"), the Exchange Act of 1934 ("the Exchange Act"), and a number of state laws in connection with their purchase of residential mortgage-backed securities ("RMBS") in offerings structured and sold by several of the defendants.  Specifically, the *Western and Southern* and *National Integrity* plaintiffs ("Plaintiffs") argue that Countrywide Financial Corporation ("CFC"), its subsidiaries, and its former management misrepresented the quality of the underlying loans in the RMBS Certificates[1] that plaintiffs purchased.  They also allege that the defendants misrepresented that they would comply with various policies, best practices, and laws related to the servicing and maintenance of the

---

[1] A Certificate is a document that shows ownership of a mortgage-backed security issued pursuant to a registration statement and prospectus supplement in a public offering.  Each Certificate represents a particular tranche within an offering.  Because "Certificate" refers to the document evidencing ownership of a specific tranche, the Court uses the terms "tranche" and "Certificate" somewhat interchangeably.  An Offering refers to the process by which the Certificates were sold to Plaintiffs.  The Offering Documents refer to the Registration Statements, Prospectuses and Prospectus Supplements, Term Sheets, and other written materials pursuant to which the Certificates were offered.

loans in the Offerings.  Finally, Plaintiffs allege that Bank of America and several related entities are liable as Countrywide's successor.

This Order refers to and draws on the Omnibus Order in its treatment of the plaintiffs' ("Plaintiffs") Securities Act claims and those portions of their Exchange Act and state law claims that relate to the alleged misrepresentations about loan quality and default risk.  In addition to those allegations, Plaintiffs have raised allegations relating to servicing and title transfer that are not raised in the five cases covered by the Omnibus Order and are relatively new to the Court.[2]  The Court writes separately in *Western and Southern* and *National Integrity* in order to treat these novel allegations fairly and to avoid conflating them with the allegations addressed in the Omnibus Order.

The various defendants ("Defendants") filed consolidated motions to dismiss that addressed only issues of standing, timeliness, and jurisdiction.  Those issues were fully briefed and the Court heard extensive oral argument on February 13, 2012.  The Court decides as follows.

## II.   LEGAL STANDARDS

A Rule 12(b)(6) motion to dismiss should be granted when, assuming the truth of the plaintiff's allegations, the complaint fails to state a claim for which relief can be granted.  *See Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).  In deciding whether the plaintiff has stated a claim, the Court must assume the plaintiff's allegations are true and draw all reasonable inferences in the plaintiff's favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the Court is not required to accept as true "allegations that are

---

[2] In two recent MDL decisions, the Court dismissed transfer of title allegations as inadequately pleaded.  *Dexia Holdings Inc. v. Countrywide Fin. Corp.*, No. 2:11-cv-07165-MRP-MAN, ECF No. 177; *Thrivent Fin. for Lutherans v. Countrywide Fin. Corp.*, No 11-cv-07154-MRP-MANx, ECF No. 170.  Because the Court has ordered bifurcated briefing in this case, Defendants' motions to dismiss do not address the adequacy of Plaintiffs' allegations, merely whether they are timely.

merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). A court reads the complaint as a whole, together with matters appropriate for judicial notice, rather than isolating allegations and taking them out of context. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

In general, the Court will apply Ninth Circuit law to federal claims and will apply the state law of the transferor forum, including the transferor forum's choice-of-law rules, to state law claims. *In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1492 (9th Cir. 1985). More detailed choice-of-law analysis is performed on a case-by-case basis below.

## III.   WESTERN AND SOUTHERN

Plaintiffs The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc., (collectively "Western and Southern") allege violations of the Securities Act, the Exchange Act, and Ohio law in connection with Western and Southern's purchase of 36 Certificates. Western and Southern filed its complaint on April 27, 2011. ECF No. 1.[3]

### A.   WESTERN AND SOUTHERN'S SECURITIES ACT CLAIMS ARE TIME-BARRED

Western and Southern filed its complaint on April 27, 2011. Each of the 36 Certificates in this case were offered to the public and purchased before April 27, 2008. CW Mot. App. 10. Western and Southern's Securities Act claims are therefore barred by the three-year statute of repose unless those claims were tolled, as Western and Southern alleges, by a series of state court actions the Court refers to as the *Luther* actions. Western and Southern Opp. at 29–36. *Luther* was a series

---

[3] Throughout this Order "ECF No." generally refers to the docket for the particular case that the Court is discussing in that Section. Exceptions to this general rule are noted by indicating the case name before "ECF No."

of putative class actions filed in state court that alleged violations of Section 11 in connection with 427 Countrywide-sponsored RMBS Offerings.[4]  The Court has previously held that *Luther* will only operate to toll a Section 11 claim with respect to Certificates that a named *Luther* plaintiff actually purchased.  *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157 (C.D. Cal. 2010) ("*Maine State I*"); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-00302-MRP (MANx), 2011 WL 4389689 (C.D. Cal. May 5, 2011) ("*Maine State III*").  The *Luther* plaintiffs only purchased two of the 36 Certificates at issue in this case.  The Securities Act claims are therefore time-barred as to the remaining 34 Certificates for the reasons set out in *Maine State* and the Omnibus Order.  Western and Southern cites a number of cases that have applied *American Pipe* tolling even where the class action plaintiff lacked standing.  Western and Southern Opp. at 33–36.  The Court is aware of the split of authority on this issue and of the decisions that Western and Southern has cited.  Nevertheless, the Court concludes that class action tolling would be inappropriate in this case for the reasons set out in the *Maine State* cases and in the Omnibus Order.

The Court briefly addresses one argument specific to Western and Southern and then turns to the remaining two Certificates.

1.      *Shared Loan Pools Do Not Create Section 11 Standing*

Western and Southern objects that six other Certificates that it purchased are backed by the same loan pools as tranches purchased by the *Luther* plaintiffs.  Western and Southern Opp. at 30.  Though Western and Southern quotes liberally from *Maine State III*, it has ignored the Court's holding in that case.  *Maine State III* considered both constitutional and statutory standing.  With respect to *American Pipe* tolling, the Court was unequivocal.  Only claims for which a *Luther* plaintiff had *statutory* standing, i.e. purchased the same security, are tolled by *Luther*.

---

[4] *Luther v. Countrywide Home Loans Servicing LP*, BC380698 (Cal. Super. Ct. 2007).

4

*Maine State III*, 2011 WL 4389689, at *6 ("[T]o the extent that the Luther state court plaintiffs did not themselves buy particular Certificates included in the SAC, the relevant limitations periods continued to run with respect to those tranches."). This holding was independent of what loan pools backed the Certificates. Next, the Court analyzed the independent requirement of constitutional standing under Article III. There too, it held that interconnectedness between tranches, and specifically the fact that "tranches may share a common pool of mortgages" was "largely irrelevant." *Id.* at 7. As in *Maine State III*, the Court holds that a shared loan pool does not confer standing.

2.    *The Two Certificates that a Luther Named Plaintiff Purchased*

Western and Southern asserts claims based on two Certificates that the *Luther* named plaintiffs also purchased. They are CWL 2006-S9 (A3) and CWALT 2005-26CB (A6). Defendants nevertheless argue that both claims are barred by the three-year statute of repose. The "offering" date for statute of repose purposes is (i) the date of the prospectus supplement for issuers and underwriters, and (ii) the date of the registration statement for directors and signing officers. 17 C.F.R. §§ 230.430B(f)(2). *See also Maine State I*, 722 F. Supp. 2d at 1166, n.8.

The shelf registration statement for CWALT 2005-26CB (A6) was filed April 21, 2005, and the Prospectus Supplement was dated May 24, 2005. CW Mot. App. 10. A plaintiff with standing to represent this tranche joined *Luther* on September 9, 2008 with the filing of the *Luther* amended complaint. CW RJN Ex. 72. The three-year statute of repose had therefore elapsed for all parties before any *American Pipe* tolling could have begun.

The shelf registration statement for CWL 2006-S9 (A3) was dated April 12, 2006 and the Prospectus Supplement became effective December 28, 2006. CW Mot. App. 10. A plaintiff with standing to represent this tranche joined *Luther* on June 12, 2008 with the filing of the *Washington State* Complaint. CW RJN Ex. 73. The statute of repose was tolled between that date and January 6, 2010, when

1   *Luther* was dismissed in the state court.  The statute of repose began to run again

2   when *Luther* was dismissed, and expired before Western and Southern filed its

3   complaint on April 27, 2011.

4       Western and Southern raises two objections.  First, it argues that CWALT

5   2005-26CB (A6) is entitled to an earlier tolling date because the *Luther* amended

6   complaint relates back to the original *Luther* complaint.  Western and Southern

7   raises this objection under California law.  Western and Southern Opp. at 30 n.26.

8   The Court notes that *American Pipe* is a federal, not state, tolling principle and that

9   federal law applies.  This Court has repeatedly held that, under federal law,

10  *American Pipe* will only toll a claim that the named plaintiff had standing to assert.

11  The purpose of this holding is, in part, to prevent overbroad placeholder lawsuits

12  filed by plaintiffs with no standing; allowing plaintiffs to cure a standing

13  deficiency by amendment and then avoid limitations and repose requirements by

14  relating back to the initial complaint would frustrate this purpose.  The Court

15  therefore reaffirms its earlier holding that a plaintiff may not assert Securities Act

16  claims "for any certificate for which the three-year statute of repose expired before

17  the *Luther* plaintiff either acquired the security or joined the *Luther* case."

18  *Stichting v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1131 (C.D. Cal. 2011)

19  ("*Stichting*").

20      Western and Southern also argues that its claims continued to toll even after

21  *Luther* was dismissed because the California Court of Appeals later reinstated it.

22  Western and Southern Opp. at 32.  Authorities are split on this question.  Many

23  cases, mostly older, have found that *American Pipe* continues to toll during a

24  successful appeal.  *Satterwhite v. City of Greenville*, 578 F.2d 987, 997 (5th Cir.

25  1978) (en banc) ("[I]f a trial court's decision that the class may not be maintained

26  is reversed on appeal, the status of class members is to be determined from the

27  time that suit was instituted."); *Gelman v. Westinghouse*, 556 F.2d 669, 701 (7th

28  Cir. 1977) (same); *In re Vertrue Mktg. & Sales Practices Litig.*, 712 F. Supp. 2d

703, 716–17 (N.D. Ohio 2010) (tolling appropriate during pendency of successful appeal).  On the other hand, several courts have held that *American Pipe* does not toll under these circumstances.  *Stone Container Corp. v. United States*, 229 F.3d 1345, 1355-56 (Fed. Cir. 2000) ("[T]olling here stopped with the dismissal of the class action by the district court."); *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1382 (11th Cir.1998) (Supreme Court "clearly assumed that tolling should end when the district court denies class certification, not after the appeals process has run and some later final order is entered."); *Giovanniello v. ALM Media, LLC*, No. 309 Civ. 1409(JBA), 2010 WL 3528649, at *3–6 (D. Conn. Sept. 3, 2010) (denial of class certification rendered class "nonexistent" and therefore ended *American Pipe* tolling).

The Court agrees with Defendants that *American Pipe* tolling ends when the trial court issues a decision that strips the action of its status as a putative class action.  This decision is based on the language of *American Pipe*, the reasonable reliance interest of an individual plaintiff, and judicial efficiency.  *American Pipe* says nothing of appeals, it addresses only proceedings in the trial court: "the commencement of the class action in this case suspended the running of the limitation period *only during the pendency of the motion to strip the suit of its class action character.*" *American Pipe*, 414 U.S. at 561 (emphasis added).  The Supreme Court later made clear that *American Pipe* tolling is meant to protect a plaintiff's reasonable reliance on the class action device.  *Crown, Cork*, 462 U.S. at 353–54.  However, as *Armstrong*, *Giovanniello*, and other cases have held, dismissal by the trial court both strips a case of its "putative class action" character and makes reasonable reliance impossible.  "Once the district court enters the order denying class certification, . . . reliance on the named plaintiffs' prosecution of the matter ceases to be reasonable, and, we hold, the excluded putative class members are put on notice that they must act independently to protect their rights." *Armstrong*, 138 F.3d at 1380.  *See also Giovanniello*, 2010 WL 3528649, at *5

("After a district court's determination of whether an action may be maintained as a class action, the class is no longer putative: having been subjected to a legal decision, the class is either extant or not.").  The California state court dismissed *Luther* in early 2010.  That order was final.  At that point *Luther* ceased being a "putative class action."  It became a putative class action again when the California Court of Appeals reinstated it.  In the meantime, there was neither any pending putative class action nor any reasonable basis for Western and Southern to believe that its claims were being tolled.  Hope that the trial court would be overturned on appeal is not enough.[5]  Though the justification is less relevant in this case, *Armstrong* noted that judicial economy and the considerations underlying statutes of limitations and repose support the rule that tolling ceases when a trial court excludes a particular plaintiff from a putative class rather than when all appeals are exhausted.  In many cases, a class is narrowed rather than completely decertified.  In such an instance, it may be years before the trial court enters a final judgment and appeal is possible.[6]  *Armstrong*, 138 F.3d at 1388.  Continuing to toll the statute under such circumstances raises the risk of stale claims, serial litigation, and forum shopping.

Western and Southern also objects that the January 6, 2010 *Luther* dismissal was not a class certification decision.  Western and Southern's interpretation of the January 6, 2010 decision is too strained.  The January 6, 2010 order was a complete dismissal on the basis that a securities class action cannot exist in state court.  After that date, there was no case at all, much less a "putative class action"

---

[5] Especially so in this case, where the trial court's finding was not on the merits and would not have precluded individual plaintiffs from filing suit.  The situation might be somewhat different if the trial court's decision had been such that a successful appeal provided the only route for an individual plaintiff's suit to proceed.  In fact, some of the *Luther* plaintiffs filed the identical *Maine State* action in federal court only a week after *Luther* was dismissed from state court.

[6] Assuming that an interlocutory appeal is not granted under Rule 23(f).

for Western and Southern to rely on.  Accordingly, Western and Southern can have had no reasonable expectation that the *Luther* action would preserve its rights after January 6, 2010.

3. *Western and Southern's Section 12(a)(2) Claims are Time-Barred*

For Section 12(a)(2), the statute of repose begins to run on the date of purchase rather than the date of "offer."  Western and Southern purchased all of the Certificates at issue in this case before April 27, 2008.  Western and Southern Amended Complaint Ex. A.  The § 12(a)(2) claims are therefore barred absent tolling.  For the reasons discussed above, claims with respect to 34 of the Certificates are not tolled by *Luther*.  Of the two remaining Certificates, Western and Southern pleads that it purchased CWALT 2005-26CB on the secondary market.  Western and Southern Amended Complaint Ex. A.  Western and Southern therefore may not pursue a Section 12(a)(2) based on this Certificate.  15 U.S.C. § 77*l*(a) (Section 12(a)(2) recovery limited to persons who purchased from a statutory seller).  Western and Southern made all of its purchases of CWL 2006-S9 (A3) on December 29, 2006, one day after the Prospectus Supplement issued.  The same analysis set out in Section III.A.2 above therefore operates to bar the Section 12(a)(2) claims on this Certificate.

For the reasons set out above, Western and Southern's Section 11 and 12(a)(2) claims are entirely barred by the statute of repose.  Because the Section 15 claims require a well-pleaded violation of Section 11 or 12(a)(2), the Section 15 claims are barred as well.  The Court therefore **DISMISSES** Western and Southern's Securities Act claims.  Dismissal is as to **ALL DEFENDANTS** and is **WITH PREJUDICE**.

## B. WESTERN AND SOUTHERN'S EXCHANGE ACT CLAIMS

1. *Statute of Limitations*

Western and Southern has organized its complaint differently from other Countrywide RMBS plaintiffs, and these differences require the Court to treat it

uniquely.  Every previous Countrywide RMBS complaint that the Court has

considered alleged a scheme to underwrite and securitize as many loans as possible

and to sell those loans into the RMBS market by misrepresenting the associated

risks.  In such a scheme, the plaintiff is harmed by the purchase of riskier-than-

anticipated RMBS.  The Court has held that a reasonable plaintiff exercising

reasonable diligence should have been aware of every element of a Section 10(b)

claim based on such a scheme, including damages and scienter, by December 27,

2008.  *Allstate Ins. Co.  v. Countrywide Fin. Corp.*, No. 2:11-CV-05236-MRP

(MANx), 2011 WL 5067128, at *11–13 (C.D. Cal. Oct. 21, 2011) ("*Allstate*").

Western and Southern alleges such a scheme, and the Court dismisses the

allegations as time-barred for the same reasons set out in *Stichting* and *Allstate*.

Western and Southern also makes an allegation that the Court has not analyzed

previously.  Because this scheme and theory of harm are different from the

abandonment of underwriting standards allegations, the Court evaluates it

separately.  *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 423–25

(S.D.N.Y. 2005).

Specifically, Western and Southern alleges a scheme to originate *more* loans

than would otherwise have been possible by failing to properly transfer title from

the originator to the Depositor.  Western and Southern Amended Complaint ¶¶

197–242.  Specifically, Countrywide was apparently able to originate more loans

by shifting resources from compliance and servicing into underwriting.  *Id.*  Unlike

previous allegations the Court has considered, these claims do not address the risk

that an underlying loan will default, but rather the consequences *when* a loan

defaults.  When a loan backing an RMBS defaults, the trustee typically forecloses

on the property, sells it, and distributes the proceeds to the trust for distribution to

Certificate-holders in accordance with the priority specified in the trusts'

governing documents.  However, in order for the trustee to foreclose on the

property, the trust must hold valid title.  It is essential that the parties observe a

1   series of technical requirements as the title is passed from the originator to the
2   Depositors and then to the trusts.  These requirements are dictated by state law and
3   the trusts' governing documents.  Western and Southern Amended Complaint ¶¶
4   197–204.

5         If title is not transferred properly, then the trustee cannot foreclose on a
6   defaulted loan.  An RMBS purchaser may be harmed either directly or indirectly in
7   such a scenario.  First, an RMBS purchaser may be directly harmed if the trustee is
8   unable to foreclose on a loan and the trust therefore receives nothing (rather than
9   the foreclosure value).  Second, if the market realizes that, due to title transfer
10  problems, RMBS that contain defaulted loans will pay less than anticipated, the
11  market should discount RMBS containing defaulted or likely-to-default loans by
12  an appropriate amount.  In either event, a purchaser would not have become aware
13  of the damages portion of its claim until it became clear that title transfer problems
14  were widespread and preventing foreclosures.

15        Defendants have identified widely disseminated reports of underwriting
16  problems at Countrywide and numerous lawsuits alleging the same.  They have
17  not, however, identified any lawsuits or public press reports before April 27, 2009
18  that should have put Western and Southern on notice that Defendants had
19  systematically failed to properly convey title.  The Court therefore **DENIES**
20  Defendants' Motions to Dismiss the Exchange Act claims based on title transfer
21  allegations.  The Court otherwise **DISMISSES** the Exchange Act claims as time-
22  barred.  Dismissal is as to **ALL DEFENDANTS** and is **WITH PREJUDICE**.
23  *2.   Statute of Repose*

24        Exchange Act claims are subject to a five-year statute of repose that begins
25  to run on the date of purchase.  28 U.S.C. § 1685(b)(2); *Arnold v. KPMG LLP*, 334
26  Fed.Appx 349, 351 (2d Cir. 2009) (Statute of repose begins to run "on the date the
27  parties have committed themselves to complete the purchase or sale transaction.")
28  (citation omitted).  Any Exchange Act claim based on a Certificate that Western

and Southern purchased more than five years before it filed its complaint on April 27, 2011 is therefore barred.  The Court **DISMISSES** the Exchange Act claims as time-barred with respect to any Certificate purchased before April 27, 2006. Dismissal is as to **ALL DEFENDANTS** and is **WITH PREJUDICE**.

## C. THE OSA AND COMMON LAW FRAUD CLAIMS

In addition to the federal claims, Western and Southern alleges violations of the Ohio Securities Act (the "OSA"), the Ohio Corrupt Activities Act ("OCAA"), and Ohio common law.  Defendants have moved to dismiss all but the OCAA claims as time-barred.[7]  The OSA contains a two-year statute of limitations and a five-year statute of repose.  OHIO REV. CODE ANN. § 1707.43(B).  Specifically, the OSA provides:

> No action for the recovery of the purchase price as provided for in this section, and *no other action for any recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707 of the Revised Code*, shall be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than five years from the date of such sale or contract for sale, whichever is the shorter period.

*Id.* (emphasis added).  Most Ohio courts have interpreted the "other action" language to mean that the OSA's statute of limitations applies to other state law actions arising out of the purchase of securities.  *E.g. Lynch v. Dean Witter Reynolds, Inc.*, 134 Ohio App. 3d 668, 671–73 (1999) ("although styled as a breach of contract claim arising after the purchase of the securities, the investors'

---

[7] The OCAA provides, "[n]otwithstanding any other provision of law providing a shorter period of limitations, a civil proceeding or action under this section may be commenced at any time within five years after the unlawful conduct terminates or the cause of action accrues."  The OCAA claims therefore appear to be timely.

claims actually related to the purchase of the securities and therefore fell within the
ambit of R.C. 1707.43."). If the OSA's limitations periods apply to Western and
Southern's OSA and common law claims, the Court must reach the same
conclusion as it did with respect to the Exchange Act claims. *Wyser-Pratte Mgmt
Co. v. Telxon Corp.*, 413 F.3d 553, 561–64 (6th Cir. 2005) (applying then-
applicable federal inquiry notice standard to OSA claims because "Ohio has
adopted a limitations period specific to claims arising out of the sale of
securities"). Western and Southern makes a number of arguments; the Court
briefly addresses the most significant. In Section III.B.1 above, the Court found
that Western and Southern's transfer of title allegations are timely under a two-
year statute of limitations. The subsections below therefore apply only to the non-
transfer-of-title allegations.

1.      *The OSA's Two-Year Statute of Limitations Applies*

        O.R.C. § 2305.09(C) provides a four-year statute of limitations for fraud
claims. Most Ohio courts have held that the OSA's two-year statute of limitations
supersedes the O.R.C.'s four-year statute of limitations when the fraud claims
"arise essentially from, and are thus predicated upon, the sale of securities." *Hater
v. Gradison Div. of McDonald & Co. Secs., Inc.*, 655 N.E.2d 189, 198 (Ohio App.
1 Dist. 1995). *See also Lynch*, 134 Ohio App. 3d at 671–73 (1999) ("although
styled as a breach of contract claim arising after the purchase of the securities, the
investors' claims actually related to the purchase of the securities and therefore
fell within the ambit of R.C. 1707.43."). Western and Southern argues that, "if the
issue came before it, the Ohio Supreme Court would apply O.R.C. § 2305.09(C) to
common law fraud claims arising out of the sale of securities." Western and
Southern Opp. at 14–15 n. 13. This argument goes against the weight of Ohio
authority, and other federal courts have treated it as a settled question. *Wyser-
Pratte Mgmt Co. v. Telxon Corp.*, 413 F.3d 553, 561 (6th Cir. 2005) ("Ohio law is
clear that because [plaintiff]'s fraud claims arise out of or are predicated on the

1  sale of securities, they are governed by the specific statute of limitations set forth

2  in Ohio Rev.Code § 1707.43(B); not the four-year general statute of limitations for

3  fraud claims."); *Metz v. Unizan Bank*, 649 F.3d 492, 499 (6th Cir. 2011) (same).

4  The same is true of other common law claims that are premised on the sale of

5  securities.  *Hardin v. Reliance Trust Co.*, No. 1:04 CV 02079, 2006 WL 2850455,

6  at *11 (N.D. Ohio Sept. 29, 2006) (OSA's two-year statute of limitations applies to

7  civil conspiracy claim when the claim is rooted in securities fraud).

8       The Court therefore holds that Western and Southern's common law claims

9  are subject to the OSA's two-year statute of limitations.

10  2.    *American Pipe Does Not Toll the OSA Claims*

11       Western and Southern argues that its OSA claims were tolled under

12  *American Pipe*.  Western and Southern Opp. at 36.  Western and Southern cites

13  several cases for the proposition that, "[w]hen state law claims rely on the same

14  evidence as the federal claims in a class action complaint, *American Pipe* tolls the

15  state as well as the federal claims."  *Id.* (citing *Cullen v. Margiotta*, 811 F.2d

16  698,720-21 (2d Cir. 1987); *Newby v. Enron Corp.*, 465 F. Supp. 2d 687, 718-719

17  (S.D. Tex. 2006); and *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 352 (E.D.

18  Pa. 2004)).  This argument is unfounded.  The OSA claims arise under state law.

19  Whether those claims are tolled by a putative class action in another state is a

20  question of state, not federal, law.  *Vaught v. Showa Denko K.K.*, 107 F.3d 1137,

21  1144 (5th Cir. 1997).  *See also Clemens*, 534 F.3d at 1025 (applying state law

22  rather than federal law to cross-jurisdictional tolling question).

23       Western and Southern also argues that *Luther* tolled its claims due to Ohio's

24  cross-jurisdictional tolling rule.  Ohio is one of the few states that has adopted

25  cross-jurisdictional tolling.  *Vaccariello v. Smith & Nephew Richards, Inc.*, 763

26  N.E.2d 160 (Ohio 2002) ("We hold that the filing of a class action, whether in

27  Ohio or the federal court system, tolls the statute of limitations as to all asserted

28  members of the class who would have been parties had the suit been permitted to

continue as a class action.").  However, *Vaccariello* limited its holding to a class action filed "in Ohio or the federal court system."  *Id.*  The *Luther* action was filed in California, not federal, court, and so *Vaccariello* does not apply.  *Arandell Corp. v. American Elec. Power Co.*, NO. 2:09-CV-231, 2010 WL 3667004, at *10 (S.D. Ohio Sept. 15, 2010) (*Vaccariello* does not apply to an action initially filed in Wisconsin state court and later removed to federal court); *Thornton v. State Farm Mut. Auto Ins. Co.*, No. 1:06-cv-00018, 2006 WL 3359448, at *8 (N.D. Ohio Nov. 17, 2006) (Illinois state court class action did not toll Ohio claims).  The *Thornton* court explicitly noted the difficulty with "extending *Vaccariello* from one foreign jurisdiction to an additional 49 foreign jurisdiction with divergent class action rules."  *Id.*  The Court agrees.  *Luther* was filed in California state court, and so may not toll Western and Southern's state law claims.

3.     *The OSA's Savings Statute Does Not Apply*

Western and Southern makes the related argument that Ohio's "savings statute" combines with the *Maine State* action in order to save its claims.  Western and Southern Opp. at 36–40.  The savings statute provides:

> In any action that is commenced or attempted to be commenced, if in due time a judgment for the plaintiff is reversed or if the plaintiff fails otherwise than upon the merits, the plaintiff . . . may commence a new action within one year after the date of the reversal of the judgment or the plaintiff's failure otherwise than upon the merits or within the period of the original applicable statute of limitations, whichever occurs later.

OHIO REV. CODE ANN. § 2305.19(A).

Western and Southern argues that its Ohio claims were timely as of January 14, 2010, the date that *Maine State* was filed.  Western and Southern Opp. at 39.  It further argues that because the Court dismissed its claims from *Maine State* based on standing, dismissal was "other than on the merits" and Western and Southern

was entitled to bring a new action within one year of the dismissal.  *Id.* at 38.  The cases Western and Southern cites hold that a dismissal based on standing is "other than on the merits" for purposes of res judicata.  The Court is not aware of any Ohio court that has applied the savings statute to a dismissal based on lack of standing.

In the absence of any Ohio Supreme Court case on point, the Court analyzes *Vacccariello*, the statute, *Maine State*, and the res judicata cases that Western and Southern cites.  None support the application of the savings statute in this context.  *Vaccariello* holds that the savings statute applies to asserted members of the class "who would have been parties had the [class action] been permitted to continue." 763 N.E.2d at 163.  In *Maine State*, the Court did permit the class action to continue, and none of the Certificates that Western and Southern purchased is in it. The entire purpose of the Court's *Maine State* orders was to determine which Certificates were actually part of the action.  The statute requires a "plaintiff" to fail "other than on the merits."  OHIO REV. CODE ANN. § 2305.19(A).  It would be somewhat anomalous to hold that Western and Southern was a "plaintiff" in *Maine State* when the problem with *Maine State* was the lack of an actual plaintiff who had purchased most of the 427 Offerings at issue.  To some extent, the question of whether Western and Southern was a plaintiff (or could reasonably have thought that it was a plaintiff) in *Maine State* is similar to and coterminal with the question of whether it was "included" in the *Luther* action.  The Court declines to repeat those arguments here.

At least one Ohio appellate court has adopted this reasoning.  In *Bowshier v. Village of North Hampton, Ohio*, No. 2001 CA 63, 2002 WL 940125, at *4–5 (Ohio App. 2 Dist. 2002), a plaintiff sought to represent a class of people who had been affected by a speed trap in various ways.  The plaintiff dismissed the complaint after the trial court decertified the class.  *Id.* at 1.  Four new plaintiffs later sought to join a re-filed individual complaint.  The Ohio Court of Appeals

held that the savings statute did not apply to the four new plaintiffs because they were not named in the original complaint.  In the words of the Ohio Court of Appeals, "we fail to see how the savings statute could have applied to the new plaintiffs by virtue of their membership in an 'unnamed' class.  Moreover, by its plain language, R.C. 2305.19 applies to the plaintiff in the original action.  [The new plaintiffs] were not plaintiffs in the [original] action."  *Id.* at 5.  Western and Southern was not a plaintiff in *Maine State*, and so the same analysis precludes it from relying on the savings statute here.

The res judicata cases that Western and Southern cites are not directly on point, but their logic supports the Court's reasoning.  There, the Ohio Supreme Court held that "the dismissal of an action because one of the parties is not a real party in interest or does not have standing is not a dismissal on the merits for purposes of res judicata."  *State ex rel. Coles v. Granville*, 877 N.E.2d 968, 977 (Ohio 2007).  *See also A-1 Nursing Care v. Florence Nightingale Nursing*, 627 N.E.2d 222 (Ohio 1994) (dismissal for lack of standing "terminates the action other than on the merits and affords proper parties the opportunity to refile without fear of the effects of res judicata").  The logic of these cases is straightforward—if a real party in interest, i.e. the party with standing, was not in the first lawsuit then its findings can have no preclusive effect as against that party.  This reasoning relies on the notion that a party without standing is not a "real party in interest" in the original suit.  As such, while they might be free to re-file the case, they would not be entitled to benefit from the savings statute.

Finally, the Court notes that its *Maine State* decisions are grounded in both standing and timeliness.  In *Maine State III*, the Court held:

Plaintiffs have standing to assert their claims with respect only to those Certificates a named Plaintiff has purchased.  Moreover, to the extent that the Luther state court plaintiffs did not themselves buy particular Certificates included in the SAC, the relevant limitations

1  periods continued to run with respect to those tranches.  There can be

2  no tolling with respect to securities the Luther plaintiffs did not

3  purchase

4  *Maine State III*, 2011 WL 4389689.  The Court did not make any effort to

5  determine which Certificates' dismissal was based on standing and which were

6  based on the statute of repose.  To the extent that 34 of the 36 Certificates at issue

7  in this case were not purchased by a *Luther* plaintiff and the statute of repose had

8  elapsed before a plaintiff who had purchased CWALT 2005-26CB (A6) joined

9  *Luther*, *Maine State's* dismissal of 35 of the 36 Certificates at-issue in this case

10  was based partially on timeliness, and therefore on the merits within the meaning

11  of Section 2305.19(A).

12  *4.     Equitable Estoppel Does Not Apply to Western and Southern's Claims*

13  Equitable estoppel may prevent a defendant from raising a statute of

14  limitations defense where the defendant, "by his conduct, has induced another to

15  change his position in good-faith reliance upon that conduct."  *Helman v. EPL*

16  *Prolong, Inc.*, 743 N.E.2d 484, 495 (Ohio App. 7th Dist. 2000).  "Furthermore, in

17  the context of a statute-of-limitations defense, a plaintiff must show either 'an

18  affirmative statement that the statutory period to bring an action was larger than it

19  actually was' or 'promises to make a better settlement of the claim if plaintiff did

20  not bring the threatened suit' or 'similar representations or conduct' on defendant's

21  part."  *Id.* (citing *Cerney v. Norfolk & W. Ry. Co.*, 104 Ohio App.3d 482, 488

22  (1996)).  The Western and Southern Amended Complaint alleges that Western and

23  Southern relied on monthly loan tapes generated by Countrywide.  Western and

24  Southern Amended Complaint ¶¶ 374–78.  These tapes purportedly confirmed that

25  there "were no material breaches of representations regarding the mortgage

26  collateral and most of the Certificates could pay out virtually all expected interest

27  and principal payments."  Western and Southern Opp. at 22 (citing Western and

28  Southern Amended Complaint ¶¶ 377–80).  None of these purported

representations addresses the statute of limitations or promises of settlement. Accordingly, equitable estoppel is not available.  *Kegg v. Mansfield*, 2001 WL 474264, at *5 (Ohio Ct. App. Apr. 30, 2001) ("The only evidence provided by appellant . . . pertains to alleged misrepresentations concerning the value of the investments, which are in no way related to misrepresentations concerning the statute of limitations or a promise of settlement as envisioned by Cerney.")

5.      *Fraudulent Concealment Does Not Apply to Western and Southern's Claims*

        Western and Southern argues that the same monthly loan tapes[8] tolled Western and Southern's claims under the doctrine of fraudulent concealment. Assuming that the fraudulent concealment doctrine even applies to the OSA's statute of limitations,[9] it would require Western and Southern to demonstrate "(1) defendants' wrongful concealment of their actions; (2) failure of the plaintiff to discover operative facts that are the basis of his cause of action; and (3) the plaintiff exercised due diligence in seeking out facts supporting a cause of action." *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc.*, 29 F. Supp. 2d

---

[8] Plaintiff sometimes refers to the loan tapes as "remittance reports."  Opp. at 3 n.6. For purposes of this Order, the Court uses the terms interchangeably.

[9] Tolling may be superfluous under the OSA.  One court has reasoned that equitable tolling is unnecessary because "[t]he statute of repose includes a two year limitation, which by its express terms begins to run only after the complainant is aware or should have been aware of the illegal activity at issue."  *Lopardo v. Lehman Bros., Inc.*, 548 F. Supp. 2d 450, 464 (N.D. Ohio 2008).   Western and Southern cites several cases.  *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc.*, 29 F. Supp. 2d 801, 809 (N.D. Ohio 1998); *In re Polyurethane Foam Antitrust Litig.*,799 F. Supp. 2d 777, 804 (N.D. Ohio 2011); *In re Nat'I Century Fin. Enters.*, 541 F. Supp. 2d 986 at 1008 (S.D. Ohio 2007); *Jelm v. Galan*, No. 58093, 1991 Ohio App. LEXIS 936, at *5-6,19 (Ohio Ct. App. 8th Dist. 1991). These cases either arose in a different context (*Iron Workers* was decided in the civil RICO context, *Polyurethane Foam* in the antitrust context), were very vague as to whether the term "fraudulent concealment" represents a separate doctrine from the OSA's "notice" requirement (*Nat'l Century*), or considered "fraudulent concealment" as a separate cause of action (*Jelm*).

801, 808 (N.D. Ohio 1998).  Western and Southern bears the burden to plead fraudulent concealment.  *Id.* at 809; *Auslender v. Energy Mgmt. Corp.*, 832 F.2d 354, 356 (6th Cir. 1987) (plaintiff facing motion to dismiss had to plead "circumstances which would indicate why the alleged fraud was not discovered earlier and which would indicate why the statute should be tolled.").

This Court has already held that, "a reasonable plaintiff exercising reasonable diligence . . . should have discovered facts sufficient to state every element of [a claim based on heightened default risk of Countrywide-issued RMBS] at least prior to February 14, 2009." *Stichting*, 802 F. Supp. 2d at 1139.[10] Western and Southern argues that the remittance reports failed to disclose material breaches and misrepresentations in the Offering Documents and that Western and Southern exercised due diligence by valuing its Certificates with a proprietary pricing model.  Western and Southern Opp. at 22.  Neither argument is persuasive. By 2009 a vast amount of information was public about Countrywide, numerous complaints alleging systematic abandonment of underwriting standards had been filed, and this Court had denied motions to dismiss in several cases.  *E.g. In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 1044, 1083 (C.D. Cal. 2008).  Under such circumstances, Western and Southern did not act reasonably in relying on loan tapes from Countrywide.  This conclusion is reinforced by the fact that Western and Southern admits that the remittance reports do not contain actual misstatements, but instead failed to disclose alleged breaches (Western and Southern Opp. at 20–22) and conveyed an "implication" and "impression" to Western and Southern that the loans would perform in accordance with Western

---

[10] As the Court discusses above, Western and Southern's transfer of title allegations are timely under both Ohio and federal law.  Western and Southern need not rely on fraudulent concealment for those claims, and so the Court only addresses claims relating to underwriting standards and heightened default risk here.

and Southern's financial models.  Western and Southern Amended Complaint at ¶ 380.

The various press reports and legal proceedings should have put Western and Southern on notice of its fraud claim before, at a bare minimum, April 27, 2009.  *See Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 563–66 (6th Cir. 2005) (Storm warnings and restatements sufficient to trigger inquiry notice under OSA given lower pleading standards for scienter than in federal cases.).  And, "[o]nce sufficient indicia of fraud are shown, a party cannot rely on its unawareness . . . to toll the statute." *Zemcik v. LaPine Truck Sales & Equip. Co.*, 706 N.E.2d 860, 866 (Ohio Ct. App. 1998).  *See also Harner v. Prudential-Bache Sec., Inc.*, 1994 WL 494871, at *6 (6th Cir. Sept. 8, 1994) ("[I]t is questioned whether concealment can exist at all without some act by the defendant that denies the plaintiff access to the relevant knowledge. . . . Here, it is clear that the state of the airline industry was public knowledge that plaintiffs could have discovered from some of the many newspaper articles they now rely on to claim fraud.").

An egregious act of concealment and reassurance would be required to counterbalance the large amount of information about Countrywide that was available in the public record before April 27, 2009.  The fact that Defendants issued remittance reports does not meet this standard, and Western and Southern has not alleged any act of concealment at all by the individual defendants.  Fraudulent concealment therefore does not toll the running of the statute of limitations.

6.     *The Ohio Constitution Bars Application of the Statute of Repose to the OSA and Common Law Transfer of Title Claims*

The Ohio Constitution provides that "All courts shall be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or

delay."  Ohio Constitution Article 1, Section 16.  The Ohio Supreme Court has held that a statute of repose deprives plaintiffs of their right to a remedy when the statute expires before the plaintiff has suffered its injury.  *Groch v. Gen. Motors Corp.*, 117 Ohio St. 3d 192, 227 (Ohio 2008).  *See also Lopardo v. Lehman Bros., Inc.*, 548 F. Supp. 2d 450, 465 (N.D. Ohio 2008) ("Ohio courts would find that the [five] year statute of repose contained in the Ohio securities statute violates the right-to-remedy clause of the Ohio Constitution.").  *Lopardo* specifically considered a securities case where the plaintiff was not aware of its injury until after the statute of repose had run.  *Id.* at 466.  The statute of repose expired for the earliest of Western and Southern's purchases in June of 2010.  Western and Southern Amended Complaint ¶ 75.  Even if Western and Southern was on notice of its title transfer claims by June 2010, applying the statute of repose to those claims would have given Western and Southern an unreasonably short period of time to file its claim.  *See Groch*, 117 Ohio St.3d at 226 (two years from date that plaintiff is aware of injury is a reasonable time to file claim).  Accordingly, the OSA's five-year statute of repose does not bar Western and Southern's state law title transfer claims.

Because the OSA's two-year statute of limitations applies but its five-year statute of repose does not, the Court **DISMISSES** Western and Southern's OSA and common law claims except as to the transfer of title allegations.  Dismissal is as to **ALL DEFENDANTS** and is **WITH PREJUDICE**.

### D. PERSONAL JURISDICTION

Defendants Mozilo, Sambol, Adler, Kripalani, Sandefur, Sieracki, and Spector have moved to dismiss on the alternative ground that personal jurisdiction does not exist as to them in Ohio.  As discussed in Section III.B above, a part of Western and Southern's Exchange Act claims remains in the case.  Those claims are asserted against Mozilo and Sambol, and so jurisdiction is proper as to them. Fed. R. Civ. Proc. 4(k)(1)(C).

This case was transferred from Ohio for pre-trial purposes only.  This Court may therefore only exercise jurisdiction to the same extent as an Ohio court.  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2005 WL 2988715, at *2 (N.D. Cal. Nov. 7, 2005) ("In MDL actions such as this one, the court is entitled to exercise personal jurisdiction over each defendant only to the same degree that the original transferor court could have.").  Western and Southern bears the burden of demonstrating that the Court has jurisdiction.  *Harris Rutsky & Co. Ins. Servs. V. Bell & Clements Ltd.*, 328 F.3d 1122, 1128–29 (9th Cir. 2003).  Western and Southern must establish both that Ohio's long-arm statute authorizes jurisdiction and that the exercise of jurisdiction comports with due process.  *Amba Mktg. Sys. Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977).  Because the Court finds that exercise of personal jurisdiction would not comport with the due process guarantees of the Fourteenth Amendment, the Court does not address the Ohio long-arm statute.

Personal jurisdiction may be general or specific.  Western and Southern argues that specific jurisdiction is appropriate.  Specific jurisdiction is analyzed under a three-prong test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011).  Western and Southern bears the burden of satisfying the first two prongs.  *Id.*  If Western and Southern does so, the burden shifts to the defendants to make a

"compelling case" that the exercise of jurisdiction would not be reasonable. *Id.* Western and Southern has failed to satisfy the first prong, and so the Court ends its inquiry there.

In cases involving tortious conduct, courts focus on purposeful direction rather than purposeful availment. *Id.* The Court evaluates purposeful direction by "applying an 'effects' test that focuses on the forum in which the defendants' actions were felt." *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc). The effects test requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* at 1206. Western and Southern may not bootstrap jurisdiction over any individual either from jurisdiction over their company or any other individual. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984).

Western and Southern's alleges that Adler, Kripalani, Sandefur, Sieracki, and Spector are liable because they either signed the Registration Statements or were control persons. Nothing in the Western and Southern Amended Complaint indicates that any of these defendants directed their own actions towards Ohio or expressly aimed Countrywide's actions towards Ohio. Each of these defendants has introduced an uncontroverted affidavit to this effect. ECF Nos. 159 (Spector), 165 (Kripalani), 166 (Sandefur), 168 (Adler), 171 (Sieracki). The Certificates at issue in this case were registered with the SEC and disseminated nationally (and internationally). Nothing in the Western and Southern Amended Complaint indicates that the Certificates were particularly aimed at Ohio or that any of these defendants helped to expressly aim the Certificates at Ohio. *See Ind. Plumbing Supply, Inc. v. Sd. of Lynn, Inc.*, 880 F. Supp. 743, 751 (C.D. Cal. 1995) (approving advertisements that appeared in forum state does not rise to purposeful direction). *C.f. Openwave Sys. Inc. v. Fuld*, No. C 08-5683 SI, 2009 WL 1622164, *12 (N.D. Cal. June 6, 2009) (purposeful direction prong satisfied when defendants

conducted a "substantial portion of its ARS business" in California and directly marketed their securities there).

Western and Southern cite several cases for the proposition that signing a registration statement constitutes purposeful direction. *In re LDK Solar Secs. Litig.*, 2008 WL 4369987, at *6 (N.D. Cal. Sept. 24, 2008); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 398 (S.D.N.Y. 2005). These cases are fundamentally inapposite; they considered only whether a foreign defendant had purposefully directed its actions to the United States as a whole for purposes of *federal* securities claims. *LDK Solar* stands for the unremarkable proposition that a foreign defendant that signs a registration statement for the sole purpose of listing on the New York Stock Exchange has purposefully directed its actions towards the United States. *In re LDK Solar Secs. Litig.*, 2008 WL 4369987, at *6 n.5 (N.D. Cal. Sept. 24, 2008) ("Fraud aimed at New York Stock Exchange investors as well as U.S. regulators is aimed at the United States, and that defendants likely would know that such a fraud would cause harm in the country."). *See also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 398 (S.D.N.Y. 2005) (requiring "'minimum contacts' with the United States as a whole"). The question in this case is not whether the defendants directed their activities towards the United States securities markets, but rather Ohio specifically.

The Court finds nothing in the Western and Southern Amended Complaint indicating that Adler, Kripalani, Sandefur, Sieracki, or Spector purposefully directed their actions towards Ohio. Exercise of personal jurisdiction over those defendants would therefore be improper. Accordingly, the Court **DISMISSES** all of Western and Southern's claims against Adler, Kripalani, Sandefur, Sieracki, and Spector. Dismissal is **WITHOUT PREJUDICE**.

## IV.   NATIONAL INTEGRITY

Plaintiff National Integrity Life Insurance Company was originally a plaintiff in the *Western and Southern* action. Western and Southern, ECF No. 1.

After the case was transferred to this Court as part of the MDL proceedings, National Integrity dropped out of the Western and Southern Amended Complaint (Western and Southern, ECF No. 140) and filed its Complaint in New York federal court the next day.  ECF No. 1.  National Integrity referred the case to the JPML shortly thereafter and did not oppose its transfer to this Court.  ECF No. 10.  Aside from the plaintiffs and the Certificates-at-issue, the National Integrity and Western and Southern Complaints are substantially identical.  The federal, OSA, and OCAA claims in the National Integrity Complaint are identical to those in the Western and Southern Amended Complaint and they are subject to the same statutes of limitations.  The Court reaches the same conclusions as above, for the same reasons.  The Court **DISMISSES** National Integrity's Securities Act Claims.  Dismissal is as to **ALL DEFENDANTS** and is **WITH PREJUDICE**.  The Court **DISMISSES** the Exchange Act claims and the OSA claims except as to the title transfer allegations.  The Court **DISMISSES** the remaining Exchange Act claims regarding all Certificates that National Integrity purchased before April 27, 2006.  Dismissal is as to **ALL DEFENDANTS** and is **WITH PREJUDICE**.

In addition, Defendants urge the Court to either dismiss the entire *National Integrity* action for forum shopping or to apply Ohio's statute of limitations through New York's borrowing statute.  Mr. Adler moves to dismiss on the alternate grounds that personal jurisdiction is not proper as to him in New York.  The Court agrees that personal jurisdiction is not proper over Mr. Adler, but otherwise finds Defendants' arguments unpersuasive.

## A. NATIONAL INTEGRITY'S FORUM SHOPPING DOES NOT WARRANT DISMISSAL

The Court starts from the premise that National Integrity dropped its participation in Western and Southern and filed a new case in New York specifically to take advantage of New York's advantageously long statute of limitations for common law fraud.  The cases are otherwise identical, and National

Integrity ensured that its case was promptly added to the JPML and transferred to this Court.  Defendants argue that the Court should punish this forum shopping by dismissing *National Integrity* under its "inherent discretion to dismiss an action to control its docket."  CW Mot. at 40 (citing *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2006)).  Defendants disclaim any abstention doctrine.  CW Reply at 34 ("Countrywide does not rely" on the abstention doctrine).  The Court cannot disclaim its authority as easily.  Each of the cases that Defendants cite involves the situation of two simultaneously pending federal cases.  Faced with such a situation, one of the two courts will step aside in the interests of convenience and judicial economy.  *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1202–03 (2d Cir. 1970) (parallel cases pending in New Jersey and New York); *Kellen Co. v. Calphalon Corp.*, 54 F. Supp. 2d 218, 220 (S.D.N.Y. 1999) (parallel cases pending in New York and Ohio).  National Integrity is no longer a plaintiff in *Western and Southern*, and so there is no duplication of judicial effort.

    In the absence of duplicative cases, the Court has a "virtually unflagging obligation . . . to exercise the jurisdiction given" it.  *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976).  Forum shopping by the plaintiff is not grounds for the Court to refuse to exercise its jurisdiction. *Fed. Deposit. Ins. Corp. v. Nichols*, 885 F.2d 633, 637–38 (9th Cir. 1989).  The Court therefore **DENIES** Defendants' request to dismiss the National Integrity case outright.

### B. NEW YORK'S BORROWING STATUTE

    New York has a borrowing statute designed to prevent "forum shopping by a nonresident seeking to take advantage of a more favorable Statute of Limitations in New York."  *Antone v. Gen. Motors Corp.*, 473 N.E.2d 742, 745 (N.Y. 1984).  Specifically, the borrowing statute provides:

> An action based upon a cause of action accruing without the state
> cannot be commenced after the expiration of the time limited by the

1   laws of either the state or the place without the state where the cause

2   of action accrued, except that where the cause of action accrued in

3   favor of a resident of the state the time limited by the laws of the state

4   shall apply.

5   N.Y. C.P.L.R. § 292.  Defendants argue that National Integrity is not a New York

6   resident and that the action "accrued" in Ohio.  National Integrity objects on both

7   counts.

8   National Integrity's state of residence determines both issues.  In New York,

9   a cause of action "accrues where the injury is sustained rather than where the

10  defendant committed the wrongful acts."  *Gordon & Co. v. Ross*, 63 F. Supp. 2d

11  405, 408 (S.D.N.Y. 1999).  "When an injury is purely economic, the place of

12  injury for purposes of the borrowing statute is where the economic impact of

13  defendant's conduct is felt, which is usually the plaintiff's place of residence."  *Id.*

14  If National Integrity is a New York resident, the borrowing statute therefore does

15  not apply and its common law claims are timely.  If National Integrity is an Ohio

16  resident, then the borrowing statute applies and the cause of action accrued in

17  Ohio.

18  In *Wydallis v. United States Fidelity & Guaranty Co.*, the New York Court

19  of Appeals held that a New York-incorporated insurance company was a New

20  York resident despite the fact that its principal place of business was elsewhere.  63

21  N.Y.2d 872, 873–75 (1984).  More recent decisions, without reference to *Wydallis*,

22  have held that a corporation is resident where it has its principal place of business.

23  *E.g. McMahon & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 727 F. Supp.

24  833, 834 (S.D.N.Y. 1989).

25  *Wydallis* has never been cited for this proposition, but it was a unanimous

26  decision of the New York Court of Appeals and has not been overturned.

27  According to the National Integrity Complaint, National Integrity is "formed under

28  the laws of, and domiciled in, the State of New York."  National Integrity

Complaint ¶ 15.  The Court therefore applies *Wydallis* and finds that National Integrity is a New York resident for purposes of N.Y. C.P.L.R. § 202.  National Integrity's common law fraud claims are therefore timely.

### C. PERSONAL JURISDICTION

Defendant Adler moves to dismiss on the unrelated grounds that exercise of personal jurisdiction would not be proper as to him in New York.  Plaintiffs have not alleged that Mr. Adler directed any activity towards New York.  The Court therefore **DISMISSES** any remaining claims against Mr. Adler for the same reasons set forth in Section III.D above.  Dismissal is **WITHOUT PREJUDICE**.

### V.   CONCLUSION

For the reasons discussed above, the Court **DISMISSES** Western and Southern's (i) Securities Act Claims, (ii) Exchange Act claims that are not based on transfer of title allegations, (iii) remaining Exchange Act claims regarding all Certificates that Western and Southern purchased before April 27, 2006, (iv) OSA and common law fraud claims that are not based on transfer of title allegations, and (v) remaining claims against Adler, Kripalani, Sandefur, Sieracki, and Spector. Dismissal is **WITH PREJUDICE** except as to Adler, Kripalani, Sandefur, Sieracki, and Spector.  Dismissal is **WITHOUT PREJUDICE** with respect to Adler, Kripalani, Sandefur, Sieracki, and Spector.  In *National Integrity*, the Court **DISMISSES** (i) the Securities Act Claims, (ii) the Exchange Act claims that are not based on transfer of title allegations, (iii) the remaining Exchange Act claims regarding all Certificates that National Integrity purchased before April 27, 2006, (iv) the OSA claims that are not based on transfer of title allegations, and (v) any remaining claims against Adler.  Dismissal is **WITH PREJUDICE** except as to Adler.  Dismissal is **WITHOUT PREJUDICE** as to Adler.

     If the Court has dismissed claims without prejudice, the affected plaintiffs
have leave to file amended complaints within **20** days of this Order.

     **IT IS SO ORDERED.**

DATED:  March  9, 2012

_____
                    Hon. Mariana R. Pfaelzer
                    United States District Judge