1  Brian E. Pastuszenski (*pro hac vice*)
   *bpastuszenski@goodwinprocter.com*
2  Inez H. Friedman-Boyce (*pro hac vice*)
   *ifriedmanboyce@goodwinprocter.com*
3  John O. Farley (*pro hac pending*)
   *jfarley@goodwinprocter.com*
4  Caroline H. Bullerjahn (*pro hac vice*)
   *cbullerjahn@goodwinprocter.com*
5  **GOODWIN PROCTER LLP**
   53 State Street
6  Boston, Massachusetts  02109
   Telephone:  617-570-1000
7  Facsimile:   617-523-1231

8  *Attorneys for Countrywide Defendants*

9              **UNITED STATES DISTRICT COURT**

              **CENTRAL DISTRICT OF CALIFORNIA**
10
                    **WESTERN DIVISION**
11

12 | IN RE COUNTRYWIDE FINANCIAL | Case No. 11-ML-02265-MRP (MANx) |
   | CORP. MORTGAGE-BACKED SE- |
   | CURITIES LITIGATION |

13                                    **COUNTRYWIDE DEFENDANTS'**
                                      **MEMORANDUM OF POINTS AND**
14                                    **AUTHORITIES IN SUPPORT OF**
                                      **THEIR MOTION TO DISMISS**
15                                    **AND MOTION FOR**
                                      **RECONSIDERATION**
16
                                      Date:          June 13, 2012
17                                    Time:          11:00 a.m.
                                      Courtroom:  12
18                                    Judge:         Hon. Mariana R. Pfaelzer

19 WESTERN AND SOUTHERN LIFE
   INSURANCE COMPANY, *et al.*,
20

21            Plaintiffs,
                                      Case No. 11-CV-07166-MRP (MANx)
22            v.

23 COUNTRYWIDE FINANCIAL COR-
   PORATION, *et al.*,
24

25            Defendants.

26 NATIONAL INTEGRITY LIFE IN-
   SURANCE COMPANY,
27
              Plaintiff,              Case No.  11-CV-09889-MRP (MANx)
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v.

COUNTRYWIDE FINANCIAL
CORPORATION, et al.,

Defendants.

1

# <u>Table of Contents</u>

2

<u>Page</u>

3

PRELIMINARY STATEMENT……………………………………………………1

4

ARGUMENT………………………………………………………………………7

5

6

I.     PLAINTIFFS DO NOT ALLEGE ANY MISSTATEMENTS. ....................7

7

    A.     The Alleged Title-Transfer Misstatements Are Nothing
8           More Than A "Straightforward Description Of The PSA's
           Requirements."...................................................................................8

9

    B.     The MBS Offering Materials Themselves Gave The Trustees
10          Title. ...............................................................................................11

11

    C.     No Defendant Represented To Plaintiffs That It Would Deliver
12          Title Documentation For Every Loan To The Trusts. ........................13

13

    D.     The Title Transfer Allegations Are Conclusory And Insufficient......15

14

    E.     Plaintiffs Fail To Allege Any MERS-Related Misstatement. ............18

15

II.    PLAINTIFFS DO NOT ADEQUATELY ALLEGE INTENT. ..................20

16

    A.     The Complaints Allege No "Diversion Of Resources,"
17          And Any Such Allegations Would Be Implausible...........................21

18

    B.     Plaintiffs Do Not Allege Countrywide Intended to Breach
19          Its Contractual Obligations At The Time The Offerings
           Were Issued.....................................................................................23

20

    C.     Plaintiffs' Allegations Are Not Tied To Any MBS They Bought......25

21

    D.     The Repurchase Or Substitution Provisions Negate Scienter............26

22

23

III.   PLAINTIFFS DO NOT ALLEGE RELIANCE. ........................................27

24

    A.     Plaintiffs Fail To Plead Reliance With The Requisite
25          Particularity....................................................................................27

26

    B.     The Complaints Fail To Plead Justifiable Reliance..........................31

27

28

IV.    PLAINTIFFS DO NOT ALLEGE LOSS CAUSATION. .............................33

V.    THE NEGLIGENT MISREPRESENTATION CLAIMS MUST BE DISMISSED. ..................................................................................................39

VI.    PLAINTIFFS' OSA CLAIMS ARE TIME-BARRED AND OTHERWISE DEFECTIVE. ..........................................................................42

VIII.  THE CIVIL CONSPIRACY CLAIMS MUST BE DISMISSED. ...............57

IX.    JANUS REQUIRES DISMISSAL OF PLAINTIFFS' SECTION 10(b) CLAIMS AGAINST CHL AND CSC. .....................................................61

X.    PLAINITFFS' CLAIMS AGAINST MR. ADLER MUST BE DISMISSED WITH PREJUDICE ................................................................62

CONCLUSION………………………………………………………63

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

# <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Aetna Cas. & Sur. v. Leahey Constr. Co.*,
    219 F.3d 519 (6th Cir. 2000) ................................................................ 60

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
--- F. Supp. 2d ----, 2011 WL 5067128 (C.D. Cal. Oct. 21, 2011) ................. passim

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................... 35

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ................................................................ 24

*Bastian v. Petren Res. Corp.*,
    892 F.2d 680 (7th Cir. 1990) ............................................................. 35

*Bays v. Canty*,
    2009 WL 2424583 (6th Cir. Aug. 7, 2009) ......................................... 58

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ............................................................. 34

*Binder v. Gillespie*,
    184 F.3d 1059 (9th Cir. 1999) (1934 Act) ......................................... 31

*Broadbent v. Americans for Affordable Healthcare, Inc.*,
    2011 WL 7115984 (S.D. Ohio Dec. 16, 2011) ................................... 29

*Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*,
    No. 10-CV-05699, slip opinion (C.D. Cal. Jan. 20, 2011) ............... 28, 29, 38

*Cervantes v. Countrywide Home Loans, Inc.*,
    656 F.3d 1034 (9th Cir. 2011) ........................................................... 20

*City of Cleveland v. Woodhill Supply, Inc.*,
    403 F. Supp. 2d 631 (N.D. Ohio 2005) ........................................... 51, 52

*Destfino v. Reiswig*,
    630 F.3d 952 (9th Cir. 2011) .............................................................. 29

*Dexia Holdings, Inc., v. Countrywide Fin. Corp.*,
    No. 2:11-cv-07165, slip opinion (C.D. Cal. Feb. 17, 2012) ...................... passim

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................... 34, 35

*Fencorp, Co. v. Ohio Kentucky Oil Corp.*,
    --- F.3d ----, 2012 WL 1109648 (6th Cir. Apr. 4, 2012) ....................... 42, 43

*Fezzani v. Bear Stearns & Co.*,
    592 F. Supp.2d 410 (2008) ............................................................. 60

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) ............................................................. 38

*Fisher v. APP Pharm., LLC*,
    783 F. Supp. 2d 424 (S.D.N.Y. 2011) ................................................. 29

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
    2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ............................ 25, 26, 27, 38

*Ford v. New Century Mortg. Corp.*,
    797 F. Supp. 2d 862 (N.D. Ohio 2011) ........................................... 28, 40

*Foster v. Wilson*,
    504 F.3d 1046 (9th Cir. 2007) ......................................................... 21

*Gorham-DiMaggio v. Countrywide Home Loans, Inc.*,
    592 F. Supp. 2d 283 (N.D.N.Y. 2008) ............................................... 61

*Gouge v. BAX Global, Inc.*,
    252 F. Supp. 2d 509 (N.D. Ohio 2003) .............................................. 31

*Granite Partners L.P. v. Bear Stearns & Co.*,
    58 F. Supp. 2d 228 (S.D.N.Y. 1999) ................................................. 33

*Gurary v. Winehouse*,
    235 F.3d 792 (2d Cir. 2000) ........................................................... 24

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir. 1996) ...................................................................................... 28, 31

*Herrick v. Liberty League Int'l*,
  2008 WL 2230702 (S.D. Ohio May 28, 2008) ................................................................ 56

*Hertzberg v. Dignity Partners, Inc.*,
  191 F.3d 1076 (9th Cir. 1999) .......................................................................................... 30

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) ...................................................................................... 36

*In re Gilead Scis Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .......................................................................................... 37

*In re Klusman*,
  29 B.R. 865 (Bankr. Ohio 1983) ...................................................................................... 30

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  568 F.Supp.2d 349 (S.D.N.Y. 2008) ................................................................................ 38

*In re Nat'l Century Fin. Enters., Inc.*,
  504 F. Supp. 2d 287 (S.D. Ohio 2007) ............................................................................ 45

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*,
  755 F. Supp. 2d 857 (S.D. Ohio 2010) ............................................................................ 44

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
  2011 WL 1842819 (N.D. Cal. May 16, 2011) .................................................................. 36

*In re Optionable Sec. Litig.*,
  577 F. Supp. 2d 681 (S.D.N.Y. 2008) .............................................................................. 18

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ...................................................................................... 34, 36

*In re Redback Networks Sec. Litig.*,
  2007 U.S. Dist. LEXIS 91042 (N.D. Cal. 2007) .............................................................. 39

*In re Stac Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) .............................................................................................. 7

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

*In re Williams v. New Day Farms, LLC*,
    2011 U.S. Dist. LEXIS 36543 (S.D. Ohio Mar. 31, 2011) ..............................58

*James v. McCoy*,
    56 F. Supp. 2d 919 (S.D. Ohio 1998).................................................................57

*Janus Capital Group, Inc. v. First Derivative Traders*
    131 S. Ct. 2296 (2011)......................................................................6, 48, 61, 62

*Javitch v. Capwill*,
    284 F. Supp. 2d 848 (N.D. Ohio 2003) .............................................................50

*Jones v. Petland, Inc.*,
    2010 WL 536894 (S.D. Ohio Feb. 11, 2010) ......................................................7

*Keers & Co. v. Am. Steel & Pump Corp.*,
    234 F. Supp. 201 (S.D.N.Y. 1964) ....................................................................24

*Kemp v. Countrywide Home Loans, Inc.* (*In re Kemp*),
    440 B.R. 624 (Bankr. D.N.J. 2010) ..............................................................13, 17

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011)....................................................38

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., et al.*,
    Case No. 11-4443, Summary Order (2d Cir. Apr. 19, 2012) ............................41

*Lapiner v. Camtek, Ltd.*,
    2011 U.S. Dist. LEXIS 99845 (N.D. Cal. Feb. 2,2011)....................................39

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) .............................................................................13

*LoPardo v. Lehman Bros., Inc.*,
    548 F. Supp. 2d 450 (N.D. Ohio 2008) .............................................................43

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
    652 F. Supp. 2d 576 (E.D. Pa. 2009).................................................................38

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
    2011 WL 4389689 (C.D. Cal. May 5, 2011)................................................27, 46

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ........................................................................ 35

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993) ........................................................................... 24

*Molecular Tech. Corp. v. Valentine*,
    925 F.2d 910 (6th Cir. 1991) .......................................................................... 33

*Mulbarger v. Royal Alliance Ass'n, Inc.*,
    1999 WL 33432317 (S.D. Ohio Dec. 22, 1999) .............................................. 41

*Murray v. Toyota Motor Distribs, Inc.*,
    664 F.2d 1377 (9th Cir. 1982) ........................................................................ 59

*Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs., LLC*,
    813 F. Supp. 2d 871 (S.D. Ohio 2011) ..................................................... passim

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ........................................................................................ 46

*Rahimi v. St. Elizabeth Med. Ctr.*,
    1997 WL 33426269 (S.D. Ohio July 16, 1997) ............................................... 55

*Reese v. BP Exploration (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) .......................................................................... 24

*Robins v. Global Fitness Holdings, LLC*,
    --- F. Supp. 2d ---, 2012 WL 163031 (N.D. Ohio Jan. 18, 2012) .................... 51

*Roque v. Suntrust Mortg., Inc.*,
    2010 WL 546896 (N.D. Cal. Feb. 10, 2010) ................................................... 61

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009) ............................................................. 56

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) .......................................................................... 7

*Sanford v. MemberWorks, Inc.*,
    625 F.3d 550 (9th Cir. 2010) ............................................................................ 8

*Shields v. UnumProvident Corp.*,
  415 F. App'x 686 (6th Cir. 2011)...........................................................49, 53, 54

*SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*,
  2010 WL 2473595 (S.D.N.Y. June 17, 2010)....................................................33

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008) ...................................................................................27

*Suss v. JP Morgan Chase Bank, N.A.*,
  2010 WL 2733097 (D. Md. July 9, 2010) .........................................................20

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007)............................................................11, 60, 61

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................20, 21

*Thornton v. Micrografx, Inc.*,
  878 F. Supp. 931 (N.D. Tex. 1995)..................................................................53

*Thrivent Fin. For Lutherans v. Countrywide Fin. Corp.*,
  No. 2:11-cv-07154, slip op. (C.D. Cal. Feb. 17, 2012)..............................passim

*Toledo Fund, LLC v. HSBC Bank USA, Nat'l Ass'n*,
  2012 WL 364045 (S.D.N.Y. Feb. 3, 2012) ......................................................41

*Valente v. University of Dayton*,
  689 F. Supp. 2d 910 (S.D. Ohio 2010).............................................................58

*VanDenBroeck v. CommonPoint Mortg. Co.*,
  210 F.3d 696 (6th Cir. 2000) .........................................................................50

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ........................................................................60

*Wadhwa v. Aurora Loan Servs., LLC*,
  2012 WL 762020 (E.D. Cal. Mar. 8, 2012).......................................................60

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
  435 F.3d 989 (9th Cir. 2006) ..........................................................................60

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

*Weiss v. Amkor Tech., Inc.,*
    527 F. Supp. 2d 938 (D. Ariz. 2007) ..................................................... 39

*Zeigler v. Findlay Indus., Inc.,*
    380 F. Supp. 2d 909 (N.D. Ohio 2005) ................................................. 59

*Ziegler v. Findlay Indus., Inc.,*
    464 F. Supp. 2d 733 (N.D. Ohio 2006) ................................................. 40

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) ................................................................ 20

**STATE CASES**

*Abacus Fed. Sav. Bank v. Lim,*
    905 N.Y.S.2d 585 (N.Y. App. Div. 2010) ............................................ 57

*Abrahami v. UPC Constr. Co.,*
    574 N.Y.S.2d 52 (N.Y. App. Div. 1991) .............................................. 61

*Avery v. Rossford, Ohio Transp. Improvement Dist.,*
    762 N.E.2d 388 (Ohio Ct. App. 2001) ................................................. 59

*Block v. Chassin,*
    319 N.Y.S.2d 86 (N.Y. Sup. Ct. App. Div. 1971) ................................ 58

*Boomershine v. Lifetime Capital Inc.,*
    2008 WL 54803 (Ohio Ct. App. Jan. 4, 2008) ................................ 21, 49

*Byrley v. Nationwide Life Ins. Co.,*
    640 N.E.2d 187 (Ohio Ct. App. 1994) ................................................. 44

*Cerabono v. Price,*
    775 N.Y.S.2d 585 (N.Y. App. Div. 2004) ............................................ 32

*CitiMortgage, Inc. v. Hoge,*
    962 N.E.2d 327 (Ohio Ct. App. 2011) ................................................... 7

*Citizens Nat'l Bank v. Barge-In, Inc.,*
    1984 WL 3429 (Ohio Ct. App. Sept. 28, 1984) .................................... 21

ix

*Cohen v. Houseconnect Realty Corp.*,
     734 N.Y.S.2d 205 (2d Dep't 2001) ...................................................... 7

*Collins v. Nat'l City Bank*,
     2003 WL 22971874 (Ohio Ct. App. Dec. 19, 2003) ............................ 60

*Crosby v. Beam,*
     615 N.E.2d 294 (Ohio Ct. App. 1992) ................................................ 59

*Crown Prop. Dev., Inc. v. Omega Oil Co.*,
     681 N.E.2d 1343 (Ohio Ct. App. 1996) .............................................. 31

*Delman v. City of Cleveland Heights*,
     534 N.E.2d 835 (Ohio 1989) ........................................................ 39, 41

*Dep't of Comm. v. Buckeye Fin. Corp.*,
     377 N.E.2d 502 (Ohio 1978) ............................................................... 48

*Dickerson Internationale, Inc. v. Klockner*,
     743 N.E.2d 984 (Ohio Ct. App. 2000) ................................................ 34

*Dowlings, Inc. v. Homestead Dairies, Inc.*,
     932 N.Y.S.2d 192 (N.Y. App. Div. 2011) ........................................... 24

*Federated Mgmt. Co. v. Coopers & Lybrand*,
     2004 WL 2941159 (Ohio Ct. App. Dec. 21, 2004) ............................. 34

*Ferritto v. Alejandro*,
     743 N.E.2d 978 (Ohio Ct. App. 2000) ................................................ 44

*Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n*,
     560 N.E.2d 206 (Ohio 1990) ........................................................ 39, 40

*Florenzano v. Olson*,
     387 N.W.2d 168 (Minn. 1986) ............................................................ 42

*Ford v. Brooks*,
     2012 WL 760741 (Ohio Ct. App. Mar. 8, 2012) .................................. 8

*Glassman v. Wachovia Bank, N.A.*,
     2007 WL 2582364 (N.Y. Sup. Ct. Sept. 7, 2007) ................................. 2

x

*Groch v. Gen. Motors Corp.*,
    883 N.E.2d 377 (Ohio 2008) ............................................................. 43

*Gutter v. Dow Jones, Inc.*,
    490 N.E.2d 898 (Ohio 1986) ......................................................... 40, 41, 42

*Harshman II Dev. Co., L.L.C. v. Meijer Stores Ltd. P'ship*,
    938 N.E.2d 53 (Ohio Ct. App. 2010) .................................................. 33

*Herakovic v. Catholic Diocese of Cleveland*,
    2005 WL 3007145 (Ohio Ct. App. Nov. 10, 2005) ........................ 49, 50, 55, 57

*In re Impax*,
    2007 WL 5076983 ........................................................................ 39

*Infocision Mgmt. Corp. v. Foundation for Moral Law, Inc.*,
    2009 WL 650282 (N.D. Ohio Jan. 14, 2009) ...................................... 56

*Johnson v. Church of the Open Door*,
    902 N.E.2d 1002 (Ohio Ct. App. 2008) ............................................. 28

*Langford v. Sloan*,
    833 N.E.2d 331 (Ohio Ct. App. 2005) .............................................. 23

*Lapos Constr., Inc. v. Leslie*,
    2006 WL 3174252 (Ohio Ct. App. Nov. 6, 2006) ................................ 33

*Laub v. Faessel*,
    745 N.Y.S.2d 534 (N.Y. App. Div. 2002)......................................... 34

*Lewis v, Friedman-Marks Clothing Co.*,
    418 N.Y.S.2d 60 (N.Y. Sup. Ct. App. Div. 1979)............................... 58

*McNabb v. Hoeppner*,
    2011 WL 2571386 (Ohio Ct. App. June 22, 2011) .............................. 40

*MERSCORP, Inc. v. Romaine*,
    861 N.E.2d 81 (N.Y. 2006) ...................................................... 14, 19

*Meyercord v. Curry*,
    832 N.Y.S.2d 29 (N.Y. App. Div. 2007)........................................... 34

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

*Morrow v. Reminger & Reminger*
    915 N.E.2d 969 (Ohio Ct. App. 2009) ................................................. 51, 52, 57

*Nicosia v. Bd. of Managers of Weber House Condo.*,
    909 N.Y.S.2d 412 (N.Y. App. Div. 2010)............................................... 8

*Non-Linear Trading Co., Inc. v. Braddis Assoc. Inc.*,
    675 N.Y.S. 2d 5 (N.Y. App. Div. 1998)................................................ 23

*Schrock v. D & N Dev., Inc.*,
    1995 WL 495488 (Ohio Ct App. June 28, 1995) ................................... 59

*SNS Bank, N.V. v. Citibank, N.A.*,
    777 N.Y.S.2d 62 (N.Y. App. Div. 2004)................................................ 2

*State v. Warner*,
    564 N.E.2d 18 (Ohio 1990) ................................................................ 48

*Stiles v. Chrysler Motors Corp.*,
    624 N.E.2d 238 (Ohio Ct. App. 1993) ........................................... 57, 58, 59

*Strunk v. Settles*,
    1980 WL 353191 (Ohio Ct. App. Feb. 13, 1980) ................................. 49

*Tanzman v. La Pietra*,
    778 N.Y.S.2d 199 (N.Y. App. Div. 2004)............................................. 23

*Tibbs v. National Homes Const. Corp.*,
    369 N.E.2d 1218 (Ohio Ct. App. 1977) .............................................. 24

*Volbers-Klarich v. Middletown Mgmt., Inc.*,
    929 N.E.2d 434 (Ohio 2010) .............................................................. 34

*Waggoner v. Caruso*,
    886 N.Y.S.2d 368 (N.Y. App. Div. 2009)............................................. 30

*Williams v. Aetna Fin. Co.*,
    83 Ohio St. 3d 464 (1998) ................................................................. 21

*Williams v. Edwards*,
    717 N.E.2d 368 (Ohio Ct. App. 1998) ................................................ 24

xii

*WIT Holding Corp. v. Klein*,
   724 N.Y.S.2d 66 (N.Y. App. Div. 2001) ........................................................40, 41

**FEDERAL STATUTES AND RULES**

15 U.S.C. § 77b(a)(4) ........................................................................................ 62

15 U.S.C. §§ 77e(b)(1)-(2) ............................................................................... 62

15 U.S.C. § 78u-4(b)(2) .................................................................................... 20

17 C.F.R. § 240.10b-5(b) .................................................................................. 61

18 U.S.C. § 1513(e) .......................................................................................... 56

28 U.S.C. § 1658(b) .......................................................................................... 19

Fed. R. Civ. P. 9(b) ......................................................................................... 6, 7

**OTHER STATUTES**

CPLR 3016(b) .................................................................................................. 7, 8

O.R.C. § 1707.41 ......................................................................................passim

O.R.C. § 1707.43 ......................................................................................passim

O.R.C. § 1707.44 ..............................................................................21, 46, 47

O.R.C. § 2913.31 ..............................................................................56, 57

O.R.C. § 2913.42 ........................................................................................... 57

O.R.C. § 2913.47 ........................................................................................... 55

O.R.C. § 2921.11 ........................................................................................... 57

O.R.C. § 2921.12 ........................................................................................... 57

O.R.C. §§ 2923.34 ..............................................................................49, 55, 57

## **PRELIMINARY STATEMENT**

The Complaints do not state a claim and should be dismissed with prejudice. On March 9, 2012, this Court dismissed as time-barred the bulk of Plaintiffs' claims, sustaining (in most cases) only those claims arising from allegations that Defendants failed to transfer title in accordance with the relevant language in the Offering Materials. Thus, with few exceptions, Plaintiffs cannot rely on the central allegations in their Complaints: that Countrywide abandoned its underwriting guidelines and concealed from investors the quality of the collateral pools, and that investors supposedly were harmed as a result.[1] Instead, in the wake of this Court's March 9, 2012 order, all that remains of the Complaints is generalized and factually unsupported allegations that title and mortgage documentation were not effectively transferred to the MBS trustees—allegations nearly identical to those this Court rejected in *Dexia* and *Thrivent. See Western & Southern* Amended Complaint ("*W&S* AC")/*National Integrity* Complaint ("*NI* Compl.") ¶¶ 197-242.[2] Everything else is off the table. These Complaints thus do not state a claim and should be dismissed with prejudice.

***No Material Misrepresentation.*** Just as this Court held in *Dexia* and *Thrivent*, the Complaints here do not allege a material misrepresentation regarding assignment and delivery of title to the trusts, which is required to sustain Plaintiffs'

---

[1]   In its March 9, 2012 order, the Court dismissed most of Plaintiffs' claims as time-barred. Specifically, the Court dismissed all 1933 Act claims as well as 1934 Act claims to the extent based on purchases made before April 24, 2006. It also dismissed all remaining 1934 Act claims, all Ohio Securities Act claims, and the Western & Southern plaintiffs' common law fraud, negligent misrepresentation and civil conspiracy claims to the extent premised on alleged underwriting abandonment. The Court also held that the National Integrity plaintiff's fraud, negligent misrepresentation and civil conspiracy claims were timely under New York's six-year statute of limitations, and that both Complaints' claims under the Ohio Corrupt Practices Act were timely under that statute's five-year limitations period. Thus, the only remaining claims now based on allegations relating to loan underwriting and collateral quality are (1) the National Integrity plaintiff's common law claims, and (2) both Plaintiffs' claims under the Ohio Corrupt Practices Act. These claims also are not well-pleaded, however, and should be dismissed as well for the reasons addressed *infra* at §§ V, VII, VII.

[2]   Because they are virtually identical, unless otherwise noted, the terms "Compl. ¶ __" and "Count" shall refer to both the Western & Southern ("W&S") and National Integrity ("NI") complaints.

1

1   claims for alleged violation of the Ohio Securities Act ("OSA") (Counts 1-5) and

2   the 1934 Act (Counts 8-9), negligent misrepresentation (Count 7), and common law

3   fraud (Count 14).[3]

4      ***First***, as this Court held in *Dexia* and *Thrivent*, the statements in the Offering

5   Materials on which Plaintiffs supposedly relied are nothing more than "straightfor-

6   ward description[s] of the PSA's requirements" and cannot form the basis of a claim

7   of material misstatement. *See Dexia Holdings, Inc., et al. v. Countrywide Fin.*

8   *Corp., et al.*, Case No. 2:11-cv-07165-MRP-MAN, slip op. at 11 (C.D. Cal. Feb. 17,

9   2012) ("*Dexia*") (RJN Ex. 44); *Thrivent Fin. For Lutherans, et al. v. Countrywide*

10  *Fin. Corp, et al.*, Case No. 2:11-cv-07154, slip op. at 9-10 (C.D. Cal. Feb. 17, 2012)

11  ("*Thrivent*") (RJN Ex. 45).  This failure to identify any supposed misstatement in

12  the Offering Materials other than descriptions of the PSAs' title transfer require-

13  ments is dispositive of Plaintiffs' title-transfer-related claims, requiring their dis-

14  missal.  The Court need go no further.

15     ***Second***, a separate and independent reason that Plaintiffs' title transfer-based

16  claims fail is that – contrary to Plaintiffs' allegations that Countrywide misrepre-

17  sented that "the underlying mortgage loans had been *validly assigned* to the Trusts

18  that issued the Certificates" (Compl. ¶ 9) (emphasis added) – assignment was ef-

19  fected *by the Offering Materials themselves*.

20     ***Third***, Plaintiffs' case is premised on the argument that all mortgage docu-

21  mentation underlying their MBS was promised to be delivered to the trustee.  But

22  _____

23  [3] When discussing National Integrity's common law claims, this memorandum pri-
    marily addresses Ohio law.  It also cites New York law where not in conflict with

24  Ohio law, consistent with the conflict-of-laws rules under the law of New York,
    where the *National Integrity* complaint was filed.  *See, e.g., SNS Bank, N.V. v. Citi-*

25  *bank, N.A.*, 777 N.Y.S.2d 62, 64 (N.Y. App. Div. 2004) (where no conflict between
    the laws of the jurisdictions involved, "then the law of the forum state where the ac-

26  tion is being tried should apply"); *Glassman v. Wachovia Bank, N.A.*, 2007 WL
    2582364, *3 (N.Y. Sup. Ct. Sept. 7, 2007) (where no conflict between the laws of

27  the jurisdictions involved, "there is no reason to engage in a choice of law analy-
    sis.") (quotation omitted).  Because the New York law cited in this memorandum is

28  not inconsistent with Ohio law, the Court may consider it as persuasive authority
    with respect to the *Western & Southern* common law claims as well.

that is untrue.  The Offering Materials on their face do *not* say that "Countrywide" (Plaintiffs' catch-all phrase that lumps together eight separate defendants) would deliver documentation for all of the mortgages to the trustee.  Instead, in describing the requirements of the PSAs, the Offering Materials state that although *in some cases* documentation *will be* delivered in the future *by the depositor* (not "Countrywide"), in *many* cases it will *not be delivered.*  Plaintiffs ignore this language, and do not even try to allege that any defendant failed to follow it.  Moreover, even if "Countrywide" had made such an unconditional promise, which it did not, the Complaints do not adequately allege that Countrywide *failed* to fulfill its obligations as to any mortgage actually collateralizing Plaintiffs' MBS.  Plaintiffs thus have not pleaded falsity.  Instead, Plaintiffs selectively highlight snippets from voluminous court records of litigation concerning just *one* unrelated Countrywide home mortgage that does not back any of the MBS Plaintiffs bought, other unrelated lawsuit allegations, and government reports on the mortgage industry generally issued years after the fact, to argue that Countywide "never" transferred or delivered title.  But those materials do not say that.  If anything, they support the opposite conclusion, observing for example that in many cases the relevant trusts *did* hold the physical titles.  Moreover, the thrust of Plaintiffs' argument is that this supposed failure (either to assign the mortgages or deliver title documentation) somehow hindered the trusts' ability to foreclose on the collateral, but the Complaints do not contain specific factual allegations to support this argument.  And in any event the Offering Materials themselves transferred legal title to the trustee.

*No Intent*.  The Complaints do not allege fraudulent intent, which is an element of Plaintiffs' claims under the 1934 Act (Counts 8, 9), common law fraud (Count 14), civil conspiracy (Count 15), and the OSA (Counts 1-5).  Plaintiffs characterize the statements from the Offering Materials they challenge as promises of future conduct (as opposed to simply statements of what the PSAs required)—*e.g.*, "Defendants represented . . . that the underlying mortgages and notes ***would be***

1   properly assigned to the trusts and the loan files ***would similarly be*** delivered to the

2   trusts." Compl. ¶ 206 (emphasis added). Even assuming for argument's sake only

3   that Plaintiffs' characterization were correct, such statements cannot support a fraud

4   claim absent particularized factual allegations showing that the speaker intended at

5   the time of the statement *not* to do what was allegedly promised. The Complaints

6   contain no facts supporting that conclusion, however, and Plaintiffs have not

7   pleaded fraudulent intent.

8   ***No Reliance.*** Plaintiffs do not allege reliance with the required factual par-

9   ticularity. Instead, they say—generally and vaguely—that they relied on an undif-

10  ferentiated mass of statements in the Offering Materials. They also do not plead

11  facts showing that any such claimed reliance was reasonable. To the contrary, the

12  Offering Materials themselves show that Countrywide did *not* unconditionally

13  promise to deliver title documentation for every mortgage to the trustee, rendering

14  any reliance unjustifiable as a matter of law.

15  ***No Loss Causation.*** Plaintiffs do not adequately allege loss causation, and

16  Counts 1-5 (OSA), Count 7 (negligent misrepresentation), Counts 8-9 (1934 Act),

17  and Count 14 (common law fraud) thus must be dismissed. The Court previously

18  has addressed the adequacy of loss causation allegations in regard to Countrywide

19  MBS. But here the Court must determine for the first time whether conclusory title-

20  transfer allegations, standing alone, satisfy the standards articulated in *Dura* and

21  *Oracle* and in similar state common law authorities. They do not. Plaintiffs plead

22  no facts that would support a plausible inference that their alleged losses (either in

23  market value or impaired payment of principal and interest) are attributable to title-

24  transfer issues, as opposed to what the Complaints *do* try to argue caused their

25  losses, including poor collateral quality, misstatements as to creditworthiness,

26  fraudulent appraisals, and the like. Plaintiffs also do not adequately plead that their

27  alleged losses are due to title-transfer issues as opposed to the financial crisis. To

28  the contrary, the Court can take judicial notice that the prices of Plaintiffs' MBS

4

1  steadily rose *after* Plaintiffs say the market first became aware of the alleged title
2  transfer issues, which negates loss causation as a matter of law.  Again, although the
3  Court has declined in the past to "untangle" the impact of the financial crisis from
4  the supposed impact of collateral quality at the pleading stage, here no untangling is
5  required.  Unless the Complaints plausibly allege that the losses (which Plaintiffs
6  say exceed 30% of their investment) were somehow caused by the vaguely-alleged
7  title-transfer deficiencies (as opposed to *any* combination of allegedly poor under-
8  writing, collateral quality, *and/or* the financial crisis), they must be dismissed.
9  Countrywide respectfully submits that these issues are ripe for resolution, and do not
10  require a fact inquiry in order to be resolved in Countrywide's favor.

11      ***Negligent Misrepresentation.***  Plaintiffs' negligent misrepresentation claims
12  (Count VII) must be dismissed, regardless of whether they are grounded in the title-
13  transfer allegations.  Negligent misrepresentation claims may not be asserted
14  where—as here—the parties engaged in arm's length business transactions not in-
15  volving a "special relationship" between the parties where the defendant was pro-
16  viding opinions to the plaintiff for use in its business.  For precisely this reason, the
17  Court dismissed the substantially identical negligent misrepresentation claims in
18  *Thrivent*.  *Thrivent*, slip op. at 12.  They should be dismissed here as well.

19      ***Certain OSA Claims Are Time-Barred And Otherwise Defective***.  Because
20  of new authority from the Sixth Circuit Court of Appeals, the Countrywide Defen-
21  dants respectfully request that the Court reconsider its decision that the "right-to-a-
22  remedy" provision of the Ohio Constitution bars enforcement of the OSA five-year
23  statute of repose.  After this Court issued its March 9, 2012 order dismissing the vast
24  majority of Plaintiffs' claims, the Sixth Circuit issued a decision sustaining the con-
25  stitutionality of the OSA statute of repose and affirming the district court's dismissal
26  of OSA claims under the repose period, expressly rejecting the argument that the
27  Ohio Constitution's "right-to-a-remedy" provision prohibited its application.  The
28  Court of Appeals held that the Ohio Constitution does *not* bar application of the

statute of repose to new statutory rights created by the Ohio Legislature.  This rea-
soning applies with equal force to the provisions of the OSA invoked by Plaintiffs
here.  Accordingly, claims based on those securities purchased more than five years
before the Complaints' respective filing dates should be dismissed as barred.  Plain-
tiffs' OSA claims as to certain defendants also must be dismissed for failure to sat-
isfy the plain language of the statute.

   ***Ohio Corrupt Practices Act ("OCPA")***.  Plaintiffs' OCPA claims (Count 6)
must be dismissed because (a) Plaintiffs do not plead the existence of a cognizable
enterprise, having failed to adequately allege that any non-Countrywide-affiliated
entity was a member of the supposed enterprise, and (b) Plaintiffs do not plead an
actionable pattern consisting of at least one corrupt act which does not involve fraud
in the sale of securities.

   ***Civil Conspiracy***.  All of Plaintiffs' civil conspiracy claims (Count 15) must
be dismissed because (a) they are predicated on Plaintiffs' underlying claims, which
are inadequately pleaded, (b) Plaintiffs have failed to allege a conspiracy between
two or more persons because the Complaints treat Defendants as the same collective
entity, making a conspiracy impossible under the "intra-corporate conspiracy doc-
trine," and (c) Plaintiffs have not alleged with factual particularity (as they must un-
der Federal Rule 9(b)) that defendants acted intentionally in furtherance of a con-
spiracy to defraud, or what steps were taken by which defendants in furtherance of
the supposed conspiracy.

   ***Janus Bars Section 10(b) Claims Against CHL and CSC***.  In *Janus Capital
Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011), the Supreme
Court held that primary liability under Rule 10b-5 is limited to the "person or entity
with ultimate authority over the statement, including its content and whether and
how to communicate it."  Because defendants CHL and CSC did not file the Offer-
ing Materials at issue with the Securities and Exchange Commission, and no state-
ment in the Offering Materials is attributed to them, Plaintiffs' remaining Section

1    10(b) claims against them must be dismissed.

2    <u>**ARGUMENT**</u>

3    **I.      <u>PLAINTIFFS DO NOT ALLEGE ANY MISSTATEMENTS.</u>**

4            In *Dexia* and *Thrivent*, this Court considered materially identical allegations

5    regarding alleged misstatements concerning the transfer of title to MBS trusts, and

6    held that the complaints failed to sufficiently allege a misstatement.  *Dexia*, slip op.

7    at 11 (". . . Plaintiffs have not identified any reason that the Prospectus Supplement

8    language in [the complaint] was either material or false."); *Thrivent*, slip op. at 9-10

9    ("As in *Dexia*, [the title transfer] allegations fail to identify a misstatement with suf-

10   ficient particularity.").  The Court should reach the same conclusion here.

11           All of Plaintiffs' claims based on alleged misrepresentations "must be pleaded

12   with particularity" under Fed. R. Civ. P. 9(b).  *Dexia*, slip op. at 10 ("Allegations of

13   fraud must be pleaded with particularity.") (citing *Vess v. Ciba-Geigy Corp. USA*,

14   317 F.3d 1097, 1104 (9th Cir. 2003) ("It is established law, in this circuit and else-

15   where, that Rule 9(b)'s particularity requirement applies to state-law causes of ac-

16   tion.")); *Thrivent*, slip op. at 9-10 (dismissing all claims premised on title-transfer

17   allegations for "fail[ure] to identify a misstatement with sufficient particularity").[4]

18   To satisfy Rule 9(b), Plaintiff must plead "*precise* allegations explaining how the

19   alleged misstatements were misleading or untrue when made," *In re Stac Sec. Litig.*,

20   89 F.3d 1399, 1409 (9th Cir. 1996), and "must set forth what is false or misleading

21

22   [4]  Ohio and New York expressly require fraud and negligent misrepresentation
     claims to be pled with particularity. *See CitiMortgage, Inc. v. Hoge*, 962 N.E.2d

23   327, 333 (Ohio Ct. App. 2011) ("The 'particularity' requirement of Civ. R. 9(b)
     means that the pleading must contain allegations of fact which tend to show each

24   and every element of a cause of action for fraud."); *Jones v. Petland, Inc.*, 2010 WL
     536894, at *4 (S.D. Ohio Feb. 11, 2010) (applying Rule 9(b) to negligent misrepre-

25   sentation); *Cohen v. Houseconnect Realty Corp.*, 734 N.Y.S.2d 205, 207 (2d Dep't
     2001) (dismissing fraud and negligent misrepresentation claims where complaint

26   failed to set forth defendant's alleged misrepresentations per CPLR 3016(b)).  Plain-
     tiffs' Ohio Securities Act claims are also subject to Rule 9(b). *Ohio Police &*

27   *Fire Pension Fund v. Standard & Poor's Fin. Servs., LLC*, 813 F. Supp. 2d 871, 878-79
     (S.D. Ohio 2011) (dismissing Ohio Securities Act claims for failure to plead a viola-

28   tion of the Act with particularity).

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

1   about a statement, and why it is false," *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d

2   1156, 1161 (9th Cir. 2009) (quotation omitted).  *See also Sanford v. MemberWorks,*

3   *Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) ("Accordingly, [t]o avoid dismissal for in-

4   adequacy under Rule 9(b), [the] complaint would need to state the time, place, and

5   specific content of the false representations as well as the identities of the parties to

6   the misrepresentation.") (quotation omitted).[5]  Plaintiffs here, however, allege no

7   false statement regarding the transfer of title for any of the loans underlying the

8   MBS they purchased, let alone with the requisite particularity.[6]

9         **A.**    **The Alleged Title-Transfer Misstatements Are Nothing More Than**
10               **A "Straightforward Description Of The PSA's Requirements."**

11        As in *Dexia* and *Thrivent*, Plaintiffs argue that "Defendants represented in the

12   Offering Materials associated with each securitization that the underlying mortgages

13   and notes would be properly assigned to the trust and that the loan files would simi-

14

15   [5]  *See also Ford v. Brooks*, 2012 WL 760741, at *7 (Ohio Ct. App. Mar. 8, 2012)
(for fraud claims, a plaintiff must plead "the time, place, and content of the false
16   representation, the fact represented, the individual who made the representation, and
the nature of what was obtained or given as a consequence of the fraud."); *Nicosia v.*
17   *Bd. of Managers of Weber House Condo.*, 909 N.Y.S.2d 412, 414-15 (N.Y. App.
Div. 2010) (dismissing "bare-bones" complaint for failure to plead with particularity
18   as required under CPLR 3016(b)).

19   [6] Plaintiffs' failure to allege a misstatement is fatal to their OSA claims under §§
1707.41, 1707.44(B)(4) and 1707.44.(J).  *See* Ohio Rev. Code §§ 1707.41 ("[A]ny
20   person that, by written or printed circular, prospectus, or advertisement offers any
security for sale, or receives the profits accruing from such sale, is liable to any per-
21   son that purchased the security relying on the circular prospectus or advertisement
from the loss or damage sustained by the relying person by reason of ***the falsity of***
22   ***any material statement*** contained therein . . . .") (emphasis added); 1707.44(B)(4)
("No person shall knowingly make or cause to be made ***any false representation***
23   concerning a material and relevant fact, in any oral statement or in any prospectus,
circular, description, application, or written statement . . . .") (emphasis added);
24   1707.44(J) ("No person, with purpose to deceive, shall make, issue, publish, or
cause to be made, issued, or published any statement or advertisement as to the
25   value of securities, or as to alleged facts affecting the value of securities, or as to the
financial condition of any issuer of securities, when the person knows that the
26   ***statement or advertisement is false in any material respect***.")(emphasis added);
1707.44(G) ("No person in purchasing or selling securities shall knowingly engage
27   in any act or practice that is, in this chapter, declared illegal, defined as fraudulent,
or prohibited by the Ohio Securities Act.").  Moreover, it is also fatal to Plaintiffs' §
28   1707.43 claim, § 1707.43 requires Plaintiffs to prove and allege a "predicate viola-
tion" of § 1707.  *Ohio Police*, 813 F. Supp. 2d at 878-79.

8

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

larly be delivered to the trusts."  Compl. ¶ 206.  But this allegation fails for the same reason it failed in *Dexia* and *Thrivent*—it does not identify any particular misstatement or explain why it was false when made.  Instead, Plaintiffs do nothing more than point to a single statement in the Offering Materials[7]:

> Pursuant to the pooling and servicing agreement [a phrase Plaintiffs chose to omit from their quote], on the closing date, *the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each mortgage loan and all right, title and interest in and to all other assets* included in Alternative Loan Trust 2007-16CB. . . .

Compl. ¶ 206 (quoting CWALT 2007-16CB Pro. Supp. at S-39-S-40) (emphasis added.)[8]  This provision is substantively identical to the alleged title transfer misstatement on which the *Dexia* and *Thrivent* plaintiffs relied:

> Under the pooling and servicing agreement, *the depositor will assign its*

---

[7] The Countrywide Defendants will, whenever possible, use seven specific prospectus supplements—two each from the CWHEQ, CWMBS, and CWABS Depositors and three from the CWALT Depositor—as illustrative examples throughout this brief.  Those prospectus supplements are:  (1) Alternative Loan Trust, Series 2007-16CB Prospectus Supplement, filed June 28, 2007 ("CWALT 2007-16CB Pro. Supp.") (Ex. 1); (2) Alternative Loan Trust, Series 2005-26CB Prospectus Supplement, filed May 24, 2005 ("CWALT 2005-26CB Pro. Supp.") (Ex. 2); (3) Alternative Loan Trust, Series 2005-J1, filed Jan. 26, 2005 ("CWALT 2005-J1") (Ex. 3); (4) CHL Mortgage Pass-Through Trust 2006-21, filed Dec. 27, 2006 ("CWMBS 2006-21") (Ex. 4); (5) CWABS Asset-Backed Certificates Trust, Series 2007-4 Prospectus Supplement, filed Mar. 28, 2007 ("CWABS 2007-4 Pro. Supp.") (Ex. 5); (6) CWHEQ Revolving Home Equity Loan Trust, Series 2006-S8 Prospectus Supplement, filed Dec. 27, 2006 ("CWHEQ 2006-S8 Pro. Supp.") (Ex. 6); and (7) CWHEQ Home Equity Loan Trust, Series 2007-S1 Prospectus Supplement, filed Feb. 27, 2007 ("CWHEQ 2007-S1 Pro. Supp.") (Ex. 7).  All of these documents (like the SEC filings in all  deals) are available at www.sec.gov/edgar/searchedgar/webusers.htm.

[8] Plaintiffs quote a few additional sentences from the Prospectus Supplement that immediately follow the statement quoted above, but these sentences are likewise nothing more than a summary of the PSA's provisions.  *Compare* Compl. ¶ 206 (quoting CWALT 2007-16CB Prospectus Supplement at S-39-S-40) *with* RJN Ex. 34, (PSA for CWALT 2007-16CB), at § 2.01(c).  Moreover, the Prospectus Supplements for the MBS at issue in *Dexia* and *Thrivent* contained virtually identical language.  *See* RJN Ex. 9 (CWALT 2007-17CB Pro. Supp.) at S-35-S-36; RJN Ex. 8 (CWALT 2006-4CB Pro. Supp.) at S-49-S-50; *see also Dexia* Compl. ¶ 193; *Thrivent* Compl. ¶ 224.

9

*right, title and interest in the representations, warranties and covenants (in-*
*cluding the sellers' repurchase and substitution obligation) to the trustee for*
*the benefit of the certificate holders.*

*Dexia* Compl. ¶ 193 (emphasis in Complaint); *Thrivent* Compl. ¶ 224 (emphasis in Complaint); *see also* Appendix A (comparing title transfer allegations in *Dexia*, *Thrivent*, *W&S* and *NI* complaints).  And like the plaintiffs in *Dexia* and *Thrivent*, the Plaintiffs here do not allege a single fact showing why this statement *was false when made*.  Plaintiffs' conclusory allegations that title was not assigned or deliv-ered does not mean that these statements about the depositors' obligation under the PSAs to transfer title did not accurately describe those obligations, let alone support any inference that the depositors did not believe these statements when made, did not comply or intend to comply with whatever obligations they had, or believe that title would not be effectively and legally transferred.  *See* Section II *infra*.

In this Court's words, these representations are nothing more than "a straight-forward description of the PSA's requirements" with respect to the depositor's transfer of title to the trustee.  *Dexia*, slip op. at 11.  Thus, as in *Dexia* and *Thrivent*, Plaintiffs "have not identified any reason that the Prospectus Supplement language . . . was either material or false." *Id*.; *Thrivent*, slip op. at 9-10 ("As in *Dexia*, [the] allegations fail to identify a misstatement with sufficient particularity.").  Plaintiffs' failure to identify a misstatement is dispositive, requiring dismissal of all claims re-maining in the Complaints that relate to alleged title transfer defects.

Moreover, as in *Dexia* and *Thrivent*, Plaintiffs' blunderbuss allegations seek to sweep within them all of the Countrywide entities named as defendants in the Complaints.  Like the *Dexia* and *Thrivent* plaintiffs, Plaintiffs here allege collec-tively that "*Countrywide* did not come close to complying with the strict rules gov-erning assignment of mortgages, and transfer of promissory notes and loan files" (Compl. ¶ 209 (emphasis added)) and that "*Countrywide* . . . made no attempt to as-sign mortgages." *Id*. (emphasis added); *see also Thrivent* Compl. ¶ 172; *Dexia*

1  Compl. ¶ 151 ("*Countrywide* . . . routinely failed to comply with the requirements of

2  applicable state laws and the PSAs for the valid transfers of the notes and security

3  instruments to the issuing trusts") (emphasis added). But, as noted below, title *was*

4  properly assigned and in any case, as this Court explained in *Dexia*, the representa-

5  tions on which Plaintiffs rely only address the *depositors*' obligations with respect to

6  title transfer to the trustee—and not any other Countrywide-related entities. *See*

7  RJN Ex. 1 (CWALT 2007-16CB Prospectus Supplement (filed June 28, 2007)), at

8  S-39 ("the *depositor* will sell, transfer, assign, set over and otherwise convey . . . all

9  right, title and interest of the depositor in and to each mortgage loan . . . .") (empha-

10  sis added).[9] Thus, as in *Dexia* and *Thrivent*, Plaintiffs' allegations do not support

11  any inference that each of the Countrywide entities named in the Complaint failed to

12  satisfy any title-transfer obligation, or made any misleading statement regarding title

13  assignment or delivery of title documentation, and must be dismissed. *Dexia*, slip

14  op. at 11; *see also Thrivent*, slip op. at 10.[10]

15      **B.**     **The MBS Offering Materials Themselves Gave The Trustees Title.**

16      A separate and independent reason that Plaintiffs' title transfer-based claims

17

18  [9] *See also* RJN Ex. 2 (CWALT 2005-26CB Pro. Supp.), at S-24; RJN Ex. 3 (CWALT 2005-J1 Pro. Supp.), at S-73; RJN Ex. 5 (CWABS 2007-4 Pro. Supp.), at

19  S-29; RJN Ex. 6 (CWHEQ 2006-S8 Pro. Supp.), at S-25; RJN Ex. 7 (CWHEQ 2007-S1 Pro. Supp.), at S-30; RJN Ex. 4 (CWMBS 2006-21 Pro. Supp.), at S-37.

20  [10] Plaintiffs generally allege that "Defendants"—as a group—"either lost, failed to timely create, or failed to timely deliver the paperwork necessary to prove title to the

21  mortgages and notices under state law" (Compl. ¶ 208) and that "Defendants failed validly to transfer the promissory notes and security instruments" (*id*. ¶ 217). "Rule

22  9(b) does not allow a complaint to merely lump multiple defendants together but re-quires plaintiffs to differentiate their allegations when suing more than one defen-

23  dant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)

24  (citations and quotations omitted). Moreover, virtually identical title transfer allega-tions as to "Defendants'" conduct were alleged in the *Dexia* and *Thrivent* com-

25  plaints, which this Court dismissed as insufficiently pleaded under Rule 9(b). *See, e.g.*, *Dexia* Compl. ¶ 194; *Thrivent* Compl. ¶ 225 ("The Countrywide Defendants

26  routinely failed to physically deliver the originally promissory notes and security in-struments for the mortgage loans to the issuing trusts."); *Thrivent* Compl. ¶ 179;

27  *Dexia* Compl. ¶ 157 ("Thus, [Countrywide] Defendants failed to validly transfer the promissory notes and security instruments for many of the mortgage loans underly-

28  ing the [Countrywide] Certificates. . . ."); *see also Dexia*, slip op. at 11.

fail is that, contrary to their allegations that Countrywide misrepresented that "the underlying mortgage loans had been validly assigned to the Trusts" (Compl. ¶ 9), the assignments were legally effected by the *Offering Materials themselves*.  As the Complaints acknowledge, the Offering Materials stated that the mortgages backing each certificate would be assigned to the trustee "[o]n the closing date."  Compl. ¶ 206.  As explained in the Offering Materials, this assignment was effected through the PSAs entered into in connection with each offering, which are expressly incorporated by reference in the Offering Materials.[11]  The PSAs first assigned the mortgages from the seller (usually the loan originator) to the depositor:

> Each Seller, concurrently with the execution and delivery [of the PSA], hereby sells, transfers, assigns, sets over and otherwise conveys to the Depositor, without recourse, all its respective right, title and interest in and to the related Initial Mortgage Loans, including all interest and principal received or receivable by such Seller, on or with respect to [the mortgage loans underlying the Certificate].

RJN Ex. 34 (CWALT 2007-16CB PSA), at § 2.01(a).[12]  The PSAs then provided for the assignment of the mortgages from the depositor to the trustee:

> Immediately upon the conveyance of the [mortgage loans] referred to in the clause (a), the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all of the right, title and interest of the Depositor in and to the Trust Fund . . .

---

[11] *See, e.g.*, RJN Ex. 1 (CWALT 2007-16CB Pro. Supp.) at S-54 ("The summaries are subject to, and are qualified in their entirety by reference to, the provisions of the pooling and servicing agreement.  When particular provisions or terms used in the pooling and servicing agreement are referred to, the actual provisions (including definitions of terms) are incorporated by reference.  We will file a final copy of the pooling and servicing agreement after the issuing entity issues the certificates.").

[12] *See also* RJN Ex. 35, (CWABS 2007-4 PSA), at Section 2.01(a) (same in substance); RJN Ex. 36, (CWHEQ 2007-S1 PSA), at Section 2.01(a) (same in substance); RJN Ex. 37, (CWMBS 2006-21 PSA), at Section 2.01(a) (same); RJN Ex. 38, (CWHEQ 2006-S8 PSA), at Section 2.01(a) (same in substance); RJN Ex. 39, (CWALT 2005-26CB PSA), at Section 2.01(a) (same); RJN Ex. 40, (CWALT 2005-J1 PSA), at Section 2.01(a) (same).

1   *Id.* at § 2.01(b).[13]

2       Accordingly, the very same Offering Materials that Plaintiffs allege were mis-

3   leading defeat the premise of Plaintiffs' claims because the PSAs legally effected

4   the very transfers Plaintiffs allege did not occur.  As the Ninth Circuit said in *Lazy Y*

5   *Ranch Ltd. v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008), this Court "need not ac-

6   cept as true allegations contradicting documents that are referenced in the complaint

7   or that are properly subject to judicial notice."  Indeed, that these assignments were

8   legally effective by virtue of the PSAs is confirmed in the foreclosure decision that

9   Plaintiffs cite in their Complaints.  *See Kemp*, 440 B.R. at 633 (citing assignment

10  provisions as giving trustee "a valid claim of ownership").

11      **C.**    **No Defendant Represented To Plaintiffs That It Would Deliver
12            Title Documentation For Every Loan To The Trusts.**

13      The Complaints also mischaracterize the nature of the disclosures regarding

14  the depositor's duties.  Contrary to what Plaintiffs allege, the Offering Materials

15  state that the depositors did *not* have an absolute obligation to deliver title documen-

16  tation directly to the trusts or record the assignment to the trusts of the pooled mort-

17  gages.  Instead, the Offering Materials disclosed that the opposite was true.  For ex-

18  ample, the Offering Materials for CWALT 2007-16CB (which Plaintiffs reference

19  in their Complaints) explicitly stated as follows:

20      Assignments of the mortgage loans to the trustee . . . will be recorded in the

21      appropriate public office for real property records, ***except*** in states where, in

22      the opinion of counsel, recording is not required to protect the trustee's in-

23      terests in the mortgage loan against the claim of any subsequent transferee . .

24      . ***The depositor expects that substantially all of the assignments will not be***

---

[13] *See also* RJN Ex. 35, (CWABS 2007-4 PSA), at Section 2.01(b) (same in sub-
stance); RJN Ex. 36, (CWHEQ 2007-S1 PSA), at Section 2.01(b) (same in sub-
stance); RJN Ex. 37, (CWMBS 2006-21 PSA), at Section 2.01(b) (same); RJN Ex.
38, (CWHEQ 2006-S8 PSA), at Section 2.01(b) (same in substance); RJN Ex. 39,
(CWALT 2005-26CB PSA), at Section 2.01(b) (same); RJN Ex. 40, (CWALT
2005-J1 PSA), at Section 2.01(b) (same).

1   ***recorded based on an opinion of counsel***.

2   RJN Ex. 1 (CWALT 2007-16CB Pro. Supp.), at S-40 (emphasis added).[14]  This rep-

3   resentation is even further caveated:

4   > Notwithstanding the foregoing, ***in lieu of providing the duly executed as-***

5   > ***signment of the mortgage to the trustee*** . . . ***and the original recorded as-***

6   > ***signment or assignments of the mortgage*** . . . the depositor may at its dis-

7   > cretion provide evidence that the related mortgage is held through the MERS

8   > System.  In addition, the mortgages for some or all of the mortgage loans in

9   > the issuing entity that are not already held through the MERS System, may,

10  > at the discretion of the master servicer, in the future be held through the

11  > MERS system.[15]

12  *Id*. at S-41 (emphasis added).[16]

13  Thus, the Offering Materials did not represent that Countrywide would de-

14  liver all of the mortgage files to the trustee.  Instead, it represented that some would

15  be transferred and others would not be transferred because it was either not required

16

17  [14] The Prospectus Supplements relating to Plaintiffs' certificates that were filed after
    April 25, 2006 contain this language.  *See* RJN Ex. 5 (CWABS 2007-4 Pro. Supp.),
18  at S-30; RJN Ex. 7 (CWHEQ 2007-S1 Pro. Supp.), at S-31; RJN Ex. 4 (CWMBS
    2006-21 Pro. Supp.), at S-37; RJN Ex. 6 (CWHEQ 2006-S8 Pro. Supp.), at S-26.
19  The Prospectus Supplements relating to Plaintiffs' certificates that were filed before
    this date contain substantively the same language.  *See e.g.*, RJN Ex. 2 (CWALT
20  2005-26CB Pro. Supp.), at S-24 ("Assignments of the mortgage loans to the trustee .
    . . will be recorded in the appropriate public office for real property records, except
21  in states such as California where in the opinion of counsel recording is not required
    to protect the trustee's interests in the mortgage loan against the claim of any subse-
22  quent transferee . . . ."); RJN Ex. 3 (CWALT 2005-J1 Pro. Supp.), at S-73 (same).

23  [15] "In 1993, the MERS system was created by several large participants in the real
    estate mortgage industry to track ownership interests in residential mortgages.
24  Mortgage lenders and other entities, known as MERS members, subscribe to the
    MERS system and pay annual fees for the electronic processing and tracking of
25  ownership and transfers of mortgages. Members contractually agree to appoint
    MERS to act as their common agent on all mortgages they register in the MERS
26  system." *MERSCORP, Inc. v. Romaine*, 861 N.E.2d 81, 83 (N.Y. 2006).

27  [16] *See also* RJN Ex. 2 (CWALT 2005-26CB Pro. Supp.) at S-25; RJN Ex. 5
    (CWABS 2007-4 Pro Supp.) at S-30; RJN Ex. 3 (CWALT 2005-J1 Pro. Supp.) at S-
28  74; RJN Ex. 4 (CWMBS 2006-21) at S-38; RJN Ex. 7 (CWHEQ 2007-S1 Pro.
    Supp.) at S-31; RJN Ex. 6 (CWHEQ 2006-S8) at S-25.

1   per opinion of counsel or due to those loans being held in the MERS system.  And

2   the Complaints do not allege that any opinion of counsel or holding of loans through

3   the MERS system was in error or that the procedures described in the Prospectus

4   Supplements were not followed, much less that Defendants were aware of any de-

5   viations from these procedures.

6          Plaintiffs also incorrectly argue that the "Offering Materials represented that

7   each mortgage represented a valid lien such that the issuing trust could foreclose

8   upon the mortgage in the event of a borrower's default."  Compl ¶ 205.  For this

9   proposition Plaintiffs point to the following sentence fragment from the Offering

10  Materials: "each loan is secured by a valid lien on, or a perfected security interest

11  with respect to, the Property."  *Id*.  But the *full* sentence in the Prospectus Supple-

12  ment that Plaintiffs cite actually states that the *representations and warranties of the*

13  *seller or originator to the depositor* "***may** include*, among other things: . . . that each

14  loan is secured by a valid lien on, or a perfected security interest with respect to, the

15  Property. . . ."  RJN Ex. 1 (CWALT 2007-16CB Pro. Supp.) at 26 (emphasis

16  added).[17]  This is thus *not* a blanket representation or warranty to MBS investors that

17  every loan underlying the MBS Plaintiffs purchased was secured by a valid lien or a

18  perfected security interest as they claim, but rather a qualified, conditional statement

19  about representations that might be made to the depositor by the seller of a loan.

20          **D.      The Title Transfer Allegations Are Conclusory And Insufficient.**

21          As ostensible support for its allegations that Countrywide "made no attempt

22  to assign mortgages and deliver the original mortgage notes to the issuing trusts"

23  (Compl. ¶ 209) and that "Defendants" (collectively) "failed validly to transfer the

24  promissory notes and security instruments for many of the mortgage loans underly-

25  ing the Certificates to the issuing trusts" (*id*. ¶ 217), the Complaints cite alleged

26  _____

27  [17]  *See also* RJN Ex. 2 (CWALT 2005-26B Pro. Supp.), at 24; RJN Ex. 3 (CWALT 2005-J1 Pro. Supp.), at 23; RJN Ex. 4 (CWMBS 2006-21 Pro. Supp.), at 26; RJN Ex. 5 (CWABS 2007-4 Pro. Supp.), at 29; RJN Ex. 6 (CWHEQ 2006-S8 Pro. Supp.), at 28; RJN Ex. 7 (CWHEQ 2007-S1 Pro. Supp.), at 28.

28

findings in a government report regarding foreclosure policies and practices of several mortgage loan servicers issued in April 2011 (*id.* ¶ 210) and alleged conduct by MERS in February 2011 (*id.* ¶ 241). But these reports were issued *years* after the MBS offerings at issue here, and thus do not support any inference that statements challenged in the prospectus supplements at issue in this case were false when made.

Moreover, these reports do not support any inference that title for the loans underlying the particular MBS that Plaintiffs bought was at any time handled in a manner inconsistent with the relevant disclosures. For example, the April 2011 *Interagency Review of Foreclosure Policies and Practices* that Plaintiffs cite does not evidence that "Countrywide routinely did not transfer the original mortgage loan documents to the issuing trusts for mortgage-backed securities transactions." *Id.* ¶ 210. Rather, this review occurred years later (fourth quarter of 2010), was not specific to Countrywide (the foreclosure policies and practices of 14 different servicers were sampled), and analyzed a "relatively small number of files from among the volumes of foreclosures processed by the servicers." RJN Ex. 48 (Fed. Reserve Sys., Office of the Comptroller of the Currency, Office of Thrift Supervision, *Interagency Review of Foreclosure Policies and Practices* (April 2011)), at 1. Plaintiffs point to one isolated statement in this report that unidentified "servicers possessed original notes and mortgages and, therefore, had sufficient documentation available to demonstrate authority to foreclose." *Id.* at 3. But this report's observation that in the "small number of files" reviewed unidentified servicers sometimes had original notes does not support any inference that "Countrywide routinely did not transfer the original mortgage loan documents to the issuing trusts" in accordance with the conditions and qualifications disclosed in the Offering Materials themselves. *See* Section I.C, *supra*. Not only is there no indication in this report as to whether the loans reviewed were included in any Countrywide MBS offering (much less the ones Plaintiffs bought), but the report expressly recognizes that "in some cases *third-party trustees* or custodians held original documents" (*id.* at 8 n.15)—*i.e.*, the

16

very parties the Plaintiffs claim were supposed to hold those documents.

Plaintiffs also cite snippets of testimony from a *single* Bank of America employee, Linda DeMartini, in an action regarding a *single* mortgage loan, *Kemp v. Countrywide Home Loans, Inc.* (*In re Kemp*), 440 B.R. 624, 663 (Bankr. D.N.J. 2010) (Compl. ¶¶ 211-17). This testimony likewise does not support any inference that—at the time the alleged representations were made—the statements in the Offering Materials regarding the depositors' title transfer obligations were not accurate, much less that Countrywide was not transferring title to mortgage loans in the manner described in the Offering Materials, that it did not intend to comply with whatever obligations it had, or did not believe that that its practices in fact complied with those obligations.

First, the Court already has addressed this issue. The *Dexia* and *Thrivent* complaints quoted extensively the very same publicly available testimony of Ms. DeMartini. *See Dexia* Compl. ¶¶ 151-57; *Thrivent* Compl. ¶¶ 173-79; *see also* Appendix A (comparing title transfer allegations in *Dexia*, *Thrivent*, *W&S*, and *NI* complaints). This Court nevertheless concluded that the *Dexia* and *Thrivent* plaintiffs had "not identified *any reason* that the Prospectus Supplement language [regarding title transfer] . . . was *either material or false*." *Dexia*, slip op. at 11 (emphasis added); *Thrivent*, slip op. at 10.

Second, the transcript of her testimony reveals that Ms. DeMartini in fact did *not* state that Countrywide "never" delivered mortgage notes to the relevant trustee. Rather, she testified as to her personal belief that this practice was "normal" procedure in the "mortgage banking business" generally—consistent with the explicit disclosures in the Offering Materials here that sometimes the PSAs would require title documentation to be delivered to trustees and other times would not. RJN Ex. 49 (DeMartini Transcript) at 15:1-6; *see* Sections I.A – I.C, *supra*. Moreover, Ms. DeMartini also conceded during this same deposition that she could not say that the mortgage notes "never moved" because she did "not specifically" "have personal

1   knowledge of under what circumstances [the note] would move or whether and to
2   what extent they're ever moved." *Id.* at 48:14-24.  Plaintiffs did not bring this por-
3   tion of Ms. DeMartini's testimony to the Court's attention, and when viewed in its
4   totality Ms. DeMartini's testimony fails to support any reasonable inference that
5   "Defendants failed validly to transfer the promissory notes and security instruments"
6   for the mortgage loans underlying the particular Certificates Plaintiffs purchased.
7   Compl. ¶ 217.  *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690-91
8   (S.D.N.Y. 2008) (dismissing fraud claims contradicted by plaintiffs' own alleged
9   sources).

10       In short, as in *Dexia* and *Thrivent*, Plaintiffs have failed to allege an action-
11  able misstatement.  Accordingly, *all* of their claims premised on alleged title-
12  transfer-related misrepresentations—*i.e.*, their remaining Section 10(b), fraud, neg-
13  ligent misrepresentation, and OSA claims—must be dismissed.

14       **E.    Plaintiffs Fail To Allege Any MERS-Related Misstatement.**

15       Plaintiffs incorrectly argue that the Offering Materials "assured investors that
16  transfers of mortgage loans through [MERS] were sufficient to ensure that the mort-
17  gage loans could be foreclosed upon in the event of a borrower's default."  Compl. ¶
18  207.  They further argue that Defendants misrepresented that "MERS ensured that
19  each Trust could foreclose upon the underlying collateral."  *Id*. ¶ 241.  These asser-
20  tions are utterly untrue.  Plaintiffs point to a single representation in the Offering
21  Materials regarding MERS, which states that any mortgage held in MERS is "re-
22  corded in the name of [MERS] as nominee for the owner of the mortgage loan" and
23  that "MERS serves as mortgagee of record on the mortgage solely as a nominee in
24  an administrative capacity on behalf of the trustee."  *Id*. ¶ 207 (quoting CWALT
25  2007-16CB Prospectus Supplement at S-41).  Plaintiffs do not dispute that this
26  statement is an accurate description of MERS and of how a mortgage loan is re-
27  corded in MERS.  It is not, as Plaintiffs contend, an *assurance* that mortgage loans
28  held in MERS could be foreclosed upon.

1   Nor is there any representation in the Offering Materials that MERS would be

2   the "beneficial owner" of each mortgage, as Plaintiffs also argue.  Compl. ¶ 241.  To

3   the contrary, the language Plaintiffs quote from the Offering Materials states that for

4   each loan held by MERS, MERS "*does not have any interest in the mortgage loan*."

5   *Id.* ¶ 242 (emphasis added).

6   Plaintiffs also plead no facts showing that the statements in the Offering Ma-

7   terials regarding MERS were false when made.  Instead, Plaintiffs mischaracterize

8   the representations in the Offering Materials as promising that MERS could fore-

9   close upon the underlying collateral, then argue this non-existent straw-man "prom-

10   ise" was false because (they claim) "multiple courts have held, because the actual

11   mortgage note is typically not transferred to MERS, MERS is a nullity."  Compl. ¶

12   241.  Besides attacking a representation no defendant ever made, Plaintiffs do not

13   identify a single such court decision, and they nowhere identify any such decision

14   that existed at the time Defendants' representations regarding MERS were made or

15   how these unidentified decisions render the Offering Materials' general description

16   of MERS false.[18]  Moreover, Plaintiffs' argument ignores the fact that numerous

17   courts have expressly *upheld* the validity of MERS and its recordation and assign-

18

19   [18]  To the extent Plaintiffs rely on judicial decisions regarding MERS as the basis for
   their allegations, these very same decisions should have put Plaintiffs on notice of

20   any claims based on MERS more than two years prior to the filing of their com-
   plaints.  Judicial decisions regarding MERS were the subject of articles in the press

21   as early as mid-2008.  *See, e.g.,* RJN Ex. 52, Gretchen Morgenson, *How One Bor-
   rower Beat the Foreclosure Machine*, N.Y. TIMES, July 27, 2008; RJN Ex. 53, Amir

22   Efrati, *Some Judges Stiffen Foreclosure Standards*, WALL ST. J., July 26, 2008.  And
   legal challenges and public investigations regarding the recording of mortgages list-

23   ing MERS as a nominee commenced as early as 2001.  *See, e.g., MERSCORP, Inc.
   v. Romaine*, 861 N.E.2d 81, 83 (N.Y. 2006) (noting a publicly available opinion of

24   the New York Attorney General in 2001concluding that recording a MERS instru-
   ment was improper because MERS had no interest in the property or loans).  Thus,

25   Plaintiffs' allegations regarding MERS should also be dismissed for the independent
   reason that they are time-barred under the applicable two-year statute of limitations

26   applicable to Plaintiffs' 1934 Act claims and Ohio Securities Act claims, as well as
   Western & Southern's common law fraud, negligent misrepresentation and civil

27   conspiracy claims.  *See* 28 U.S.C. §1658(b); *W&S/NI* Order, 2012 WL 1097244, at
   *7 (C.D. Cal. Mar. 9, 2012) (holding that OSA's two-year statute of limitations ap-

28   plies to Western & Southern's common law claims).

ment system.[19] *See, e.g., Suss v. JP Morgan Chase Bank, N.A.*, 2010 WL 2733097, at *5 (D. Md. July 9, 2010) ("As to Plaintiff's criticism of MERS, courts that have considered the issue have found that the system of recordation is proper and assignments made through that system are valid.") (collecting cases); *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1038 (9th Cir. 2011) ("The plaintiffs' claim depends upon the conclusion that any home loan within the MERS system is unenforceable through a foreclosure sale, but that conclusion is unsupported by the facts and law on which they rely.").

## II. PLAINTIFFS DO NOT ADEQUATELY ALLEGE INTENT.

The Complaint does not adequately allege that any defendant intended to deceive Plaintiffs through statements made in the Offering Materials regarding assignment and delivery of title documentation to the MBS trustee. To plead securities fraud, a plaintiff must allege particularized facts giving rise to a "strong inference" of scienter—"that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (citation and quotation omitted); 15 U.S.C. § 78u-4(b)(2). A plaintiff thus "must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 991. And, "the inference of scienter must be more than merely 'reasonable' or 'permissible.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Rather, it must be "cogent and *at least as compelling* as any opposing inference one could draw from the facts al-

---

[19] Likewise, Plaintiffs nowhere explain how the allegation that in February 2011— several years after they bought their MBS—"MERS instructed its lender members to stop foreclosing in the name of MERS" (Compl. ¶ 241) could support any inference that the MERS representations in the Offering Materials were false when made.

1  leged," weighing all "plausible, nonculpable explanations for the defendant's con-

2  duct" against "inferences favoring the plaintiff." *Id*. (emphasis added).[20]  Plaintiffs

3  have not met these stringent requirements.

### A.  The Complaints Allege No "Diversion Of Resources," And Any Such Allegations Would Be Implausible.

6  In its March 9, 2012 order the Court hypothesized that the Plaintiffs might ar-

7  gue that Defendants had "a scheme to originate more loans" by "shifting resources

8  from compliance and servicing into underwriting."  But there are no such allegations

9  in the Complaints here.  Nor are any facts alleged (with the required particularity or

10  otherwise) that would support an inference that Countrywide was in any way con-

11  strained in its ability to originate loans by the resources it otherwise directed to

12  "compliance and servicing" – that it needed to "divert" resources in order to be able

13

14  _____

[20]  "Common law fraud requires the plaintiff to plead facts which support an infer-
ence of scienter."  *Allstate Ins. Co. v. Countrywide Fin. Corp.*, --- F. Supp. 2d ----,
2011 WL 5067128, at *18 (C.D. Cal. Oct. 21, 2011) (*citing Ford v. Sivilli*, 2 A.D.3d
773, 774 (NY. App. Div. 2003) ("The plaintiffs' cause of action sounding in fraud
required 'a particularized factual assertion which supports the inference of sci-
enter.'") (citation omitted).  The standard for pleading scienter for a violation of §
10(b) is essentially identical to the standard for pleading scienter for common law
fraud or aiding and abetting fraud.  *See Foster v. Wilson*, 504 F.3d 1046, 1050 (9th
Cir. 2007) ("Federal securities fraud, like its common law fraud ancestor, requires
knowingly making a false statement with intent to deceive.").  Plaintiff's claim for
civil conspiracy also requires a strong showing of intent to do harm—malice.  *Wil-
liams v. Aetna Fin. Co.*, 83 Ohio St. 3d 464, 475 (1998) (malice defined as "that
state of mind under which a person does a wrongful act purposely, without a reason-
able or lawful excuse, to the injury of another") (quotation omitted).  Plaintiff's
claims under §§ 1707.41 and 1707.44 of the Ohio Securities Act similarly require
"knowledge of the falsity of a representation or lack of diligence in ascertaining its
truth or falsity on the part of the seller," *Citizens Nat'l Bank v. Barge-In, Inc.*, 1984
WL 3429, at *5 (Ohio Ct. App. Sept. 28, 1984) (regarding § 1707.41 claim), which
standard Plaintiffs also do not satisfy. ORC § 1707.44(J) also requires that the de-
fendant act with the "purpose to deceive."  The Complaint fails to allege that Defen-
dants had such a purpose and therefore the Plaintiffs' ORC § 1707.44(J) claims
should be dismissed on this independent basis.  *See Boomershine v. Lifetime Capital
Inc.*, 2008 WL 54803, *3 (Ohio Ct. App. Jan. 4, 2008).  While § 1707.43 does not
require scienter, it requires a purchaser to allege and prove a primary violation of §
1707.  *Ohio Police*, 813 F. Supp. 2d at 878-79.  Thus, if Plaintiffs fail to allege sci-
enter (or any other required element) under §§ 1707.41 and 1707.44, their § 1707.43
claim must also be dismissed.  *Id*. (dismissing a claim under ORC § 1707.43 be-
cause plaintiffs failed to "establish a predicate violation" under ORC § 1707.41).

21

1   to originate the volume of loans for which there was borrower demand.[21]  Nothing in

2   the Complaints suggests that Countrywide needed to "divert" resources in order to

3   originate more loans, that it would in fact have originated more loans had it "di-

4   verted" resources, or that the huge volumes of loans it originated were the result of

5   any such "diversion."

6       Moreover, had Plaintiffs actually alleged that resources were diverted from

7   "servicing" to "origination," any such allegations would have been implausible.  To

8   the extent that the loans backing the MBS that Plaintiffs bought were to be serviced

9   by Countrywide Home Loans Servicing, LP (Countrywide's servicing entity), the

10  Offering Materials explicitly disclose that the servicer's fees associated with servic-

11  ing those loans are to be paid not by Countrywide, but from the income received

12  from the MBS trusts themselves.  *See* RJN Ex. 1 (CWALT 2007-16CB Pro. Supp.),

13  at S-17).[22]  Thus, because the servicer entity was not compensated by Countrywide

14  for its activities relating to the loans backing the MBS Plaintiffs bought, Country-

15  wide logically could not have diverted to origination funds that Countrywide other-

16  wise would have spent on servicing.

17      In short, like the other Countrywide MBS complaints this Court has ad-

18  dressed, the Complaints argue that Countrywide sought to deceive MBS investors

19  by claiming its loans were of high quality when in fact they were not.  But it con-

20  tains no factual allegations – let alone ones pled with the requisite particularity –

21  that would support the inference Countrywide sought to deceive investors as to its

22  mortgage transfer and assignment practices.  Thus, in addition to Plaintiffs' funda-

23  mental failure to allege any title-transfer-related misstatement in the Offering Mate-

---

24  [21] During the period in which Countrywide originated the loans that back the MBS

25  Plaintiffs bought, Countrywide originated approximately one-half ***trillion*** dollars of residential mortgage loans ***each year***.  *See* RJN Exs. 41 (Form 10-K for 2005); 42

26  (Form 10-K for 2006), and 43 (Form 10-K for 2007).

    [22] *See also* RJN Ex. 2 (CWALT 2005-26CB Pro. Supp.), at S-34; RJN Ex. 3

27  (CWALT 2005-J1 Pro. Supp.), at S-88; RJN Ex. 4 (CWMBS 2006-21 Pro. Supp.), at S-12; RJN Ex. 5 (CWABS 2007-4 Pro. Supp.), at S-8; RJN Ex. 6 (CWHEQ 2006-

28  S8 Pro. Supp.), at S-7; RJN Ex. 7 (CWHEQ 2007-S1 Pro. Supp.), at S-8.

22

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

1  rials, Plaintiffs' remaining Section 10(b), common law fraud, OSA, and conspiracy

2  claims must be dismissed for failure to allege intent to deceive as well.

3  **B.      Plaintiffs Do Not Allege Countrywide Intended to Breach Its**
   **Contractual Obligations At The Time The Offerings Were Issued.**

4

5  Moreover, even assuming for argument's sake only that Plaintiffs had alleged

6  "a scheme to originate more loans" by "shifting resources from compliance and ser-

7  vicing into underwriting," which they did not, the Complaints' fraud, conspiracy,

8  and OSA claims would still fail.  *First*, according to Plaintiffs, the allegedly mis-

9  leading statements are statements of future intent, representing that "the underlying

10 mortgage notes *would be* properly assigned . . . and that the loan files *would simi-*

11 *larly be* delivered to the trusts."  Compl. ¶ 206 (emphasis added).  *Second*, even if

12 the objective description of the PSA title transfer requirements set forth in the Pro-

13 spectus Supplements could be characterized as a promise in this way, Plaintiffs al-

14 lege no facts—let alone facts pleaded with particularity—supporting the necessary

15 inference that these statements were knowingly false when made.

16 More specifically, Plaintiffs point to various statements in the Prospectus

17 Supplements which they characterize as statements of future intention.  *See, e.g.*,

18 RJN Ex. 1 (CWALT 2007-16CB Prospectus Supplement) at S-39-S-40 ("the deposi-

19 tor *will* sell, transfer, assign, set over and otherwise convey;" and "[assignments]

20 *will be recorded*").  "A complaint based upon a statement of future intention," how-

21 ever, "must allege facts to show that the defendant, ***at the time the promissory rep-***

22 ***resentation was made***, never intended to honor or act on his statement."  *Non-*

23 *Linear Trading Co., Inc. v. Braddis Assoc. Inc.*, 675 N.Y.S. 2d 5, 13 (N.Y. App.

24 Div. 1998) (emphasis added).  In other words, "[a] present expression of the intent

25 to perform a future act is actionable as fraud only if actually made with a precon-

26 ceived and undisclosed intention of not performing it."  *Tanzman v. La Pietra*, 778

27 N.Y.S.2d 199, 201 (N.Y. App. Div. 2004) (citation omitted).  *Accord Langford v.*

28 *Sloan*, 833 N.E.2d 331, 335 (Ohio Ct. App. 2005) ("representation that something

23

will be done in the future, or a promise to do it, from its nature cannot be true or false at the time when it is made, and thus cannot generally be fairly viewed as a representation of fact"); *Tibbs v. National Homes Const. Corp.*, 369 N.E.2d 1218, 1222 (Ohio Ct. App. 1977) ("generally true that fraud ***cannot*** be predicated upon promises or representations relating to future actions or conduct") (emphasis added); *Williams v. Edwards*, 717 N.E.2d 368, 374 (Ohio Ct. App. 1998) (promise not actionable unless defendant had "no intention of keeping the promise"). For that reason, "[t]he mere fact that the expected performance was not realized"—precisely what Plaintiffs argue here—"is insufficient to demonstrate that [the promisor] falsely stated its intentions." *Dowlings, Inc. v. Homestead Dairies, Inc.*, 932 N.Y.S.2d 192, 193 (N.Y. App. Div. 2011) (quotation omitted). This rule applies to both common law claims as well as statutory securities fraud claims.[23]

Here, however, Plaintiffs have not alleged any facts that would support the inference that any Defendant either unconditionally promised to deliver title documentation (as Plaintiffs claim) or that any Defendant made any promise concerning the transfer of title which Defendant did not intend to honor. To the contrary, the Complaints make only generalized assertions that Countrywide failed to deliver mortgage files and assign loans. Even if it were true that Countrywide's practices

---

[23] *See, e.g., Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 683-84 (9th Cir. 2011) ("breach of a contractual promise of specific future conduct, even though the contract is filed in conjunction with [SEC] reporting requirements, was not a sufficient foundation for a securities fraud action"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007) ("While the failure to carry out a promise in connection with a securities transaction might constitute breach of contract, it does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform") (citation omitted); *Gurary v. Winehouse*, 235 F.3d 792, 800 (2d Cir. 2000) ("It is well settled that the failure to carry out a promise made in connection with a securities transaction is normally a breach of contract and does not justify a Rule 10b-5 action.") (quotation omitted); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (same); *Keers & Co. v. Am. Steel & Pump Corp.*, 234 F. Supp. 201, 203 (S.D.N.Y. 1964) ("Where representations are promissory in nature, as here, the promisee may not recover unless there is proof that at the time the promises were made the promisor had no intention of keeping them. The lack of intention to perform is what constitutes the fraud.").

24

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

were legally defective, however, these allegations do not support an inference based on particularized facts that Countrywide intended to "break" any supposed promises *at the time they allegedly were made*.[24]  At most, these allegations (which Countrywide disputes) would show only that the documentation for some loans might not have been transferred properly, but not that Countrywide never intended to follow practices consistent with the language in the Offering Materials.

### C.    Plaintiffs' Allegations Are Not Tied To Any MBS They Bought.

There are no allegations concerning the MBS the Plaintiffs actually bought. But to plead intent to defraud, Plaintiffs cannot rely on generalized allegations about Countrywide's transfer and assignment practices that are not linked to the actual securities they purchased. *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010), is directly on point and compels dismissal here.  In *Footbridge*, "[p]laintiffs allege[d] that a 'corrupt culture' at Countrywide, combined with defendants' 'lust for high yields and high profits' motivated defendants to make fraudulent misrepresentations to plaintiffs in order to induce them to invest in the Securities."  2010 WL 3790810, at *4.  The district court found the complaint inadequate as a matter of law, dismissing allegations of scienter because they were not connected to the particular MBS at issue:

> Plaintiffs do not tie the allegations about a general "corrupt corporate culture" to the Securitizations at issue in this case or the misrepresentations that plaintiffs assert constituted the fraud they claim here. . . .  [A] general allegation that defendants wanted to originate as many loans as possible in order to

---

[24]  The Countrywide Defendants understand the Court to have implicitly recognized in *Dexia* that the representations in the Offering Materials stated only that the depositor planned at some point in the future to assign all its right, title and interest to the trustee for the benefit of the certificate holders, pursuant to the conditions set forth in the Offering Materials.  *Dexia*, slip op. at 11 (holding that "[e]ven if it could be read as a manifestation of present intent," the language in the Prospectus Supplement relied on by plaintiffs was insufficient to support their claims).

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

1    increase profits and market share, without more, is insufficient to set forth a

2    strong inference of scienter.

3  *Id.* at *20.  Assuming the Complaints did include a generalized allegation that

4  the Defendants' alleged failure to properly transfer title was accomplished as

5  part of a scheme "to originate more loans by shifting resources from compli-

6  ance and servicing into underwriting," that is precisely the sort of generalized

7  allegation correctly rejected by *Footbridge*.[25]

8          **D.**    **The Repurchase Or Substitution Provisions Negate Scienter.**

9          In addition to the deficiencies in Plaintiffs' title transfer allegations, the re-

10  purchase or substitution provisions of the Offering Materials independently under-

11  mine any inference of scienter.  The Offering Materials state that should the docu-

12  mentation for a loan not be complete or otherwise defective in a material way,

13  Countrywide will be obligated to replace or repurchase the mortgage loan:

14        The trustee will review each mortgage file relating to the mortgage loans

15        within 90 days of the closing date . . . ***and if any document in a mortgage file***

16        ***is found to be missing or defective in a material respect*** and Countrywide

17        Home Loans does not cure the defect within 90 days of notice . . . Countrywide

18        Home Loans will be obligated to repurchase the related mortgage loan from

19        the issuing entity. . . .  Rather than repurchase the mortgage loan as provided

20        above, Countrywide Home Loans may remove the mortgage loan . . . and sub-

21        stitute in its place another mortgage loan. . . .

22

---

23  [25] Moreover, Plaintiffs apparently have not conducted any investigation concerning
     the mortgage loans actually included in the MBS at issue here.  They have not iden-
24  tified any failure by Countrywide to transfer a single mortgage file, record a single
     assignment, or foreclose on a single loan backing the MBS they bought.  Rather,
25  Plaintiffs' allegations of title transfer practices are fatally generalized.  The only
     "detail" concerns a handful of foreclosure proceedings in Ohio not identified as con-
26  cerning any of the loans in the pools at issue here, and they are based exclusively on
     alleged conduct (supposed "robo-signing" and an alleged "cover up") that allegedly
27  took place years after the Offering Materials were issued.  *See e.g.*, Compl. ¶ 239.
     These generic allegations in no way support an inference of intent to deceive years
28  earlier when the MBS were issued.

RJN 1 (CWALT 2007-16CB Pro. Supp.), at S-40 (emphasis added).[26]  As the
*Footbridge* court observed, "the 'repurchase or substitute' clauses change the nature
of [Countrywide's] representation."  2010 WL 3790810, at *16; *see supra*, at 25-26.
"If [plaintiffs] had alleged that [Countrywide] falsely represented to prospective in-
vestors that it would repurchase or substitute delinquent mortgages, they might have
stated a case of fraud under the pertinent agreements."  *Footbridge*, 2010 WL
3790810, at *16.  That, however, is not Plaintiff's claim.  Because the Complaint
nowhere alleges that Countrywide never intended—or subsequently refused—to
cure any defective loans, it does not plead scienter.  *Id*. at *21 ("The [complaint]
does not allege that defendants did not intend to fulfill this obligation.  Plaintiffs do
not identify a motive that leads to an inference of scienter that is compelling in light
of defendants' obligation to cure any noncompliant loan.").[27]

## III.    PLAINTIFFS DO NOT ALLEGE RELIANCE.

### A.    Plaintiffs Fail To Plead Reliance With The Requisite Particularity.

Plaintiffs' claims must be dismissed for the separate and independent reason
that they fail to plead facts sufficient to show that Plaintiffs actually and justifiably
relied on Countrywide's alleged misrepresentations regarding title transfer at the
time they allegedly purchased the MBS at issue.  Reliance is an "essential element
of the § 10(b) private cause of action," which ensures that "the 'requisite causal
connection between a defendant's misrepresentation and a plaintiff's injury' exists
as a predicate for liability."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,*

[26] *See also* RJN Ex. 2, (CWALT 2005-26CB Pro. Supp.) at S-24; RJN Ex. 3,
(CWALT 2005-J1 Pro. Supp.) at S-73; RJN Ex. 4, (CWMBS 2006-21 Pro. Supp.) at
S-37; RJN Ex. 5, (CWABS 2007-4 Pro. Supp.) at S-31; RJN Ex. 6, (CWHEQ 2006-
S8 Pro. Supp.) at S-26; RJN Ex. 7, (CWHEQ 2007-S1 Pro. Supp.) at S-31.

[27]   The Countrywide Defendants are aware that the Court has previously rejected the
argument that the either/or nature of the representations about the pooled mortgage
loans undermines scienter allegations, *Allstate*, 2011 WL 5067128, at *24 and
*Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *21 (C.D.
Cal. May 5, 2011), but respectfully request that the Court reconsider its ruling.  As
explained in *Footbridge*, Plaintiffs' failure to identify a lack of intent to carry
through with this obligation negates an inference of scienter.  2010 WL 3790810, at
*21.

1  *Inc.*, 552 U.S. 148, 159 (2008) (citation omitted).  It is likewise an "essential ele-

2  ment" of Plaintiffs' common law fraud and negligent misrepresentation claims, as

3  well as certain of their OSA claims.[28]  *See Johnson v. Church of the Open Door*, 902

4  N.E.2d 1002, 1007 (Ohio Ct. App. 2008) (the "elements of fraud and negligent mis-

5  representation are very similar" under Ohio law and "[i]n particular, justifiable reli-

6  ance is an essential element of both"); *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d

7  Cir. 1996) ("Reasonable reliance must also be proved under New York law to re-

8  cover for fraud and negligent misrepresentation.").[29]

9        For each of these claims, reliance must be pled with particularity under Rule

10  9(b).  *Dexia*, slip op. at 10 (allegations of fraud, including state law causes of action,

11  "must be pleaded with particularity" under Rule 9(b)).  Thus, "[a]t a minimum,

12  [Plaintiffs] must allege the time, place and contents of the misrepresentations upon

13  which [they] relied."  *Ford v. New Century Mortg. Corp.*, 797 F. Supp. 2d 862, 874

14  (N.D. Ohio 2011) (applying Ohio law) (citation omitted).  In addition, as this Court

15  has held, where, as here, "a plaintiff does not rely on an efficient market, courts

16  more vigorously enforce Rule 9(b)'s particularity requirement."  RJN Ex. 46, *Cen-*

17  *taur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, No. 10-

18  CV-05699, slip op. at 15 (C.D. Cal. Jan. 20, 2011) ("*Centaur*") (citing *Argent Clas-*

---

19  [28]  Section 1707.41 of the Ohio Securities Act only imposes liability "for the loss or

20  damage sustained by the relying person by reason of the falsity of any material mis-statement."  OHIO REV. CODE ANN. § 1707.41(A) (emphasis added).

21  [29]  With respect to National Integrity's common law fraud claims premised on alle-gations pertaining to underwriting, appraisals, loan-to-value ratios and ratings, the

22  Countrywide Defendants contend that these claims are inadequately pled and must be dismissed on the same grounds articulated in their memoranda of law in support

23  of their motions to dismiss in *Allstate* and *Dexia*.  *See Allstate Ins. Co. v. Country-wide Fin. Corp.*, No. 2:11-cv-05236-MRP-MAN, Memorandum of Law in Support

24  of Countrywide Defendants' Motion to Dismiss, at Sections II-VI (C.D. Cal. filed Mar. 30, 2011) (Doc. No. 88); *Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, No.

25  2:11-cv-07165-MRP-MAN, Defendants' Joint Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Complaint, at Sections III(C)-(F) (C.D. Cal.

26  filed May 16, 2011) (Doc. No. 108).  The Countrywide Defendants acknowledge, however, that this Court has sustained similar fraud claims in these actions premised

27  on such allegations.  *See, e.g., Allstate*, 2011 WL 5067128, at *18-19; *Dexia*, slip op. at 10.  The Countrywide Defendants respectfully reserve all of their rights in re-

28  gard to these arguments.

1    *sic Convertible Arbitrage Fund v. Countrywide Fin. Corp. et al.,* 2008 WL 8166001,

2    at *3 (C.D. Cal. Nov. 13, 2008)). Thus, Plaintiffs "must plead facts that show ac-

3    tual, direct reliance on a particular alleged misstatement or omission." *Id.*

4           Plaintiffs, however, do not allege reliance with particularity. Instead, in re-

5    gard to the disclosures relating to title transfer, Plaintiffs allege only that "[t]hese

6    disclosures *led investors to conclude* that Defendants had taken all steps necessary

7    to ensure the trusts could negotiate loan modifications with proper authority and,

8    when necessary, foreclose upon any defaulted mortgage loan." Compl. ¶ 208 (em-

9    phasis added). Vague and in the passive voice, this allegation does *not* affirmatively

10   allege that Plaintiffs (or any other investor, for that matter) *actually read and relied*

11   *on* any of the title transfer representations in the Offering Materials. Moreover, this

12   allegation undercuts Plaintiffs' subsequent generic allegation that they affirmatively

13   "relied upon Defendants' representations and assurances regarding the quality of the

14   mortgage collateral underlying the Certificates, including . . . the assignment of the

15   underlying mortgage loans." Compl. ¶ 283. Plaintiffs' reliance allegations also are

16   insufficient because they refer to "Defendants' representations and assurances"

17   without specifying which statements each Plaintiff relied on for each (or any) pur-

18   chase. *See Centaur*, slip op. at 15 (dismissing claims where "[e]ach plaintiff" failed

19   to "identify [their] transactions" and "the misrepresentations [they] relied upon

20   when engaging in the transactions").[30] Such "everyone did everything allegations"

21   are insufficient to plead reliance and fail as a matter of law. *Destfino v. Reiswig*,

22

23   _____

30    *See also Broadbent v. Americans for Affordable Healthcare, Inc.*, 2011 WL
24   7115984, at *4 (S.D. Ohio Dec. 16, 2011) ("[A] fraud complaint may not rely upon
     blanket references to acts or omissions by all of the defendants.") (internal quotation
25   omitted); *Fisher v. APP Pharm., LLC*, 783 F. Supp. 2d 424, 433 (S.D.N.Y. 2011)
     (holding that "Rule 9(b) is not satisfied where the complaint vaguely attributes the
26   alleged fraudulent statements to 'defendants'" and dismissing claim for fraudulent
     concealment where the complaint "fail[ed] to differentiate among the named Defen-
27   dants in each allegation" and thus failed to inform each defendant of the "circum-
     stances surrounding the fraudulent conduct with which he individually stands
28   charged") (internal quotation omitted).

1   630 F.3d 952, 958 (9th Cir. 2011).[31]

2        Moreover, the thrust of Plaintiffs' complaints, like other Countrywide MBS

3   complaints, is that Countrywide misrepresented the quality of the mortgages in the

4   underlying pools.  Plaintiffs' allegations concerning title transfer are covered by

5   catch-all allegations that, for example, "[b]ut for the misrepresentations and omis-

6   sions in the Offering Materials, [Plaintiffs] would not have purchased or acquired

7   the Certificates as [they] ultimately did."  Compl. ¶ 285.  This type of conclusory

8   allegation concerns the impact on Plaintiffs' decision-making process of the "total

9   mix" of alleged misstatements identified in the Complaints, including the predomi-

10  nant allegations concerning collateral quality, as well as allegations concerning in-

11  flation of appraisals and manipulation of the ratings process.  *See id.* ¶¶ 243-282.

12  The title-transfer allegations make up only a small fraction of this "total mix."[32]  Fi-

13  nally, the Complaints are devoid of any allegations that they relied on the alleged

14  title transfer misrepresentations "to their detriment."  *See, e.g.*, *Waggoner v. Caruso*,

15  886 N.Y.S.2d 368, 371 (N.Y. App. Div. 2009) (dismissing fraud claims for failure

16  

---

17  [31]  The inadequacy of Plaintiffs' reliance allegations is especially stark in regard to their secondary market purchases.  Twenty-three of 36 purchases by the *Western & Southern* plaintiffs and 14 of 26 purchases by National Integrity were made on the
18  secondary market, some *two to three years* after the date the relevant prospectus supplement was filed.  *See* Compl. Ex. A.  The more time that passes between the
19  issuance of disclosure documents and the purchase of a security, the more attenuated any inference that the plaintiff purchased in reliance on those documents as opposed
20  to other information or factors (here, for example, the information contained in the monthly distribution reports issued by the MBS trustees that provided detailed per-
21  formance data, which Plaintiffs here allege they received—*see, e.g.*, *W&S* AC ¶ 375; *NI* Compl. ¶ 374).  *Cf. Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076,
22  1081-82 (9th Cir. 1999) (where security purchase made after earnings statement is-sued covering 12 months or more, "in all likelihood the purchase and price of the
23  security purchased after publication of such an earning statement will be predicated upon that statement rather than upon the information disclosed upon registration")
24  (quoting H.R. REP. No. 73-1838 at 41 (1934)); *In re Klusman*, 29 B.R. 865, 868 (Bankr. Ohio 1983) (holding that experienced credit manager's reliance on year-old
25  financial statement was not reasonable).

26  [32]  *See* Compl. ¶¶ 197-242.  The "Substantive Allegations" section of the *Western & Southern* Amended Complaint is 107 pages and is divided into 16 sections.  *See also*
27  *NI* Compl. at 14-110.  A single 16-page section, consisting almost entirely of sum-maries of testimony and allegations in unrelated actions and investigations, concerns
28  title transfer issues.  *See W&S* AC at 60-76; *NI* Compl. at 53-67.

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

1  to "plead with the required detail" "how [plaintiffs] changed their position or other-

2  wise relied on any purported misrepresentations or omissions to their detriment").

3  Because Plaintiffs do not allege that they relied on the title transfer representations

4  *per se* and to their detriment or that, but for the representations concerning title

5  transfer standing alone, they would not have purchased the Certificates, they have

6  failed to plead reliance in connection with statements concerning title transfer.[33]

7  ## B.  <u>The Complaints Fail To Plead Justifiable Reliance.</u>

8  Plaintiffs' claims requiring reliance fail for the additional reason that any al-

9  leged reliance was not justifiable.[34]  Here, Plaintiffs claim to have relied on "Defen-

10  dants' representations and assurance regarding . . . assignment of the underlying

11  mortgage loans" (Compl. ¶ 283), pointing to representations that "the depositor **will**

12  sell, transfer, assign, set over and otherwise convey without recourse to the trustee in

13  trust for the benefit of the certificateholders all right, title and interest of the deposi-

14  tor in and to each mortgage loan" and that "the depositor **will** deliver or cause to be

15  delivered to the trustee . . . the mortgage file." *Id.* ¶ 206 (quoting CWALT 2007-

16  16CB Pro. Supp. at S-39-S-40) (emphasis added).  Putting aside the fact that these

17  statements from the Prospectus Supplement simply describe the obligations imposed

18  by the PSAs (*see* Sections I.A, *supra*), because—as characterized by Plaintiffs—

19  "defendants' representations amounted to statements of future intentions and con-

20  duct," they "cannot justifiably be relied upon as a matter of law." *Gouge v. BAX*

21

22  <hr>

[33]  Because the Court ruled that National Integrity's allegations concerning under-writing deficiencies were not time-barred with respect to its common-law claims, *W&S/NI Order*, 2012 WL 1097244, at *16, this argument does not apply to those claims.  They are inadequately pleaded, however, for other, independent reasons. *See infra*, §§ V, VII, VIII.

[34]  Justifiable reliance is a required element of Plaintiffs' 1934 Act and common law claims. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999) (1934 Act); *Crown Prop. Dev., Inc. v. Omega Oil Co.*, 681 N.E.2d 1343, 1350 (Ohio Ct. App. 1996) (under Ohio law, justifiable reliance is "a necessary element for both a fraud claim and a negligent misrepresentation claim"); *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996) ("Reasonable reliance must also be proved under New York law to recover for fraud and negligent misrepresentation.").

1   *Global, Inc.*, 252 F. Supp. 2d 509, 518 (N.D. Ohio 2003) (applying Ohio law).[35]

2       In addition, the statements in the Offering Materials regarding transfer and

3   recordation are neither unconditional nor absolute and as such could not reasonably

4   have supported reliance.  *See supra* Section I.B.  To the contrary, the Offering Mate-

5   rials expressly state that title might *not* be delivered at closing, disclosing (in text

6   immediately following the representations on which Plaintiffs say they relied

7   (Compl. ¶ 206)) that "[w]ith respect to up to 50% of the mortgage loans in each

8   group, the depositor **may deliver** all or **a portion** of each related mortgage file to the

9   trustee" within thirty days after the closing date.  RJN Ex. 1 (CWALT 2007-16CB

10   Pro. Supp.) at S-40.[36]  The Offering Materials further state that assignment docu-

11   mentation might *never* be delivered to the trustee:  "***in lieu of providing the duly***

12   ***executed assignment of the mortgage to the trustee*** . . .***and the original recorded***

13   ***assignment or assignment of the mortgage*** . . . the depositor may at its discretion

14   provide evidence that the related mortgage is held through the MERS System."  *Id.*

15   at S-41.[37]  Given these disclosures, it simply was not justifiable for Plaintiffs alleg-

16   edly to have relied on the Offering Materials as promises or guarantees that (in

17   Plaintiffs' words) "the loan files would  . . . be delivered to the trusts."  Compl. ¶

18   206.[38]

19   ─────────────
[35]  *Accord Cerabono v. Price*, 775 N.Y.S.2d 585, 586 (N.Y. App. Div. 2004) (find-

20   ing plaintiff failed to allege justifiable reliance where "the alleged misrepresentation amounted to nothing more than a mere unfulfilled promise as to what the defendant

21   would do in the future").

[36]  *See also* RJN Ex. 2, (CWALT 2005-26CB Pro. Supp.) at S-24; RJN Ex. 5,

22   (CWABS 2007-4 Pro Supp.) at S-30; RJN Ex. 3, (CWALT 2005-J1 Pro. Supp.) at S-73; RJN Ex. 4, (CWMBS 2006-21) at S-37; RJN Ex. 7, (CWHEQ 2007-S1 Pro.

23   Supp.) at S-31; RJN Ex. 6, (CWHEQ 2006-S8) at S-26.

[37]  *See also* RJN Ex. 2, (CWALT 2005-26CB Pro. Supp.) at S-25; RJN Ex. 5,

24   (CWABS 2007-4 Pro Supp.) at S-30; RJN Ex. 3, (CWALT 2005-J1 Pro. Supp.) at S-74; RJN Ex. 4, (CWMBS 2006-21) at S-38; RJN Ex. 7, (CWHEQ 2007-S1 Pro.

25   Supp.) at S-31; RJN Ex. 6, (CWHEQ 2006-S8) at S-25.

26   [38]  Plaintiffs also argue (Compl. ¶ 206) that this language was a promise that the "un-derlying mortgages and notes would be properly assigned," *id.*, but this language

27   does not address assignment, just delivery of title documentation.  As noted above, the assignments which Plaintiffs claims not to have occurred were effected by the

28   Offering Materials themselves.  *See* I.A – I.C, *supra*.

In determining whether plaintiffs justifiably relied on a misrepresentation for 1934 Act claims, courts take into account "the sophistication of expertise of the plaintiff in financial and securities matters." *Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 918 (6th Cir. 1991). The same is true under both Ohio and New York law.[39] As sophisticated investors, Plaintiffs are "obligated to investigate information available to [them] with the care and prudence expected from people blessed with full access to information." *SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, 2010 WL 2473595, at *14 (S.D.N.Y. June 17, 2010), *aff'd*, 448 Fed. App'x 116 (2d Cir. 2011) (internal quotation omitted). Because the alleged misrepresentations regarding title transfer concern future conduct, and the Offering Materials unequivocally say that no defendant would have an unconditional obligation to deliver title, Plaintiffs' claimed reliance on the Offering Materials as having described an unconditional obligation is not justifiable as a matter of law. *SRM*, 2010 WL 2473595, at *14 (dismissing fraud claim because "it was unreasonable for [Plaintiff] to rely upon the highly general statements alleged as misstatements in this case") (citation and quotation omitted); *cf. Lapos Constr., Inc. v. Leslie*, 2006 WL 3174252, at *5 (Ohio Ct. App. Nov. 6, 2006) (noting appellant's "level of sophistication and experience, and [] complete lack of investigation" in finding appellant's reliance was not justifiable).

## IV.   PLAINTIFFS DO NOT ALLEGE LOSS CAUSATION.

The Complaints fail adequately to allege loss causation. To state a claim un-

---

[39] Under Ohio law the factors to be considered in determining whether the reliance was justified include, among others, "the respective intelligence, experience, age and mental and physical condition of the parties, and their respective knowledge and means of knowledge." *Harshman II Dev. Co., L.L.C. v. Meijer Stores Ltd. P'ship*, 938 N.E.2d 53, 58-59 (Ohio Ct. App. 2010) (citation omitted) (holding that the court "cannot ignore the fact that Harshman II is composed of experienced, knowledgeable, and sophisticated commercial real estate lawyers and developers" in affirming summary judgment for defendant on fraud claim). Under New York law, "[i]n evaluating whether a plaintiff has adequately alleged justifiable reliance, a court may consider, *inter alia*, the plaintiff's sophistication and expertise in finance . . . ." *Granite Partners L.P. v. Bear Stearns & Co.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999) (applying New York law).

1   der Section 10(b) and Rule10b-5, a plaintiff must plausibly allege loss causation—

2   that its losses were caused by the allegedly concealed "truth," and not other, inde-

3   pendent forces. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010);

4   *accord Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). The same is re-

5   quired for virtually all of Plaintiffs' other remaining claims.[40] But Plaintiffs have

6   not adequately alleged facts supporting an inference of loss causation, and each of

7   their remaining claims must be dismissed.[41]

8        In earlier Countrywide MBS cases in which plaintiffs alleged that misstate-

9   ments concerning *collateral quality* and *credit risk* caused their losses, this Court

10  has held that loss causation was adequately pled despite plaintiffs' failure to address

11  the impact of the intervening financial crisis, leaving for a later stage of the litiga-

12  tion the "complicated" task of "untangling" those causes from one another. *See*,

13  *e.g.*, *Dexia* slip. op. at 13; *Thrivent* slip. op. at 5-7; *Allstate Ins. Co. v. Countrywide*

14  *Fin. Corp.*, --- F. Supp. 2d ----, 2011 WL 5067128, at *19 (C.D. Cal. Oct. 21, 2011)

15  ("*Allstate*"). But this case presents a different situation. Here, the Court has dis-

16  missed as untimely the vast majority of Plaintiffs' claims to the extent they are

17

---

18  [40] *See*, *e.g.*, *Ohio Police*, 813 F. Supp. at 880 ("One who . . . supplies false informa-
tion for the guidance of others in their business transactions, is subject to liability for

19  *pecuniary loss caused to them* by their justifiable reliance upon the information. . . ."
(emphasis added)); *Volbers-Klarich v. Middletown Mgmt., Inc.*, 929 N.E.2d 434,

20  440 (Ohio 2010) (elements of common law fraud in Ohio include proximate causa-
tion); *Meyercord v. Curry*, 832 N.Y.S.2d 29, 30 (N.Y. App. Div. 2007) (loss causa-

21  tion required for negligent misrepresentation claim); *Federated Mgmt. Co. v. Coo-
pers & Lybrand*, 2004 WL 2941159, at *8 (Ohio Ct. App. Dec. 21, 2004) (plaintiffs

22  suing for fraud under the OSA must prove that the alleged misstatements were a
"significant contributing cause" of the plaintiff's losses) (citation omitted); *Laub v.*

23  *Faessel*, 745 N.Y.S.2d 534, 536 (N.Y. App. Div. 2002) ("To establish causation [for
purposes of a common law fraud claim brought under New York law], plaintiff must

24  show . . . that the misrepresentations directly caused the loss about which plaintiff
complains (loss causation).") (citations omitted); *Dickerson Internationale, Inc. v.*

25  *Klockner*, 743 N.E.2d 984, 988 (Ohio Ct. App. 2000) (proximate cause an element
of negligent misrepresentation); *see also* Section III.A, *supra*.

26  [41] The Ninth Circuit has suggested that Rule 9(b) may govern allegations of loss
causation, requiring that they be pled with particularity. *See Berson v. Applied Sig-*

27  *nal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Regardless whether Rule 9(b) is
applied here, the Complaints' allegations concerning causation are inadequate be-

28  cause they also fail to meet the more liberal pleading requirements of Rule 8(a).

based on alleged misstatements concerning underwriting practices, collateral qual-
ity, and credit risk.  For the most part, what survived the initial motion to dismiss are
allegations based on alleged misstatements concerning delivery of title.  Thus, these
Complaints can survive the current dismissal motion only if they allege facts suffi-
cient plausibly to support the conclusion that Plaintiffs' claimed losses were caused
by defective title delivery, and *not* by *either* the supposed underwriting deficiencies
*or* the global financial crisis.  *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009)
(holding that, even under Rule 8(a), the factual allegations must be sufficient to
move the claims "across the line from conceivable to plausible") (quoting *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  These Complaints, however, do not
allege any such facts.

In *Dura*, the Supreme Court held that a securities plaintiff must allege not
only that it purchased securities at an artificially inflated price, but also:  (1) a sub-
sequent decline in the price of the security *and* (2) a causal link between the alleged
misrepresentation and the price decline.  *See* 544 U.S. at 346-47.  Phrased differ-
ently, "the complaint must allege that the defendant's [security] price fell signifi-
cantly after the truth became known."  *Metzler Inv. GMBH v. Corinthian Colleges,
Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (quotation omitted).  Otherwise, there is
no basis to conclude that the reduced security value was caused by the alleged fraud,
as opposed to other factors such as "changed economic circumstances, changed in-
vestor expectations, new industry-specific or firm-specific facts, conditions or other
events. . . ."  *Dura*, 544 U.S. at 343.  Complaints that try to allege securities fraud in
the absence of adequate allegations of loss causation risk turning the securities laws
into "investment insurance."  *See Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685
(7th Cir. 1990).

In other Countrywide MBS cases, this Court has suggested that the law does
not require purchasers of "highly illiquid RMBS" to plead a "perfectly linked cor-
rective disclosure and price decline" in order to satisfy *Dura*'s requirement that

35

1  plaintiffs plead "an adequate causal nexus between misrepresentation and damage."

2  *Dexia*, slip op. at 13; *accord Thrivent*, slip. op. at 5-7.[42]  Nonetheless, the Court

3  made clear that Plaintiffs *still* must comply with *Dura*'s requirement that they allege

4  facts sufficient to plausibly infer a causal relationship between the alleged fraudu-

5  lent statements and their alleged loss.  Put another way, the MBS buyer may not

6  survive a motion to dismiss without alleging actual facts supporting a plausible link

7  between an alleged misrepresentation and a detectable harm.

8       Here, the Complaints allege that the market value of the Certificates has de-

9  clined by more than 30%, *see NI* Compl. ¶ 106 (alleging a 33% decline); *W&S* AC

10  ¶ 106 (alleging a 31.1% decline).[43]  But they contain no factual allegations that

11  would suggest a causal relationship between this alleged decrease in value and the

12  alleged misrepresentations concerning *title transfer*.  To the contrary, the Com-

13  plaints expressly and affirmatively try to argue that something else caused Plaintiffs'

14  losses—namely, alleged misstatements regarding *collateral quality*.  For example, in

15  a section of the Complaints titled "Widespread Defaults and Downgrades Confirm

16  That Countrywide Abandoned Its Underwriting Standards," Plaintiffs try to attribute

17  the alleged more-than-30% decline in market value of the Certificates to Country-

18  wide's supposed "*abandon[ment] [of] its underwriting standards*."  *See NI* Compl.

19  _____

20  [42]  The Countrywide Defendants respectfully note that the Ninth Circuit has held
that *Dura* requires all securities fraud plaintiffs to plead a corrective disclosure and

21  resulting decline in value, *see, e.g.*, *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 392,
and courts have applied this rule to both liquid and illiquid securities alike, *see, e.g.*,

22  *In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *10 (N.D.
Cal. May 16, 2011) (distinguishing *In re Charles Schwab Corp. Sec. Litig.*, 257

23  F.R.D. 534, 547-48 (N.D. Cal. 2009)).  Moreover, Plaintiffs here expressly allege
that "[n]umerous brokers are now active in making a secondary market for mortgage

24  backed securities," Compl. ¶ 287, which at least calls into question the conclusion
that the securities are sufficiently illiquid to justify a departure from *Dura*.

25  [43]  Plaintiffs allege that they have been damaged both as a result of "substantial
losses in the market value of [their] Certificates" and because "the income and prin-

26  cipal payments that [Plaintiffs] received have been less than [Plaintiffs] expected"
when they purchased the Certificates.  Compl. ¶ 288.  Plaintiffs concede, however,

27  that "only six of [their] thirty-six tranches have suffered principal or interest short-
falls to date."  Compl. ¶ 384.  Accordingly, the primary basis for Plaintiffs' claimed

28  damages is the alleged diminution in market value.

1   ¶¶ 104-106 (emphasis added); *W&S* AC ¶¶ 104-106 (same).[44]

2   Indeed, the sole allegation in the Complaints that suggests any link between

3   title transfer and any loss is a conclusory afterthought.  And this sole allegation is

4   not supported by any pleaded facts, tacked on to the end of an allegation that af-

5   firmatively tries to tie the losses to poor collateral quality and poor borrower credit,

6   and focuses on the alleged failure to *assign* the mortgages, which, as noted above,

7   was effected by the Offering Materials themselves.  In that one allegation Plaintiffs

8   assert that "[t]he drastic and rapid loss in value of [Plaintiffs'] Certificates was *pri-*

9   *marily and proximately* caused by the *issuance of loans to borrowers who could not*

10  *afford them*, in contravention of *underwriting guidelines* described in the Offering

11  Materials, *and* by the *failure to assign mortgage loans to each trust* in a manner suf-

12  ficient to allow the trust to foreclose upon the underlying property in the event of

13  default."  Compl. ¶ 289 (emphasis added).[45]  But the Complaints allege no *facts* to

14  support the conclusory allegation that "failure to assign mortgage loans" even oc-

15  curred, much less caused (or even contributed to) any loss incurred by these Plain-

16  tiffs.

17  The Ninth Circuit has explained that although an alleged "misrepresentation

18  need not be the only reason for the decline in value of the securities," nonetheless "it

19  must be a 'substantial cause.'"  *In re Gilead Scis Sec. Litig.*, 536 F.3d 1049, 1055

20  (9th Cir. 2008) (quoting *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th

21  Cir. 2005)).  Because the Complaints fail to allege that anything related to title trans-

22  _____

23  [44]  Indeed, the Complaints actually suggest that Countrywide's representations con-
    cerning title transfer are causally immaterial due to the "extraordinarily high" de-

24  fault and delinquency rates that Plaintiffs attribute to Countrywide's alleged failure
    to comply with its "disclosed underwriting guidelines."  *See* Compl. ¶ 286.

25  [45]  The Complaints also allege that "[t]he cover-up [of improper title transfer prac-
    tices] *made possible and facilitated* the execution of additional securitizations *which*

26  *damaged investors* such as [Plaintiffs]."  Compl. ¶ 209.  But these vague allegations
    at most weakly address *transaction* causation—*i.e.*, what allegedly induced Plain-

27  tiffs' purchase of one or more MBS.  They do not address any inference of *loss* cau-
    sation—*i.e.*, any inference that Plaintiffs lost money *because of* any such title trans-

28  fer practices as opposed to the allegedly riskier nature of the collateral.

1    fer was a "substantial cause" (or any cause at all) of Plaintiffs' losses, they must be

2    dismissed for failure to plead loss causation. Moreover, although Plaintiffs attribute

3    the allegedly sudden increase in defaults and delinquencies in late 2007 and early

4    2008—and the alleged decline in the market value of the Certificates—to Country-

5    wide's alleged failure to comply with its "disclosed underwriting guidelines"

6    (Compl. ¶ 286), this Court has taken judicial notice of the simultaneous nationwide

7    collapse in housing prices, the seizing up of the capital markets, and the global fi-

8    nancial crisis that devastated the mortgage industry.  *See*, *e.g.*, *Centaur*, slip op. at

9    15-16 ("[I]t is . . . especially important that Plaintiffs plead with particularity . . . the

10   dates of their purchases and sales . . . and the basis of their alleged losses" for any

11   alleged injuries suffered during 2007, as that time period was "unusually signifi-

12   cant" given "the volatility of the U.S. economy and events then occurring in the

13   business of Countrywide.").  And numerous other courts also have taken judicial no-

14   tice of these and other similar macroeconomic events to reject loss causation allega-

15   tions.[46]  Plaintiffs' failure to address the impact of these macroeconomic events on

16   causation is as stark as their failure to tie any claimed losses to the alleged title

17   ───────────────

18   [46] *See*, *e.g.*, *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon caus-ing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases."); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 2011 WL 1158028, at *14 (S.D.N.Y. Mar. 30, 2011) ("Considering that the price of Freddie Mac's stock was clearly linked to the 'marketwide phenomenon' of the housing price collapse, there is a decreased probability that Plaintiffs' losses were caused by fraud."); *Footbridge*, 2010 WL 3790810, at *22 ("The [complaint] does not include facts which, if proven, would show that the loss in value of plaintiffs' Securities was caused by the alleged misstatements as opposed to the 'broader mar-ket declines.'"); *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 578, 591-94 (E.D. Pa. 2009) (because complaint was "silent as to how [plaintiffs'] loss can be distinguished from the market-wide losses in mortgage-backed securities generally," the "historically unprecedented" "market downturn in the mortgage industry that developed in early- to mid-2007[] is sufficient to under-mine the inference of a nexus between Defendants' misrepresentations and the per-formance of [plaintiffs' MBS]").  "[W]here"—as here—"the complaint fails to 'al-lege[ ] facts to show that [defendant's] misstatements, among others . . . that were much more consequential and numerous, were the proximate cause of plaintiffs' loss," "a plaintiff cannot plead loss causation."  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F.Supp.2d 349, 363 (S.D.N.Y. 2008) (alterations in original) (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007)).

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

1   transfer misstatements.

2       In particular, Plaintiffs do not allege any price reaction to disclosure of the al-

3   leged title issues.  This no doubt is because there was no such reaction.  To the con-

4   trary, MBS prices already had dropped long before September 2010, the month in

5   which Plaintiffs claim the title transfer issues "only began to surface." Compl. ¶

6   386.  (Plaintiffs' alleged harm in connection with 30 of the 36 MBS tranches at issue

7   in this matter stems solely from alleged declines in market price.  *See*

8   Compl. ¶ 384.)  What is more, prices steadily *rose* during and after September 2010,

9   as matter of law negating even the most remote inference of causation.  *See* Appen-

10  dix B (reflecting price data for the MBS Plaintiffs bought).  Thus, as a matter of law

11  and simple logic, the disclosure of the title-transfer issues cannot have caused any

12  harm, and the claims must be dismissed.[47]

13  **V.   THE NEGLIGENT MISREPRESENTATION CLAIMS MUST BE**
14  **DISMISSED.**

15      A plaintiff pursuing a negligent misrepresentation claim must plead particu-

16  larized facts showing that the defendant "supplie[d] false information for the guid-

17  ance of others in their business transactions."  *Delman v. City of Cleveland Heights*,

18  534 N.E.2d 835, 838 (Ohio 1989); *see also Floor Craft Floor Covering, Inc. v.*

19  *Parma Cmty. Gen. Hosp. Ass'n*, 560 N.E.2d 206, 211 (Ohio 1990) (same).

20  "[L]iability may be imposed for negligent misrepresentation only if the disseminator

21  of the information intends to supply it to a specific person or to a limited group of

22  ───────────────

23  [47] *See, e.g., Lapiner v. Camtek, Ltd.*, 2011 U.S. Dist. LEXIS 99845, at *32-33
    (N.D. Cal. Feb. 2,2011) (plaintiffs did not plead loss causation because the alleged
    disclosures "were not followed by decreases in Camtek's stock"); *In re Impax*, 2007
24  WL 5076983, at *6 (dismissing for failure to plead loss causation because "there
    was no loss associated with Impax's announcement that it would restate its 1Q04
25  and 2Q04 revenues, because the stock price increased after the truth was dis-
    closed"); *In re Redback Networks Sec. Litig.*, 2007 U.S. Dist. LEXIS 91042, at *15-
26  18 (N.D. Cal. 2007) (upon disclosure, defendant's "stock price actually closed
    higher, thus negating any inference that the disclosure caused investor losses by re-
27  vealing fraud"); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 945-48 (D. Ariz.
    2007) (dismissing for failure to allege loss causation when two of the disclosures
28  were followed by immediate increases in the stock price).

people." *Ohio Police*, 813 F. Supp. 2d at 880; *see also Gutter v. Dow Jones, Inc.*, 490 N.E.2d 898, 900 (Ohio 1986).  Accordingly, a negligent misrepresentation claim will lie only in "special circumstances," such as where the defendant is a "professional (e.g., an accountant) in the business of rendering opinions to others for their use in guiding their business." *Ford v. New Century Mortg. Corp.*, 797 F. Supp. 2d 862, 872 (N.D. Ohio 2011) (dismissing claims).  "Those who are in the business of supplying information for the guidance of others typically include attorneys, surveyors, abstractors of title, and banks dealing with non-depositors' checks." *Ziegler v. Findlay Indus., Inc.*, 464 F. Supp. 2d 733, 738 (N.D. Ohio 2006) (quotation omitted).

By contrast, where parties negotiate an arm's length business transaction, neither party can be liable for making a negligent misrepresentation to the other. *Ford*, 797 F. Supp. 2d at 872 (dismissing negligent misrepresentation claim because parties engaged in "arm's length" transaction); *Ziegler*, 464 F. Supp. 2d at 738 (dismissing claim, holding an "arms-length transaction" is not "covered by negligent misrepresentation"); *McNabb v. Hoeppner*, 2011 WL 2571386, at *4 (Ohio Ct. App. June 22, 2011) (where "[parties] were engaged in an arms-length business transaction, there was no special relationship between them. . . .").  In addition, statements made to an "unresolved class of persons unfixed in number" cannot give rise to a claim. *Floor Craft*, 560 N.E.2d at 211.

Similarly, under New York law, "[a] claim alleging negligent misrepresentation must [] be based on some special relationship which implies a close degree of trust between the plaintiff and the defendant." *WIT Holding Corp. v. Klein*, 724 N.Y.S.2d 66 (N.Y. App. Div. 2001).  As the Second Circuit recently recognized in affirming dismissal of a negligent misrepresentation claim, "the law of negligent misrepresentation requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified." *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., et al.*, Case No. 11-

4443, Summary Order, (2d Cir. Apr. 19, 2012)), at 5 (RJN Ex. 47)  Thus, "[a]n arms-length commercial transaction does not generally implicate such a 'special relationship.'"  *Dexia*, slip. op. at 15; *see Toledo Fund, LLC v. HSBC Bank USA, Nat'l Ass'n*,  2012 WL 364045, at *6 (S.D.N.Y. Feb. 3, 2012); *WIT Holding*, 724 N.Y.S.2d at 68.

Here, Plaintiffs fail to allege any facts—let alone particularized facts[48]—that any of the Countrywide Defendants were providing "information for the guidance of [Plaintiffs] in their business transactions."  *Delman*, 534 N.E.2d at 838.  To the contrary, the Complaints describe a series of arm's-length transactions in complex securities between sophisticated parties.  Plaintiffs' allegation that "Countrywide had unique and special knowledge and expertise regarding . . . the servicing practices employed as to [the] loans" (Compl. ¶ 429) does not save their claim, as a disparity of knowledge is commonplace in arm's-length transactions.[49]

For these same reasons, this Court in several other cases has dismissed negligent misrepresentation claims against Countrywide nearly identical to those asserted here.  *See Dexia*, slip. op. at 15 (dismissing claims under New York law where plaintiffs "pleaded no facts that would elevate its purchases from an arms-length commercial transaction"); *Allstate*, 2011 WL 5067128, at *23 (same).  Thus, because Plaintiffs here – like the plaintiffs in *Dexia* and *Allstate* – have "pleaded no facts that would elevate [their] purchases from an arms-length commercial transaction," their negligent misrepresentation claim must likewise be dismissed.  *Dexia*, slip. op. at 15; *Allstate*, 2011 WL 5067128, at *23; *Thrivent*, slip. op. at 12.  This Court's words in *Thrivent* apply with equal force to the nearly identical allegations

---

[48]  *See Mulbarger v. Royal Alliance Ass'n, Inc.,* 1999 WL 33432317, at *2 (S.D. Ohio Dec. 22, 1999) (applying Ohio law) ("The standards of Rule 9(b) apply to claims of negligent misrepresentation."), *aff'd*, 10 Fed. App'x 333 (6th Cir. 2001).

[49]  Plaintiffs' negligent misrepresentation claims fail for the additional reason that they allege that all of the supposed misstatements regarding title transfer appeared in the Offering Materials (Compl. ¶¶ 205-08), and concede that the Offering Materials were directed to "investors" as a whole, rather than to a "limited class," as Ohio law requires.  *See Gutter*, 490 N.E.2d at 900.

1    here and mandate dismissal here as well:[50]

2         Defendants in this case were in the business of selling RMBS, not information

3         or advice concerning RMBS.  Plaintiffs . . . argue that Defendants' possession

4         of . . . information [concerning loans] rendered the transactions unequal.

5         Plaintiffs confuse equality of knowledge with equality of bargaining power.

6         Every side in a commercial transaction has private information; this alone can-

7         not be enough to create a duty in tort.

8    *Thrivent*, slip op. at 12.[51]

9    **VI.   PLAINTIFFS' OSA CLAIMS ARE TIME-BARRED AND**
10        **OTHERWISE DEFECTIVE.**

11        In addition to the deficiencies discussed above in regard to intent, knowledge,

12   reliance, and the existence of a material misstatement (*see* 8 n.6, 21 n.20, 29 n.30

13   *supra*), Plaintiffs' OSA claims fail for the following separate and independent rea-

14   sons as well.

15        ***OSA Statute of Repose***.  In its March 9 order, this Court declined to dismiss

16   Plaintiffs' OSA claims to the extent based on their title transfer allegations, holding

17   that the "right to a remedy" provision of the Ohio Constitution barred application of

18   the OSA's five-year statute of repose.  *W&S/NI Order*, 2012 WL 1097244, at *12.

19   On April 4, 2012, however, the United States Court of Appeals for the Sixth Circuit

20   *upheld* the constitutionality of the OSA statute of repose in *Fencorp, Co. v. Ohio*

21   *Kentucky Oil Corp.*, --- F.3d ----, 2012 WL 1109648, at *10 (6th Cir. Apr. 4, 2012).

22   In light of this new authority, the Countrywide Defendants respectfully request that

23   the Court reconsider its prior decision and dismiss Plaintiffs' transfer of title claims

24   _____

25   [50]  The Court in *Thrivent* applied Minnesota law, which, like Ohio, has adopted Sec-
     tion 552 of Restatement (Second) Torts as the standard for negligent misrepresenta-
26   tion claims.  *See Florenzano v. Olson*, 387 N.W.2d 168, 174 (Minn. 1986) (Minne-
     sota law); *Gutter*, 490 N.E.2d at 900 (Ohio law).

27   [51]  Plaintiffs' allegations that they had a "longstanding relationship" with Country-
     wide (Compl. ¶ 431) does nothing to save their claim, as the identical allegation was
28   pled and dismissed in *Thrivent*.  *See* RJN Ex. 51, (*Thrivent* Compl.), at ¶ 309.

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

1   under the OSA to the extent that such claims are barred by the OSA statute of re-

2   pose.

3      The OSA contains a five-year statute of repose.  OHIO REV. CODE. ANN.

4   §1707.43(B).  Because the *Western & Southern* Complaint was filed April 27, 2011,

5   and the *National Integrity* Complaint was filed on November 9, 2011, this repose

6   period bars Plaintiffs' transfer of title claims based on purchases by the *Western &*

7   *Southern* Plaintiffs before April 27, 2006 and by the *National Integrity* Plaintiff be-

8   fore November 9, 2006.  Relying on *Groch v. Gen. Motors Corp.*, 883 N.E.2d 377

9   (Ohio 2008), which did not involve the OSA's statute of repose, and *LoPardo v.*

10  *Lehman Bros., Inc.*, 548 F. Supp. 2d 450, 465 (N.D. Ohio 2008), this Court held that

11  the five-year statute of repose was unconstitutional under the "right to a remedy"

12  clause of the Ohio Constitution because the Court said it would have deprived plain-

13  tiffs of a remedy before they would have had a reasonable time to sue on their

14  claims.  *W&S/NI Order*, 2012 WL 1097244, at *12.[52]

15     After the Court issued its ruling, however, the Sixth Circuit addressed the

16  constitutionality of the OSA statute of repose in *Fencorp*, which involved allega-

17  tions of fraud and misrepresentation in the issuance of securities related to oil and

18  gas interests.  2012 WL 1109648, at *1.  The district court held that the OSA statute

19  of repose barred certain claims.  *Id.*  Like Plaintiffs here, the plaintiff in *Fencorp* ar-

20  gued that the statute of repose violated the Ohio Constitution's "right to a remedy"

21  provision.  *Id.* at *9.  Reviewing Ohio law at length, the Sixth Circuit disagreed, up-

22  holding the constitutionality of the repose period.  *Id.* at *10.

23     The Sixth Circuit explained that Ohio law requires a "high degree of cer-

24  tainty" before a law may be declared contrary to the Ohio Constitution, and there-

25  _____

26  [52] *See W&S/NI Order*, 2012 WL 1097244, at *12 (citing Ohio Const. Art. 1, §16, which provides:  "All courts shall be open, and every person, for an injury done him

27  in his lands, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.").

28

fore that "it must appear beyond a reasonable doubt that the legislative and constitutional provisions are clearly incompatible." *Id*. (quoting *State ex rel. Dickman v. Deffenbacher*, 128 N.E.2d 59, 60 (Ohio 1955)).  The Court then held that under the Ohio Constitution "the right to remedy provision . . . applies only to existing, vested rights." *Id*. (citation omitted).  Because plaintiff's OSA claim was not a right "vested" in common law, but was a statutory right created by the Ohio legislature, it was not unconstitutional for the Legislature to qualify that right by limiting its availability (through the repose period).  *Id*.  The Court thus explained that, "[w]here the legislature creates a new, statutory right, it is reasonable that the legislature also has the ability to shape contours and limits of that right.  To hold otherwise would mean that any statutorily-created right in Ohio, once created, could not be limited by a statute of repose." *Id*.

Like the plaintiff's OSA claims in *Fencorp*, these Plaintiffs' OSA claims also involve new rights that the Ohio Legislature was constitutionally permitted to limit by means of a statutory repose period.[53]  Accordingly, in light of the Sixth Circuit's holding and thorough explication of Ohio law in *Fencorp*, Countrywide respectfully requests that the Court reconsider its prior holding invalidating the repose period and, instead, hold that OSA's statute of repose bars any claims based on MBS certificates purchased by the *Western & Southern* Plaintiffs prior to April 27, 2006 and by National Integrity prior to November 9, 2006.  Application of the repose period to these purchases would bar these Plaintiffs' OSA claims based on the following purchases:

---

[53]  Like plaintiff's OSA claims in *Fencorp*, Plaintiffs' claims under OSA §§ 1707.41, 1707.43 and 1707.44 (B)(4), (J) and (G) involve new rights created by the Ohio Legislature that did not exist at common law.  More specifically, claims under § 1707.41 require a different state of mind than is required under Ohio common law.  *See Byrley v. Nationwide Life Ins. Co.*, 640 N.E.2d 187, 200 (Ohio Ct. App. 1994).  Claims under §§ 1707.43 and 1707.44(B)(4), (J) and (G) do not require proof of all the same elements required to plead claims of common law fraud and negligent misrepresentation under Ohio law.  *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 755 F. Supp. 2d 857, 884 (S.D. Ohio 2010); *Ferritto v. Alejandro*, 743 N.E.2d 978, 982 (Ohio Ct. App. 2000).

44

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

| Offering/Tranche | Western & Southern Purchase Date |
|---|---|
| CWALT 2005-20CB 1A3 | 4/18/2006 |
| CWALT 2005-20CB 1A4 | 6/21/2005 |
| CWALT 2005-28CB 2A4 | 11/9/2005 |
| CWALT 2005-54CB 1A4 | 9/30/2005 |
| CWALT 2006-7CB 1A14 | 4/12/2006 |
| CWHL 2005-24 A33 | 12/12/2005 |
| CWHL 2005-24 A7 | 11/2/2005 |
| CWHL 2005-25 A6 | 11/9/2005 |

| Offering/Tranche | National Integrity Purchase Date |
|---|---|
| CWALT 2005-20CB 1A3 | 4/18/2006 |
| CWALT 2005-30CB 1A6 | 6/30/2006 |
| CWALT 2005-54CB 1A4 | 9/30/2005 |
| CWALT 2006-14CB A7 | 4/29/2006 |
| CWALT 2006-7CB 1A14 | 4/12/2006 |
| CWHL 2005-24 A7 | 11/2/2005 |
| CWHL 2005-25 A6 | 11/9/2005 |

**OSA Section 1707.41**.  This section applies only to a person or entity that "offers any security for sale, or receives the profits accruing from such sale."  The Ohio cases hold that one "offers a security for sale" for purposes of this statute if one is: (1) an owner who passes title, or other interest in the security, to the buyer for value or (2) a person who for personal financial gain successfully solicits the purchase of a security.  *See In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 306 (S.D. Ohio 2007) (citing *Byrley v. Nationwide Life Ins. Co.,* 640 N.E.2d 187, 196 (Ohio Ct. App. 1994) (relying on the definition of "seller" articulated in *Pinter v. Dahl,*

486 U.S. 622, 647 (1988))).[54]  Thus, except as to any MBS allegedly purchased directly from Countrywide Securities Corporation ("CSC") as an underwriter in the initial offering, all claims under this section must be dismissed as to all Countrywide Defendants.

More specifically, all of the MBS Offerings at issue here were "firm commitment" underwritings with respect to the MBS purchased by Plaintiffs whereby the Depositor entities—CWALT, CWMBS, CWABS, and CWHEQ—sold the Certificates not to investors but to the underwriters of the MBS offerings, which in turn sold them to the public. *See* Appendix C (detailing *Western & Southern* Plaintiffs' purchases) and Appendix D (detailing *National Integrity* Plaintiff's purchases). For example, the prospectus supplement for CWALT 2007-16CB states:

> [T]he depositor has agreed to sell to Deutsche Bank and Deutsche Bank has agreed to purchase from the depositor the Class A Certificates (the "Deutsche Bank Underwritten Certificates") and the depositor has agreed to sell to Banc of America and Banc of America has agreed to purchase from the depositor the Class M-1, Class M-2, Class B-1 and Class B-2 Certificates (the "Banc of America Underwritten Certificates" and, together with the Deutsche Bank Underwritten Certificates, the "Underwritten Certificates").

RJN Ex. 1, at S-132.  As this Court recognized in *Maine State*, in such firm commitment underwritings, "title passed from the [depositor] to the underwriters before passing to the ultimate purchasers."  *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *9 (C.D. Cal. May 5, 2011).  Because of the "firm commitment" nature of each offering, unless Plaintiffs bought their MBS directly from CSC as an underwriter in the initial offering, none of the Countrywide Defendants were a

---

[54]   Section 1707.44(G) only applies to persons who engage in fraudulent conduct *while* "selling securities." *See* Ohio Rev. Code § 1707.44(G) ("No person *in purchasing or selling securities* shall knowingly engage in any act or practice that is, in this chapter, declared illegal, defined as fraudulent, or prohibited") (emphasis added).

seller for purposes of § 1707.41. This is because no Countrywide entity would have been in a position to offer the securities for sale, and there is no allegation in the Complaints that any such entities solicited Plaintiffs specifically to buy the securities.

Moreover, here, eleven of the Offerings at issue in *Western & Southern* and seven of the Offerings at issue in *National Integrity* were entirely underwritten by underwriters who are not even parties to this action, such as Credit Suisse, Deutsche Bank, and Morgan Stanley. *See* Appendix C and Appendix D. For these Offerings, *none* of the Countrywide Defendants qualify as sellers of the MBS.[55] And the Complaints indicate that Plaintiffs bought only a small number of their securities directly from CSC as underwriter in the initial offering of the MBS.[56]

The fact that all Offerings at issue here were "firm commitment" underwritings also means that no Countrywide entity "receive[d] *the profits* accruing from *such sale*." O.R.C. § 1707.41 (emphasis added). As evidenced by the language quoted above, the depositor entities sold the "Underwritten Certificates" to the underwriters—and got paid by the underwriters—before any investor had purchased a single Certificate. RJN Ex. 1 (CWALT 2007-16CB Pro. Supp.) at S-132. And the depositor entities would have received that payment regardless of whether the underwriters ever sold a single MBS to a single investor. Thus, no Countrywide entity "received the profits accruing from [any] sale" of any MBS to Plaintiffs or any other investor, and the "recei[pt] of profits" component of § 1707.41 thus provides no basis for a claim against any Countrywide Defendant except to the extent Plaintiffs

---

[55] Because none of the Countrywide Defendants were "sellers" of the MBS, Plaintiffs' claims under Section 1707.44(G) also fail because this section applies only to persons that engage in fraudulent conduct *while* "selling securities." *See* Ohio Rev. Code § 1707.44(G) ("No person *in purchasing or selling securities* shall knowingly engage in any act or practice that is, in this chapter, declared illegal, defined as fraudulent, or prohibited") (emphasis added).

[56] According to the Complaints, the *Western & Southern* Plaintiffs only purchased 8 of their 36 MBS in initial offerings underwritten by CSC (*see* Appendix C), and the *National Integrity* Plaintiff purchased 7 of its 26 MBS in initial offerings underwritten by CSC (*see* Appendix D).

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

1   purchased directly from CSC itself in the offering.  *See Ohio Police*, 813 F. Supp.

2   2d at 878 (dismissing § 1707.41 claims against non-sellers).

3       ***OSA Sections 1707.44 (B)(4) and (J)***.  These sections apply only to persons

4   who "make" or "cause to be made" material misstatements with intent to deceive for

5   the purpose of selling securities.  *See, e.g., State v. Warner*, 564 N.E.2d 18, 38 (Ohio

6   1990).  Here, with the exception of the depositor entities (which are deemed to be

7   the issuers of the securities and are responsible for filing the Offering Materials with

8   the SEC), Plaintiffs have alleged no facts—as opposed to factually unsupported

9   conclusions—that would support an inference that any of the other Countrywide De-

10  fendants caused the alleged misstatements in the Offering Materials to be made or

11  were even involved in their preparation.  *Cf. Janus Capital Group, Inc. v. First De-

12  rivative Traders*, 131 S. Ct. 2296, 2302 (2011) (maker of a statement under Rule

13  10b-5 is limited to the "person or entity with ultimate authority over the statement,

14  including its content and whether and how to communicate it").[57]

15      ***OSA Section 1707.43***.  Section 1707.43 applies only to persons who partici-

16  pated in or aided in *the sale* of securities.  *Dep't of Comm. v. Buckeye Fin. Corp.*,

17  377 N.E.2d 502, 504 (Ohio 1978) (the purchaser has a claim against "'every person

18  who has participated in or aided the seller in any way' *in making the sale*") (empha-

19  sis added) (citation omitted).  This claim fails as to all of the Countrywide Defen-

20  dants (except for CSC to the extent Plaintiffs allegedly bought directly from it as an

21  underwriter in the initial offering) because Plaintiffs bought their securities in firm

22  commitment underwritings from underwriters that had bought those securities for

23  sale to investors.  By definition, the Countrywide Defendants did not "participate" in

24  these sales by the underwriters and were wholly uninvolved "in making the sale" to

25  —————————————

26  [57] For example, with respect to Countrywide Financial Corporation ("CFC") and Countrywide Capital Markets ("CCM"), Plaintiffs conclusorily allege—with no factual support—that these entities "controlled the disclosures made in connection with

27  each securitization." Compl. ¶ 304.  With respect to Countrywide Home Loans, Inc. ("CHL") and CSC, Plaintiffs simply assert—again with no factual support—that

28  CHL "participated in the preparation of Offering Materials." *Id.* ¶ 422.

1   investors like Plaintiffs here.  And Ohio courts have rejected § 1707.43 claims made

2   against defendants that, as here, did not participate in the challenged securities sales.

3   *See, e.g., Boomershine v. Lifetime Cap., Inc*., 2008 WL 54803, at *2 (Ohio Ct. App.

4   Jan. 4, 2008) (affirming dismissal on summary judgment of § 1707.43 defendants

5   who were not "involved in the sale" of the securities at issue) (emphasis in original);

6   *Strunk v. Settles*, 1980 WL 353191, at *5 (Ohio Ct. App. Feb. 13, 1980) (parent cor-

7   poration and its exclusive owner not liable under § 1707.43 where they did not aid

8   or participate in sale of subsidiary's majority stockholder's shares).

9   **VII.   PLAINTIFFS' OCPA CLAIMS MUST BE DISMISSED.**

10        The OCPA requires Plaintiffs to plead with factual particularity that (i) defen-

11   dant conducted or participated in an "enterprise," (ii) through a "pattern," (iii) of

12   two or more specifically enumerated crimes constituting "corrupt activity," at least

13   one of which is distinct from "any offense involving fraud in the sale of securities."

14   OHIO REV. CODE §§ 2923.34(A); 2923.32(A)(1).  Plaintiffs do not adequately plead

15   these elements, let alone with particularity, and their OCPA claims must be dis-

16   missed.

17        **A.      The Complaints Do Not Allege A Cognizable "Enterprise."**

18        The first element of an OCPA claim is that the defendant conducted or par-

19   ticipated in an "enterprise."[58]  But "a corporation may not be liable . . . for partici-

20   pating in the affairs of an enterprise that consists only of its own subdivisions,

21   agents, or members. . . .  Thus, '[a]n organization cannot join with its own members

22   to undertake regular corporate activity and thereby become an enterprise distinct

23   from itself.'"  *Shields v. UnumProvident Corp.,* 415 F. App'x 686, 691 (6th Cir.

24   2011) (citation omitted); *accord Herakovic v. Catholic Diocese of Cleveland*, 2005

---

[58]   Courts interpreting the OCPA rely on federal RICO decisions, including those
discussing the meaning of "enterprise."  *See, e.g., Herakovic v. Catholic Diocese of
Cleveland*, 2005 WL 3007145, at *4 (Ohio Ct. App. Nov. 10, 2005) (construing
*United States v. Turkette*, 452 U.S. 576 (1981), and deeming the OCPA's definition
of "enterprise" to be "substantially the same as the federal RICO definition of enter-
prise").

1   WL 3007145, at *4 (Ohio Ct. App. Nov. 10, 2005) (*citing Fitzgerald v. Chrysler*

2   *Corp*, 116 F.3d 225, 227-28 (7th Cir. 1997)).  Here, however, the defendants named

3   in the OCPA count consist exclusively of members of the same corporate family.

4   More specifically, the defendants accused of OCPA violations are wholly-owned

5   subsidiaries of Countrywide Financial Corporation ("CFC"), employees and officers

6   of CFC and its subsidiaries, and BAC Home Loans Servicing, LP (formerly known

7   as Countrywide Home Loans Servicing, LP) (the "OCPA Defendants")).[59]  *See*

8   Compl. ¶¶ 20-31, 38-40.  In light of *Shields* and *Herakovic*, alleging an enterprise

9   among the OCPA Defendants does not suffice.  Although Plaintiffs argue that a so-

10  called "association in fact" existed among the OCPA Defendants and a sprawling

11  list of non-defendant non-Countrywide entities (Compl. ¶ 420, the "Outside Enti-

12  ties")—including hundreds, maybe thousands, of *unnamed* correspondent lenders,

13  appraisers, underwriters, foreclosure law firms, and PMI insurers,[60] Plaintiffs do not

14  adequately plead with specificity anything more than ordinary business relationships

15  between the Outside Entities and the OCPA Defendants.  This dooms any inference

16  of an OCPA "enterprise."

17        In addition, Plaintiffs also must plead specific facts showing not just the exis-

18  tence of a business relationship—*or even of a conspiracy to violate the law*[61]—but

19  participation in a separate, ongoing, coordinated criminal enterprise beyond an ordi-

---

[59]   The Complaints describe BAC Servicing only as having been somehow involved in alleged "robo-signing" predicate acts (Comp. ¶¶ 219, 225, 229-40), which as demonstrated below cannot be part of the same OCPA claim.  *See* Section VII.B *infra*.  Plaintiffs also name Bank of America Corporation ("BAC") and Bank of America, N.A. ("BANA"), but not as members of the alleged enterprise and only as alleged successors in interest to Countrywide.  Compl. ¶ 39.  BAC Servicing (f/k/a Countrywide Home Loans Servicing, LP) has now been merged into BANA, which is a wholly-owned subsidiary of BAC.  *Id.* ¶ 40.

[60]   Plaintiffs' attempt to plead enterprise via entire groups of unnamed market participants (underwriters, PMI insurers, appraisers, law firms, correspondent lenders) also fails.  *See VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 700 (6th Cir. 2000) ("business relationship[s]" with undifferentiated actors is "too unstable and fluid" to constitute an enterprise).

[61]   *See Javitch v. Capwill*, 284 F. Supp. 2d 848, 857 (N.D. Ohio 2003) ("Simply conspiring to commit fraud is not enough to trigger" OCPA liability).

50

1   nary business relationship.  *See Morrow v. Reminger & Reminger*, 915 N.E.2d 969,

2   708 (Ohio Ct. App. 2009) (dismissal when "no allegation suggesting that the pur-

3   ported association in fact between appellees acted separate and apart from the al-

4   leged predicate acts [but instead] that appellees functioned in their contractual

5   roles. . . .").  Moreover, "since diverse parties customarily act for their own gain or

6   benefit in commercial relationships, a complaint founded on commercial relation-

7   ships between the alleged components of the enterprise . . . should plead facts to

8   dispel the notion that the different parties entered into [the] agreements . . . for their

9   own gain or benefit."  *City of Cleveland v. Woodhill Supply, Inc.*, 403 F. Supp. 2d

10   631, 635 (N.D. Ohio 2005) (quotation omitted).  For this reason, an "unwitting ac-

11   complice," *i.e.*, a third-party acting for its own benefit, as opposed to for the purpose

12   of advancing the criminal enterprise, does not become an enterprise member by vir-

13   tue of that business relationship.  *Robins v. Global Fitness Holdings, LLC*, --- F.

14   Supp. 2d ---, 2012 WL 163031, at *18 (N.D. Ohio Jan. 18, 2012).

15        Here, however, literally every supposed member of the criminal enterprise

16   had an arm's length "commercial relationship" with one or more Countrywide enti-

17   ties.  The Complaints do not allege that the Outside Entities participated in a sepa-

18   rate, ongoing, coordinated and *criminal* enterprise beyond an ordinary business rela-

19   tionship (*Morrow*, 915 N.E.2d at 708), nor do they "dispel the notion" that those en-

20   tities did anything other than act for their own pecuniary gain (*Woodhill*, 403 F.

21   Supp. 2d at 635), or were "unwitting accomplices" (*Robins*, 2012 WL 163031 at

22   *18).

23        For example, the Complaints argue that Countrywide used more than *1,760*

24   correspondent lenders, that these lenders had no incentive to comply with underwrit-

25   ing guidelines because they allegedly were able to off-load their risky loans on

26   Countrywide (which in turn allegedly sold them to investors), and, as a result, Coun-

27   trywide bought scores of fraudulent loans from some unspecified number of these

28   correspondent lenders.  Compl. ¶¶ 181-85.  Plaintiffs do not identify which of these

51

1    more than 1,760 lenders was part of the "enterprise,"[62] how any specific lender par-

2    ticipated, how any such alleged conduct would even be consistent with participation

3    in the alleged enterprise (as opposed to consistent with that lender's own commer-

4    cial business interests), or allege any fact to "dispel the notion" that the lenders just

5    acted for their own gain (as Plaintiffs themselves strongly imply in the Com-

6    plaints).[63] *Morrow*, 915 N.E.2d at 708; *Woodhill*, 403 F. Supp. 2d at 635.

7         Plaintiffs also allege that an undifferentiated mass of "PMI Insurers" were

8    part of the enterprise because they "paid unlawful kickbacks to Countrywide."

9    Compl. ¶ 420. ("PMI" stands for "private mortgage insurance." *See id.* ¶¶ 264,

10   273.) Plaintiffs, however, plead no facts whatsoever to support this conclusory as-

11   sertion. Moreover, they disregard their own allegations that Countrywide suppos-

12   edly strong-armed these insurers into making payments to Countrywide so that they

13   might keep Countrywide's business—allegations that, if accepted as true (which

14   Countrywide disputes), would make these insurers victims acting to preserve their

15   businesses, not participants in a criminal enterprise. Compl. ¶¶ 264-71.[64]

---

16   [62]  Plaintiffs accuse six specific correspondent lenders—out of 1,760—of being

17   "among" the "correspondent lenders who regularly sold Countrywide fraudulent loans." Comp. ¶ 186. But Plaintiffs' factually unsupported characterization of some

18   unspecified number of the loans these third party lenders sold Countrywide as "fraudulent"—even if true—does not render them or their loan sales part of a crimi-

19   nal enterprise for OCPA purposes. Indeed, a lender could have decided for its own business reasons to defraud Countrywide, and that would not make Countrywide

20   and that lender part of an OCPA "enterprise." The Complaints make no other alle-gations about any particular correspondent lender.

21   [63]  Plaintiffs argue that the "correspondent lenders had little motivation to ensure that the loans they sold to Countrywide were properly underwritten since they would

22   bear no risk of loss from non-performing loans." Compl. ¶ 185. But this allegation in no way supports an inference of an OCPA "enterprise," let alone provides factu-

23   ally particularized support for such an inference. For one thing, this allegation (if true) does no more than describe a classic example of an independent commercial

24   motivation having nothing to do with participation in a criminal enterprise. For an-other, if there were any factual basis in the Complaints for the conclusion that the

25   correspondent lenders were participants in the alleged enterprise, which there is not, the Complaints would not say that they had "little motivation" to ensure proper un-

26   derwriting. Rather, the Complaints would explain why and how they were moti-vated *not to* undertake such underwriting in furtherance of the supposed enterprise.

27   [64]  The Complaints' allegations are similarly infirm with respect to the scores of un-named appraisers, foreclosure law firms, and underwriters alleged to be part of the

28   enterprise. Compl. ¶ 420. In each case, the Complaints lack any specific factual al-

These accusations about the "PMI Insurers" also make no sense on their face. The Complaints do not explain how or why these nearly 2000 PMI Insurers would participate in an enterprise whose *alleged purpose* was to enable the origination and securitization of thousands upon thousands of loans that Plaintiffs claim were destined to default—loans that upon default would obligate the insurers to make the holder of the mortgage whole and leave these "PMI Insurers" holding the bag.  No rational business would enter into such an enterprise, and this Court is not required to "leave its common sense on the courthouse steps" in assessing the adequacy of these allegations, which border on the frivolous. *See Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 938 (N.D. Tex. 1995).

In the handful of places where Plaintiffs named specific entities that allegedly were part of the enterprise, their allegations also fail because the improprieties conclusorily attributed to them still all took place *within the context of a business relationship with one or more Countrywide entities*.  What the Complaints must do—but do not anywhere do—is "cogently allege activity that would show ongoing, coordinated behavior among the" entities in support of an enterprise, *Shields*, 415 F. App'x at 691, not allege (as Plaintiffs do here) that the alleged enterprise members were acting solely out of self-interest as part of an ordinary business relationship.

For example, Plaintiffs single out Credit Suisse Securities and Deutsche Bank in accusing these securities underwriting firms of being part of the criminal enterprise.  Compl.  ¶¶ 126-30.  But far from alleging participation in a criminal enterprise, the Complaints do nothing more than allege that these two investment banks (plus all the other unnamed underwriters) simply shirked their diligence duties in order to collect fees.  Whether or not the underwriters did that as alleged, such an alleged decision to reap underwriting fees without doing the corresponding work (if

legations whatsoever that would support an inference of an enterprise and do nothing to allege that any of these parties (almost all of them unnamed) did anything more than act in their own self-interest as part of a commercial relationship with Countrywide.

1   true) would amount at most to a dereliction of the underwriters' duties to Country-

2   wide and to investors in the MBS being underwritten, and a decision to put the un-

3   derwriters' own interests before those of their clients and the ultimate investors.

4   Such allegations would *not*, however, support any inference that such firms engaged

5   in a separate, structured criminal enterprise with Countrywide.  Compl. ¶ 122.

6         Plaintiffs also allege that Bank of New York "*neglected* its duty to put back to

7   Countrywide billions of dollars of loans" that did not meet underwriting guidelines.

8   Compl. ¶ 420 (emphasis added).  But the Complaints say nothing else about this re-

9   lationship and allege no facts to support the conclusion that BNY coordinated with

10  (much less was in an enterprise with) any Countrywide entity or the other alleged

11  enterprise members.  Again, the alleged failure by a commercial party ("neglect" in

12  Plaintiffs' words) to fulfill its contractual duties (whether as a trustee or an under-

13  writer) does not support any inference that that entity was engaged in a criminal "en-

14  terprise" for OCPA purposes.

15        In short, because Plaintiffs do not allege with the required factual particularity

16  that any Outside Entity was a member of an association in fact, the supposed enter-

17  prise here—and therefore Plaintiffs' entire OCPA claim—fails as a matter of law.

18  All that remains then is Countrywide and its subsidiaries and officials, but an enter-

19  prise cannot be created between just a corporation and its subdivisions and their di-

20  rectors and officers.  *See Shields*, 415 F. App'x at 691.  These meretricious claims

21  should be dismissed.

22  **B.    No "Pattern" Of "Corrupt Activity" Has Been Alleged.**

23        Where—as here—a plaintiff has alleged securities fraud as a predicate act, the

24  alleged "pattern" must contain at least one predicate act ***not*** "involving fraud in the

25  sale of securities."  *See* O.R.C. § 2923.34(A).[65]  But Plaintiffs have failed to allege

---

26  [65] Any Defendant which has committed a pattern consisting only of securities fraud
27  acts cannot be liable under the OCPA.  *See* O.R.C. § 2923.34(A); *Herakovic*, 2005
    WL 3007145, at *4 ("[Plaintiff] must allege *each* element of an [OCPA] claim
28  against *each* [defendant] in order to survive a [Rule] 12(B)(6) motion") (emphasis
    added).

1    any separate and independent predicate acts.  Rather, *every* predicate act alleged in

2    the Complaints is—per Plaintiffs' own allegations—in furtherance of the alleged se-

3    curities fraud.  *See* Compl. ¶ 7 ("Countrywide employees many times forged docu-

4    ments to create the appearance that the borrower qualified for the loan."); *id.* ¶ 10

5    ("To generate an ever-growing volume of loans to securitize and sell to investors,

6    Countrywide abandoned all semblance of underwriting guidelines, regularly origi-

7    nating or purchasing loans issued to borrowers regardless of ability to repay. . . .").

8    Plaintiffs thus fail to establish the requisite "pattern."[66]

9         Moreover, the predicate acts Plaintiffs allege—which must be pleaded with

10   specificity since Plaintiffs allege an enterprise to commit fraud—are *themselves* in-

11   sufficiently pleaded.  For example, for their "insurance fraud" allegations, Plaintiffs

12   argue that Mortgage Guaranty Insurance Corporation ("MGIC") reviewed Country-

13   wide loan files and found "differences between the truth and what Countrywide

14   claimed."  Compl. ¶ 114.  Plaintiffs do not specify *who* made the alleged misstate-

15   ments to MGIC, *when* such alleged misstatements were made, or whether the al-

16   leged misstatements appeared in insurance applications or claims or in other con-

17   texts *not* reached by the insurance fraud statute (and thus not insurance fraud).[67]

18   O.R.C. § 2913.47 also requires knowledge, but Plaintiffs have not alleged that any

19   OCPA Defendant knew that any alleged misstatements to MGIC or any other in-

20   surer were false or deceptive.

21        Plaintiffs' "forgery" and "records tampering" allegations (Compl. ¶¶ 131-44,

22   158, 161, 164-67) are also insufficient.  These allegations assert improprieties in in-

23

24   _____

     [66] For example, Plaintiffs identify "theft" as a predicate act (Compl. ¶ 424), but theft
25   involved in the sale of securities is not a separate predicate act for OCPA purposes.
     *Cf. Rahimi v. St. Elizabeth Med. Ctr.*, 1997 WL 33426269, at *2 n.1 (S.D. Ohio
26   July 16, 1997) (theft involving fraud in the sale of securities not separate predicate
     act).

27   [67]  The insurance fraud statute proscribes only misstatements made in the context of
     "an application for insurance, a claim for payment pursuant to a policy, or a claim
28   for any other benefit pursuant to a policy."  O.R.C. § 2913.47 (B).

1  dividual loan applications, but with one exception[68] Plaintiffs have not named the

2  Countrywide representative that allegedly forged or tampered with these docu-

3  ments (¶¶ 133, 147, 150, 158), which renders the allegations insufficient.  And be-

4  cause "[o]nly defrauded financial institutions" —*i.e.*, banks—"have standing to as-

5  sert bank fraud as a RICO predicate [act]" (*Herrick v. Liberty League Int'l*, 2008

6  WL 2230702, at *4 (S.D. Ohio May 28, 2008)), and the same standing rule applies

7  under the OCPA (*Infocision Mgmt. Corp. v. Foundation for Moral Law, Inc.*, 2009

8  WL 650282, at *9-10 (N.D. Ohio Jan. 14, 2009)), Plaintiffs here lack standing to as-

9  sert bank fraud as a predicate act.  In any event, their attempt to support their bank

10 fraud allegations by citing to allegations in other complaints brought by other plain-

11 tiffs, and by alleging that "the conduct of the Defendants [in those cases] substan-

12 tially mirrors the conduct set forth herein" (Compl. ¶ 279), is not allowed.  *RSM*

13 *Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009).

14     As for Plaintiffs' "witness retaliation" allegations, "retaliation" for OCPA

15 purposes may occur only where one "knowingly, with the intent to retaliate, takes

16 any action harmful to any person . . . for providing *to a law enforcement officer* any

17 truthful information relating to the commission or possible commission of any

18 Federal offense . . ." (18 U.S.C. § 1513(e)).  Plaintiffs, however, do not allege that

19 any witness was ever retaliated against due to contact with "a law enforcement

20 office."  These allegations thus fail as well.  Compl. ¶¶ 131-43, 251-52.[69]

21 ───────────────────

[68] The allegations involving a named Countrywide employee (Compl. ¶¶ 153-57)
22 fail as well, because (i) Plaintiffs do not allege that the Countrywide employee fab-
   ricated or created any writing or purported to authenticate any writing by any
23 means; and (ii) since "forgery" and "records tampering" require a "purpose to de-
   fraud, or know[ledge] that the person is facilitating a fraud" (O.R.C. §§ 2913.31(A);
24 2913.42(A)), Plaintiffs' admission that Countrywide *informed* the borrower of the
   information it intended to use in processing his loan dooms the claim.

25 [69] Plaintiffs try to argue that Eileen Foster was retaliated against for this reason.
   Compl. ¶ 143.  But according to a recording of her FCIC Staff interview, Ms. Foster
26 stated: "I didn't have interaction with the regulators when I was in the Fraud Risk
   Management Group. . . . I spoke with a regulator one time in February of two-
27 thousand-, January or February of 2008. . . .  But that's was the only time I've ever
   talk-, I had like, maybe a thirty-minute conversation with a regulator who was
28 asking about internal controls at Countrywide."  *See* Eileen Foster, Countrywide,

1    For all these reasons, Plaintiffs fail to plead the necessary "pattern" contain-

2 ing at least one predicate act not "involving fraud in the sale of securities." *See*

3 O.R.C. § 2923.34(A)).  The OCPA claim must thus be dismissed.  *See Herakovic*,

4 2005 WL 3007145, at *3.[70]

5 **VIII.  THE CIVIL CONSPIRACY CLAIMS MUST BE DISMISSED.**

6    Under Ohio law, "[t]he civil action of conspiracy is defined as a malicious

7 combination of two or more persons to injure another in person or property, in a way

8 not competent for one alone, resulting in actual damages." *Stiles v. Chrysler Motors*

9 *Corp.*, 624 N.E.2d 238, 266 (Ohio Ct. App. 1993) (internal quotation marks omit-

10 ted).  Similarly, "under New York law, to establish a claim of civil conspiracy, the

11 plaintiff must demonstrate the primary tort, plus . . . : (1) an agreement between two

12 or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' in-

13 tentional participation in the furtherance of a plan or purpose; and (4) resulting dam-

14 age or injury." *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (N.Y. App.

15 Div. 2010) (quotation omitted).  Plaintiffs have not adequately alleged these ele-

16 ments, and their conspiracy claims must be dismissed.

17    As a threshold matter, Plaintiffs' conspiracy claims must be dismissed be-

18 cause they depend on the existence of a predicate violation of federal or state law,

19

20 Resource Library: Financial Crisis Inquiry Commission, at 42:53 – 43:46, *available at* http://fcic.law.stanford.edu/interviews/view/381 (last visited Apr. 19, 2012).

21 [70] The remaining alleged predicate acts pertaining to "robo-signing"—Forgery (O.R.C. § 2913.31), Perjury (O.R.C. § 2921.11), Evidence Tampering (O.R.C. §

22 2921.12), and Tampering with Records (O.R.C. § 2913.42)—are not well pleaded or sufficiently related to the alleged "pattern" of fraudulent loan origination and securi-

23 ties fraud to be part of the same OCPA claim. *Morrow*, 915 N.E.2d at 708 (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).  Although Plaintiffs allege

24 robo-signing-related predicate acts (*see* Compl. ¶¶ 231, 233-236, 238), they lack "the same or similar purposes, results, participants, victims, or methods of commis-

25 sion" as the predicate acts discussed above (*James v. McCoy*, 56 F. Supp. 2d 919, 941, 943 (S.D. Ohio 1998) (citing *H.J.*, 492 U.S. at 240)).  Indeed, in its March 9,

26 2012 order in this matter, this Court observed that that the alleged robo-signing "scheme and theory of harm are *different* from the abandonment of underwriting

27 standards" and allegations of robo-signing involve different alleged results than the other alleged predicate acts. *W&S/NI Order*, 2012 WL 1097244, at *5 (emphasis

28 added).

1    but here all such predicate claims also must be dismissed for the reasons addressed

2    above.  *See Stiles*, 624 N.E.2d at 266 ("An underlying tort is necessary to give rise

3    to a cause of action for conspiracy"); *Block v. Chassin*, 319 N.Y.S.2d 86, 87 (N.Y.

4    Sup. Ct. App. Div. 1971) ("With the underpinnings of the substantive alleged tor-

5    tious conduct dismissed the charge of conspiracy to effectuate them adds nothing

6    and must also fall."); *see supra* at 7-49.

7         The conspiracy claims must be dismissed as a matter of law for the separate

8    and independent reason that Plaintiffs' own allegations contradict and undermine

9    any inference of an unlawful agreement or combination between "two or more per-

10   sons."  "Where all defendants, allegedly co-conspirators, are members of the same

11   collective entity, there are not two separate 'people' to form a conspiracy . . ."

12   *Valente v. University of Dayton*, 689 F. Supp. 2d 910, 929 (S.D. Ohio 2010) (inter-

13   nal quotation marks and citation omitted); *accord Bays v. Canty*, 2009 WL 2424583,

14   at *1 (6th Cir. Aug. 7, 2009) (holding that Ohio Supreme Court likely would adopt

15   the intra-corporate conspiracy doctrine, which is based "on a 'common sense' in-

16   sight that a person cannot conspire with himself").  Applying the "intra-corporate

17   conspiracy doctrine," numerous courts have held that a subsidiary cannot conspire

18   with its parent corporation and corporate affiliates cannot conspire with one another.

19   *See, e.g., In re Williams v. New Day Farms, LLC*, 2011 U.S. Dist. LEXIS 36543, at

20   *33 (S.D. Ohio Mar. 31, 2011) ("It is well settled that wholly-owned subsidiaries of

21   a single parent company are legally incapable of conspiring because a single legal

22   entity cannot conspire with itself."); *Lewis v, Friedman-Marks Clothing Co.,* 418

23   N.Y.S.2d 60, 61-62 (N.Y. Sup. Ct. App. Div. 1979) (dismissing conspiracy claim

24   against parent, subsidiary, and three officers of subsidiary under New York law on

25   ground that all defendants "constitute a single entity"); *Murray v. Toyota Motor Dis-*

26   *tribs, Inc*., 664 F.2d 1377, 1379 (9th Cir. 1982) ("In general, affiliated corporations

27   cannot conspire with each other where they function as a single economic unit.")

28   (quoting *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 927 n.5 (9th

58

1   Cir. 1980)) (quotation marks omitted).[71]

2       Here, rather than alleging an unlawful agreement or combination among sepa-

3   rate individuals or entities, the Complaints allege a conspiracy among affiliated

4   *Countrywide* entities and treat these subsidiaries and their parent (Countrywide Fi-

5   nancial Corporation) as *a single unit*. Plaintiffs explicitly allege that these entities

6   were a "collective enterprise" controlled by Countrywide Financial Corporation.

7   Compl. ¶ 297. Indeed, in the preamble to both Complaints, Plaintiffs define the

8   various Countrywide corporate entities as "collectively, 'Countrywide'" and resort

9   to that definition throughout their pleadings. These "collective enterprise" allega-

10   tions preclude any conspiracy claim.[72]

11       In addition, the civil conspiracy claims must be dismissed because Plaintiffs

12   have failed to allege any facts, let alone facts pleaded with particularity, showing

13   that the Countrywide Defendants engaged in conspiratorial conduct. Because Plain-

14   tiffs allege that all defendants conspired to commit fraud, Rule 9(b)'s particularity

15   requirement applies to the conspiracy claims. *See Wasco Prods., Inc. v. Southwall*

16   *Techs., Inc.*, 435 F.3d 989, 991-92 (9th Cir. 2006) (applying Rule 9(b) to civil con-

17   spiracy where "the object of the conspiracy is fraudulent"); *Vess v. Ciba-Geigy*

18   *Corp. USA*, 317 F.3d 1097, 1103-04, 1106, 1108 (9th Cir. 2003) (same); *Wadhwa v.*

19

20   [71]  *Accord Schrock v. D & N Dev., Inc.*, 1995 WL 495488 at *2 (Ohio Ct App. June
28, 1995) (noting that "a corporation cannot conspire with a corporate agent" acting

21   within the scope of his or her authority).

22   [72]  In addition to these defects, Ohio courts have held that civil conspiracy plaintiffs
must allege that they sustained damages attributable to the conspiracy itself that are
separate and independent from the damages attributable to the underlying tort (secu-

23   rities fraud). *See Stiles*, 624 N.E.2d at 266 ("[T]here must be actual damages attrib-
utable to the conspiracy *in addition to those damages caused by the underlying tort*

24   . . . .") (emphasis added); *Avery v. Rossford, Ohio Transp. Improvement Dist.*, 762
N.E.2d 388, 395 (Ohio Ct. App. 2001) (same); *Crosby v. Beam,* 615 N.E.2d 294,

25   304 (Ohio Ct. App. 1992) (same). Plaintiffs have not alleged any damages here
other than the decline in value of their securities or loss of income from certain se-

26   curities. *See* Compl. ¶ 499. *But see Zeigler v. Findlay Indus., Inc.*, 380 F. Supp. 2d
909, 913-915 (N.D. Ohio 2005) (finding "that, to succeed on a claim of civil con-

27   spiracy under Ohio law, a plaintiff need not plead or prove damages above and be-
yond those resulting from the tort or torts that are the object of the conspiracy") (cit-

28   ing *Gosden v. Louis*, 687 N.E.2d 481 (Ohio Ct. App. 1996)).

1  *Aurora Loan Servs., LLC*, 2012 WL 762020, at *8 (E.D. Cal. Mar. 8, 2012) (same).

2  Indeed, Plaintiffs have failed to allege even the most basic facts required to support

3  a conspiracy claim.  "[C]onspiracy focuses on whether the defendant *agreed to join*

4  *in* the wrongful conduct."  *Aetna Cas. & Sur. v. Leahey Constr. Co.*, 219 F.3d 519,

5  538 (6th Cir. 2000) (quotation omitted); *see also Collins v. Nat'l City Bank*, 2003

6  WL 22971874, *5  (Ohio Ct. App. Dec. 19, 2003) ("A claim of civil conspiracy

7  rests upon an actual agreement to participate in wrongful activity").  Here, however,

8  Plaintiffs do not allege the existence of any agreement among the Countrywide De-

9  fendants or between any Countrywide Defendant and any other individual or entity,

10  let alone particularized facts from which any such agreement could be inferred.

11  Rather, Plaintiffs assert—with no factual detail whatsoever—that Defendants "con-

12  spired to underwrite and purchase fraudulently and improperly underwritten loans,

13  to package those loans for resale, and to fraudulently service such loans. . . . "

14  Compl. ¶ 497.  This is nothing more than a legal conclusion and is plainly insuffi-

15  cient.  *See Fezzani v. Bear Stearns & Co.*, 592 F. Supp.2d 410, 432 (2008) (dismiss-

16  ing civil conspiracy claim under New York law where "Plaintiffs state conclusions,

17  not specifics, about the alleged agreement and how this agreement occurred");

18  *Collins*, 2003 WL 22971874 at *5 (affirming dismissal for failure to state a claim

19  where "complaint alleges no operative facts constituting an agreement" among the

20  defendants to participate in wrongful activity).

21       Moreover, to satisfy Rule 9(b), Plaintiffs must "detail the roles played by the

22  [D]efendants in the alleged conspiracy to defraud."  *Swartz v. KPMG LLP*, 476 F.3d

23  756, 765 (9th Cir. 2007).  "Rule 9(b) does not allow a complaint to merely lump

24  multiple defendants together but requires plaintiffs to differentiate their allegations

25  when suing more than one defendant and inform each defendant separately of the

26  allegations surrounding his alleged participation in the fraud."  *Id*. at 764-65 (quota-

27  tion omitted).  Here, however, Plaintiffs have indiscriminately grouped all Defen-

28  dants together without making any attempt to specify each Defendant's role in the

60

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION

1   alleged fraudulent scheme.  Accordingly, Plaintiffs' civil conspiracy claims must be

2   dismissed.  *Roque v. Suntrust Mortg., Inc.*, 2010 WL 546896, at *6 (N.D. Cal. Feb.

3   10, 2010) (dismissing conspiracy claim for failure to satisfy Rule 9(b)).[73]

4   **IX.   *JANUS* REQUIRES DISMISSAL OF PLAINTIFFS'
        SECTION 10(b) CLAIMS AGAINST CHL AND CSC.**

5

6          Plaintiffs' Section 10(b) and Rule 10b-5 claims against Countrywide Home

7   Loans, Inc. ("CHL") and Countrywide Securities Corporation ("CSC") are barred by

8   *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011).  In

9   *Janus*, the Supreme Court held that primary liability under Rule 10b-5—which pro-

10  hibits "mak[ing] any untrue statement of a material fact," 17 C.F.R. § 240.10b-5(b),

11  in connection with the purchase or sale of securities—is limited to the "person or en-

12  tity with ultimate authority over the statement, including its content and whether and

13  how to communicate it."  *Janus*, 131 S. Ct. at 2302.  The Court thus held that share-

14  holders of Janus Capital Group ("JCG") could not sue JCG or its wholly-owned sub-

15  sidiary, Janus Capital Management LLC ("JCM"), for statements made in prospec-

16  tuses filed by Janus Investment Fund, notwithstanding allegations that JCG and JCM

17  were "significantly involved in preparing" the prospectuses.  *Id*. at 2305.  The Court

18  reasoned that:  (i) "only Janus Investment Fund . . . bears the statutory obligation to

19  file the prospectuses with the SEC"; (ii) "Janus Investment Fund filed the prospec-

20

21  ───────────────
    [73] For example, Plaintiffs allege that "the notes and security instruments" are "trans-

22  ferred from the originator to the depositor, either directly or via one or more special-
    purpose entities."  Compl. ¶ 201.  Plaintiffs, however, do not even generally allege

23  which Countrywide entity did what in this process, let alone identify specific facts
    evidencing that any particular Countrywide entity bore responsibility for, or was

24  aware of, the allegedly ineffective assignment of mortgages.  This is plainly inade-
    quate.  *See, e.g., Gorham-DiMaggio v. Countrywide Home Loans, Inc.*, 592 F. Supp.

25  2d 283, 299 (N.D.N.Y. 2008) (dismissing conspiracy claim because "[m]ere conclu-
    sory allegations that a massive conspiracy occurred to steal the equity in Plaintiff's

26  home does not suffice to survive the motion to dismiss absent any allegations of
    specific conduct evidencing this plot"); *Abrahami v. UPC Constr. Co.*, 574

27  N.Y.S.2d 52, 53 (N.Y. App. Div. 1991) (dismissing conspiracy claim where there
    were no "allegations of fact from which it could be inferred that [any defendant] had

28  agreed or entered into an understanding with the other defendant . . . to cooperate in
    any fraudulent scheme").

1  tuses"; (iii) nothing "on the face of the prospectuses indicate[d] that any statements

2  therein came from JCM rather than Janus Investment Fund"; and (iv) "[t]here [wa]s

3  no allegation that JCM in fact filed the prospectuses and falsely attributed them to

4  Janus Investment Fund." *Id*. at 2304-05.  The Court held that "one who prepares or

5  publishes a statement on behalf of another is not its maker." *Id*. at 2302.  Although

6  the petitioner argued that defendant JCM had a "uniquely close relationship" with

7  the Janus Investment Fund, the Court "decline[d] this invitation to disregard the cor-

8  porate form," and explained that "[a]ny reapportionment of liability in the securities

9  industry in light of the close relationship . . . is properly the responsibility of Con-

10  gress and not the courts." *Id.* at 2304.

11  Similarly, here, only the Depositor entities—CWALT, CWMBS, CWABS,

12  and CWHEQ—had the statutory obligation to file the Offering Materials with the

13  SEC.  *See* 15 U.S.C. §§ 77e(b)(1)-(2); *see also* 15 U.S.C. § 77b(a)(4); *Asset-Backed*

14  *Securities,* 70 Fed. Reg. 1506, 1510-11 (Jan. 7, 2005).  Moreover, the Offering Ma-

15  terials were filed with the SEC by CWALT, CWMBS, CWABS, or CWHEQ (*see*

16  RJN Exs. 1-33).  No statement is attributable to CHL or CSC, and Plaintiffs do not

17  allege that CHL or CSC in fact filed the Offering Materials and falsely attributed

18  them to the Depositors.  As such, under the bright-line rule established by *Janus*,

19  CHL and CSC did not "make" any statements and may not be held liable as primary

20  violators under Section 10(b) and Rule 10b-5.  *Janus*, 131 S. Ct. at 2301.

21  **X.    PLAINTIFFS' CLAIMS AGAINST MR. ADLER
        MUST BE DISMISSED WITH PREJUDICE.**

22

23  In its March 9, 2012 Order, the Court dismissed Plaintiffs' 1933 Act claims

24  and OSA claims premised on alleged underwriting abandonment against N. Joshua

25  Adler (and all other Defendants) with prejudice.  2012 WL 1097244, at *5, *12.  It

26  also dismissed Plaintiffs' remaining OSA claims premised on title transfer allega-

27  tions and civil conspiracy claims against Mr. Adler without prejudice for lack of

28  personal jurisdiction.  *Id.* at *14-15.  Because Plaintiffs elected not to amend their

1   Complaints to address the pleading deficiencies identified by the Court with respect

2   to personal jurisdiction over Mr. Adler, the remaining OSA and civil conspiracy

3   claims against Mr. Adler should now be dismissed with prejudice. *Pratts v. Sujan*,

4   176 F.3d 484, 1999 WL 274662, at *1 (9th Cir. Apr. 23, 1999)("[Plaintiff] was

5   given leave to amend his claims by the district court, as well as instruction on what

6   he needed to allege to state valid claims, but [plaintiff] chose not to amend.  This

7   failure means his . . . claims are now dismissed with prejudice.").

8   ## CONCLUSION

9       For the reasons set forth above, the Countrywide Defendants respectfully re-

10  quest that the Court dismiss the *Western & Southern* Amended Complaint and *National Integrity* Complaint in their entirety, and with prejudice.

11  

12  

13  Dated:  April 20, 2012                **GOODWIN PROCTER LLP**

14                                        /s/ Brian E. Pastuszenski
                                          Brian E. Pastuszenski (*pro hac vice*)
15                                        Inez H. Friedman-Boyce (*pro hac vice*)
                                          John O. Farley (*pro hac pending*)
16                                        Caroline H. Bullerjahn (*pro hac vice*)

17                                        *Counsel for the Countrywide Defendants*

18  

19  

20  

21  

22  

23  

24  

25  

26  

27  

28  

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION FOR RECONSIDERATION