1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***O***

LINKS: 173, 175, 176, 177, 178, 179,

180

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORPORATION MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 2:11-ML-02265-MRP (MANx) |
| FEDERAL HOUSING FINANCE AGENCY, as conservator for THE FEDERAL NATIONAL MORTGAGE ASSOCIATION and THE FEDERAL HOME LOAN MORTGAGE CORPORATION, | Case No. 2:12-CV-1059 MRP (MANx) *SECOND CORRECTED* **Order Re Motions to Dismiss the First Amended Complaint** |
| Plaintiff, | |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION, et al., | |
| Defendants. | |

# I.    *Background*

The Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") are government-sponsored enterprises ("GSEs").  The GSEs are private corporations chartered by Congress to provide stability to the U.S. mortgage market, to respond appropriately to the private capital markets and to provide assistance to the secondary market for residential markets.  12 U.S.C. § 1716; 12 U.S.C. § 1451 note.  The GSEs were a dominant force in the home mortgage market, together holding trillions of dollars in mortgage debt and mortgage-backed securities as of 2006.  In the years before the housing crisis, Fannie Mae sought "bigger market share, profits, and bonuses, which led it to ramp up its exposure to risky loans and securities."  FINANCIAL CRISIS INQUIRY REPORT xix (2011).[1]  Housing prices began to fall in 2007, which precipitated "substantial losses" in the value of the mortgages and mortgage-backed securities held by the GSEs.  First Am. Compl. ("FAC") ¶ 11.  In light of these losses, Congress passed the Housing and Economic Recovery Act of 2008 on July 30, 2008.  HERA created the Plaintiff Federal Housing Finance Agency ("FHFA,") and empowered the Director of the FHFA to place both GSEs into conservatorship and appoint the Agency as conservator.  12 U.S.C. § 4617(a)(1).  The Director did so on September 6, 2008.  FAC ¶ 13.  As conservator, FHFA succeeded to all legal rights of Fannie Mae and Freddie Mac.  12 U.S.C. § 4617(b)(2).

On September 2, 2011, FHFA sued the defendants and other issuers of mortgage-backed securities in New York state court.  Defendants removed the case to federal court on September 30, 2011.  The portion of the case involving these

---

[1]    The Defendants have submitted excerpts of the Financial Crisis Inquiry Report, and the Court takes judicial notice of those excerpts as well as the entire report under Rule 201 of the Federal Rules of Evidence.  *See F.D.I.C. as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *7 n.17 (Nov. 21, 2012).

1  defendants was transferred to this Court as part of the Countrywide Multidistrict
2  Litigation proceedings in February 2012.  After the Court rejected FHFA's motion
3  to remand the case to state court, FHFA filed an Amended Complaint.  Defendants
4  moved to dismiss the Amended Complaint on timeliness and legislative
5  jurisdiction grounds.  The Court rejected that motion as to most of the claims on
6  October 18, 2012.  *Fed. Hous. Fin. Agency v. Countrywide Fin. Corp.*, 2012 WL
7  5275327 (C.D. Cal. Oct. 18, 2012).  The defendants now move to dismiss the First
8  Amended Complaint on the grounds that it fails to state a claim upon which relief
9  can be granted.

10      In the FAC, FHFA asserts that the GSEs purchased approximately $26.6
11  billion in residential mortgage-backed securities ("RMBS") between August 30,
12  2005 and January 23, 2008, that were originated, sponsored or deposited by
13  Countrywide Financial Corporation ("CFC,") Countrywide Home Loans, Inc.
14  ("CHL,") Countrywide Capital Markets, LLC ("CCM,") Countrywide Securities
15  Corporation ("CSC,") CWALT, Inc. ("CWALT,") CWABS, Inc. ("CWABS") and
16  CWMBS, Inc. ("CWMBS") (the last three are the "Depositor Defendants," and
17  collectively all seven are "Countrywide" or the "Countrywide Defendants").  Banc
18  of America Securities LLC, Citigroup Global Markets, Inc., Deutsche Bank
19  Securities, RBS Securities, Inc., UBS Securities, LLC (collectively, with
20  Countrywide Securities Corporation, the "Underwriter Defendants") underwrote
21  the securities.

22      The RMBS were created through a process called "securitization."
23  Securitization refers to the creation of pools of residential mortgage loans, each of
24  which produces cash-flows from the payment on the loans.  The rights to the cash-
25  flows of these pools are sold to investors as "certificates."  Here, CHL originated
26  or acquired thousands of mortgage loans.  It sold the loans to the Depositor
27  Defendants, which then transferred the loans to trusts pursuant to a contract called
28  the "Pooling and Servicing Agreement."  The trusts issued separate securities in

1 | the form of certificates for purchase by investors.  A certificate entitled the holder
2 | to a portion of the cash-flow from the pool of underlying mortgages.  The
3 | certificates were sold in "tranches," i.e., slices of the loan pool with different
4 | priorities of payment, interest rates and credit protection.  Upon issuance, the credit
5 | rating agencies credit ratings to each tranche.  If they wished, investors could select
6 | riskier certificates in "junior" tranches with higher interest payments but lower
7 | credit ratings, instead of the more "senior" tranches with lower interest payments
8 | and higher credit ratings.

9 |      The legal mechanism by which the securities issued began with the
10 | Depositor Defendants, who filed "shelf" registration statements with the SEC, that
11 | entitled them to issue certificates at a later date.  The certificate would then issue
12 | after the "prospectus," which explains the general structure of the investment, and
13 | a "prospectus supplement," which includes the detailed descriptions of the
14 | mortgage pools underlying the certificate, were filed with SEC.  Investors could
15 | learn detailed information about the characteristics of their certificates through
16 | reading all of the documents filed with the SEC, which were the shelf registration
17 | statements, prospectuses and prospectus supplements (collectively, the "Offering
18 | Documents").

19 |      The FAC alleges that the Offering Documents included four types of false
20 | statements, and FHFA brings causes of action based on federal and state securities
21 | and common law for the injuries it allegedly suffered from those misstatements.

22 | ## II.    *Legal Standards*

23 |      The Amended Complaint includes thirteen causes of action.  FHFA sues the
24 | Underwriter Defendants, CWALT, Inc., CWABS, Inc. and the "Individual
25 | Defendants" (N. Joshua Adler, Ranjit Kripalani, Stanford Kurland, Jennifer S.
26 | Sandefur, Eric Sieracki and David A. Spector) for violation of Section 11 of the
27 | Securities Act of 1933.  15 U.S.C. § 77k.  The elements of a Section 11 claim are
28 | that a registration statement contained an omission or misrepresentation, and that

that omission or misrepresentation was material. *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994). Unlike common law fraud or securities fraud statutes, the plaintiff need not show that the defendant knew the information was false. *Id.* FHFA sues the Underwriter and Depositor Defendants for violations of Section 12(a)(2) of the Securities Act. 15 U.S.C. § 77l(a)(2). Liability extends to defendants that offered or sold a security, using interstate commerce, by means of a prospectus or oral communication that contained an untrue statement of material fact or omits to state a material fact necessary to make the statement not misleading. *Miller v. Thane Int'l Inc.*, 519 F.3d 879, 885 (9th Cir. 2007). *Scienter* is not an element of Section 12(a)(2). *Id.* at 886. FHFA alleges that CFC, CHL, CCM and the Individual Defendants (collectively, the "Control Person Defendants,") controlled one or both of CSC and the Depositor Defendants in violation of Section 15 of the Securities Act. 15 U.S.C. § 77o(a). Section 15 requires that plaintiffs show that a primary violation of Section 11 and 12(a)(2) occurred, and that the defendant controlled the primary violator. *Id.*

FHFA sues CSC, Citigroup Global Markets, Inc., Deutsche Bank Securities and RBS Securities, Inc., each of whom underwrote securities sold to Freddie Mac, for violations of Virginia state "blue sky" law Section 13.1-522(A)(ii). "Any person who . . . sells a security by means of an untrue statement of a material fact . . . shall be liable to the person purchasing such security from him." VA Code Ann. § 13.1-522(A)(ii). The statute applies only to parties who pass title to the plaintiff, and is "otherwise identical"[2] to Section 12(a)(2). *Fed. Hous. Fin. Agency v. Barclays Bank PLC*, No. 11 Civ. 6190(DLC), 2012 WL 5844189, at *3 (S.D.N.Y. Nov. 19, 2012). FHFA sues CSC, Banc of America Securities, Deutsche Bank Securities, RBS Securities, UBS Securities, each of whom underwrote securities

---

[2] In this Court's interpretation of Section 12(a)(2), *see infra* Section V, the Virginia blue sky law is identical to 12(a)(2).

sold to Fannie Mae, and the Depositor Defendants for violations of the
Washington, D.C. blue sky law section 31-5606.05(a)(1)(B), which is "nearly-
identical" to Section 12(a)(2). *Hite v. Leeds Weld Equity Partners, IV, LP*, 429 F.
Supp. 2d 110, 114 (D.D.C. 2006). FHFA sues the Control Person Defendants
under the control-person provisions of Washington, D.C. law, and CFC and CCM
under the control-person provisions of Virginia law, both of which parallel Section
15. D.C. Code § 31- 5606.05(c) (extending liability over a person "who directly or
indirectly controls a person liable under" the primary liability subsection);
*Barclays Bank*, 2012 WL 5844189, at *2 (interpreting VA Code Ann. § 13.1-
522(C)).

FHFA sues CSC and the Depositor Defendants for negligent
misrepresentation. The parties disagree about the elements of negligent
misrepresentation. This case was transferred from New York, so New York
choice-of-law rules apply. *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 699
n.12 (9th Cir. 2011). New York only applies its choice-of-law rules when there is
an "actual conflict between the laws of the jurisdictions involved." *Matter of
Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993). There is an actual conflict
here. New York, which is the transferor state, the place where "many of the acts
and transactions alleged" in the Amended Complaint occurred, and the principal
place of business of most of the Underwriter Defendants, FAC ¶ 37, requires a
"special relationship" between the plaintiff and defendant as an element of the
cause of action for negligent misrepresentation. *Kimmell v. Schaefer*, 89 N.Y.2d
257, 263–64 (1996). Neither Virginia nor Washington, D.C., which are the
locations of Fannie Mae and Freddie Mac, FAC ¶ 14, require such a relationship.
*Hall v. Ford Enters., Ltd.*, 445 A.2d 610, 612 (D.C. 1982); *Fentress Families
Trust v. Va. Elec. & Power Co.*, 81 Va. Cir. 67, 2010 WL 7765113, at *11 (Cir. Ct.
July 29, 2010). When there is an actual conflict between the jurisdictions, New

1  York choice-of-law rules turn to "interest analysis." *Schultz v. Boy Scouts of Am.,*
2  *Inc.,* 65 N.Y.2d 189, 196 (1985).

3       There are two types of tort claims, those that "regulate primary conduct,"
4  and "those that allocate losses after the tort occurs." *Cooney v. Osgood*
5  *Machinery, Inc.,* 81 N.Y.2d 66, 72 (1993).  The parties agree that the law of
6  negligent misrepresentation is conduct-regulating.  Countrywide Defs.' Reply
7  Mem. of P. & A. ("Countrywide Reply") 27, ECF No. 201; Opp. to Countrywide
8  Defs.' Mot. to Dismiss ("Opp. to Countrywide") 57, ECF No. 187 (citing cases
9  that discuss conduct-regulating rules).  In such a circumstance, "the law of the
10 jurisdiction where the tort occurred will generally apply because that jurisdiction
11 has the greatest interest in regulating behavior within its borders." *Cooney,* 81
12 N.Y.2d at 72.  The authorities and the parties are split on where a tort like this
13 occurred.  Some courts hold that a tort occurs in the place "where its economic
14 impact is felt, normally, the plaintiff's residence." *Intellivision v. Microsoft Corp.,*
15 No. 07 Civ. 4079(JGK), 2008 WL 3884382, at *5 (examining a claim for negligent
16 misrepresentation); *Dutton v. Glass,* No. 04 CV 3496(GBD), 2005 WL 146503, at
17 *2 (S.D.N.Y. Jan. 20, 2005) (collecting cases).  Others apply the law of another
18 state that "was the site of virtually all the conduct at issue in the transaction."
19 *Amusement Indus., Inc. v. Stern,* 693 F. Supp. 2d 327, 341 (S.D.N.Y. 2010)
20 (applying the law of the state parties "should have reasonably expected" to govern
21 a claim for negligent misrepresentation); *Fed. Hous. Fin. Agency v. UBS Ams.,* 858
22 F. Supp. 2d 306, 335–36 (S.D.N.Y. 2012) (applying New York law to the
23 companion case to the instant action because "the defendants prepared and
24 disseminated the allegedly misleading offering materials that are at the center of
25 this litigation" in New York).

26      Though a particularly close question, the Court concludes that New York
27 law applies.  The Amended Complaint plainly states that "many of the acts and
28 transactions alleged herein occurred in substantial part in New York."  FAC ¶ 37.

1   The only connections to Washington, D.C. or Virginia are the GSEs' residence

2   there, *id.* ¶ 14, and the alleged targeting of Fannie Mae and Freddie Mac in those

3   jurisdictions. *Id.* ¶¶ 55, 456, 490.  The Court must assume the allegations in the

4   Complaint are true, which means that the locus of the supposedly negligent

5   misrepresentations occurred in New York.  New York has the largest interest in

6   regulating transactions within its borders, and "seek[ing] to deter the behavior" of

7   defendants like the Underwriter Defendants, most of whom have principal places

8   of business in New York, and the Depositor Defendants, none of whom have

9   connections to Washington, D.C. or Virginia. *UBS Ams.*, 858 F. Supp. 2d at 335.

10  The elements of a negligent misrepresentation claim under New York law are a

11  "special relationship with the defendant which generally implies a closer degree of

12  trust than the ordinary buyer-seller relationship," which "imposes on that defendant

13  a duty to use reasonable care to impart correct information"; "that the information

14  is false or incorrect"; and "that the plaintiff reasonably relied upon the information

15  given." *Pappas v. Harrow Stores, Inc.*, 140 A.D.2d 501, 504 (N.Y. 2d Dep't

16  1988).

17      FHFA sues CSC, CHL and the Depositor Defendants (the "Countrywide

18  Fraud Defendants") for fraud and aiding and abetting fraud.[3]  The elements of

19  fraud under New York law are a misrepresentation of a material fact, which the

20  defendant knew to be false, which the defendant made with the intention of

21  inducing reliance, upon which the plaintiff reasonably relied and which caused

22  injury to the plaintiff. *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

23  The elements of aiding and abetting fraud are the existence of an underlying fraud,

24  knowledge of the fraud by the aider and abettor and substantial assistance by the

25  aider and abettor in completion of the fraud. *Stanfield Offshore Leveraged Assets,*

26

27  _____

28  [3]      There is no "actual conflict" between the laws of New York, Washington, D.C. or
    Virginia on either cause of action.

8

1  *Ltd. v. Metro. Life Ins. Co.*, 64 A.D.3d 472, 476 (N.Y. 1st Dep't 2009). Finally,

2  FHFA sues Bank of America as Countrywide's successor, and accuses Bank of

3  America of fraudulently conveying Countrywide's assets.

4       All of the defendants have filed motions to dismiss the Complaint.

5  ***III.    The Complaint Adequately Pleads that the Offering Documents Contained***

6  ***Misrepresentations***

7       An element of each cause of action brought by FHFA is that the Defendants

8  made a material misstatement.[4]  The Amended Complaint includes four types of

9  misrepresentations: that the loan-to-value ratios ("LTV ratios") in the Offering

10  Documents were false; that the Defendants deviated from the listed underwriting

11  guidelines; that the credit ratings on the securities were false, on account of

12  behavior by the Defendants; and that the data about owner residence in the homes

13  was untrue.  The Court must assess whether the FAC includes "sufficient factual

14  material, accepted as true, to state a claim to relief that is plausible on its face."

15  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).[5]  In other words,

16

---

17  [4]     Adequate allegations of this element by itself means that Plaintiff's Section 11, 12(a)(2)
18  and state statutory misrepresentation based claims are sufficient to defeat the motion to dismiss.
    [5]     The Countrywide Defendants argue that the entire Amended Complaint should be judged
19  against the heightened pleading standards of Rule 9(b) rather than 8(a), which would require that
    FHFA state with particularity the circumstances constituting the misstatement.  Countrywide
20  argues that the Amended Complaint "sounds in fraud" and alleges a "unified course of fraudulent
    conduct."  Countrywide Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss ("Countrywide
21  MTD") 18-20, ECF No. 180 (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005)
    (citations omitted)).  In the Complaint, FHFA specifically disclaims fraud allegations for their
22  Section 11, 12(a)(2), 15 and Washington, D.C. and Virginia securities causes of action.  FAC ¶¶
    400, 414, 434, 450, 468, 484, 502, 518.  The mere disclaimer of fraud does not evade Rule 9(b).
23  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012); *In re Refco, Inc. Sec.*
24  *Litig.*, 503 F. Supp. 2d 611, 633 (S.D.N.Y. 2007).
        However, FHFA goes further and specifically distinguishes allegations that support the
25  fraud causes of action from those that support the statutory claims.  FAC ¶ 197.  FHFA mentions
26  throughout the Complaint statements that were "objectively false," and that Defendants failed to
    exercise "due diligence and failed conduct a reasonable investigation."  *Id.* ¶¶ 134 (emphasis in
27  original), 410.  Those are terms of strict liability or negligence, not fraud, which proves that the
28  statutory claims need only meet Rule 8(a).  *Refco*, 503 F. Supp. 2d at 633.  The remaining fraud

1　the Court must determine whether FHFA plausibly alleges that the Defendants

2　made a false statement for each of the four types of misrepresentations.

3　　　　A.　　*The Complaint Adequately Pleads that the LTV Ratios in the Offering*

4　　　　　　　　　　　*Documents Were Misstated*

5　　　　The Offering Documents for each of the securitizations stated the

6　certificate's LTV ratio which compares the balance of the mortgage loan to the

7　value of the mortgaged property. FAC ¶ 113. The denominator in the LTV ratio is

8　the value of the property, which is the lower of the purchase price and its appraised

9　value. *Id.* ¶ 114. The LTV ratio is a measure of the default risk of a mortgage

10　loan, because lower ratios mean that a decline in the value of the property will be

11　less likely to wipe out the borrower's equity, and provides a cushion upon

12　foreclosure by increasing the likelihood that the proceeds will cover the unpaid

13　balance of the loan. *Id.* ¶ 117. Therefore, the LTV ratio is material to a reasonable

14　investor. *Id.* ¶ 118.

15　　　　The Amended Complaint describes the automated valuation model

16　("AVM") FHFA used to test the accuracy of the LTV ratios reported in the

17　Offering Documents. The AVM is an "industry standard" tool that calculates the

18　value of the underlying property at the time the mortgage loan was originated. *Id.*

19　¶ 129. AVMs rely on the same data as relied upon by appraisers, and produce

20　independent estimates of the value of the properties securing the sampled loans.

21　*Id.* ¶ 129-130.

22　　　　The Complaint lists statements from the Offering Documents of the

23　securitization for CWALT 2007-OA10, that the none of the loans from the

24　supporting pools had an LTV ratio over 100 percent, and that 81.69 percent of the

25

26　and negligent misrepresentation claims, though, must meet Rule 9(b). *Neilson v. Union Bank of*

27　*California, N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003) ("It is well-established in the

　　Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s

28　particularity requirements.")

loans had LTV ratios at or below 80 percent. *Id.* ¶ 131. The AVM reveals both statements to be false – 26.25 percent of the sample[6] of loans reviewed had LTV ratios above 100 percent, and only 42.14 percent of the loans had ratios below 80 percent. *Id.* This illustrative example is indicative of data results from "each Securitization" – the Offering Documents misrepresented the percentage of loans with an LTV ratio above 100 percent and the percentage with an LTV ratio below 80 percent at the time of origination. *Id.* ¶ 132. The Offering Documents stated that *none* of the loans for any of the certificates purchased by Fannie Mae or Freddie Mac had an LTV ratio above 100 percent. *Id.* ¶ 133. However, the AVM reveals that at least 2.97 percent of each of the mortgage pools had an LTV ratio over 100 percent. *Id.* ¶ 132. The Offering Documents also overstated the percentage of loans with an LTV ratio of less than 80 percent. *Id.* In other words, the Complaint alleges that the appraisals relayed in the Offering Documents systematically inflated the reported value of the properties, which deflated the LTV ratios.

The Amended Complaint does not mention the margin of error for the "ValuePoint4" AVM. Countrywide MTD 24. Despite the lack of disclosure of this critical information,[7] the specific factual allegations in the FAC must be accepted as true. *Iqbal*, 556 U.S. at 678. The Court must accept that the AVM revealed that the true LTV ratios were higher than those reported in the Offering

---

[6]     The Countrywide Defendants do not, and could not, argue that the sample used for the AVM is unrepresentative. The Offering Documents reported that no loans had LTV ratios exceeding 100%. The AVM alleges that some loans did have LTV ratios over 100%. FAC ¶ 133. Regardless of the sample of loans examined, the statement that *no loans* had such a high LTV ratio is plausibly false. *Bank Hapoalim B.M. v. Countrywide Fin. Corp.*, 2012 WL 6814194, at *5 n.10 (C.D. Cal. Dec. 21, 2012).

[7]     If FHFA plans on relying on an AVM or any other statistical study as the litigation proceeds, they must reveal the margin of error. *Cf. MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, ECF No. 276, slip op. at 10 (finding Plaintiff's methodology for analyzing securitizations acceptable when "Plaintiff has explained its proposed methodology in open court.").

1    Documents, and that the AVM accurately reflects the ultimate sales prices of the
2    homes given its inputs.  The Complaint specifically identifies the misstatements in
3    the Offering Documents and how those statements are false, so the allegations in
4    the FAC are sufficient to state a claim that the LTV ratios were misstated.  *See*
5    *Bank Hapoalim*, 2012 WL 6814194, at *5; *Dexia Holdings, Inc. v. Countrywide*
6    *Fin. Corp.*, 2012 WL 1798997, at *5 (C.D. Cal. Feb. 17, 2012); *Allstate Ins. Co. v.*
7    *Countrywide Fin. Corp.* ("*Allstate I*,") 824 F. Supp. 2d 1164, 1185–86 (C.D. Cal.
8    2011); *Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.* ("*Capital*
9    *Ventures J.P. Morgan*,") No. 12-10085-RWZ, 2013 WL 535320, at *5 (D. Mass.
10   Feb. 13, 2013) (citing to AVM results as supporting the plausibility of a
11   misstatement in offering documents).

12        The Countrywide Defendants make four arguments against the reliance on
13   the AVM.  First, they argue, as they have done before, that the failure to disclose
14   "critical information" about the AVM like the standard deviation or margin of
15   error dooms the claim, because without this "information, it is impossible for the
16   Court to assess whether Plaintiff's AVM results are consistent or inconsistent with
17   the LTV ratios disclosed in the Offering Documents," as the AVM result may be
18   "*entirely consistent*" with the data in the Offering Documents "despite the
19   superficial difference between the two values."  Countrywide MTD 23-24
20   (emphasis in original).  The AVM may be correct, but the conclusions that the
21   FHFA has drawn from those results are erroneous.  Countrywide Reply 8.

22        This argument fails for the same reason it failed in prior cases.  The LTV
23   ratios in the Offering Documents are plausibly false because the Court must accept
24   that the AVM reflects reality given its inputs.  Any questions or challenges to the
25   results reached by the AVM, rather than the choice of inputs, are inappropriate on
26   a motion to dismiss.  *Allstate I*, 824 F. Supp. 2d at 1184–85.  In their Reply Brief,
27   Countrywide decries FHFA's failure to "show that the percentage of loans that fall
28   below the 80% threshold or above the 100% threshold in its AVM results was not

1  simply the result of the normal, symmetrical distribution of the range of results

2  generated by the model." Countrywide Reply 9. In fact, FHFA has *alleged* that

3  the deviations from the Offering Documents were not the result of the normal

4  distribution, but they have not "shown" that, in the sense that they have not *proven*

5  that random variance is excluded. But of course, there is no need to exclude

6  random variance at this stage of the litigation. Even without the margin of error,

7  the Court can assess that the LTV ratios in the Offering Documents and AVM are

8  "inconsistent," though it cannot offer exact statistical confidence in that result.

9  Requiring such confidence would impose an unacceptable "probability

10  requirement" on FHFA. *Iqbal*, 556 U.S. at 678.[8] The difference between the two

11  "could simply reflect the random distribution of the AVM results around the true

12  value," Countrywide Reply 9, but they also could not. That is the very definition

13  of a "plausible" allegation. *Id.*[9]

14       Second, Countrywide argues that the appraisals are subjective opinions, not

15  statements of fact, and so can be legally actionable only if the "appraiser did not

16  truly believe the appraisal at the time it was issued." *In re IndyMac Mortg.-Backed*

17

18  _____

[8]   Countrywide's Memorandum even argues that the Complaint must meet the "commonly
19  accepted" 95% confidence interval, which means that FHFA must show with 95% confidence
20  that the true LTV ratio exceeded that given in the Offering Documents. Countrywide MTD 24.
     That is exactly the type of probability standard *Iqbal* forbids. Regardless of whether the AVM
21  results were two, or one, or one-half, or even lower, standard deviations above that given in the
     Offering Documents, the Complaint would allege that specific statements in the Offering
22  Documents were untrue. That is all the Federal Rules, both 8(a) and 9(b), require.
[9]   In the hearing on this motion, counsel for Countrywide argued that the failure to include
23  the margin of error means that the Court cannot determine whether the AVM results that
24  deviated from the Offering Documents' report of 80% were "79, 78, 81, 82," and "all clustered
     around 80%" so that "for all practical purposes the same as 80%," or much higher numbers. Tr.
25  of Hearing on Motions 19-20, February 20, 2013, ECF No. 212. That is irrelevant. The
     Complaint alleges that statements in the Offering Documents were false. The magnitude of the
26  falsity may bear on other elements of FHFA's claims, but is not relevant to whether the Offering
27  Documents contained misstatements. Indeed, as counsel for FHFA mentioned, highly
     sophisticated parties may rely even more than unsophisticated investors on the precise veracity
28  of any offering documents.

1  *Sec. Litig.*, 718 F. Supp. 2d 495, 511 (S.D.N.Y. 2010).  According to the

2  Defendants, the Amended Complaint fails to include any such allegations of

3  disbelief.  The Court rejects this argument.  FHFA includes plausible allegations

4  that CHL pressured appraisers to issue inflated appraisals, which means that the

5  appraisers did not believe the appraisals.  FAC ¶¶ 183, 186-188.[10]

6       Third, the Countrywide Defendants argue that the AVM relies too heavily

7  on the estimated appraisal value, because some of the LTV ratios in the Offering

8  Documents were based upon the "purchase price" of the home.  *Id.* ¶ 114.  The true

9  value of the home must equal the purchase price, Countrywide Reply 7 (citing the

10  *Black's Law Dictionary* definition of "fair market value").  The Amended

11  Complaint does not distinguish when the LTV ratios in the Offering Documents

12  were based upon purchase price and when on appraisals.  Countrywide argues that

13  this means the Complaint does not show that the Offering Documents were false.

14  In line with its prior rulings and those of other federal courts, the Court rejects this

15  proposition, because analyzing the exact details of the AVM is better resolved at

16  summary judgment.  *Bank Hapoalim*, 2012 WL 6814194, at *6; *Fed. Hous. Fin.*

17  *Agency v. Morgan Stanley*, No. 11 Civ. 6739(DLC), 2012 WL 5868300, at *3

18  (S.D.N.Y. Nov. 19, 2012).

19       Finally, Countrywide argues that unlike other plaintiffs in this MDL, FHFA

20  cannot rely on the AVM, because the GSEs each warned of the limited usefulness

21  of the automated model.  Countrywide Defs.' Notice of and Request for Judicial

22  Notice ("Countrywide RJN") Ex. 21, ECF No. 180 (excerpt from Fannie Mae

23

24

25  [10]     Some courts have rejected the conclusion of *IndyMac*, and do not require plaintiff to plead that appraisers did not subjectively believe the appraisals. *Mass. Mut. Life Ins. Co. v. Res. Funding Co., LLC*, ("*RFC*,") 843 F. Supp. 2d 191, 204 (D. Mass. 2012) (interpreting a state law identical to the federal 1933 Securities Act); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 377–78 n.48 (S.D.N.Y. 2011) (regardless of whether the appraisals made by the defendants are "opinions," the "alleged appraisal misconduct surely distorted the resulting LTV ratios, which were then featured in the Offering Documents.").

26

27

28

website) (Fannie believes that "AVMs have generally not evolved sufficiently to fully replace traditional appraisals and human judgment for the origination of first lien mortgages" and "AVMs have generally not evolved sufficiently to fully replace traditional appraisals and human judgment for the origination of first lien mortgages."); Countrywide RJN Ex. 20 (excerpt from Freddie Mac website) ("AVMs cannot replace the depth and breadth of knowledge of a competent appraiser."). Though this may open the Plaintiff to a justifiable charge of hypocrisy, it does not undermine the documented statistical evidence in the Amended Complaint. Countrywide offers no legal reason that plaintiff's prior statements should bar the use of a statistical method, and the Court can think of none.

The Amended Complaint plausibly alleges that an automated valuation model reveals that the loan-to-value ratios in the Offering Documents were misstated. The Court must accept that the AVM reflects reality given its inputs, so the Amended Complaint properly alleges a misstatement as to LTV ratios.

### B.     *The Complaint Pleads that the Stated Underwriting Guidelines in the Offering Documents were False*

The Amended Complaint alleges that Countrywide misstated their compliance with the underwriting standards listed in the Offering Documents, instead using a "matching strategy" to create the most aggressive guidelines in the origination market, making excessive and wholesale use of "exceptions" to its normal underwriting standards, and that "Countrywide's only criterion for approving a loan was whether the loan could be sold into the secondary market," despite the more stringent standards listed in the Offering Documents. FAC ¶¶ 143-144, 146-147. The FHFA alleges that underwriting standards were disregarded wholesale, and that "all of the loans were issued by deviating from the underwriting guidelines." *Me. State Ret. Sys. v. Countrywide Fin. Corp.* ("*Me. State III*,") 2011 WL 4389689, at *17 (C.D. Cal. May 5, 2011). That claim,

1    supported as here with specific examples of the underwriting culture at

2    Countrywide, and its use of exceptions, adequately alleges that a large percentage

3    of loans did not meet the standards given in the Offering Documents. *Id.*

4        Countrywide offers a number of arguments in response. First, the

5    Defendants argue that the Complaint does not allege that the Offering Documents

6    included materially false statements, because the information FHFA complains of

7    was either true or immaterial. Second, the Offering Documents included detailed

8    disclosures of the credit risk characteristics of the underlying mortgage loans.

9    Third, the Amended Complaint fails to link the allegedly false underwriting

10   standards to the specific loans and securities that are the subject of this litigation.

11   Finally, Countrywide argues that the substitute or repurchase provisions in the

12   Offering Documents constitute the only remedy for defective loans in the RMBS.

13       This Court has previously considered and rejected each argument. The

14   Amended Complaint alleges that Countrywide expanded its underwriting

15   guidelines through the "matching strategy," but did not disclose that information to

16   investors. The mere expansion of underwriting guidelines does not support a claim

17   under the securities laws, but failing to disclose that expansion to investors

18   constitutes a viable misstatement. *Allstate I*, 824 F. Supp. 2d at 1189. FHFA has

19   alleged exactly that. FAC ¶¶ 194, 214. For purposes of a motion to dismiss, the

20   Court cannot assess whether the public utterances Countrywide claims were made

21   to investors alerted them to Countrywide's deviations from stated underwriting

22   guidelines, and made the misstatements in the Offering Documents immaterial.[11]

23   *See SEC v. Mozilo*, No. 09-CV-3994-JFW, 2010 WL 3656068, at *11 (C.D. Cal.

24   Sept. 16, 2010) (deciding, for purposes of summary judgment, that "although

25   Countrywide repeatedly disclosed that its strategy was to offer the 'broadest'

26

27

28   [11]    Indeed, FHFA includes the testimony of a former Countrywide employee stating he "did
not think investors were aware of Countrywide's internal 'matching' strategy." FAC ¶ 214.

1   product menu in the mortgage industry, Countrywide never disclosed that it
2   employed the strategy in such a way to make its underwriting guidelines a
3   composite of the most aggressive guidelines in the industry.")

4        Countrywide also argues that the percentage of loans extended using the
5   "exception" policy is too low to constitute "systematic abandonment" of the
6   underwriting guidelines. Countrywide MTD 29-30; FAC ¶ 183. The Court finds
7   this argument bewildering. Countrywide seems to argue that if only 3%, or 20%,
8   of the loans were issued through exceptions, then as a matter of law, they could not
9   have "abandoned" or "disregarded" the underwriting standards. The opposite is
10  true: *any* deviation from information in the Offering Documents could constitute a
11  misstatement. Resolving the exact percentage of loans issued under the exception
12  policy is a fact question appropriate for a later stage of litigation, at which time, the
13  Court may also determine the legal and mathematical definition of the word
14  "abandon." Further, the exception policy is used in the Amended Complaint as
15  just "one aspect of the near total breakdown of" Countrywide's underwriting
16  standards. Opp. to Countrywide 24.

17       Countrywide's broad risk disclosures about underwriting standards are not
18  sufficient to inoculate the Defendants from liability, because none of the
19  disclosures contradict the statement in the Offering Documents that underwriting
20  was performed "in accordance with its credit, appraisal and underwriting process."
21  FAC ¶ 96. Disclosures that do not directly and clearly contradict that assurance
22  cannot undermine the plaintiffs' claims. *Me. State III*, 2011 WL 4389689, at *17;
23  *UBS Ams.*, 858 F. Supp. 2d at 332 ("Nor are plaintiff's claims defeated by the
24  disclosure in seven of the prospectus supplements that a 'substantial' number of
25  the loans deviated from the underwriting standards. These prospectus supplements
26  also represented that any deviations would be warranted based on 'compensating

27
28

factors.'  By plausibly alleging a widespread failure to conduct any underwriting, the plaintiff has adequately pleaded the falsity of this representation.").[12]

Third, this Court again rejects the proposition that plaintiffs must allege that Countrywide's abandonment of underwriting guidelines affected the mortgage pools underlying the RMBS that FHFA purchased. *See Bank Hapoalim*, 2012 WL 6814194, at *7; *Strategic Capital Bank*, 2012 WL 5900973, at *6; *Allstate I*, 824 F. Supp. 2d at 1184 n.23 ("The Court adopts its earlier logic here; representations relating to Countrywide's underwriting practices are sufficiently pleaded as applying to Countrywide's entire operation and therefore to the specific Offerings purchased by [plaintiff].").  FHFA alleges that Countrywide systematically abandoned its underwriting standards, which gives "rise to the inference that the mortgage originators deviated from stated underwriting guidelines in large numbers of cases," including in the mortgage pools backing FHFA's RMBS. *Bank Hapoalim*, 2012 WL 6814194, at *7.  Nothing more is required to plead FHFA's claim, though it may not be enough to prove that claim.

Finally, Countrywide argues that it promised only that "any non-compliant loans would be repurchased or substituted," and did not make an "absolute, unqualified representation that the each [sic] of the underlying loans complied with all applicable underwriting guidelines." Countrywide MTD 38 (citing *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010)).  The Court rejects this argument again. *See Bank Hapoalim*, 2012 WL 6814194, at *6.  Unlike in *Lone Star*, FHFA claims there was mass abandonment of underwriting

---

[12] Language in this Court's ruling in *Strategic Capital Bank* is not to the contrary.  The Court mentioned that in claims under Section 11 like those here "[t]he actual underwriting standards . . . are irrelevant." 2012 WL 5900973, at *11.  The next sentence continues "[w]hat matters for RMBS litigation alleging misstatements . . . is what the defendants said about those standards." *Id.*  That is the subject of this litigation – not the substance of the underwriting standards themselves, but whether Countrywide told the truth about their conformance to those standards.

1  standards, not just a "limited number of loans that failed to conform to the
2  representation regarding their default status." *Emps.' Ret. Sys. of the Gov't of the*
3  *Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 154–55
4  (S.D.N.Y. 2011) (distinguishing *Lone Star*).  Further, a contractual provision
5  cannot force the holder of a security to forego its rights.  *Id.*

6       Therefore, the Amended Complaint sufficiently alleges that the Offering
7  Documents misstated the underwriting guidelines used to issue loans, because
8  FHFA pleads that Countrywide "abandoned" the listed guidelines, which creates
9  the plausible inference that such abandonment affected the RMBS that FHFA
10  purchased.

11  C.    *The Amended Complaint Sufficiently Alleges that the Defendants Reported*
12       *Credit Ratings They Knew Were Based on False Information*

13       The Amended Complaint alleges that the "Defendants reported the credit
14  ratings for each tranche in the Prospectus Supplements," and that those "ratings . . .
15  were inflated as a result of Defendants' provision of incorrect data concerning the
16  attributes of the underlying mortgage collateral to the ratings agencies."  FAC ¶
17  122.  That allegation is adequate under Rule 8, because it alleges that the ratings
18  were misstated as a result of Countrywide's provision of false information
19  regarding the loan population to the credit rating agencies.  *Fed. Hous. Fin. Agency*
20  *v. Merrill Lynch & Co.*, No. 11 Civ. 6202(DLC), 2012 WL 5451188, at *1 n.2
21  (S.D.N.Y. Nov. 8, 2012); *Allstate I*, 824 F. Supp. 2d at 1184–85; *Assured Guar.*
22  *Mun. Corp. v. UBS Real Estate Sec., Inc.*, No. 12 CV 1579(HB), 2012 WL
23  3525613, at *5 (S.D.N.Y. Aug. 15, 2012) (credit ratings supported claim where
24  defendant "procured the ratings by providing false and misleading information to
25  the agencies").[13]

26

27  [13]    The parties argue over whether the credit ratings are third party opinions.  Regardless, the
28  Complaint states a claim as to those ratings.  Opinion statements "can give rise to a claim under
section 11 only if the complaint alleges with particularity that the statements were both

1     Countrywide's arguments to the contrary are unconvincing.  Countrywide
2 asserts that "Plaintiff's allegation that Countrywide provided false information to
3 the rating agencies is entirely conclusory and boilerplate . . . To the extent that
4 Plaintiff is alleging that Countrywide provided false owner-occupancy data or LTV
5 ratios, that allegation is derivative of Plaintiff's other claims and fails for the
6 reasons specified above."  Countrywide Reply 17-18.  Of course, this Court
7 rejected Countrywide's arguments about LTV ratios and underwriting standards,
8 and the widespread abandonment of underwriting guidelines infected the credit
9 ratings for all of the MBS.  Finally, this argument is distinct from the owner-
10 occupancy allegations this Court has previously resolved, because the initial
11 misstatements were made by Countrywide, not a third party.

12 *D.*    *The Amended Complaint does not Allege that the Owner-Occupancy Data in*
13     *the Offering Documents was False*

14     Countrywide included data regarding how the borrowers used the mortgaged
15 home in the Offering Documents.  The documents explain how many loans were
16 used as investment properties or primary or secondary residences.  *See, e.g.,*
17 Countrywide RJN Ex. 15 S-41.  This data was a useful factor for an investor to
18 assess credit risk, because borrowers who live in the mortgaged properties are less
19 likely to default.  FAC ¶ 111.  According to the Amend Complaint, that data was
20 routinely misstated.  *Id.* ¶¶ 124-128.

21
22

23 objectively and subjectively false or misleading."  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009).  The Amended Complaint does not allege that the rating agencies
24 "did not accurately communicate their subjective views regarding the" ratings at issue.  *UBS Ams.*, 858 F. Supp. 2d at 326.  However, as described below, FHFA does plead that Countrywide
25 knew the representations in the Offering Documents and provided to the ratings agencies were false.  Accurately reporting a credit rating that Countrywide knew was based on false
26 information is a misstatement for purposes of Section 11.  *Plumbers' Union Local No. 12*
27 *Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 775 (1st Cir. 2011) ("Liability may on this theory [if it does not represent the actual belief] also extend to one who accurately
28 described the opinion.").

20

1    This Court has previously rejected the assertion that this information was
2    actionable when the defendants report, as they did here, that the occupancy data
3    was "[b]ased upon representations of the related borrowers at the time of
4    origination." Countrywide RJN Ex. 15 at S-41; *id.* Ex. 16 at A-6. The Offering
5    Documents do not include misstatements, since Countrywide merely "accurately
6    repeat[ed] information about occupancy provided by borrowers." *Mass. Mut. v.*
7    *Countrywide Fin. Corp.* ("*Mass Mut. II*,") 2012 WL 3578666, at *2 (C.D. Cal.
8    Aug. 17, 2012).

9    FHFA cites case law from other district and state courts that find owner-
10   occupancy information like this to be actionable. Opp. to Countrywide 35 (citing
11   cases). The Court is unconvinced.   First, there is no plausible allegation[14] that
12   Countrywide did not accurately represent the information provided by the
13   borrowers, which means that Countrywide itself did not make a misrepresentation.
14   *RFC*, 843 F. Supp. 2d at 205. Second, the Amended Complaint does not even
15   plausibly allege that Countrywide "passed on information that they knew was
16   false," a different rule that some Massachusetts courts[15] have applied. *Capital*
17   *Ventures Int'l v. UBS Secs. LLC* ("*Capital Ventures UBS*",) No. 11-11937-DJC,
18   2012 WL 4469101, at *8 (D. Mass. Sept. 28, 2012); *Capital Ventures J.P. Morgan,*
19   2013 WL 535320, at *5 (denying the motion to dismiss because plaintiff
20   "specifically and plausibly alleges that defendants knew borrowers were
21   misrepresenting their intent to live at the mortgaged properties."). FHFA alleges
22   that a study showing discrepancies between the true and reported owner-occupancy

---

24   [14]    The Amended Complaint mentions that former borrowers accused Countrywide loan
25   officers of completing the loan "application with misrepresentations without the borrowers'
     knowledge." FAC ¶ 199. There is no allegation that those misrepresentations included false
26   information of owner-occupancy. *See id.* ¶ 220-227.
     [15]    Those courts are interpreting the Massachusetts Uniform Securities Act section 410,
27   which "is modeled after section 12(a)(2) of the Securities Act of 1933 . . . and courts have
     interpreted [the act] in conformity with the federal act." *Capital Ventures UBS*, 2012 WL
28   4469101, at *3.

1   data for all of the securitizations "is clear and compelling proof" that Countrywide

2   knew the data was misstated, but never claims that the discrepancy alerted

3   Countrywide that the specific statements about owner-occupancy were false.  FAC

4   ¶ 199.  The Complaint describes Countrywide's internal documents, revealing that

5   high level officials knew that representations in the Offering Documents were

6   false, but the internal reports do not mention owner-occupancy data.  *Id.* ¶¶ 205-

7   219.  Finally, this Court rejects any interpretation of the Securities Act that ignores

8   its text, which imposes liability when "any part of the registration statement . . .

9   contained an untrue statement of a material fact or omitted to state a material fact."

10  15 U.S.C. § 77k(a).  Countrywide did not make an untrue statement or omission.

11  Countrywide told investors that owner-occupancy data was self-reported by

12  borrowers, and FHFA fails to allege that Countrywide did not accurately repeat the

13  information they received.  Therefore, the owner-occupancy data was not

14  materially misstated.[16]

15  **IV.   *The Complaint Adequately Alleges that FHFA was Defrauded, but not***

16  ***that Defendants are Liable for Negligent Misrepresentation or Aiding and***

17  ***Abetting the Fraud of Others***

18          FHFA sues CSC, CHL and the Depositor Defendants for fraud and aiding

19  and abetting fraud, and sues CSC and the Depositor Defendants for negligent

20  misrepresentation.  Those defendants argue that the FAC does not include

21  sufficient allegations[17] of justifiable reliance, *scienter*, loss causation, the "special

22

23  [16]     FHFA argues that this Court allowed claims based on owner-occupancy to proceed in *Allstate I.*  824 F. Supp. 2d at 1184–85.  However, FHFA has failed even to plead that

24  Countrywide made a misrepresentation as to owner-occupancy data, which means this is *not* a "mixed question[] of law and fact . . . more appropriately considered at summary judgment," *id.*,

25  but instead a simple question of law.

    [17]     The Court determines that the Complaint includes facts that plead with particularity that

26  the Offering Documents contained misrepresentations, so the Complaint meets Rule 9(b).

27  *Allstate I,* 824 F. Supp. 2d at 1185–86.  The Complaint meets the heightened standard, so the statutory claims based upon those misrepresentations are well-pled, regardless of whether Rule

28  8(a) or 9(b) applies.  *See supra* n. 5.

1  relationship" needed to plead negligent misrepresentation under New York law, or
2  the elements of aiding and abetting fraud.

3       *A.*       *The Amended Complaint Alleges that FHFA Justifiably Relied on the*
4                        *Offering Documents*

5           The Amended Complaint alleges that Fannie Mae and Freddie Mac required
6  compliance with certain investment standards, which included specific information
7  found in the Offering Documents. FAC ¶ 242. Countrywide knew of these
8  compliance standards, and intended that the GSEs rely on the Offering Documents.
9  *Id.* ¶¶ 243-244. The GSEs allege that they did rely on those representations, and
10 specifically decided to purchase the RMBS based on their belief that the
11 certificates met their requirements. *Id.* ¶ 250-251. Therefore, the Amended
12 Complaint sufficiently alleges that Fannie Mae and Freddie Mac justifiably relied
13 upon the Offering Documents, because the Court cannot resolve as a matter of law
14 whether reasonable diligence would have revealed the misstatements. *Allstate I,*
15 824 F. Supp. 2d at 1187-88; *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.,*
16 No. 11 Civ. 6188(DLC), 2012 WL 5395646, at *16 (S.D.N.Y. Nov. 5, 2012).

17          In response, the Countrywide Fraud Defendants argues that the GSEs, as
18 dominant forces in the mortgage market, must be considered so sophisticated that
19 they are different from plaintiffs like Allstate, and could not have justifiably relied
20 on any misstatements in the Offering Documents. But the Court cannot conclude
21 that as a matter of law. The defendants may be correct that reliance by the GSEs
22 was unjustified, or that the GSEs did not actually rely on the Offering Documents.
23 That determination cannot be made on a motion to dismiss, especially when based
24 solely on broad statements about Fannie Mae and Freddie Mac's sophistication, or
25 general warnings from government regulators about risky securities.[18]

26

27 [18]       The sole case cited by the Defendants does not hold otherwise. *N.J. Carpenters Health*
28 *Fund v. Residential Capital, LLC,* 272 F.R.D. 160, 169 (S.D.N.Y. 2011) ("Freddie and Fannie
   issued trillions of dollars of residential mortgage backed securities," which "gives rise to a

1    The Court similarly rejects the assertion that because the GSEs purchased

2 the certificates before the relevant prospectus supplements were filed, they did not

3 rely upon statements in the Offering Documents.  The preliminary materials that

4 FHFA reviewed, like the term sheets and free writing prospectuses, FAC ¶ 243,

5 contained the same misstatements and false data as the prospectus supplements.

6 *Fed. Hous. Fin. Agency v. Deutsche Bank AG*, No. 11 Civ. 6192(DLC), 2012 WL

7 5471864, at *3 (S.D.N.Y. Nov. 12, 2012).

8    B.    *The Amended Complaint Adequately Pleads that the Defendants Knew the*

9          *Offering Documents Contained Misrepresentations*

10    FHFA has sufficiently pled that the Countrywide Fraud Defendants knew

11 the representation in the Offering Documents were false.  *Allstate I*, 824 F. Supp.

12 2d at 1186–87.  As described above, the Amended Complaint plausibly alleges that

13 the Offering Documents contained misstatements.  The Complaint further includes

14 the same type of information as in *Allstate I* about Countrywide's knowledge:

15 "statistical analyses purporting to demonstrate that that appraisals and owner-

16 occupancy statistics were overstated," FAC ¶¶ 124-135, "third party reports

17 purporting to show the same," *id.* ¶¶ 233-239, "internal documents purporting to

18 show that Countrywide was aware that it had sacrificed underwriting standards for

19 market share," *id.* ¶¶ 200-219, "statements by Countrywide insiders and customers

20 purporting to show that it was company policy to circumvent the underwriting

21 guidelines," *id.* ¶¶ 228-232, "and statements by appraisal companies and customers

22 who claim Countrywide acted to inflate appraisal values," *id.* ¶¶ 220-227.  *Allstate*

23 *I*, 824 F. Supp. 2d at 1186–87.

24

25

26   reasonably reliable inference that they possessed at least some knowledge of underwriting

27   practices.")  The fact that Freddie and Fannie possessed "some knowledge" of underwriting
     practices, which distinguished them from other plaintiffs for purposes of class certification, does

28   not undermine the inference that the GSEs relied upon the Offering Documents.

The Court has rejected each of the responses offered by Countrywide.[19]   At this point, FHFA does not need to tie its allegations of Countrywide's underwriting culture directly to the securities they purchased. *Allstate I*, 824 F. Supp. 2d at 1184 n.23. Nor is the AVM "fraud-by-hindsight," which would not support the allegation that the Defendants knew of misstatements at the time. *Bank Hapoalim*, 2012 WL 6814194, at *6 ("The Complaints do not constitute 'fraud-by-hindsight'"). Countrywide's risk disclosures cannot shield them from liability, and do not, as a matter of law, undermine the inference that Countrywide acted with *scienter*.   *JPMorgan Chase*, 2012 WL 5395646, at *17.

C.      *The Complaint Adequately Alleges that FHFA's Securities Lost Value as a Result of the Defendants' Misrepresentations*

Plaintiff must show "loss causation" under New York fraud law, which requires plaintiff to show that "a defendant's misrepresentations were the direct and proximate cause of the claimed losses." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 295 (N.Y. 1st Dep't 2011).  A complaint meets that standard when there is an "adequate causal nexus between misrepresentation and damage." *Dexia*, 2012 WL 1798997, at *6. Just like in *Dexia* and *Thrivent*, 2012 WL 1799028, at *2 (C.D. Cal. Feb. 17, 2012), the Plaintiffs allege that "the underlying loans had a higher-than-advertised risk of default, and that they were therefore worth less than Plaintiffs paid for them," FAC ¶ 256, and that the certificates "have experienced higher-than-anticipated rates of default and that they are now worth less than Plaintiffs paid for them," *id.* ¶¶ 193, 195. *Dexia*, 2012 WL 1798997, at *6.

Countrywide responds that the losses suffered by the RMBS are attributable to the general credit crisis of 2008, not the misstatements in the Offering

---

[19]    There is no need to determine whether Countrywide acted with scienter as to misstatements as to owner-occupancy, since the Offering Documents did not contain a misstatement. *See supra*.

1 Documents.   This argument fails because determining "which losses were
2 proximately caused by Countrywide's misrepresentation and which are due to
3 extrinsic or insufficiently linked forces" is a question for the fact-finder. *In re*
4 *Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d 1132, 1174 (C.D. Cal. 2008).
5 Separating the source of the losses requires a full factual record.

6 Countrywide attempts to buttress its argument by pointing to statements and
7 court filings made by the GSEs that any losses suffered were caused by the "worst
8 housing crisis since the Great Depression." Countrywide RJN Ex. 43 (Mem. Supp.
9 Freddie Mac's Mot. to Dismiss 21-22, *Kuriakose v. Fed. Home Loan Mortg. Corp.,*
10 et. al., No. 08-cv-7281 (JFK) (S.D.N.Y. Feb. 24, 2010)). The Court declines to
11 exercise judicial estoppel against FHFA, especially because FHFA alleges that
12 Countrywide may have contributed to that housing crisis. *In re Countrywide*, 588
13 F. Supp. 2d at 1174. FHFA has adequately alleged that the misrepresentations the
14 value of the RMBS to decline, and resolving the relative culpability of different
15 actors, including the GSEs themselves, must await discovery.[20]

16     **D.**   *The Complaint Does not Plead Negligent Misrepresentation*
17 Under New York law, a plaintiff must show that they had a "special
18 relationship" with the defendant in order to recover for negligent
19 misrepresentation. *Schaefer*, 89 N.Y.2d at 264. An arms-length commercial
20 transaction is not usually the predicate for such a relationship. *Id.* at 263 ("liability
21 for negligent misrepresentation has been imposed only on those persons who
22 possess unique or specialized expertise, or who are in a special position of
23 confidence and trust with the injured party such that reliance on the negligent
24 misrepresentation is justified."). The defendants sued for negligent

25

---

26 [20]    Given the allegations in the Complaint that Plaintiffs have suffered damage, the Court
27 declines to rule as a matter of law that FHFA have not incurred legally cognizable damage with
respect to certificates that make all required payments. *Allstate I*, 824 F. Supp. 2d at 1188
28 ("damages . . . present[] complicated questions of fact ... best reserved for summary judgment").

1    misrepresentation were not "in a special position of confidence and trust with" the
2    GSEs, because the RMBS were sold in public offerings to numerous investors.
3    The Amended Complaint must show instead that Countrywide possessed "unique
4    or specialized expertise." Since the GSEs were not "so unequally situated vis-à-vis
5    the defendants," and "were highly sophisticated players in the mortgage-backed
6    securities market, which they participated in not only as purchasers but also as
7    packagers and marketers of securities," the mere fact that Countrywide had
8    "greater knowledge of the underlying loan files . . . is not sufficient to establish a
9    'special relationship.'" *UBS Ams.*, 858 F. Supp. 2d at 335; *Thrivent*, 2012 WL
10   1799028, at *6.

11       *E.*    *The Complaint does not Allege that Any Defendants Aided and Abetted the*
12           *Fraud of Others*

13           The Amended Complaint fails to properly allege that the Countrywide Fraud
14   Defendants aided and abetted the fraud of others, because a party cannot aid and
15   abet its own fraud, and FHFA does sufficiently allege that the defendants knew of
16   any independent fraud. *Bank Hapoalim*, 2012 WL 6814194, at *9.

17   *V.*    *The Depositor Defendants Cannot be Liable under Section 12(a)(2) or the*
18           *D.C. Blue Sky Laws*

19           Any person who "offers or sells a security" by means of a prospectus or oral
20   communication that includes a misstatement is liable under Section 12(a)(2) of the
21   Securities Act. 15 U.S.C.A. § 77l(a)(2). The Supreme Court has interpreted that
22   language to contemplate a "buyer-seller relationship not unlike traditional
23   contractual privity." *Pinter v. Dahl*, 486 U.S. 622, 642 (1988). Liability extends
24   only to the "immediate sellers" of securities and "those who solicit purchasers to
25   serve their own financial interests or those of the securities owner." *Me. State III*,
26   2011 WL 4389689, at *9 (citations omitted). The Depositor Defendants did not
27   pass title directly to Fannie Mae or Freddie Mac, because the title passed to the
28   Underwriter Defendants before passing to the ultimate purchasers. *Id.* The

1    Amended Complaint alleges that the Depositor Defendants registered the

2    certificates with the SEC, and "targeted" the GSEs by sending offering materials,

3    FAC ¶¶ 55, 421, but does not include any allegations that the Depositor

4    Defendants directly solicited or communicated with the plaintiff regarding the

5    security purchases. *Id.*; *RFC*, 843 F. Supp. 2d at 207. Therefore, the Depositor

6    Defendants cannot be liable under Section 12(a)(2).

7       FHFA argues in response that SEC Rule 159A, which was promulgated in

8    2005, trumps the Supreme Court's earlier decision in *Pinter*. *See* 17 C.F.R. §

9    230.159A (for purposes of section 12(a)(2), "seller shall include the issuer of the

10   securities sold . . . and the issuer shall be considered to offer or sell the securities").

11   As a general matter, "it is for agencies, not courts, to fill statutory gaps." *Nat'l*

12   *Cable Telecom. Ass'n v. Brand X Internet Servs.* ("*Brand X,*"), 545 U.S. 967, 982

13   (2005) (citing the Supreme Court's foundational decision in *Chevron, U.S.A., Inc.*

14   *v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984,) which created a

15   two-step test in granting deference to agency interpretations of a statute whenever

16   the statute was ambiguous and the agency interpretation was reasonable). An

17   agency construction of a statute will trump a court's prior interpretation unless "the

18   prior court decision holds that its construction follows from the unambiguous terms

19   of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at

20   982. In this case, the interpretation of "offers or sells" in SEC Rule 159A applies

21   unless the decision in *Pinter* interpreted the statute as "unambiguously

22   foreclose[ing] the agency's interpretation," because then there would be "no gaps

23   for the agency to fill." *Id.* at 982–83.

24       *Pinter* was unambiguous. "At the very least, however, the language of

25   ["offers or sells"] contemplates a buyer-seller relationship not unlike traditional

26   contractual privity." *Pinter*, 486 U.S. at 642. The Supreme Court continued that

27   "[t]here is no support in the statutory language or legislative history for expansion

28   of [the "offers or sells" language] beyond persons who pass title and persons who

1  'offer,' including those who 'solicit' offers." *Id.* at 650.  This focus on the

2  statutory language means that the *Pinter* court resolved the issue "under the first

3  step of *Chevron* by examining the text of the relevant statutes and their legislative

4  histories." *Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1238 (9th Cir.

5  2007).  Therefore, *Pinter* was unambiguous, and there were no statutory gaps for

6  the SEC to fill.  The SEC's rule exceeded the statutory language of Section

7  12(a)(2) and cannot apply.  The Section 12(a)(2) claims against the Depositor

8  Defendants must be dismissed.  *Capital Ventures UBS*, 2012 WL 4469101, at *14

9  n.9; *RFC*, 843 F. Supp. 2d at 207.  The D.C. blue sky law claims against the

10  Depositor Defendants are also dismissed[21] because that section is "nearly-

11  identical" to section 12(a)(2), so "case law interpreting that statute should apply" to

12  the blue sky law as well.  *Hite*, 429 F. Supp. 2d at 114.

13  **VI.    *The Individual Defendants Cannot be Liable for Misstatements that Post-***

14  ***Date the Registration Statements they Signed***

15        The Individual Defendants move to dismiss the Section 11 claims, because

16  the registration statements they signed did not contain any information alleged to

17  be false and misleading.  Under Section 11, liability extends to the signers of

18  registration statements whenever "any part of the registration statement, when such

19  part became effective, contained an untrue statement of a material fact or

20  [omission]."  15 U.S.C. § 77k(a).  In this case, the registration statements

21  themselves "contained only an illustrative form of a prospectus supplement.  It was

22  the final prospectus supplement filed with the SEC . . . that contained 'a

23  description of the mortgage pool underlying the Certificates and the underwriting

24  standards by which the mortgages were originated.'"  *Me. State Ret. Sys. v.*

25

26  [21]     FHFA has already dismissed the Virginia law claims against the Depositor Defendants,
27  since Virginia law uses statutory language that makes clear that issuers cannot be liable.
    *Barclays Bank PLC*, 2012 WL 5844189, at *3; Joint Stip. Dismissing Certain of Pl.'s Virginia
28  Blue Sky Claim, ECF No. 195.

1  *Countrywide Fin. Corp.* ("*Me. State I*,") 722 F. Supp. 2d 1157, 1164 (C.D. Cal.

2  2010) (citing the complaint in that case); FHFA Opp. to Indiv. Defs.' Mot. to

3  Dismiss 10, ECF No. 191 ("each Registration Statement was filed on SEC Form S-

4  3 and included a 'base prospectus' containing only generic information about

5  future offerings.  Each base prospectus contained 'blanks' for virtually all details

6  that would be relevant to an investor assessing the worth of the underlying

7  collateral and structure of the Certificates.").  The Amended Complaint relies on

8  misrepresentations and misstatements in the prospectus supplements, which were

9  filed after the registration statements signed by the Individual Defendants.  FAC

10  IV.A. ("Statistical Data Provided in the Prospectus Supplements Concerning

11  Owner Occupancy and LTV Ratios Was Materially False or Misleading"), ¶ 51,

12  Table 3 ("filing dates of the Shelf Registration Statements and Amendments"), ¶

13  53 ("The dates on which the Prospectus Supplement . . . were filed for each

14  Securitization").

15      Under SEC regulations, information in a prospectus supplement "shall be

16  deemed to be part of and included in the registration statement on the earlier of the

17  date such subsequent form of prospectus is first used or the date and time of the

18  first contract of sale of securities in the offering to which such subsequent form of

19  prospectus relates."  17 C.F.R. § 230.430B(f)(1).  That date (when the prospectus

20  supplement is first "used" or the date of the first sale of securities occurs) becomes

21  "the new effective date" "for purpose of liability under section 11 of the Act of the

22  issuer and any underwriter at the time only."  *Id.* § 230.430B(f)(2).  However, that

23  date "shall not be an effective date . . . as to [a]ny director . . . of the issuer [or]

24  [a]ny person signing any report or document incorporated by reference into the

25  registration statement," except under two exceptions.  *Id.* § 230.430B(f)(4).  The

26  first exception requires issuers to update the financial information in a registration

27  statement after its effective date.  15 U.S.C. § 77j(a)(3).  The rule does not apply to

28  registration statements filed by issuers of asset-backed securities.  SEC Release

1   Nos. 33-8591, 34-52056, 76 Fed. Reg. 47948-01, 47961 n. 102 (Aug. 5, 2011).
2   The other exception requires an entity to file a post-effective amendment to a
3   registration statement when facts or events arise that "represent a fundamental
4   change in the information set forth in the registration statement." 17 C.F.R. §
5   229.512(a)(1)(ii). A "fundamental change" does not occur "if the registration
6   statement is on Form S-3 . . . and the information required to be included in a post-
7   effective amendment . . . is contained in a form of prospectus filed pursuant to
8   Rule 424(b)." *Id.* § 229.512(a)(1)(B). Countrywide's registration statements were
9   filed on Form S-3 and the prospectus supplements were filed "pursuant to Rule
10  424(b)(5)." Spector Request for Jud. Notice Ex. I, ECF No. 177. The second
11  exception also does not apply.

12      Neither exception applies. Therefore, the date the prospectus supplements
13  become part of the registration statement is *not* a new "effective date" for directors
14  or signers of the registration statement. The only effective date, then, is the filing
15  date of the registration statements. On that date, the registration statements were
16  "blank," in the words of FHFA, and did not contain any of the misstatements
17  described in the Complaint. For the Individual Defendants, the registration
18  statements did not contain misstatements on their effective dates. The Individual
19  Defendants cannot be held liable under Section 11.

20      SEC guidance documents support this conclusion. "The prospectus filing
21  will not create a new effective date for directors or signing officers of the issuer,"
22  except when the two exceptions listed above occur. SEC Release ("SEC 2005
23  Release") Nos. 33-8591, 34-52056, 70 Fed. Reg. 44722, 44774 (Aug. 3, 2005).
24  That "published interpretation of its own regulations" must be treated as
25  "controlling if it is not 'plainly erroneous or inconsistent with the regulations.'"
26  *Strom v. United States*, 641 F.3d 1051, 1063 (9th Cir. 2011) (applying that
27  treatment to an SEC Release and citing *Auer v. Robbins*, 519 U.S. 452, 461
28  (1997)). The SEC guidance is not plainly erroneous and must be treated as

1   controlling.  Therefore, the prospectus supplement does not alter the effective date

2   for directors and signing officers.

3       FHFA argues that the term "effective date" in Rule 430B(f)(2) and (f)(4) is

4   actually the date of the initial *bona fide* offering, which commences the statute of

5   repose.  Under FHFA's interpretation, the statute of repose begins to run for issuers

6   and underwriters on the date each prospectus supplement is filed, but begins to run

7   for directors and signers on the earlier filing date of the registration statement.

8   This interpretation is wrong.  There is no mention of the "initial *bona fide* offering"

9   date in Rule 430B(f)(4) or the SEC guidance documents.  The SEC Release is clear

10  that the "liability of auditors, other experts, and outside directors"[22] are treated

11  similarly, and that the 2005 regulations "should provide clarity for auditors, among

12  others, that a new effective date for them is not created."  SEC 2005 Release, 70

13  Fed. Reg. at 44774.

14      FHFA cites unconvincing case law in support of its position.  *In re Marsh &*

15  *McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006); *Fed. Hous. Fin.*

16  *Agency v. Bank of Am. Corp.*, No. 11 Civ. 6195(DLC), 2012 WL 6592251

17  (S.D.N.Y. Dec. 18, 2012).  In *Marsh & McLennan*, the prospectus supplement

18  incorporated by reference company filings signed by the individual defendants.

19  *Marsh & McLennan*, 501 F. Supp. 2d at 491–92.  In *Bank of America*, the court

20  does not clearly distinguish the directors and signers, who are governed by Rule

21  430B(f)(4), from other defendants.  The other arguments offered by FHFA are

22  similarly flawed.  Though it may be "axiomatic" that the content of a prospectus

23  supplement is part of the registration statement, and general SEC regulations

24  support that position, SEC 2005 Release, 70 Fed. Reg. at 44771, specific SEC

25  regulations clearly limit the Section 11 liability of directors and signers.

26

27

28

---

[22]   The Court recognizes that the Individual Defendants are not outsider directors, but the actual SEC regulations at issue do not make a distinction between inside and outside directors.

1    **VII.    *The Complaint Adequately Pleads Control Liability Where a Primary***
2    ***Violation has Been Alleged***

3        The Individual Defendants, CFC, CHL and CCM (collectively, the "Control
4    Person Defendants") move to dismiss the control person claims.  The first element
5    of a control person claim under federal, D.C. or Virginia law is that a primary
6    violation is adequately pled.  As described above, the Amended Complaint does
7    adequately plead primary violations against the Underwriter Defendants, including
8    CSC, for violations of Sections 11 and 12(a)(2), and CWALT and CWABS for
9    violations of Section 11.[23]

10       The Individual Defendants argue that they did not control CWALT and
11   CWABS.  At the motion to dismiss stage, allegations that "go no farther than
12   listing the defendant's name, title, and listing which registration statements that
13   defendant signed . . . are marginally sufficient to support a Section 15 claim."
14   *Dexia*, 2012 WL 1798997, at *4.  "It is a plausible inference that a director or high-
15   level officer of an entity exercised control over that entity."  *Id.*  The Amended
16   Complaint contains allegations that Kripalani, Kurland, Sandefur, Sieracki, Adler
17   and Spector were high-ranking officers and directors of CWALT and CWABS.
18   FAC ¶¶ 76-81.  Each Individual Defendant signed at least two registration
19   statements.  *Id.* ¶ 51.  The Individual Defendants "participated in the operation and
20   management of the Depositor Defendants [including CWALT and CWABS] and
21   their related subsidiaries, and conducted and culpably participated, directly and
22   indirectly, in the conduct of the Depositor Defendants' business affairs."  *Id.* ¶ 436.
23   That is sufficient to plead that the Individual Defendants controlled CWALT and
24   CWABS.

25
26

27   [23]    Since the Depositor Defendants cannot be liable under Section 12(a)(2) or the D.C.
28   analogue to that statute, the control claims proceed only against the Individual Defendants for
their control of CWALT and CWABS' breaches of Section 11.

1    The Individual Defendants offer two arguments in response.  First, they
2   argue that the Amended Complaint is contradictory, because it alleges that CHL
3   "controlled all aspects of the business of the Depositor Defendants." *Id.* ¶ 279.
4   There is no contradiction, because "multiple persons can exercise control
5   simultaneously." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1088 (9th
6   Cir. 2010).  FHFA has alleged such "dual control" here.  Second, the Individual
7   Defendants argue that because CWALT and CWABS were merely special purpose
8   entities with a limited and temporary purpose, control does not plausibly apply to
9   directors or officers.  This is a factual question that must be resolved at a later stage
10  of the litigation. *Mass. Mut. II*, 2012 WL 3578666, at *4.[24]

11   The Complaint also plausibly alleges that the CFC and CCM controlled CSC
12  for the Sections 11 and 12(a)(2) violations, and CFC and CHL controlled CWALT
13  and CWABS for their violation of Section 11.  CHL "controlled all aspects of the
14  business of the Depositor Defendants" and "was able to, and did in fact, control the
15  contents of the nine Registration Statements filed by the Depositor Defendants."
16  FAC ¶¶ 279, 439.  CCM "controlled the business operations of Defendant
17  Countrywide Securities," by virtue of its status as "sole owner" of CSC, and had
18  the practical ability to direct and control the actions of [CSC] in issuing and selling
19  the Certificates, and in fact exercised such direction and control." *Id.* ¶ 440.  The
20  Complaint offers specific allegations as to the "high level of day-to-day control"
21  CCM exercised over CSC, and details how information passed from CFC, to CCM,
22  to ensure that CSC followed the priorities established by CFC and CCM, including
23  "the manner in which Countrywide Securities and the trusts selected and sold the
24  securitized loans through certificate offerings, and controlled the disclosures made
25  in connection with each securitization." *Id.* ¶¶ 293-294.  CFC "controlled the

26

27  ――――――――――――――
    [24]    Neither Stanford Kurland nor David Spector can be held liable for securities that were
28  issued after they left Countrywide.

business operations of the Depositor Defendants and Countrywide Securities," because it is "the corporate parent of the Depositor Defendants and the ultimate corporate parent of Countrywide Securities," with the "practical ability to direct and control the actions" of CSC and the Depositor Defendants. *Id.* ¶ 442. CFC exercised that power, and culpably participated in the Sections 11 and 12(a)(2) violations, using their "high level of day-to-day scrutiny and control over its subsidiaries." *Id.* ¶ 285. These allegations are sufficient to allege that the CFC, CCM and CHL had "actual power or influence" over CSC, CWALT and CWABS, regardless of whether they actually participated or exercised that power. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065–66 (9th Cir. 2000). Indeed, the Amended Complaint includes many allegations Countrywide argues are necessary for control, alleging that CCM and CFC had a "high level of day-to-day control" over the primary offenders, and that CFC "culpably participated" in the primary violations. FAC ¶¶ 285, 293, 444.[25]

## VIII. The Amended Complaint Fails to State a Claim Against the Bank of America Defendants

FHFA reiterates allegations this Court has considered many times regarding Bank of America's successor liability for Countrywide. This Court rejects that assertion again. FHFA files claims based upon "*de facto*" merger, assumption of liabilities and fraudulent conveyance.

New York choice-of-law rules point to the law of Delaware on the issue of successor liability.[26] *Allstate I*, 824 F. Supp. 2d at 1174. The law of Delaware

---

[25]     The allegations against CCM and CFC are also adequately pled under the Washington, D.C. and Virginia blue sky control person statutes, since the Complaint alleges that CSC violated those statutes. Despite the assertion in Countrywide's Reply Brief 38 n.37, the Complaint adequately alleges one type of control person claim against CHL under Section 15, for its control of CWALT and CWABS in their violations of Section 11.

[26]     The Court may take the opportunity to further reiterate its position on the choice-of-law, in light of the completed briefing on successor liability in the New York state court, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, ECF Nos. 4029, 4030.

1   does not support a claim for *de facto* merger in these circumstances.  *Allstate Ins.*
2   *Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1231 (C.D. Cal. 2012).  The
3   facts in the Amended Complaint fail to plead assumption of liabilities or fraudulent
4   conveyance.  *Id.* at 1223–31.

### IX.    *Conclusion*

6       The Court dismisses allegations in the Amended Complaint involving
7   owner-occupancy data.  The Court dismisses the negligent misrepresentation and
8   aiding and abetting claims.  The Court dismisses the Section 12(a)(2) and D.C.
9   blue sky law claims as to the Depositor Defendants.  The Court dismisses Section
10  11 claims filed against the Individual Defendants.  Each dismissal is with
11  prejudice.  The Court dismisses all successor liability claims against the Bank of
12  America Defendants with prejudice, except those of intentional and constructive
13  fraudulent conveyance.  The Plaintiff has indicated its intention to file a motion to
14  amend as to those claims, and the Court will permit such a motion to be filed.

16  IT IS SO ORDERED.
17  DATED:  March 15, 2013

                       Hon. Mariana R. Pfaelzer
                       United States District Judge